IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY LEE WILLIAMS, | : | CIVIL ACTION |
| | : | NO. 21-1248 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN E. WETZEL, et al., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                    July 21, 2022

## I. INTRODUCTION

This is a pro se prisoner civil rights action. Plaintiff Roy Williams ("Plaintiff") brings this action against Defendant John E. Wetzel, the former Secretary of Corrections, in his individual capacity and against Defendant George Little[1] in his official capacity as the Secretary of the Department of Corrections (collectively, "Defendants"), alleging Defendants violated the Americans with Disabilities Act ("ADA") and Plaintiff's Eighth Amendment rights. Plaintiff contends that his placement in indefinite solitary confinement following his

---

[1]    Plaintiff's ADA claim was originally brought against John Wetzel in his official capacity as the Secretary of Corrections. Since Plaintiff filed suit, Wetzel retired from his position as the Secretary of Corrections and George Little has become the acting Secretary of Corrections. Pursuant to Federal Rule of Procedure 25(d), any official capacity claims should be deemed to be against the acting official. Accordingly, the Court has deemed Plaintiff's ADA claim to be against George Little in his official capacity as the Secretary of Corrections. See Ords., ECF Nos. 32-33.

conviction for capital murder violated his rights in light of his history of depression and suicidal ideation.

Defendants have filed a motion for summary judgment. For the following reasons, the Court will grant Defendant's motion.

## II.  BACKGROUND
### A.  Plaintiff's Conviction and Mental Health History

In 1992, Plaintiff was convicted of murder in Pennsylvania state court and sentenced to death.[2] Following his conviction, Plaintiff was placed in custody at the State Corrections Institution Graterford ("SCI-Graterford"). In the mid-1990's, Plaintiff was transferred to the State Corrections Institution Greene ("SCI-Greene") and in July 2020, he was transferred to the State Corrections Institution Phoenix ("SCI-Phoenix"). Plaintiff has since remained at SCI-Phoenix.

In 1979, over a decade before his conviction, Plaintiff was involuntarily committed to the Philadelphia Psychiatric Center (the "PPC") for approximately 60 days after making suicidal threats and exhibiting violent behavior towards his family. Plaintiff was diagnosed with depression and suicidal ideation. The PPC also noted that Plaintiff's "most striking problem was the control of his angry feelings." Defs.' Statement of Material Facts ("SOMF") ¶ 41 (internal quotation marks and citation

---

[2]      Plaintiff has since appealed his conviction and sought to obtain post-conviction relief. Plaintiff's appeals have not been successful and his capital sentence remains in place.

omitted). After his release from the PPC, Plaintiff was voluntarily committed for an additional 90 days, though it is not apparent if he received any other diagnoses at that time.

Plaintiff's mental health was again evaluated after his conviction. In 1996, Plaintiff's criminal defense attorney hired two external mental health professionals, Barry Crown Ph.D and Robert A. Fox, M.D., to conduct clinical examinations of Plaintiff. In September 1996, following their evaluations of Plaintiff, both Dr. Crown and Dr. Fox prepared declarations with their reports.[3] Dr. Crown indicated that Plaintiff suffers from "cerebral dysfunction" and "brain damage." Ex. A., ECF No. 2-1 at 48-49 ¶¶ 3-4. Dr. Crown also noted that records from Plaintiff's 1979 involuntary commitment at the PPC "are consistent with [Plaintiff's] brain damage and psychological impairments, and show that he suffered from these impairments from an early age." Id. at 49 ¶ 6. Dr. Crown explained that Plaintiff has "neuropsychological and psychological deficiencies" which include "emotional problems and cognitive dysfunction." Id. at 50 ¶ 8. In his declaration, Dr. Fox noted that Plaintiff has "ingrained psychological and emotional

---

[3]    Plaintiff initially attached these declarations to his Complaint. As Plaintiff refers to these declaration in response, the Court has considered them here.

3

impairments" including depression and suicidal ideation. Id. at 53 ¶ 3; 55 ¶ 9.

It is not clear whether Dr. Crown and/or Dr. Fox provided copies of their declarations to the Department of Corrections (the "DOC"). Since his conviction, Plaintiff has been housed in the Capital Case Unit (the "CCU"). Plaintiff's placement and treatment in the CCU at SCI-Graterford and SCI-Greene were governed by the DOC's policy concerning Capital Case Administration. When inmates enter the CCU they are given a psychological evaluation "to screen for intellectual, personality, and emotional stability." Defs.' SOMF ¶ 18. "[A]ny inmate with evidence of mental illness receives a more comprehensive assessment" and subsequent mental health treatment. Defs.' SOMF ¶ 20. While Plaintiff was at SCI-Graterford and SCI-Greene, psychology staff visited inmates in the CCU at least five times per week to assess inmates for risk of suicide. See Defs.' SOMF ¶ 23. Inmates were additionally able to request appointments to speak with mental health professionals. Id. Any CCU inmates showing signs that they may harm themselves or others were referred to the mental health department for evaluation. The record shows that Plaintiff was never diagnosed with a mental illness or mental impairment by an internal DOC staff member.

Plaintiff has provided summaries of his DOC mental health records.[4] The summaries show that in January 1996, Plaintiff was referred to an internal psychiatrist but did not show any signs of "mental decomposition or emotional problems." See Ex. A, ECF No. 28. On July 3, 1996, Plaintiff was referred to DOC mental health professionals following a suicide attempt. Id. According to Plaintiff's deposition testimony, while at SCI-Graterford, he attempted to commit suicide while in the CCU and was placed in a psychiatric observation cell for mental health professionals to monitor and evaluate him. Plaintiff was evaluated for 48-72 hours and "was released after he told doctors that he faked the suicide attempt to get out of his cell to make a phone call." Defs.' SOMF ¶ 31. Plaintiff testified that he did not fake the attempt but was "telling [the mental health professionals] anything just to get out of the cell . . . ." Pl. Dep. 25:14-15, ECF No. 24-1. The mental health professionals, believing Plaintiff's claim, deemed Plaintiff "not depressed" and, in their records, noted that Plaintiff was attempting to "manipulate the system." See Ex. A, ECF No. 28. Plaintiff did not personally request additional treatment from mental health

---

[4]    Plaintiff did not provide the original mental health records. Instead, Plaintiff filed a motion to supplement his response and included summaries of the mental health records prepared by his counsel at the Defender Association of Philadelphia. See Mot., ECF No. 28. As Defendants have not opposed Plaintiff's motion to supplement, the Court has relied on the summaries of the records here.

professionals after that incident and "dealt with everything on [his] own." Pl. Dep. 25:22-23. Whenever he interacted with the mental health staff, Plaintiff would inform the staff he was feeling fine.

In 2008, Plaintiff was referred to mental health staff for out-of-cell appointments following an incident in which Plaintiff suffered a case of heat exhaustion and developed headaches. Plaintiff was seen by two mental health professionals on five separate occasions. There is no evidence in the record showing that these mental health professionals diagnosed Plaintiff with a mental illness.

Plaintiff did not receive assistance from mental health professionals on any other occasion. Additionally, Plaintiff does not believe that he was ever diagnosed with a mental illness by a DOC professional while in the CCU. Pl. Dep. 36:13-16.

**B.    The Solitary Confinement Class Action and Updated DOC Policies**

In January 2018, a class action lawsuit was filed in the Middle District of Pennsylvania on behalf of CCU inmates alleging that the conditions in the CCU amounted to "solitary confinement" in violation of the inmates' Eighth and Fourteenth Amendment rights. See Reid v. Wetzel, No. 18-0176 (M.D. Pa.). In November 2019, the parties executed a settlement agreement in

6

which the DOC agreed to implement a policy creating more
socialization opportunities for CCU inmates (the "Reid
Settlement"). See Ex. D, ECF No. 24-4.

Following the Reid Settlement, on December 3, 2019, the DOC
issued a new policy reflecting updated conditions for CCU
confinement. See Ex. E, ECF No. 24-5. The new CCU policy took
effect on December 10, 2019. Defendants aver that SCI-Greene
began updating its internal policy with respect to CCU
confinement as early as March 12, 2018, which allowed SCI-Greene
to increase socialization opportunities for CCU inmates. Defs.'
SOMF ¶¶ 10-12. Plaintiff does not recall the date in which these
policy changes were implemented at SCI-Greene, but Plaintiff
remembers that the official DOC policy outlining changes to CCU
confinement was issued on December 3, 2019. See Pl. Dep. 12:1-9.

### C. Plaintiff's Grievances

Following the Reid Settlement, Plaintiff filed three
grievances in connection with his treatment in the CCU.
Plaintiff filed his first grievance on November 13, 2020,[5] after
he was transferred to SCI-Phoenix, claiming that he has a mental
disability that has been exacerbated by his prolonged isolation
in the CCU (Grievance No. 898857) (the "first grievance").
Plaintiff filed his second grievance on November 30, 2020 making

---

[5]    During his deposition, Plaintiff recalled filing his first grievance in
December, but the DOC's records indicate this grievance was filed on November
13, 2020. See Ex. H, ECF No. 24-8 at 9.

the same claims but adding more details about his mental health history (Grievance No. 902000) (the "second grievance"). Plaintiff filed his third grievance on February 24, 2021, again making the same claims but adding more information about his mental health (Grievance No. 916331) (the "third grievance").

The DOC has a policy that applies to inmate grievances. Under the policy, "an inmate must file a grievance within 15 working days after the event upon which the claim is based." Defs.' SOMF ¶ 51 (internal quotation marks and citation omitted). After receiving a response, "the inmate may file an appeal within 15 working days to the Facility Manager" where the inmate is housed. Id. ¶ 52. Following receipt of the Facility Manager's appeal, the inmate may file a final review appeal to the Secretary's Office of Inmate and Grievance Appeals (the "SOIGA"). If an inmate appeals to SOIGA, the inmate is required to include all relevant documentation with the appeal. Id. ¶ 54.

On February 17, 2021, SOIGA issued a final appeal decision notice dismissing Plaintiff's first grievance due to Plaintiff's failure to provide SOIGA with all required documentation. On March 15, 2021, SOIGA issued a final appeal notice dismissing Plaintiff's second grievance due to Plaintiff's untimely filing of the grievance beyond the 15-day deadline. On April 20, 2021, SOIGA issued a notice regarding Plaintiff's third grievance

8

indicating that plaintiff failed to submit an appeal or indicate what action Plaintiff sought from SOIGA.

### D.    Procedural History

On March 3, 2021, Plaintiff filed this action. Plaintiff brought claims under 42 U.S.C. § 1983 alleging that Defendant Wetzel, in his official capacity, violated Plaintiff's Eighth and Fourteenth Amendment rights and an individual capacity claim under Title II of the ADA. In April 2021, the Court entered an order dismissing Plaintiff's Fourteenth Amendment claims with prejudice. See Ord. ¶ 5, ECF No. 7. The Court's order dismissed the official capacity Eighth Amendment claim against Defendant Wetzel, but permitted Plaintiff to proceed with an individual capacity Eighth Amendment claim against Defendant Wetzel. Id. The Court has also deemed the ADA claim to be against the acting Secretary of Corrections in his official capacity. See Ord. ¶ 3, ECF No. 29. The acting Secretary of Corrections is George Little. Accordingly, the remaining claims are: (1) an Eighth Amendment claim under section 1983 against Defendant Wetzel in his individual capacity and (2) an ADA claim against Defendant Little in his official capacity. Defendants have filed a motion for summary judgment. Plaintiff has since responded and the motion is now ripe before the Court.[6]

---

[6]    Pursuant to the Court's scheduling orders, Defendant was granted leave to depose Plaintiff by December 13, 2021 and to file a motion for summary judgment by January 28, 2022. See Ord., ECF Nos. 18, 21. The Court's Second

## III. LEGAL STANDARD

Summary judgment is "appropriate only when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A fact is material "if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A factual dispute is genuine "if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. If the movant meets this obligation, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. At the summary judgment stage, the Court must view the facts "in the light most favorable to" the nonmoving party and "draw all reasonable inferences in favor" of that party. Young v. Martin, 801 F.3d 172, 174 n.2 (3d Cir. 2015).

---

Scheduling Order provided that if Defendant files a motion for summary judgment, Plaintiff may respond or submit an affidavit pursuant to Federal Rule of Civil Procedure 56(d) indicating that he is unable to present facts essential to justify his opposition and additional discovery is needed. See Ord., ECF No. 21. Plaintiff submitted a response to Defendants' motion and did not indicate that additional discovery is needed. Accordingly, Defendants' motion is ripe for disposition.

10

A document filed pro se is to be "liberally construed" and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). In addition, when considering a motion in a pro se plaintiff's proceedings, a court must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." Holley v. Dep't of Veteran Affairs, 165 F.3d 244, 247-48 (3d Cir. 1999). However, on a motion for summary judgment, "a pro se plaintiff is not relieved of his obligation under Rule 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." Ray v. Fed. Ins. Co., No. 05-2507, 2007 WL 1377645, at *3 (E.D. Pa. May 10, 2007) (Robreno, J.). "[M]erely because a non-moving party is proceeding pro se does not relieve him of the obligation under Rule 56(e) to produce evidence that raises a genuine issue of material fact." Boykins v. Lucent Techs., Inc., 78 F.Supp.2d 402, 408 (E.D. Pa. 2000) (Robreno, J.).

## IV. DISCUSSION

Defendants move for summary judgment arguing that (A) the action should be dismissed because Plaintiff has failed to exhaust his administrative remedies, (B) Plaintiff's claims are

11

barred by the statute of limitations, (C) Defendant Wetzel is
protected by qualified immunity, and (D) Plaintiff cannot point
to evidence to support his ADA claim against Defendant Little.[7]
These arguments will be addressed in turn.

**A.    Exhaustion of Administrative Remedies**

Defendants first argue that Plaintiff's claims must fail
because Plaintiff failed to exhaust the administrative remedies
available to him under the Prison Litigation Reform Act (the
"PLRA"). The PLRA provides that "[n]o action shall be brought
with respect to prison conditions under section 1983 of this
title, or any other Federal law, by a prisoner confined in any
jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted." 42
U.S.C. § 1997e(a) (amended by Pub. L. 104-134, Title I, S101(a),
110 Stat. 1321-71 (1996)) (emphasis added). A prisoner must also
exhaust administrative remedies for claims brought under the
ADA. See Cobb v. Weyandt, 359 F. App'x 285, 287 (3d Cir. 2009)
(noting that the district court properly rejected the argument
that administrative exhaustion was unnecessary for claims
brought under the ADA). "Exhaustion is mandatory in cases
covered by the PLRA." Dawson v. Cook, 238 F. Supp. 3d 712, 718

---

[7]    Defendants also argue that Plaintiff's Fourteenth Amendment claim
fails. See Defs.' Mot. at 15-20, ECF No. 23. Because the Court already
dismissed this claim with prejudice, see Ord. ¶ 5, ECF No. 7, the Court need
not address this argument here.

(E.D. Pa. 2017) (Robreno, J.) (citing <u>Porter v. Nussle</u>, <u>534 U.S. 516, 524</u>, <u>532</u> (2002)).

Failure to exhaust administrative remedies is an affirmative defense which Defendants have the burden of pleading and proving. <u>Rinaldi v. United States</u>, <u>904 F.3d 257, 268</u> (3d Cir. 2018) (citing <u>Ray v. Kertes</u>, <u>285 F.3d 287, 295</u> (3d Cir. 2002)); <u>see also</u> <u>Brown v. Croak</u>, <u>312 F.3d 109, 111</u> (3d Cir. 2002) (same). "[O]nce the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." <u>Rinaldi</u>, <u>904 F.3d at 268</u> (citing <u>Tuckel v. Grover</u>, <u>660 F.3d 1249, 1253</u> (10th Cir. 2011)).

"[T]o properly exhaust administrative remedies prisoner must 'complete the administrative review process in accordance with the applicable procedural rules.'" <u>Jones v. Bock</u>, <u>549 U.S. 199, 218</u> (2007) (quoting <u>Woodford v. Ngo</u>, <u>548 U.S. 81, 88</u> (2006)). Such rules are "defined not by the PLRA, but by the prison grievance process itself." <u>Id.</u> "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." <u>Woodford</u>, <u>548 U.S. at 90-91</u>. To complete the process, the inmate-plaintiff must substantially comply with the prison's grievance procedure. <u>Small v. Camden</u>

Cnty., 728 F.3d 265, 272 (3d Cir. 2013); Spruill v. Gillis, 372
F.3d 218, 232 (3d Cir. 2004). The inmate-plaintiff is barred
from bringing suit if he fails to properly pursue his grievance
through the prescribed process. Spruill, 372 F.3d at 231-32;
Potts v. Holt, No. 09-1805, 2010 WL 2080106, at *6 (M.D. Pa.
Apr. 8, 2010).[8]

The DOC has a policy, DC-ADM-804, which sets forth specific
instructions for filing prisoner grievances. Defendants argue
that Plaintiff failed to exhaust his administrative remedies
because he did not submit his grievances by the requisite
deadline. DC-DM-804 requires that inmates submit their grievance
to the Facility's Grievance Coordinator/Designee within 15 days
of when the claim is based. See Ex. I, DC-ADM-804, § 1.A.8, ECF
No. 24-9. Defendants contend that Plaintiff's claims are based
on conditions he experienced in the CCU before SCI-Greene
relaxed its policies on March 12, 2018, so Plaintiff must have
filed his grievance within 15 days of March 12, 2018;

---

[8]    In fact, the Third Circuit has noted that policy considerations favor
strictly enforcing these exhaustion requirements. These considerations
include:

> (1) avoiding premature interruption of the administrative process
> and giving the agency a chance to discover and correct its own
> errors; (2) conserving scarce judicial resources, since the
> complaining party may be successful in vindicating his rights in
> the administrative process and the courts may never have to
> intervene; and, (3) improving the efficacy of the administrative
> process. Each of these policies, which Congress seems to have
> had in mind in enacting the PLRA, is advanced by the across-the-board,
> mandatory exhaustion requirement in § 1997e(a).

Nyhuis v. Reno, 204 F.3d 65, 75 (3d Cir. 2000).

alternatively, Plaintiff's grievances must have been filed within 15 days of December 3, 2019, the date when the DOC implemented the new CCU policy with respect to solitary confinement.

Here, Plaintiff's first grievance did not specify a time period for Plaintiff's complaints. In his grievance, Plaintiff generally complained that "his mental disability has [been] exacerbated due to the effects of prolonged isolation." See Ex. H, ECF No. 24-8 at 9. Though Plaintiff testified that he acknowledged the new CCU policy was implemented on December 3, 2019, it is not clear if Plaintiff believes the alleged violations ended on that date. See Pl. Dep: 12:1-24; 13:1; 54:8-13. Additionally, the DOC did not dismiss Plaintiff's first grievance for failing to comply with the 15-day deadline. Thus, the Court finds that Defendants have not met their burden of showing Plaintiff failed to exhaust his administrative remedies here.

Defendants also argue that Plaintiff failed to exhaust his administrative remedies with respect to the first grievance because Plaintiff did not properly appeal the first grievance to SOIGA. As noted, if an inmate's initial grievance is rejected, the inmate may appeal it to the Facility Manager/Designee "within 15 working days from the date of the initial review response/rejection." Ex. I, DC-ADM-804, § 2.A.1, ECF No. 24-9.

Plaintiff's first grievance was rejected because the Facility Grievance Coordinator found that Plaintiff was not "personally affected by a Department or facility action or policy." Ex. H ECF No. 24-8 at 10. Plaintiff appealed the initial rejection to the Facility Manager and it was again rejected because Plaintiff was not "personally affected by a Department or facility action or policy." Id. at 11. Consistent with DC-ADM-804, Plaintiff then appealed the dismissal to SOIGA. See Ex. I. at §§ 2.B.1.b; 2.B.1.i, ECF No. 24-9.

An appeal to SOIGA must include the following documents:

(1) a legible copy of the Initial Grievance;

(2) a copy of the initial review response/rejection and/or remanded initial review response/rejection;

(3) a legible copy of the Inmate Appeal to the Facility Manager;

(4) a copy of the Facility Manager/designee's decision and/or remanded Facility Manager/designee's decision;

(5) a written appeal to the SOIGA;

(6) failure to provide any of the documentation noted above may result in the appeal being dismissed; and

(7) the copies of the initial review response/rejection and the Facility Manager/designee's decision cannot be handwritten.

Id. at § 2.B.1.k.

Plaintiff's appeal to SOIGA was dismissed as incomplete because Plaintiff failed to provide the requisite documentation.

16

Plaintiff specifically failed to provide "a legible copy of
[the] appeal to [the] Facility Manager." See Ex H, ECF No. 24-8
at 8. The record shows that on January 4, 2021, a notice was
issued to Plaintiff indicating Plaintiff was directed to provide
all completed documents necessary within 15 working days of the
notice and "[a] failure to provide the missing information
(identified [in the notice]) within this time period may result
in a dismissal of [the] appeal." Id. The record shows that on
January 11, 2021, Plaintiff responded and included legible
copies of his appeal to the Facility Manager. Id. at 6-7.
Despite this, on January 19, 2021, Plaintiff received another
notice indicating that his appeal was defective because he had
not provided legible copies of his appeal to the Facility
Manager. Id. at 5. Plaintiff did not respond, and on February
17, 2021, his grievance was dismissed.

It seems there was an error on the part of SOIGA as
Plaintiff did in fact submit a copy of the required documents on
January 11, 2021. See id. at 6-7. It is not apparent why SOIGA
did not consider Plaintiff's submission and subsequently
dismissed Plaintiff's appeal, but it appears that Plaintiff
otherwise complied with the appeals process. Thus, the Court
finds that Defendants have not met their burden of showing

17

Plaintiff failed to exhaust his administrative remedies[9] and finds that Defendants are not entitled to summary judgment on this ground.[10]

### B. Statute of limitations

Defendants next argue that Plaintiff's claims are barred by the statute of limitations. "Because 42 U.S.C. § 1983 does not contain a statute of limitations, courts look to 42 U.S.C. § 1988, which requires use of the statute of limitations for the state where the federal court sits, unless its application would conflict with the Constitution or with federal law." Jackson v. Se. Pa. Transp. Auth., 260 F.R.D. 168, 183 (E.D. Pa. 2009) (quoting Lake v. Arnold, 232 F.3d 360, 368 (3d Cir. 2000)). Courts typically apply the underlying state's statute of limitations for personal injury claims to determine the statute of limitations for section 1983 claims. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d

---

[9] Plaintiff contends that grievance procedures were not available to him because the policy provides that "issues concerning . . . the reasons for placement in administrative custody will not be addressed through the Inmate Grievance System" and must be addressed through DC-ADM-802, the policy governing "Administrative Custody procedures." Ex. I, DC-ADM-804, § 1.A.7, ECF No. 24-9. The Court need not reach this argument. Because Defendants have not met their burden of proving Plaintiff failed to exhaust his administrative remedies, the burden does not shift to Plaintiff to show the remedies were not available to him. Rinaldi, 904 F.3d at 268.

[10] Defendants also argue that Plaintiff failed to exhaust his administrative remedies with respect to the second and third grievances. However, the Court need not reach these arguments. Plaintiff has still preserved his claims because all three grievances address the same underlying issues—all three allege that Plaintiff has mental disability that was exacerbated by his prolonged isolation in the CCU.

18

Cir. 1998); Padilla v. Twp. of Cherry Hill, 110 F. App'x 272, 276 (3d Cir. 2004); Jackson, 260 F.R.D. at 183. Under Pennsylvania law, there is a two-year statute of limitation for personal injury actions, see 42 Pa. C.S. § 5524, so "the same two-year period is applicable to Plaintiff's section 1983 claims." Jackson, 260 F.R.D. at 183. Courts apply this statute of limitations to ADA claims as well. See Disabled in Action of Pa. v. Se. Pa. Transp. Auth., 539 F.3d 199, 208 (3d Cir. 2008).

"A section 1983 cause of action accrues when the plaintiff knew or should have known of the injury upon which its action is based." Sameric, 142 F.3d at 599. The same is true for cases arising under the ADA, but for ADA cases, "the focus is on when the discriminatory act occurs, not when the consequences of the act become painful." Bukhart, 70 F. App'x at 53 (quoting Chardon v. Fernandez, 454 U.S. 6, 8 (1981)).

A statute of limitations may be tolled under the continuing violations doctrine. "[W]hen defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (quoting Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1295 (3d Cir. 1991)). Under the

doctrine, "equity demands that so long as the most recent offensive utterance or adverse action occurred within the limitations period, the entire scope of that continuing violation may be considered." Tearpock-Martini v. Borough of Shickshinny, 756 F.3d 232, 236 (3d Cir. 2014) (citation omitted).

"In order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is more than the occurrence of isolated or sporadic instances." Cowell, 263 F.3d at 292 (quotation marks and citation omitted).[11] The Third Circuit has "cautioned, however, that equitable relief from the statutory limitations period is appropriate only where the alleged violation is 'occasioned by continual unlawful acts, not continual ill effects from an original violation.'" Tearpock, 756 F.3d at 236 (quoting Cowell, 263 F.3d at 293). "Under this doctrine, 'when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing

---

[11]    The Third Circuit has held that:

Courts should consider at least three factors: (1) subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency—whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence—whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

Cowell, 263 F.3d at 292.

the continuing practice falls within the limitations period.'"
Cibula v. Fox, 570 F. App'x 129, 133 (3d Cir. 2014)
(quoting Cowell, 263 F.3d at 292).

Here, Defendants do not contest that the doctrine applies.
Instead, Defendants argue that even when applying the doctrine,
Plaintiff has brought his claims outside of the requisite
limitations period. Defendants argue that because Plaintiff's
claims relate to the isolation policies at the CCU, and because
officials at SCI-Greene began loosening restrictions related to
CCU inmates early as March 12, 2018, the last act evidencing
continuous practices was March 12, 2018. Defendants aver that
because Plaintiff filed his complaint on March 3, 2021, this was
past the expiration of the statute of limitations so his claims
must be dismissed.

However, Plaintiff testified that his claims relate to his
isolation in the CCU from the time of his initial placement in
the CCU until, at least, December 3, 2019, when the new DOC
policy was issued. Pl. Dep: 12:1-24; 13:1; 54:8-13. Though
Defendants point to evidence that SCI-Greene instituted changes
in March 2018, see Defs.' SOMF ¶¶ 11-12, Plaintiff maintains
that he did not benefit from any policy changes until January
2022. See Pl. Affidavit, ECF No. 27 at 4. Viewing the evidence
in the light most favorable to Plaintiff, it is not clear that
this was the last act evidencing a continuing practice.

Here, the Court finds that there is a question of fact as to the date of the last act evidencing a continuing practice and declines to grant summary judgment on this ground.

**C.   Qualified Immunity-Defendant Wetzel**

Defendants next argue that Plaintiff's claim alleging violations of Plaintiff's Eighth Amendment rights against Defendant Wetzel must be dismissed because Defendant Wetzel is entitled to qualified immunity.[12]

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, (1982). Government officials are entitled to immunity in their individual capacities unless "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the alleged constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001).

---

[12]     Plaintiff brings this claim against Defendant Wetzel in his individual capacity. This defense is "available only for governmental officials when they are sued in their personal, and not in their official, capacity." Melo v. Hafer, 912 F.2d 628, 636 (3d Cir. 1990) (collecting cases).

The Supreme Court has emphasized that "the clearly established right must be defined with specificity." <u>City of Escondido v. Emmons</u>, <u>139 S. Ct. 500, 503</u> (2019). Although this specificity is "particularly important in excessive force cases," in any type of case in which qualified immunity is raised, the Court must be careful to avoid "clearly established law at a high level of generality." <u>Id.</u> (quoting <u>Kisela v. Hughes</u>, <u>138 S.Ct. 1148, 1152</u> (2018)) (internal quotation marks omitted). "[T]here does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate." <u>Dist. of Columbia v. Wesby</u>, <u>138 S.Ct. 577, 590</u> (2018) (internal quotation marks and citation omitted). But, "there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." <u>Id</u>. (internal quotation marks and citation omitted).

As Defendants point out, the Third Circuit has recently held that in a case where a death row inmate challenged the conditions of his solitary confinement under the Eighth Amendment, DOC officers were entitled to qualified immunity. <u>Porter v. Pennsylvania Dep't of Corrections</u>, <u>974 F.3d 431, 450</u> (3d Cir. 2020). The Third Circuit held that Eighth Amendment rights with respect to conditions of solitary confinement on death row are not "clearly established." <u>Id.</u> at 450-451; <u>see</u>

also <u>Johnson v. Pennsylvania Dep't of Corrections</u>, <u>846 F. App'x</u>
<u>123, 129</u> (3d Cir. 2021) (finding that the Third Circuit was
bound by its "holding in <u>Porter</u> that the Eighth Amendment right
in this context was not clearly established at the time of
Porter's (and Johnson's) solitary confinement, so the Defendants
can assert a qualified immunity defense" at the summary judgment
stage). Thus, the Court is bound by <u>Porter</u> here. Accordingly,
the Court will grant Defendants' motion with respect to the
section 1983 claim against Defendant Wetzel.[13]

> **D.**  **ADA Claim Against Defendant Little**

Defendants contend that Plaintiff cannot maintain his ADA
claim against Defendant Little in his capacity as the Secretary
of Corrections.[14] As a preliminary matter, the claim may be
barred by Eleventh Amendment immunity. But, Defendants have not
raised this argument or briefed this issue, and it is not
necessary for the Court to consider it. "When subject matter
jurisdiction is at issue, a federal court is generally required
to reach the jurisdictional question before turning to the

---

[13]    In response, Plaintiff argues that the defense is waived because
Defendants did not raise this as an affirmative defense in their Amended
Answer. Pursuant to <u>Federal Rule of Civil Procedure 15</u>, the Court has since
granted Defendants leave to file a Second Amended Answer. <u>See</u> Ord. ¶ 2, <u>ECF</u>
<u>No. 29</u>. On July 12, 2022, Defendants filed a Second Amended Answer and
included the defense of qualified immunity. Thus, Plaintiff's argument is now
moot.

[14]    As noted, this claim is deemed to be against Defendant Little in his
official capacity. <u>See</u> Ord. ¶ 3, ECF No. 29; Ord., ECF No. 33.

merits." In re Hechinger Inv. Co. of Delaware Inc., 335 F.3d
243, 249 (3d Cir. 2003) (Alito, J.) (first citing Steel Co. v.
Citizens for a Better Env't, 523 U.S. 83, 93-93 (1998); then
citing Larsen v. Senate of the Commw., 152 F.3d 240, 245 (3d
Cir. 1998)). However, the Third Circuit has held that courts are
not required to resolve issues related to Eleventh Amendment
immunity before proceeding to the merits of a case. Id.; see
also, e.g., Lombardo v. Pa. Dep't of Public Welfare, 540 F.3d
190, 197 n.6 (3d Cir. 2008) (noting that federal courts are not
required to raise Eleventh Amendment immunity issues sua
sponte). Thus, the Court may consider the merits of Plaintiff's
claim here.

To bring a claim under the ADA, a plaintiff "must
demonstrate: (1) he is a qualified individual; (2) with a
disability; (3) [who] was excluded from participation in or
denied the benefits of the services, programs, or activities of
a public entity, or was subjected to discrimination by any such
entity; (4) by reason of his disability." Haberle v. Trozell,
885 F.3d 170, 178-79 (3d Cir. 2018) (quoting Bowers v. Nat'l
Collegiate Athletic Ass'n, 475, F.3d 524, 533 n.32 (3d Cir.
2007)) (alterations in original).

Defendants argue that Plaintiff cannot prove the second
element of his claim because the record does not show that
Plaintiff "has a severe mental illness or intellectual

25

disability." Defs.' Mot. at 21, ECF No. 23. Under the ADA,
disability is defined as "a physical or mental impairment that
substantially limits one or more major life activities of such
individual," "a record of such an impairment," or "being
regarded as having such an impairment (as described in paragraph
(3))" of the statute. 42 U.S.C. § 12102(1). Without referring to
the statute, Defendants seem to argue that there is no evidence
that Plaintiff had a qualified disability under the ADA.

Though Defendants acknowledge that Plaintiff was diagnosed
with depression and suicidal ideation prior to coming into the
custody of the DOC, Defendants aver that Plaintiff did not
actively seek treatment from mental health professionals while
at the DOC. According to summaries of Plaintiff's mental health
records, in January 1996, Plaintiff was referred to a DOC
psychiatrist but did not show any signs of "mental
decomposition" or emotional problems. See Ex. A, ECF No. 28.
Though Plaintiff maintains he attempted suicide in July 1996,
the DOC's records show that Plaintiff indicated he faked the
attempt and the DOC's mental health staff reported that
Plaintiff was "not depressed." Id. After that incident,
Plaintiff did not seek additional mental health treatment. In
fact, Plaintiff does not believe that he was ever diagnosed with
a mental illness by a DOC mental health professional. Pl. Dep.
36:13-16.

However, Plaintiff still maintains that DOC staff had record of Plaintiff's diagnoses of depression and suicidal ideation. See Pl. Dep: 15:3-20. In fact, in 1996, Plaintiff was referred by his criminal attorney for evaluation by external mental health professionals. The mental health professionals, Dr. Fox and Dr. Crown, prepared declarations on Plaintiff's behalf and noted that Plaintiff suffers from emotional problems and mental impairments including depression and suicidal ideation. See Ex. A., ECF No. 2-1 at 50 ¶ 8; 53 ¶ 3; 55 ¶ 9. Though it is not clear if/when the DOC staff received these records, there is at least an issue of fact as to whether the DOC had record of Plaintiff's mental health diagnoses.[15] Thus, there is an issue of fact with regard to whether, under the ADA's definition, Plaintiff has a disability.

Regardless, Plaintiff's claim still fails because he cannot show evidence of intentional discrimination. Plaintiff seeks to recover compensatory damages here, a remedy which is not available under the ADA "absent proof of 'intentional discrimination.'" Haberle, 885 F.3d at 181 (quoting S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 261 (3d Cir. 2013)). To prove intentional discrimination, the plaintiff must

---

[15]    Plaintiff does not argue that he has a physical or mental impairment that substantially limits one or more major life activities of such individual," or that he was "regarded as having such an impairment." 42 U.S.C. § 12102(1).

show "at least deliberate indifference and to plead deliberate indifference, a claimant must allege '(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge.'" Id. (quoting Lower Merion Sch. Dist., 729 F.3d at 265) (internal citation omitted).

Defendants contend that there is no evidence that the Secretary of Corrections, or any other DOC staff member, acted with deliberate indifference towards Plaintiff. Plaintiff fails to point to any evidence to contest this argument. Accordingly, Plaintiff cannot maintain his ADA claim, so Defendants' motion will be granted with respect to this claim.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion. An appropriate order follows.