# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

————————

## No. 22-2399

————————

ROY LEE WILLIAMS,

Plaintiff-Appellant,

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS and
JOHN E. WETZEL,

Defendants-Appellees.

————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:21-cv-1248)
District Judge: Honorable Eduardo C. Robreno

————————————————————————————————

## BRIEF FOR APPELLANT ROY LEE WILLIAMS
## AND VOLUME I OF THE APPENDIX (JA001–JA037)

————————————————————————————————

Matthew A. Feldman
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
215-925-2966
mfeldman@pilp.org

*Counsel for Appellant*

January 20, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................iii

JURISDICTIONAL STATEMENT.................................................... 1

ISSUES PRESENTED.................................................................... 1

STATEMENT OF RELATED CASES............................................... 1

STATEMENT OF THE CASE.......................................................... 2

    I.    Statement of Facts.......................................................... 2

    II.    Procedural History......................................................... 7

    III.    Rulings Presented for Review............................................ 8

SUMMARY OF ARGUMENT........................................................ 8

ARGUMENT............................................................................ 12

    I.    Secretary Wetzel is not entitled to qualified immunity on
        Mr. Williams's Eighth Amendment claim............................ 12

        A.    Standard of Review.............................................. 12

        B.    Secretary Wetzel violated Mr. Williams's Eighth Amendment
            rights when he kept him in solitary confinement for
            twenty-six years despite his history of mental illness and
            suicidality............................................................ 13

        C.    The right of a prisoner with a known history of mental
            illness and suicidality not to be subjected to prolonged
            solitary confinement by an official aware of that history
            and the associated risk of harm has long been clearly
            established........................................................... 19

            1.    In relying on *Porter*, the District Court defined the
                right at issue too broadly................................. 19

            2.    Any reasonable official would have known that
                keeping Mr. Williams in solitary confinement for
                twenty-six years violated the Eighth Amendment, in
                light of his history of mental illness and suicidality........... 24

    II.    The DOC is not entitled to summary judgment on Mr.
        Williams's ADA claim.................................................... 33

        A.    Standard of Review.............................................. 33

B.      The DOC discriminated against Mr. Williams by failing to ameliorate the effects of solitary confinement on him in light of his psychiatric disabilities, and the factual dispute as to the DOC's awareness of his mental illness forecloses summary judgment as to the DOC's deliberate indifference............................ 34

III.    The District Court improperly dismissed Mr. Williams's Fourteenth Amendment claim and abused its discretion in doing so without granting him leave to file an amended complaint.................... 41

A.      Standard of Review................................................................ 41

B.      The District Court should have construed Mr. Williams's *pro se* complaint as asserting a Fourteenth Amendment procedural due process claim..................................................... 42

C.      Mr. Williams's complaint adequately stated a procedural due process claim............................................................................. 45

D.      In the alternative, the District Court should have granted Mr. Williams leave to amend........................................ 48

CONCLUSION............................................................................................ 49

CERTIFICATE OF COMPLIANCE................................................................ 50

CERTIFICATE OF BAR MEMBERSHIP........................................................ 50

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*A.M. ex rel. JMK v. Luzerne Cnty. Juvenile Det. Ctr.,*
   372 F.3d 572 (3d Cir. 2004)............................................................... 16

*Allah v. Seiverling,*
   229 F.3d 220 (3d Cir. 2000)............................................................... 42

*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011)............................................................................ 20

*Beers-Capitol v. Whetzel,*
   256 F.3d 120 (3d Cir. 2001)............................................................... 29

*Braggs v. Dunn,*
   257 F. Supp. 3d 1171 (M.D. Ala. 2017)............................................ 31

*Chisolm v. McManimon,*
   275 F.3d 315 (3d Cir. 2001)............................................................... 37

*Clark v. Coupe,*
   55 F.4th 167 (3d Cir. 2022).................. 9, 14, 16, 20, 21, 23, 24, 25, 26, 27, 31, 32

*Coleman v. Wilson,*
   912 F. Supp. 1282 (E.D. Cal. 1995)................................................... 30

*Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.,*
   796 F.3d 293 (3d Cir. 2015)............................................................... 36

*Disabled in Action v. SEPTA,*
   539 F.3d 199 (3d Cir. 2008)............................................................... 34

*District of Columbia v. Wesby,*
   138 S. Ct. 577 (2018)................................................................... 20, 33

*Dooley v. Wetzel,*
   957 F.3d 366 (3d Cir. 2020)..................................................... 42, 43, 48

*E.D. v. Sharkey,*
   928 F.3d 299 (3d Cir. 2019)..................................................... 12, 19, 28

*Elder v. Holloway,*
    510 U.S. 510 (1994)............................................................... 24

*Emrit v. Indep. Music Awards,*
    605 F. App'x 103 (3d Cir. 2015)........................................... 42

*Farmer v. Brennan,*
    511 U.S. 825 (1994)............................................. 13, 15, 28, 31

*Fields v. City of Philadelphia,*
    862 F.3d 353 (3d Cir. 2017)................................................. 25

*Furgess v. Pa. Dep't of Corr.,*
    933 F.3d 285 (3d Cir. 2019)............................................ 38, 41

*Ga. Advoc. Office v. Jackson,*
    No. 19-1634, 2019 U.S. Dist. LEXIS 238805 (N.D. Ga. Sep. 23, 2019).............. 38

*Garrett v. Wexford Health,*
    938 F.3d 69 (3d Cir. 2019)................................................. 43

*Grayson v. Mayview State Hosp.,*
    293 F.3d 103 (3d Cir. 2002)................................................ 48

*Haberle v. Borough of Nazareth,*
    936 F.3d 138 (3d Cir. 2019) ("*Haberle II*")........................... 39, 40, 41

*Haberle v. Troxell,*
    885 F.3d 171 (3d Cir. 2018) ("*Haberle I*")................... 34, 37, 39, 40, 41

*Higgins v. Beyer,*
    293 F.3d 683 (3d Cir. 2002)................................................ 43

*Higgs v. Att'y Gen.,*
    655 F.3d 333 (3d Cir. 2011)................................................ 43

*Hope v. Pelzer,*
    536 U.S. 730 (2002)...................................................... 25, 27

*Hubbard v. Taylor,*
    399 F.3d 150 (3d Cir. 2005)................................................ 44

*Hutto v. Finney,*
    437 U.S. 678 (1978)....................................................... 14

*Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.,*
    No. 8-1317, 2012 U.S. Dist. LEXIS 182974 (S.D. Ind. Dec. 31, 2012)............ 30, 31

*Jefferson v. Lias,*
    21 F.4th 74 (3d Cir. 2021)........................................................................ 24

*Johnson v. Pa. Dep't of Corr.,*
    846 F. App'x 123 (3d Cir. 2021)............................................................. 23

*Johnson v. Wetzel,*
    209 F. Supp. 3d 766 (M.D. Pa. 2016).................................................... 18

*Jones 'El v. Berge,*
    164 F. Supp. 2d 1096 (W.D. Wis. 2001)................................................ 30

*Kedra v. Schroeter,*
    876 F.3d 424 (3d Cir. 2017)............................................................ 29, 42

*Langley v. Coughlin,*
    715 F. Supp. 522 (S.D.N.Y. 1989)........................................................ 30

*Madrid v. Gomez,*
    889 F. Supp. 1146 (N.D. Cal. 1995)...................................................... 30

*Martinez v. UPMC Susquehanna,*
    986 F.3d 261 (3d Cir. 2021).................................................................. 42

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)............................................................................. 45

*McNeil v. United States,*
    508 U.S. 106 (1993)............................................................................. 43

*McTernan v. City of York,*
    577 F.3d 521 (3d Cir. 2009)................................................................. 42

*Morrow v. Balaski,*
    719 F.3d 160 (3d Cir. 2013)................................................................. 42

*Mullenix v. Luna,*
    577 U.S. 7 (2015)................................................................................. 20

*Pa. Dep't of Corr. v. Yeskey,*
    524 U.S. 206 (1998)............................................................................. 35

*Paladino v. Newsome,*
    885 F.3d 203 (3d Cir. 2018)................................................................ 17

*Palakovic v. Wetzel,*
    854 F.3d 209 (3d Cir. 2017)................................................. 9, 14, 17, 25

*Partridge v. Smith,*
    No. 17-02941, 2020 U.S. Dist. LEXIS 31693 (D. Colo. Feb. 25, 2020)............... 38

*Payan v. Los Angeles Cmty. Coll. Dist.,*
    11 F.4th 729 (9th Cir. 2021)............................................................. 37

*Pearson v. Callahan,*
    555 U.S. 223 (2009)....................................................................... 12

*Peroza-Benitez v. Smith,*
    994 F.3d 157 (3d Cir. 2021)............................................... 12, 19, 21, 24

*Porter v. Clarke,*
    923 F.3d 348 (4th Cir. 2019)............................................................. 17

*Porter v. Pa. Dep't of Corr.,*
    974 F.3d 431 (3d Cir. 2020)................ 3, 14, 15, 17, 20, 21, 22, 23, 28, 29, 31, 47

*Presta v. Peninsula Corridor Joint Powers Bd.,*
    16 F. Supp. 2d 1134 (N.D. Cal. 1998)..................................................... 37

*Ruiz v. Johnson,*
    37 F. Supp. 2d 855 (S.D. Tex. 1999)...................................................... 30

*S.H. v. Lower Merion Sch. Dist.,*
    729 F.3d 248 (3d Cir. 2013)........................................................... 39, 41

*Sandin v. Conner,*
    515 U.S. 472 (1995)....................................................................... 45

*Saucier v. Katz,*
    533 U.S. 194 (2001)....................................................................... 19

*Shoats v. Horn,*
    213 F.3d 140 (3d Cir. 2000)........................................................... 46, 47

*Sourbeer v. Robinson,*
    791 F.2d 1094 (3d Cir. 1986)............................................................. 46

*Talley v. Clark*,
    851 F. App'x 306 (3d Cir. 2021)............................................... 14, 17, 47

*Tellis v. Leblanc*,
    No. 18-541, 2022 U.S. Dist. LEXIS 3593 (W.D. La. Jan. 6, 2022)..................... 37

*Thomas v. Cumberland Cnty.*,
    749 F.3d 217 (3d Cir. 2014).................................................12, 33

*Tourscher v. McCullough*,
    184 F.3d 236 (3d Cir. 1999)................................................... 42

*Turner v. Wetzel*,
    No. 21-2879, 2022 U.S. App. LEXIS 23124 (3d Cir. Aug. 19, 2022).................. 15

*Vogt v. Wetzel*,
    8 F.4th 182 (3d Cir. 2021)............................................. 43, 44, 45

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)................................................... 45, 46

*Williams v. Sec.'y Pa. Dep't of Corr.*,
    848 F.3d 549 (3d Cir. 2017)........................................... 45, 46, 47

*Young v. Quinlan*,
    960 F.2d 351 (3d Cir. 1992)....................................... 13, 14, 22, 32

## Statutes

28 U.S.C. § 1331................................................................ 1

28 U.S.C. § 1291................................................................ 1

28 U.S.C. § 1915...................................................... 7, 41, 42, 48

42 U.S.C. § 1983......................................................... 1, 7, 41

42 U.S.C. § 12101.............................................................. 34

42 U.S.C. § 12102.......................................................... 35, 36

42 U.S.C. § 12131.............................................................. 1

42 U.S.C. § 12132.......................................................... 34, 36

**Regulations**

28 C.F.R. § 35.101.................................................................. 36

28 C.F.R. § 35.108.................................................................. 36

28 C.F.R. § 35.130.................................................................. 38

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................... 42

Fed. R. Civ. P. 56(a)........................................................... 12, 33

Fed. R. Civ. P. 56(c)............................................................. 17

Fed. R. Civ. P. 56(d)............................................................... 7

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Mr. Williams's complaint asserted claims under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq*. The District Court entered a final judgment on July 21, 2022. JA037. Mr. Williams filed a timely notice of appeal on July 27, 2022. JA001–003. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.    Whether Secretary Wetzel violated Mr. Williams's clearly established Eighth Amendment rights by keeping him in solitary confinement for twenty-six years despite his awareness of Mr. Williams's history of mental illness and suicidality and the risks prolonged solitary confinement posed to him. *See* JA009–010; JA030–032.

II.   Whether the acknowledged factual dispute as to the DOC's awareness of Mr. Williams's mental illness forecloses summary judgement on his Americans with Disabilities Act claim. *See* JA032–036.

III.  Whether the District Court erred in *sua sponte* dismissing Mr. Williams's Fourteenth Amendment claim for failure to state a claim and abused its discretion when it did not grant him leave to file an amended complaint. *See* JA005, ¶ 5 & n.1.

## STATEMENT OF RELATED CASES

Counsel is not aware of any related proceedings.

1

# STATEMENT OF THE CASE

## I.    Statement of Facts

Roy Lee Williams was sentenced to death—but he was not sentenced to nearly three decades of torture. Nonetheless, for twenty-six years, the Pennsylvania Department of Corrections ("DOC") and its former top official, Secretary John E. Wetzel, kept him in solitary confinement, in conditions that have almost universally been recognized—including by this Court—as causing grave psychological harm. The deleterious psychological effects of solitary confinement are particularly pronounced and dangerous when it is imposed on individuals, like Mr. Williams, who have pre-existing mental illness.

Mr. Williams's psychiatric difficulties date back to his childhood. JA055–056. He was born into a family with a history of mental illness. JA055. His father physically abused both him and his mother, and his home life was full of "extraordinary violence." JA055. Mr. Williams's father emotionally abused him too, subjecting him to "extreme, unrelenting, and irrational rejection." JA057. Mr. Williams experienced mental health problems throughout his childhood. JA057. By age fourteen, he was involuntarily committed to a psychiatric hospital, where he was diagnosed with depression and suicidal ideation. JA044; JA057; JA103–104.

Despite this history, when Mr. Williams entered the DOC in 1993, he was placed in solitary confinement on the Capital Case Unit ("CCU"), where he remained for the next twenty-six years. JA098–099; JA134. The DOC held Mr. Williams in solitary confinement solely because of his death sentence, pursuant to its policy at

the time of automatically, and permanently, placing all individuals with death sentences in solitary confinement. JA047; JA252.

While the record before the Court does not include a detailed description of the conditions to which Mr. Williams was subjected, the CCU's conditions are well-known to this Court. As described in *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431 (3d Cir. 2020), an individual housed on the CCU spent the overwhelming majority of his time alone in his cell, which measured no more than 7 feet by 12 feet, and included a metal bed with plastic mattress, a sink, a toilet, and a desk. *Id.* at 436. He ate his meals alone in his cell and was only permitted to leave his cell for at most ten hours per week, up to two hours a day on Monday through Friday. *Id.* Before leaving his cell, he had to undergo a visual strip search and was either handcuffed behind his back or in front using a belt and tether. *Id.* He was permitted to exercise outside up to five days a week, but this was in an exercise cage that was, at most, only twice the size of his cell. *Id.* The only job assignments available were janitorial duties within the CCU, which were performed in confined small spaces. *Id.* CCU prisoners were barred from participating in any vocational or other educational programming, aside from solitary in-cell study, and they were not permitted to attend religious services. *Id.*

The DOC held Mr. Williams in these conditions despite knowing of his history of and ongoing struggles with mental illness and suicidality. In 1996, Dr. Barry Crown, a psychologist and neuropsychologist, and Dr. Robert Fox, a psychiatrist, evaluated Mr. Williams and shared their conclusions with his criminal defense attorneys, who, in turn, shared them with the DOC. JA051–061; JA104; JA243–244.

Both doctors provided information on Mr. Williams's traumatic childhood and his struggles with mental illness, including his psychiatric hospitalization. JA052; JA055–057. Dr. Crown documented Mr. Williams's brain damage and the resulting "impairments and deficiencies" that neuropsychological testing had revealed. JA051–52. These included "impaired cognition," "emotional lability," and deficiencies in "reasoning capacity." JA052–053. Dr. Fox further documented what he referred to as Mr. Williams's "ingrained psychological and emotional impairments," including symptoms of PTSD. JA056. The affidavits from Dr. Crown and Dr. Fox thus demonstrated to the DOC that Mr. Williams was "severely psychologically, cognitively and emotionally impaired." JA055. Mr. Williams himself also told a DOC psychologist about his history of suicidality and his psychiatric hospitalization. JA252.

Not surprisingly, Mr. Williams's mental illness persisted after he entered the DOC. A DOC psychologist diagnosed him with a psychiatric disability, and he was placed on the DOC's Mental Health Roster with a "C" designation, which is reserved for individuals requiring psychiatric treatment. JA125–126; JA139; JA205; JA243. Mr. Williams attempted suicide in his cell on the CCU, using a noose he fashioned from a sheet. JA113–115; JA294. He had reported to prison staff that he was experiencing depression and anxiety and hearing voices telling him to kill himself. JA294. In response to Mr. Williams's suicide attempt, DOC staff stripped him of his clothes and placed him in a Psychiatric Observation Cell. JA113–114. Mr. Williams was so desperate to get out of that cell that he falsely told staff that he had faked the

suicide attempt. JA114–115. The prison mental health professional who spoke to Mr. Williams apparently believed, correctly, that Mr. Williams had genuinely attempted suicide because he offered him Prozac. JA115; JA294. Nonetheless, prison officials punished Mr. Williams for making the noose and attempting suicide by placing him on disciplinary custody ("DC") status for six months. JA114. Being on DC status meant Mr. Williams was subjected to even further restrictions on top of the already harsh conditions of the CCU. JA115–116. As a result of the punitive response to his suicide attempt, Mr. Williams decided not to seek further help from DOC mental health staff and, instead, tried to deal with his depression and other struggles on his own. JA114.

The DOC's treatment of Mr. Williams and others in solitary confinement drew the attention of the United States Department of Justice. The DOJ investigated the DOC's use of solitary confinement on prisoners with serious mental illness, expressly including death-sentenced prisoners on the CCU within the scope of its investigation. JA062; JA066. In 2014, the DOJ sent a "findings letter" to the Governor of Pennsylvania, Secretary Wetzel, and other DOC officials with the results of its investigation. JA062; JA086–089. The DOJ stated that, by subjecting individuals with serious mental illness "to prolonged periods of solitary confinement under harsh conditions that are not necessary for legitimate security-related reasons, [the DOC] exposes them to an excessive and obvious risk of serious harm." JA068. "[A]s a direct result of these practices," the DOJ explained, incarcerated individuals with serious mental illness had "suffered serious psychological and physical harms, including

psychosis, trauma, severe depression, serious self-injury, and suicide." JA068; *see* JA072–075 (discussing specific incarcerated individuals with mental illness and how they were affected by solitary confinement). The DOJ concluded that "the manner in which [the DOC] continues to use solitary confinement on prisoners with [serious mental illness] violates the Eighth Amendment[.]" JA067.

The DOJ also addressed the applicability of Title II of the Americans with Disabilities Act ("ADA") to the DOC's solitary confinement practices. The DOJ concluded that the DOC was violating the ADA in two distinct ways that are relevant here: first, by automatically placing individuals with serious mental illness in solitary confinement without an individualized assessment of their mental health needs and the appropriateness of the placement; and, second, by failing to ensure that prisoners with serious mental illness placed in solitary confinement for reasons unrelated to their disabilities could participate in and benefit from prison activities, programs, and services. JA082–083.

Mr. Williams remained in solitary confinement until December 2019, when, pursuant to the settlement of a class action lawsuit, the DOC implemented changes to the conditions on the CCU that effectively ended solitary confinement for death-sentenced prisoners. JA098–099; JA134.[1]

---

[1] *See Reid v. Wetzel*, No. 18-cv-176 (M.D. Pa.).

## II.    Procedural History

Mr. Williams filed a *pro se* complaint against Secretary Wetzel in his individual and official capacities, asserting claims under Title II of the ADA and 42 U.S.C. § 1983, and seeking nominal, compensatory, and punitive damages. JA043–050.

Because Secretary Wetzel resigned from his position after the commencement of this action, the District Court properly substituted his successor, Acting Secretary George Little, in his official capacity, as the defendant to Mr. Williams's ADA claim, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. JA009, n.1. The District Court had previously held, properly, that Mr. Williams's official-capacity ADA claim was tantamount to a claim against the DOC. JA005–006, ¶ 6 & n.2.

On April 1, 2021, pursuant to 28 U.S.C. § 1915(e)(2)(b)(ii), the District Court *sua sponte* dismissed Mr. Williams's Fourteenth Amendment claim for failure to state a claim, "with prejudice" and without leave to amend. JA005, ¶ 5 & n.1.

The District Court subsequently issued two scheduling orders that permitted the defendants to depose Mr. Williams and set a due date for the defendants to file a motion for summary judgment but did not allow for other discovery. JA017–018, n.6. The scheduling orders stated that after the defendants filed their motion for summary judgment, Mr. Williams could either file a response or submit an affidavit pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. *Id.*

Secretary Wetzel and the DOC subsequently filed a motion for summary judgment, and Mr. Williams filed a response rather than a Rule 56(d) affidavit. *Id.* On July 21, 2022, the District Court granted the defendants' motion for summary

judgment, holding that Secretary Wetzel was entitled to qualified immunity on Mr. Williams's Eighth Amendment claim and that Mr. Williams's ADA claim failed as a matter of law because, the District Court said, there was no evidence that the Secretary or any other DOC employee acted with deliberate indifference toward Mr. Williams. JA008; JA030–036. The District Court rejected the defendants' arguments that Mr. Williams's claims were barred by the statute of limitations and that he had failed to exhaust administrative remedies. JA020–030.

## III.  Rulings Presented for Review

The rulings presented for review are (1) the District Court's April 1, 2021 *sua sponte* dismissal of Mr. Williams's Fourteenth Amendment claim, JA005, ¶ 5, and (2) its July 21, 2022 entry of summary judgment, JA008–036.

## SUMMARY OF ARGUMENT

I.    Secretary Wetzel is not entitled to qualified immunity on Mr. Williams's Eighth Amendment claim because Secretary Wetzel kept him in solitary confinement for twenty-six years despite his awareness of the substantial risks of serious harm such confinement poses for individuals, like Mr. Williams, with a history of mental illness and suicidality. Secretary Wetzel did not dispute below that his conduct violated the Eighth Amendment, and he would have been hard-pressed to do so. A reasonable jury could conclude based on the evidence in the record that Secretary Wetzel was aware of Mr. Williams's mental illness. A reasonable jury could also conclude that Secretary Wetzel was well-aware of the serious risks of psychological harm prolonged solitary harm poses, especially for individuals with pre-existing

mental illness. Secretary Wetzel was thus deliberately indifferent to Mr. Williams's health and safety, in violation of the Eighth Amendment.

The specific right at issue here—the right of an individual with a history of mental illness and suicidality not to be subjected to prolonged, indefinite solitary confinement by an official who was aware of that history and the risks solitary confinement posed to him—has long been clearly established. This Court's decisions in *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017) and *Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022) conclusively demonstrate that the right at issue here was clearly established at least as far back as 2016. Before that, in 2014, the DOJ communicated directly to Secretary Wetzel that the DOC's solitary confinement practices violated the Eighth Amendment rights of individuals with serious mental illness. Any reasonable prison official who had read the DOJ's letter would have understood that continuing to hold Mr. Williams in solitary confinement violated the Eighth Amendment. Moreover, even before that, a robust consensus of district court cases had held that prolonged solitary confinement of the mentally ill violated the Eighth Amendment—especially when, as here, imposed without penological justification. Secretary Wetzel is therefore not entitled to qualified immunity.

II.    The DOC is not entitled to summary judgment on Mr. Williams's ADA claim because it subjected him to disability-based discrimination by failing to ameliorate the particularly harsh effects solitary confinement had on him due to his psychiatric disabilities. The factual dispute the District Court acknowledged as to the

DOC's awareness of Mr. Williams's mental illness forecloses summary judgment as to the DOC's deliberate indifference.

Mr. Williams's diagnoses of mental illness and brain damage make him an individual with a disability under the ADA. Failing to make reasonable accommodations for an individual's disabilities is a form of discrimination prohibited by the ADA. This includes failing to make modifications to facially neutral policies that, like the DOC's policy that mandated permanent solitary confinement for individuals with death sentences, disparately impact individuals with disabilities. Since the DOC failed to do that here, a reasonably jury could conclude that it violated the ADA.

A reasonable jury could also conclude that the DOC's discrimination was intentional, a finding required for Mr. Williams to obtain damages. Intentional discrimination can be established with evidence of deliberate indifference. The evidence in the record that the DOC had knowledge of Mr. Williams's mental illness and the risks and harms prolonged solitary confinement caused for people like him, but failed to ameliorate those harsh effects, is evidence of the DOC's deliberate indifference.

III.   The District Court erred in *sua sponte* dismissing Mr. Williams's Fourteenth Amendment claim and abused its discretion in doing so without granting him leave to amend. In contravention of this Court's repeated statements that *pro se* pleadings should be construed liberally, the District Court narrowly construed Mr. Williams's complaint as bringing a substantive due process claim and ignored the

obvious indications that he was attempting to pursue a procedural due process claim. Mr. Williams's allegations that he was being subjected to automatic solitary confinement without an administrative hearing or any individualized review should have signaled to the District Court that Mr. Williams was asserting a procedural due process claim.

Indeed, Mr. Williams's complaint adequately states a claim against Secretary Wetzel for violating his right to procedural due process. He had a liberty interest in avoiding prolonged solitary confinement, one that this Court has recognized for confinement periods much shorter than Mr. Williams's twenty-six years in solitary. The lack of an opportunity to contest his continued solitary confinement and the absence of any meaningful review deprived Mr. Williams of the process to which he was due.

Even if the District Court had been correct that Mr. Williams's complaint failed to state a procedural due process claim, it abused its discretion by not granting him leave to file an amended complaint. Dismissal without leave to amend is only appropriate when amendment would be inequitable or futile. When, as here, a District Court refuses to grant leave to amend without a finding that amendment would be inequitable or futile, it abuses its discretion.

# ARGUMENT

## I.    Secretary Wetzel is not entitled to qualified immunity on Mr. Williams's Eighth Amendment claim.

### A.    Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014). Summary judgment is inappropriate unless the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a)). The Court must construe the record in the light most favorable to the non-moving party and must draw all reasonable inferences in his favor. *Thomas*, 749 F.3d at 222.

When analyzing a qualified immunity defense, courts apply a non-sequential, two-part test, asking (1) whether, "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established, such that it would have been clear to a reasonable officer that his conduct was unlawful." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021); *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Defendants bear the burden of establishing they are entitled to qualified immunity, *E.D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019), which they can do by showing "[a]n answer in the negative to either prong" of the analysis, *Peroza-Benitez*, 994 F.3d at 165.

B. **Secretary Wetzel violated Mr. Williams's Eighth Amendment rights when he kept him in solitary confinement for twenty-six years despite his history of mental illness and suicidality.**

Keeping an individual with a known history of mental illness and suicidality in solitary confinement for a prolonged period of time—let alone for twenty-six years—violates the Eighth Amendment. Indeed, Secretary Wetzel did not even attempt to argue below that his conduct did not violate the Eighth Amendment. A reasonable jury could easily conclude that Secretary Wetzel was deliberately indifferent to the substantial risk of harm prolonged solitary confinement posed to Mr. Williams, in light of his history of mental illness and suicidality.

Prison officials violate the Eighth Amendment when they are deliberately indifferent to an incarcerated person's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The deliberate indifference standard includes an objective component and a subjective component. *Id.* To satisfy the objective prong, "the deprivation alleged must be, objectively, sufficiently serious." *Id.* (cleaned up). Conditions of confinement implicate the Eighth Amendment when they "result in the denial of the minimal civilized measure of life's necessities" or "pos[e] a substantial risk of serious harm." *Id.* (cleaned up). While prisons may punish incarcerated people, they "may not do so in a manner that threatens the[ir] physical and mental health." *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992), *superseded by statute on other grounds.* The overall conditions and their effects on the individual prisoner are central to the objective component of the Eighth Amendment inquiry. *See id.* ("The touchstone is the health of the inmate."). Moreover, conditions that might pass constitutional

muster when imposed for a short period of time may be unconstitutional when imposed for extended periods of time. *See Hutto v. Finney*, 437 U.S. 678, 686–87 (1978); *Young*, 960 F.2d at 364 ("The duration . . . of segregated confinement cannot be ignored in deciding whether such confinement meets constitutional standards.").

A claim like Mr. Williams's—that his prolonged solitary confinement violated the Eighth Amendment in light of his known mental illness history—must be analyzed "against th[e] backdrop of [the] extremely serious and potentially dire consequences" prolonged solitary confinement causes, even for individuals with no history of mental illness. *Clark v. Coupe*, 55 F.4th 167, 179–80 (3d Cir. 2022) (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017)). It is "well-established" that "prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim" even for individuals with no pre-existing mental illness. *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 451 (3d Cir. 2020). It follows that the potential Eighth Amendment violation is only more pronounced for individuals who do have serious mental illness. *See Clark*, 55 F.4th at 180 (holding that seven months in solitary confinement satisfied the objective prong for an individual with mental illness); *Talley v. Clark*, 851 F. App'x 306, 310 (3d Cir. 2021) (thirteen months); *Palakovic*, 854 F.3d at 216–17, 226 (multiple thirty-day stints).

Mr. Williams's nearly three decades in solitary confinement is by far the longest such duration ever considered by this Court, which has repeatedly held shorter periods violative of the Eighth Amendment. The facts here are thus easily

14

"sufficiently serious" to satisfy the objective prong, particularly in light of Mr. Williams's similar history of mental illness and suicidality.

Drawing all reasonable inferences in Mr. Williams's favor, the record also establishes that Secretary Wetzel possessed the requisite state of mind, a point which, again, he did not dispute below. The subjective prong of the Eighth Amendment analysis requires that the defendant "have a sufficiently culpable state of mind," *i.e.*, deliberate indifference. *Farmer*, 511 U.S. at 834 (cleaned up). Prison officials are deliberately indifferent when they know a prisoner faces a substantial risk of serious harm but "fail[ ] to take reasonable measures to abate it." *Id.* at 847. The absence of a legitimate penological purpose can also satisfy the subjective prong because "[t]he Eighth Amendment prohibits punishments without penological justification." *Porter*, 974 F.3d at 446.

A plaintiff can rely on circumstantial evidence to establish deliberate indifference, and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see Porter*, 974 F.3d at 445 ("The inmate may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that defendants must have known about the risk.") (cleaned up). In light of the role of circumstantial evidence and the fact-bound nature of the inquiry, "whether a defendant's conduct amounts to deliberate indifference has been described as a 'classic issue for the fact finder.'" *Turner v. Wetzel*, No. 21-2879, 2022 U.S. App. LEXIS 23124, at *4 (3d Cir. Aug. 19,

2022) (non-precedential) (quoting *A.M. ex rel. JMK v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 587–88 (3d Cir. 2004)).

Here, Mr. Williams satisfies the subjective prong because Secretary Wetzel was aware of his history of mental illness and of the risks prolonged solitary confinement posed to him in light of that history. *See Clark*, 55 F.4th at 180. As the District Court correctly found, there is a genuine factual dispute as to Secretary Wetzel's awareness of Mr. Williams's history of mental illness and suicidality. JA012; JA035. Indeed, the record is replete with evidence that the DOC was aware of Mr. Williams's depression and suicidality. The record includes sworn statements from Mr. Williams that:

- his criminal defense attorneys provided copies of Drs. Fox's and Crown's declarations, which documented his mental illness and brain damage, to the DOC, JA051–061; JA243–244;

- he told a DOC psychologist about his history of suicidality and that he had been involuntarily committed to a psychiatric hospital as a teenager, JA252;

- a DOC psychologist diagnosed him with having a psychiatric disability, *see* JA139; JA243;

- he was placed on the DOC's Mental Health Roster and given a designation of "C," which is reserved for individuals requiring psychiatric treatment, JA125–126; JA205; JA243;

- he attempted suicide while in DOC custody and was then placed in a Psychiatric Observation Cell, JA113–115; JA252; and

- DOC mental health staff offered him Prozac, JA115.

These sworn statements alone would be enough because a plaintiff's sworn statements, made on personal knowledge, must be considered at summary judgment,

and they can be sufficient on their own to create a genuine dispute of material fact. *See Porter*, 974 F.3d at 443; *Paladino v. Newsome*, 885 F.3d 203, 209 (3d Cir. 2018); *see also* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(4).

Moreover, several of these facts are corroborated by Mr. Williams's DOC mental health records.[2] JA293–294. These records also note that Mr. Williams was referred to a DOC psychiatrist because of his depression and anxiety and that he was hearing voices telling him to kill himself. JA294. Taken together, these facts are more than enough to at least create the inference that Secretary Wetzel was aware of Mr. Williams's history of mental illness and suicidality. *See Palakovic*, 854 F.3d at 226 (holding that it can be inferred that DOC officials, including Secretary Wetzel, are aware of prisoners' inclusion on the Mental Health Roster); *see also Talley*, 851 F. App'x at 311.

Secretary Wetzel cannot plausibly dispute his awareness of the risks of harm associated with the prolonged solitary confinement of the mentally ill. First, this Court has held that prison officials generally and Secretary Wetzel specifically are aware of the risks posed by prolonged solitary confinement. *See Porter*, 974 F.3d at 445–46 (discussing Secretary Wetzel's and other DOC officials' acknowledgment of the risks and harms associated with prolonged solitary confinement and also stating that the risks are "obvious"); *see also Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir.

---

[2] Mr. Williams provided the District Court with summaries of DOC mental health records made by his criminal defense counsel; Appellees did not oppose the District Court's consideration of these summaries. JA013; JA292–295; *see also* JA125 ("They won't let me see the mental health records.").

17

2019) (stating it would "defy logic" to suggest any corrections professionals could be unaware of the potential harm the lack of human interaction in solitary confinement can cause); *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 779 (M.D. Pa. 2016) ("Secretary Wetzel knows well the risks inherent in prolonged isolation.").

Second, in 2014, the U.S. Department of Justice communicated directly to Secretary Wetzel and other DOC officials that, by subjecting individuals with serious mental illness "to prolonged periods of solitary confinement under harsh conditions that are not necessary for legitimate security-related reasons, [the DOC] exposes them to an excessive and obvious risk of serious harm." JA068; JA086. The DOJ concluded that "as a direct result of these practices, prisoners [in the DOC] with [serious mental illness] have suffered serious psychological and physical harms, including psychosis, trauma, severe depression, serious self-injury, and suicide." JA068. Death-sentenced prisoners housed on the DOC's Capital Case Units were expressly included within the scope of the solitary confinement units addressed by the DOJ's investigation. JA066.

A reasonable jury could easily conclude that, in light of Mr. Williams's history of mental illness and suicidality, Secretary Wetzel was deliberately indifferent to his health and safety when he knowingly subjected him to twenty-six years in solitary confinement despite his awareness of the serious risks such confinement posed. That the record is completely devoid of any purported penological justification for Mr. Williams's prolonged solitary confinement makes the analysis even more straightforward.

**C.    The right of a prisoner with a known history of mental illness and suicidality not to be subjected to prolonged solitary confinement by an official aware of that history and the associated risk of harm has long been clearly established.**

The District Court erred in granting Secretary Wetzel qualified immunity because the right of an incarcerated person with a history of mental illness and suicidality not to be placed in prolonged solitary confinement has long been clearly established. The "judicially created doctrine of qualified immunity," *Peroza-Benitez*, 994 F.3d at 164, only shields government officials from civil damages liability "if they can show that a reasonable person in their position at the relevant time could have believed, in light of clearly established law, that their conduct comported with recognized legal standards." *E.D.*, 928 F.3d at 306. In assessing whether a right has been clearly established, the Court conducts a two-part inquiry: first, it "define[s] the right allegedly violated at the appropriate level of specificity," and, second, it determines "whether the right was 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Peroza-Benitez*, 994 F.3d at 165 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

**1.    In relying on *Porter*, the District Court defined the right at issue too broadly.**

The District Court's qualified immunity analysis was fatally flawed because it ignored Mr. Williams's history of mental illness and suicidality and Secretary Wetzel's knowledge of the risks of serious harm prolonged solitary confinement consequently posed to him. While this Court held in *Porter* that it had not previously been clearly established that prolonged solitary confinement on death row violated

19

the Eighth Amendment, *Porter*, 974 F.3d at 450–51, whether it was clearly established that such confinement of someone ***with a history of mental illness*** violated the Eighth Amendment is an entirely distinct question, one that the District Court completely ignored.

The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *see, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."). Rather, the question courts must ask is "whether the violative nature of ***particular*** conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (emphasis in original). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* So, when a defendant asserts qualified immunity on an Eighth Amendment deliberate indifference claim, courts must include relevant facts about the plaintiff (*e.g.*, pre-existing mental illness) and the defendant's knowledge of the risk of harm in their framing of the right at issue. *See Clark*, 55 F.4th at 182.

Here, in granting Secretary Wetzel qualified immunity based on *Porter*, the District Court defined the right at issue far too broadly, in violation of the Supreme Court's clear and repeated guidance to the contrary. *See* JA031–032. While the District Court never explicitly defined the right at issue, as it was required to do, *see*

*Peroza-Benitez*, 994 F.3d at 165, it tacitly defined the right as the right of a prisoner not to be held in solitary confinement on death row. *See* JA031 (stating that the *Porter* Court "held that Eighth Amendment rights with respect to conditions of solitary confinement on death row are not 'clearly established'"). This definition of the right is far too broad and cannot be squared with Supreme Court doctrine.[3] It omits key, legally relevant facts, including the duration of Mr. Williams's solitary confinement and, crucially, his pre-existing mental illness and suicidality and Secretary Wetzel's awareness of the resulting risks such confinement posed to him.[4] Since these facts were not present in *Porter*, the District Court's reliance on it to grant qualified immunity here was entirely misplaced.

Mr. Williams's claim differs from the claim in *Porter* in a crucial respect, which the District Court ignored. Although Mr. Williams and the plaintiff in *Porter* both asserted Eighth Amendment claims challenging their prolonged solitary confinement on death row in the DOC, Mr. Williams's claim, unlike the claim in *Porter*, is based on the particular harms and risks such confinement caused for him as a result of his pre-existing mental illness and suicidality. JA043–048. Indeed, while the District Court ignored this in its qualified immunity analysis, it acknowledged it elsewhere

---

[3] Indeed, the *Porter* Court went out of its way to stress that its ruling was limited to Mr. Porter's claim and was not a general pronouncement regarding "all inmates in solitary confinement or on death row." *Porter*, 974 F.3d at 447 n.12.

[4] Compounding its error, by referring to "solitary confinement **on death row**" and relying on *Porter*, JA031 (emphasis added), the District Court tacitly included a legally irrelevant fact—that Mr. Williams had a death sentence—in its definition of the right at issue. *See infra* § I.C.2 (citing *Clark*, 55 F.4th at 177 n.9, 182).

in its opinion. *See* JA009–010 ("Plaintiff contends that his placement in indefinite solitary confinement following his conviction for capital murder violated his rights ***in light of his history of depression and suicidal ideation***.") (emphasis added). In contrast, the Eighth Amendment claim in *Porter* did not involve any allegations of pre-existing mental illness or exacerbation thereof; rather, the claim there was based on the duration of Mr. Porter's solitary confinement. *See Porter*, 974 F.3d at 440 ("Porter . . . argues that Defendants violated his Eight Amendment right to be free from cruel and unusual punishment by subjecting him to solitary confinement for thirty-three years."); *id.* at 447.

To be sure, *Porter* does include discussion of the "detrimental effects" of solitary confinement on the plaintiff, including depression and anxiety. *Id.* at 443. But his claim was not based on any allegations of a history of mental illness or particularized risks posed to him by solitary confinement. *See id.* at 450 (explaining that the claim in *Porter* was distinguishable from the claim in *Palakovic* because only the latter involved an individual with "specific known mental health issues pre-assignment to solitary confinement"). A claim that an individual had ***pre-existing*** mental illness that was ***exacerbated*** by solitary confinement, like Mr. Williams's claim, is distinct from a claim that an individual ***developed*** mental illness as a ***result*** of solitary confinement, like the claim in *Porter*, and the District Court erred by implicitly conflating the two.

Since "[t]he touchstone [of the Eighth Amendment analysis] is the health of the inmate," *Young*, 960 F.2d at 364, Mr. Williams's claim—and Secretary Wetzel's

qualified immunity defense—must be considered in light of the risks and harms prolonged solitary confinement created for Mr. Williams, an individual with known pre-existing mental illness. *See Clark*, 55 F.4th at 183 ("[D]etermining the constitutionality of prison conditions is a heavily fact-specific inquiry, where the particular characteristics of the prisoner raising the challenge are taken into consideration."). Thus, while Mr. Williams and Mr. Porter may have been subjected to the same conditions on the CCU, *Porter* is not dispositive because those conditions affected Mr. Williams differently. While *Porter* held that it had not previously been clearly established that prolonged solitary confinement on death row necessarily violated the Eighth Amendment, *Porter*, 974 F.3d at 450–51, whether it was clearly established that such confinement of someone with Mr. Williams's mental illness history violated the Eighth Amendment is a different question, which was not before the *Porter* Court and which it did not address.[5]

Stated with the appropriate specificity, and framed based on a construal of the record in the light most favorable to Mr. Williams, as it must be, the question the Court must address here is whether an incarcerated person with a known history of mental illness and suicidality had a clearly established right not to be subjected to prolonged, indefinite solitary confinement by an official who was aware of that history

---

[5] The District Court's reliance on this Court's non-precedential opinion in *Johnson v. Pa. Dep't of Corr.*, 846 F. App'x 123 (3d Cir. 2021), *see* JA032, is equally misplaced because, as in *Porter*, prolonged solitary confinement of an individual with pre-existing mental illness was not at issue. *See Johnson*, 846 F. App'x at 129 (explaining that the plaintiff attempted to distinguish his case from *Porter* based on the cases' different procedural postures, not based on allegations of pre-existing mental illness).

and the risks solitary confinement posed to him. *Cf. Clark*, 55 F.4th at 182 (finding the district court's characterization of the right at issue "insufficiently specific" and modifying it to include the defendants' awareness of both the plaintiff's mental illness and the risks solitary confinement posed to him).

> ## 2. Any reasonable official would have known that keeping Mr. Williams in solitary confinement for twenty-six years violated the Eighth Amendment, in light of his history of mental illness and suicidality.

In light of his history of mental illness and suicidality, Mr. Williams had a clearly established Eighth Amendment right not to be subjected to prolonged, indefinite solitary confinement by an official who was aware of that history and the risks solitary confinement posed to him. Controlling precedents of this Court, the conclusions of the DOJ communicated directly to Secretary Wetzel, and a robust consensus of persuasive authority dating back decades clearly establish that prolonged solitary confinement of the mentally ill violates the Eighth Amendment.

This Court "takes a broad view of what constitutes an established right of which a reasonable person would have known." *Peroza-Benitez*, 994 F.3d at 166. Appellate review of qualified immunity dispositions should consider "all relevant precedents, not simply those cited to, or discovered by, the district court." *Id.* at 166 n.3 (quoting *Elder v. Holloway*, 510 U.S. 510, 512 (1994)). In addition to applicable Supreme Court precedent and precedential opinions of this Court, a "robust consensus of cases of persuasive authority," including "district court cases, from within the Third Circuit or elsewhere" can clearly establish a right for the purposes of qualified immunity. *Jefferson v. Lias*, 21 F.4th 74, 81 (3d Cir. 2021); *see Clark*, 55

F.4th at 181, 186–87; *Fields v. City of Philadelphia*, 862 F.3d 353, 361 (3d Cir. 2017). Non-judicial materials, including statutes, internal prison policies, and government reports, also factor into the qualified immunity analysis, as such materials can be relevant to the determination of whether officials had fair warning that their conduct was unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 743–45 (2002); *Clark*, 55 F.4th at 185, 187–88.

This Court's 2017 opinion in *Palakovic* conclusively resolves the question of whether Secretary Wetzel was on notice that keeping Mr. Williams in solitary confinement violated the Eighth Amendment. In *Palakovic*, the Court held that allegations that the DOC, Secretary Wetzel, and other DOC officials were aware of Brandon Palakovic's serious mental illness and "placed him on a mental health roster," but nonetheless permitted him to be repeatedly placed in solitary confinement, were "more than sufficient" to state an Eighth Amendment claim, especially "in light of the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health." 854 F.3d at 226.[6] That Mr. Palakovic, who died by suicide while in solitary confinement, was subjected only to multiple thirty-day stints in solitary confinement over the course of a thirteen-month period, *id.* at 216–17, while Mr. Williams was in solitary confinement for ***twenty-six***

---

[6] *Palakovic* addresses three distinct Eighth Amendment claims: (1) failure to protect an individual with a particular vulnerability to suicide from self-harm, 854 F.3d at 221–24; (2) a conditions-of-confinement claim challenging the solitary confinement of an individual with mental illness, *id.* at 225–26; and (3) an inadequate mental healthcare claim, *id.* at 227–29. It is only the discussion of the second claim that is relevant here.

*years*, only makes it clearer that, by 2017 at the latest, any reasonable official would have known Mr. Williams's solitary confinement was unconstitutional.

While *Palakovic* demonstrates the right at issue here was clearly established by 2017 at the latest, this Court's recent opinion in *Clark* demonstrates it was clearly established at least a year earlier. In *Clark*, the Court held that prison officials who, in 2016, knowingly kept a man "in solitary confinement for seven months despite knowing of his serious mental illness" were not entitled to qualified immunity on his Eighth Amendment conditions-of-confinement claim because "the circumstances of his time spent in solitary confinement violated rights long protected by Eighth Amendment jurisprudence." *Clark*, 55 F.4th at 173, 181, 182. The Court went on to discuss a wide variety of authorities, including district court cases and cases addressing the infliction of mental injury outside of the solitary-confinement context, in explaining why no reasonable official could have believed the solitary confinement of the plaintiff was lawful, in light of his mental illness. *Id.* at 184–87. If the *Clark* plaintiff's **seven months** in solitary confinement violated clearly established law, surely Mr. Williams's **twenty-six years** did too.

That is not the end of the analysis, though, because Mr. Williams was in solitary confinement long before 2016. Two years before the events at issue in *Clark*, in 2014, the DOJ sent its "findings letter" to Secretary Wetzel after its investigation of the DOC's solitary confinement practices. *See* JA062–089; *supra* § I.B. As discussed above, the DOJ's letter stated that the DOC's placement of individuals with serious mental illness in solitary confinement exposed those individuals "to an excessive and

obvious risk of serious harm" and listed the "serious psychological and physical harms" many of those individuals had already suffered. JA068; *see* JA072–075 (discussing specific incarcerated individuals with mental illness and how they were affected by solitary confinement). The DOJ ultimately concluded that "the manner in which [the DOC] continues to use solitary confinement on prisoners with [serious mental illness] violates the Eighth Amendment[.]" JA067.

The DOJ letter is relevant to the qualified immunity analysis here in two independent ways. First, the DOJ's conclusions signal to prison officials the state of the law, especially in conjunction with other authorities. *See Hope*, 536 U.S. at 744–45; *Clark*, 55 F.4th at 185, 187–88 (re-affirming the relevance of non-judicial materials to the qualified immunity analysis). In *Hope*, the Supreme Court relied on a similar DOJ report in support of its denial of qualified immunity to employees of the Alabama Department of Corrections ("ADOC") who shackled a man to a hitching post for seven hours without justification. 536 U.S. at 738, 744–45. The *Hope* Court explained that the "conclusion that a reasonable person would have known . . . of the violation [wa]s buttressed by the fact that the DOJ specifically advised the ADOC of the unconstitutionality of its practices before the incidents in this case took place." *Id.* at 744. That there was "nothing in the record indicating that the DOJ's views were communicated to [the individual defendants]" did not stop the Court from relying on the DOJ report because the DOJ's communications with ADOC nonetheless "len[t] support to the view that reasonable officials in the ADOC should have realized" the treatment the plaintiff alleged violated the Eighth Amendment. *Id.* at 745. Here,

where the DOJ report was sent to Defendant Wetzel himself, *see* JA086, its role in the qualified immunity analysis is even greater. After reading the DOJ report, it would have been clear to any reasonable prison official that continuing to hold individuals with serious mental illness in prolonged, indefinite solitary confinement violated the Eighth Amendment.

Second, the DOJ report is relevant to the qualified immunity analysis by way of its relevance to the underlying Eighth Amendment deliberate indifference analysis. The qualified immunity and deliberate indifference analyses both contain knowledge components. The qualified immunity inquiry addresses what a reasonable person would have known: for a defendant to obtain qualified immunity, they must show that a reasonable official could have believed the conduct in question was lawful. *E.D.*, 928 F.3d at 306. The Eighth Amendment inquiry addresses what the defendant actually knew: prevailing on an Eighth Amendment deliberate indifference claim requires a showing that the defendant had knowledge of "an excessive risk to inmate health or safety." *Porter*, 974 F.3d at 441.

Non-judicial materials like the DOJ findings letter and other investigative reports can be evidence of prison officials' knowledge of the risks of harm associated with the relevant conduct or conditions. The mere existence of these materials can be circumstantial evidence that the defendants had the requisite knowledge of an excessive risk of harm. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial

evidence[.]"); *Porter*, 974 F.3d at 445–46 (explaining how the fact that "a wide range of researchers and courts have repeatedly described the serious risks associated with solitary confinement" was relevant to evaluating the defendants' knowledge of the risks). When, as with the DOJ letter here, the record demonstrates that the defendant was familiar with the materials in question, then these materials are direct evidence that the defendant had the knowledge needed to sustain an Eighth Amendment claim. *See supra* § I.B.

This subjective knowledge is relevant to the qualified immunity inquiry because the greater the level of the defendant's knowledge of the risk, the less plausible it is that a reasonable person with that knowledge could have nonetheless believed the conduct in question conformed with the Eighth Amendment. *See Kedra v. Schroeter*, 876 F.3d 424, 450 (3d Cir. 2017) ("[A] reasonable state actor could not believe that his actions comported with clearly established law while also believing that there is an excessive risk to the plaintiff and failing to adequately respond to that risk."); *accord id.* at 459 (Fisher, J., concurring); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001). Here, no reasonable prison official who, like Secretary Wetzel, had read the DOJ findings letter and was aware of Mr. Williams's history of mental illness and suicidality could have believed keeping him in solitary confinement for twenty-six years conformed with the Eighth Amendment.

Finally, even before the DOJ letter, nearly three decades of district court opinions from around the country also made clear that solitary confinement of individuals with known serious mental illnesses violates the Eighth Amendment,

particularly when, as here, it is imposed on a prolonged, indefinite basis and without

penological justification:

- In 1989, in *Langley v. Coughlin*, a court held that prison officials' "failure to screen out from [solitary confinement] those individuals who, by virtue of their mental condition, are likely to be severely and adversely affected by placement there" plausibly violates the Eighth Amendment. 715 F. Supp. 522, 540, 542 (S.D.N.Y. 1989).

- In 1995, in *Coleman v. Wilson*, a court held that the California prison system's "present policies and practices with respect to housing of [prisoners with serious mental illness] in administrative segregation and in segregated housing units violate the Eighth Amendment[.]" 912 F. Supp. 1282, 1321 (E.D. Cal. 1995).

- Also in 1995, in *Madrid v. Gomez*, a different court held that it violates the Eighth Amendment to place in solitary confinement individuals who "are at a particularly high risk for suffering very serious or severe injury to their mental health . . . as a result of the conditions in [solitary confinement, including] the already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression." 889 F. Supp. 1146, 1265 (N.D. Cal. 1995). The Court explained that placing these individuals in solitary confinement "is the mental equivalent of putting an asthmatic in a place with little air to breathe." *Id.*

- In 1999, in *Ruiz v. Johnson*, a court held that "[c]onditions in [Texas prisons'] administrative segregation units clearly violate constitutional standards when imposed on . . . mentally-ill prisoners." 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001).

- In 2001, in *Jones 'El v. Berge*, a court held that plaintiffs had a likelihood of success on their Eighth Amendment claim challenging placement of individuals with serious mental illness in solitary confinement and granted their motion for a preliminary injunction. 164 F. Supp. 2d 1096, 1116–23, 1125 (W.D. Wis. 2001).

- In 2012, in *Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, a court found after a bench trial that solitary confinement is harmful to people with serious mental illness due to "the lack of

social interaction," "significant sensory deprivation," and "enforced idleness" and that "[t]hese factors can exacerbate the prisoners' symptoms of serious mental illness." No. 8-1317, 2012 U.S. Dist. LEXIS 182974, at *38 (S.D. Ind. Dec. 31, 2012). The plaintiffs prevailed on their Eighth Amendment claim. *Id.* at *66.

- In 2017, in *Braggs v. Dunn*, a court held that it violates the Eighth Amendment to "[p]lac[e] seriously mentally ill prisoners in segregation without extenuating circumstances and for prolonged periods of time" and to "plac[e] prisoners with serious mental-health needs in segregation without adequate consideration of the impact of segregation on mental health." 257 F. Supp. 3d 1171, 1267–68 (M.D. Ala. 2017).

Taken together, these cases form exactly the sort of "robust consensus" that is sufficient to put officials on notice of the unlawfulness of their conduct. *See Clark*, 55 F.4th at 186–87 (citing many of these same cases and explaining that they "provide a robust consensus of decisions specifically addressing the constitutionality of assigning mentally ill prisoners to solitary confinement").

That Mr. Williams was in solitary confinement because of his death sentence is of no moment. While the *Porter* Court, in holding that the Eighth Amendment right at issue there was not clearly established, found *Palakovic* distinguishable in part because Mr. Palakovic was not on death row, *Porter*, 974 F.3d at 450, this passing remark should not be read as creating a categorical carve-out from the holding of *Palakovic* and the other cases cited here for individuals with death sentences. Such a reading would be entirely inconsistent with Eighth Amendment principles. Prison officials violate the Eighth Amendment when they are deliberately indifferent to conditions of confinement that result "in the denial of the minimal civilized measure of life's necessities" or "pos[e] a substantial risk of serious harm." *Farmer*, 511 U.S.

at 834. "The touchstone is the health of inmate," not the purported reason that the incarcerated person is being subjected to the challenged conditions. *Young*, 960 F.2d at 364. Indeed, this Court recently stressed that "[w]hy a prisoner is placed in solitary confinement is not an element in challenging that condition" and noted that, in holding there was a viable Eighth Amendment claim in *Palakovic*, the Court saw no reason to address the reasons Mr. Palakovic was repeatedly placed in solitary confinement. *Clark*, 55 F.4th at 177 n.9; *see also id.* at 182 (defining the right at issue without reference to the reason the plaintiff had been placed in solitary confinement).

Likewise, the reason Mr. Williams was placed in solitary confinement—that he had been sentenced to death—has no bearing on the applicability of the robust body of case law discussed here to his claim. To dispute this, Secretary Wetzel would have to argue that the deleterious effects of solitary confinement are somehow reduced for individuals with death sentences. It is hard to imagine how this could be the case, and, in any event, there is no evidence supporting this proposition in the record. The irrelevance of Mr. Williams's death sentence to the qualified immunity analysis is particularly heightened here because there is not even a shred of evidence in the record related to the DOC's purported justification for automatically putting all individuals with death sentences in solitary confinement—often for decades. For the Court to consider potential justifications the Secretary Wetzel might have had for such a policy would require speculation and inferences to which he is not entitled on this posture.

Each of the authorities discussed here—*Palakovic*, *Clark*, the 2014 DOJ letter, and the combined weight of the nearly thirty years' worth of district court cases—is enough on its own to establish that any reasonable official would have been on notice that keeping a man with a history of mental illness and suicidality in solitary confinement for twenty-six years violated the Eighth Amendment, especially, as here, when such confinement lacked penological justification. Each, on its own, is sufficient to defeat Secretary Wetzel's qualified immunity defense. Taken together, they have even greater weight. Construing the evidence in the light most favorable to Mr. Williams, as the Court must, the unconstitutionality of Secretary Wetzel's conduct is "beyond debate." *See Wesby*, 128 S. Ct. at 589. Therefore, Secretary Wetzel should be denied qualified immunity on Mr. Williams's Eighth Amendment claim.

## II.    The DOC is not entitled to summary judgment on Mr. Williams's ADA claim.

### A.    Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014). Summary judgment is inappropriate unless the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a)). The Court must construe the record in the light most favorable to the non-moving party and must draw all reasonable inferences in his favor. *Thomas*, 749 F.3d at 222.

**B.    The DOC discriminated against Mr. Williams by failing to ameliorate the effects of solitary confinement on him in light of his psychiatric disabilities, and the factual dispute as to the DOC's awareness of his mental illness forecloses summary judgment as to the DOC's deliberate indifference.**

The District Court erred in granting summary judgment on Mr. Williams's ADA claim because the record supports a finding that the DOC was deliberately indifferent to Mr. Williams's right to be from disability discrimination when it kept him in prolonged solitary confinement despite his psychiatric disabilities. Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). As a remedial statute, the ADA must be "broadly construed to effectuate its purposes." *Disabled in Action v. SEPTA*, 539 F.3d 199, 208 (3d Cir. 2008). Title II of the ADA bars public entities from excluding individuals with disabilities from its services, programs, or activities or from otherwise subjecting individuals with disabilities to discrimination. 42 U.S.C. § 12132. Mr. Williams can prevail on his ADA claim because a reasonable jury could find that "(1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *See Haberle v. Troxell*, 885 F.3d 171, 178 (3d Cir. 2018) ("*Haberle I*") (cleaned up). The record also supports a finding of intentional discrimination here, as is required for Mr. Williams to obtain compensatory damages, because a reasonable jury could find that the DOC was deliberately indifferent. *See id.* at 181.

The first element is not in dispute, nor could it be. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210–11 (1998). As for the second element, the District Court correctly held that factual disputes precluded summary judgment in the DOC's favor as to whether Mr. Williams is an individual with a disability. JA035. In reaching this conclusion, the District Court noted, correctly, that there was "an issue of fact as to whether the DOC had record of Plaintiff's mental health diagnoses." JA035; *see supra* § I.B (discussing evidence in the record of the DOC's awareness of Mr. Williams's mental illness and citing JA113–115; JA125–126; JA139; JA243–244; JA252; JA293–294). As for the third and fourth elements, in keeping Mr. Williams in solitary confinement despite his psychiatric disabilities, the DOC engaged in unlawful discrimination under the ADA. The DOC did not dispute this below, and the District Court did not address these elements. But, crucially, the District Court erred in concluding there was no evidence of deliberate indifference because that conclusion cannot be squared with the fact dispute it already acknowledged regarding the DOC's knowledge of Mr. Williams's mental illness. *See* JA035–036.

Mr. Williams's diagnoses of mental illness and brain damage, and the limitations they impose on his ability to function, make him an individual with a disability under the ADA. The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).[7] Major life activities include thinking, communicating, and brain

---

[7] The District Court only addressed an alternative definition of "disability" in the ADA, namely "*a record* of such an impairment." *See* § 12102(1)(B) (emphasis added); JA035. The District Court's statement that Mr. Williams did not claim to have a

function. § 12102(2). The 2008 amendments to the ADA require courts to construe the definition of "disability" in the ADA "in favor of broad coverage of individuals." § 12102(4)(A); *see* 28 C.F.R. § 35.101(b). It "should easily be concluded" that mental illnesses including depression and PTSD, at a minimum, substantially limit brain function and, thus, that individuals with those conditions have disabilities within the definition of the ADA. 28 C.F.R. § 35.108(d)(2)(iii); *see Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015).

Mr. Williams's mental illness and organic brain damage, as documented by Drs. Crown and Fox, thus clearly demonstrate that Mr. Williams is an individual with a disability. *See generally* JA051–061; *see, e.g.*, JA052 (documenting Mr. Williams's brain damage and the resulting "impairments and deficiencies" revealed by neuropsychological testing); JA052–053 (listing Mr. Williams's impairments, including deficiencies in "reasoning capacity," "emotional lability," and "impaired cognition"); JA056 (documenting Mr. Williams's "ingrained psychological and emotional impairments," including symptoms of PTSD).

The DOC discriminated against Mr. Williams by failing to provide reasonable accommodations for him to ameliorate the detrimental effects solitary confinement has on individuals with psychiatric disabilities. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be subjected . . . to discrimination by [a public entity]." 42 U.S.C. § 12132. Discrimination

---

physical or mental impairment that substantially limits one or more major life activities," JA034, n.15, is flatly contradicted by Mr. Williams's complaint. JA044; JA051–061.

prohibited by the ADA "encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Haberle I*, 885 F.3d at 180. This means that public entities are required to make modifications to their facially neutral policies that, like the DOC's policy that mandated permanent solitary confinement for individuals with death sentences, disparately impact individuals with disabilities. *See Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021).

While non-discrimination is often thought of as treating everyone the same, in some circumstances, the ADA requires public entities to treat individuals with disabilities differently from others—by providing them with reasonable accommodations. *See, e.g.*, *Tellis v. Leblanc*, No. 18-541, 2022 U.S. Dist. LEXIS 3593, at *19 (W.D. La. Jan. 6, 2022) (denying summary judgment on ADA claim because defendants conceded they "do[] not limit the use of extended lockdown for inmates with a diagnosed [serious mental illness] or consider these inmates' mental health before placing them on extended lockdown for a prolonged period of time"); *Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998) ("[A] person with a disability may be the victim of discrimination precisely because [they] did not receive disparate treatment when [they] needed accommodation.").

That the record may not include a request from Mr. Williams for a specific accommodation is inconsequential. Public entities have an affirmative obligation to take "pro-active measures to avoid the discrimination proscribed by Title II" even in the absence of a request for an accommodation. *Chisolm v. McManimon*, 275 F.3d

315, 324–25 (3d Cir. 2001). This is no less true for Mr. Williams, who was kept in solitary confinement because of his death sentence, than it is for others. *See Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 291 (3d Cir. 2019) ("[A] prison's obligation to comply with the ADA . . . does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there.").

Since Mr. Williams has psychiatric disabilities that were adversely impacted by solitary confinement. and the DOC failed to make reasonable modifications that would have ameliorated the effects of solitary confinement on him, it discriminated against him in violation of the ADA. *See, e.g.*, *Partridge v. Smith*, No. 17-02941, 2020 U.S. Dist. LEXIS 31693, at *34 (D. Colo. Feb. 25, 2020); *Ga. Advoc. Office v. Jackson*, No. 19-1634, 2019 U.S. Dist. LEXIS 238805, at *36–37 (N.D. Ga. Sep. 23, 2019). Incarcerated individuals with psychiatric disabilities are more detrimentally affected by the lack of social interaction and enforced idleness of solitary confinement than are people without such conditions. Reasonable modifications the DOC could have made include offering Mr. Williams additional out-of-cell time, providing him additional opportunities for social interaction, allowing him to participate in additional programming, or removing him from solitary confinement. But the DOC did none of these things.

The only way for the DOC to defeat liability would be by meeting its burden of showing that the available reasonable modifications would have "fundamentally alter[ed] the nature" of its programs or services. 28 C.F.R. § 35.130(b)(7)(i). But the record here is completely devoid of any evidence along those lines. Indeed, there is

38

not even any evidence in the record explaining why Mr. Williams was in solitary confinement in the first place, aside from the mere fact of his death sentence. A reasonable jury could thus easily conclude—and, indeed, on this record, would be compelled to conclude—that removing Mr. Williams from solitary confinement, let alone making any of the other modifications proposed above, would not have fundamentally altered the DOC's programs or services.

Since, as the District Court correctly held, summary judgment for the DOC is inappropriate here as to any of the Title II's liability elements, the DOC is not entitled to summary judgment unless it can show that compensatory damages are legally foreclosed, *i.e.*, that no reasonable jury could find that it intentionally discriminated against Mr. Williams. *Haberle I*, 885 F.3d at 181. The DOC cannot make such a showing. Intentional discrimination can be proved by demonstrating that a public entity was deliberately indifferent. *Id.* To establish deliberate indifference, a plaintiff "must present evidence that shows both: (1) ***knowledge*** that a federally protected right is substantially likely to be violated . . . and (2) ***failure to act*** despite that knowledge." *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 265 (3d Cir. 2013) (emphasis in original); *see also Haberle v. Borough of Nazareth*, 936 F.3d 138, 141 & n.2 (3d Cir. 2019) ("*Haberle II*") (explaining that, for an ADA claim, as for an Eighth Amendment claim, deliberate indifference is established if an official "acted or failed to act despite his knowledge of a substantial risk of serious harm"). Only the knowledge prong is at issue here, as it is undisputed that the DOC neither removed

Mr. Williams from solitary confinement nor made any modifications to its policies or procedures to accommodate Mr. Williams's disabilities.

The requisite knowledge is established when a government agency "was aware that its existing policies made it substantially likely that disabled individuals would be denied their federally protected rights under the ADA." *Haberle I*, 885 F.3d at 181. Here, this is demonstrated in two ways. First, the DOC's "policies caused a failure to adequately respond to a pattern of past occurrences of injuries like [Mr. Williams's]." *Id*. The 2014 DOJ letter is proof of this. The DOJ concluded the DOC was violating the ADA in two distinct ways that are relevant here: (1) by automatically placing individuals with serious mental illness in solitary confinement without an individualized assessment of their mental health needs and the appropriateness of such placement; and (2) by failing to ensure that prisoners with serious mental illness placed in solitary confinement for reasons unrelated to their disabilities could participate in and benefit from prison activities, programs, and services. JA082–083. When the DOC read this but continued to keep Mr. Williams in solitary confinement and failed to make any modifications to accommodate his disabilities, it was deliberately indifferent. *See Haberle II*, 936 F.3d at 141–42 (finding deliberate indifference where a police department was aware of a pattern of police encounters involving harm to individuals with mental disabilities but failed to adopt an accommodation policy).

Second, "the risk of cognizable harm" here "was so great and so obvious that the risk and the failure to respond [ ] alone" demonstrate deliberate indifference.

*Haberle I*, 885 F.3d at 181 (cleaned up). This is evident for the same reasons it is clear Secretary Wetzel violated Mr. Williams's Eighth Amendment rights. *See supra* § I.B; *Haberle II*, 936 F.3d at 141 n.2 ("[T]he definition of deliberate indifference in the ADA context is consistent with our standard of deliberate indifference in the context of § 1983 suits by prison inmates.") (cleaned up).

Since, as a reasonable jury could conclude, the DOC was aware of Mr. Williams's mental illness and failed to act to ameliorate the effects of solitary confinement on him, the DOC was deliberately indifferent. *See Furgess*, 933 F.3d at 292 (holding that knowledge of a disabled prisoner's need for an accessible shower and failure to provide it was deliberate indifference); *S.H.*, 729 F.3d at 265–67 (explaining that knowledge that the plaintiff's daughter was likely not disabled and should not have been in special education would have sufficed to establish the requisite knowledge for a finding of deliberate indifference). "The relevant inquiry is knowledge," *id.* at 266, and because the District Court correctly found there was a factual dispute as to the DOC's knowledge of Mr. Williams's disability, summary judgment was inappropriate.

## III.     The District Court improperly dismissed Mr. Williams's Fourteenth Amendment claim and abused its discretion in doing so without granting him leave to file an amended complaint.

### A.     Standard of Review

This Court reviews a district court's *sua sponte* dismissal of a claim under 28 U.S.C. § 1915(e)(2) *de novo*, and it reviews a district court's decision not to grant leave

to amend for abuse of discretion. *Dooley v. Wetzel*, 957 F.3d 366, 373, 376 (3d Cir. 2020).

The standard for dismissal for failure to state a claim on which relief can be granted under 28 U.S.C. § 1915(e)(2)(B)(ii) is the same as under Fed. R. Civ. P. 12(b)(6). *See Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000); *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999); *see also Emrit v. Indep. Music Awards*, 605 F. App'x 103, 104 (3d Cir. 2015). The Court must determine "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Kedra*, 876 F.3d at 440–41 (cleaned up). In so doing, the Court must accept all well-pleaded allegations of the complaint as true, view them in the light most favorable to the plaintiff, and draw all inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc); *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009). Factual allegations must be taken as true, regardless of their specificity; only legal conclusions that restate "the ultimate legal issue that the plaintiff[] need[s] to prove" should be disregarded. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266–67 (3d Cir. 2021).

### B. The District Court should have construed Mr. Williams's *pro se* complaint as asserting a Fourteenth Amendment procedural due process claim.

In violation of this Court's repeated directives regarding the liberal construal of *pro se* pleadings, the District Court narrowly—and incorrectly—interpreted Mr. Williams's *pro se* complaint as asserting a Fourteenth Amendment substantive due process claim and failed to recognize that he had adequately pleaded a procedural

due process claim. This Court has repeatedly stressed that *pro se* pleadings must be construed liberally. *See, e.g., Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019); *Higgs v. Att'y Gen.*, 655 F.3d 333, 339–40 (3d Cir. 2011). This obligation is heightened when the *pro se* litigant is in prison. *McNeil v. United States*, 508 U.S. 106, 113 (1993); *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021); *Dooley*, 957 F.3d at 374. *Pro se* pleadings are construed liberally because courts "must make reasonable allowances to protect *pro se* litigants from the inadvertent forfeiture of important rights due merely to their lack of legal training." *Garrett*, 938 F.3d at 92.

While *pro se* plaintiffs are not relieved of the obligation to allege sufficient facts to support their claims, they need not accurately identify the applicable legal principles. *See Vogt*, 8 F. 4th at 185 ("[W]e apply the relevant legal principle even when the complaint has failed to name it."); *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002) ("[W]e will apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name."). In *Vogt*, a *pro se* incarcerated plaintiff alleged that prison officials violated his due process rights when the prison rejected his incoming mail without providing him notice. *Vogt*, 8 F. 4th at 183–84. After the district court dismissed his due process claim and the plaintiff appealed, the prison officials argued that the dismissal should be affirmed because the plaintiff's complaint did not explicitly assert a liberty interest, a required element of his procedural due process claim. *Id.* at 184–85. This Court reversed, explaining that the plaintiff did not forfeit his due process claim simply because his complaint failed to use the word "liberty." *Id.* at 186. Because case law supported the proposition that

prisoners have a liberty interest in communicating through the mail, the plaintiff's allegation that prison officials rejected his mail without notice was sufficient. *Id.*

Similarly, here, the District Court improperly dismissed Mr. Williams's Fourteenth Amendment claim because he failed to use the word "procedural" in his complaint. The District Court dismissed Mr. Williams's Fourteenth Amendment claim *sua sponte* because it took him to be challenging his conditions of confinement under the Fourteenth Amendment—*i.e.*, bringing a substantive due process claim—and rightly concluded that, as a convicted prisoner, his conditions-of-confinement claim was only cognizable under the Eighth Amendment. JA005, ¶ 5 & n.1 (citing *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005)). But the Court failed to recognize that, in multiple places, Mr. Williams's *pro se* complaint indicated his intent to challenge his prolonged solitary confinement as a violation of his right to procedural due process. Mr. Williams pleaded that:

- "subjecting a prisoner to solitary confinement without an administrative hearing is a violation of the Fourteenth Amendment's guarantee of Due Process," JA046;

-  "an actual controversy exists regarding the constitutionality of Defendant's practices and policies regarding the Plaintiff's automatic placement in indefinite solitary confinement," JA048;[8] and

- "the DOC unlawfully placed plaintiff in solitary confinement, without either individually assessing the risk he may actually and objectively pose for others . . . or otherwise justifying the need for isolation," JA049.

---

[8] Mr. Williams repeated this statement a few paragraphs later. JA049.

These statements should have been more than enough to signal to the District Court that Mr. Williams was asserting a procedural due process claim, notwithstanding his omission of the word "procedural," especially in light of the Court's duty to construe his *pro se* pleading liberally. *See Vogt*, 8 F.4th at 185–86. Indeed, this would have been the more logical reading of Mr. Williams's complaint, rather than taking him to be asserting duplicative conditions-of-confinement claims under the Eighth and Fourteenth Amendments. This is especially so since Mr. Williams's complaint did in fact include sufficient allegations to adequately state a procedural due process claim.

### C. Mr. Williams's complaint adequately stated a procedural due process claim.

By keeping Mr. Williams in solitary confinement for twenty-six years, with no meaningful review or opportunity to be heard, Secretary Wetzel violated Mr. Williams's Fourteenth Amendment right to procedural due process. The Due Process Clause of the Fourteenth Amendment "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). While incarceration is itself a deprivation of liberty, people serving criminal sentences nonetheless have a constitutionally protected liberty interest in avoiding "restrictive conditions of confinement" that "impose[ ] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 222–23 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995)); *see Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 559 (3d Cir. 2017). Prison officials thus violate the Fourteenth Amendment when they keep incarcerated people in such conditions without providing adequate

procedural protections, including "the most fundamental right of due process," which is "a ***meaningful*** opportunity to be heard." *Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir. 1986) (emphasis in original).

To determine whether restrictive conditions of confinement create a constitutionally protected liberty interest, courts consider "(1) the duration of the challenged conditions; and (2) whether the conditions overall impose[ ] a significant hardship in relation to the ordinary incidents of prison life." *Williams*, 848 F.3d at 560. The proper comparator is conditions in general population. *Id.* at 564 ("The terms 'ordinary' and 'routine' direct us to use a general metric (the general population), not one specific to a particular inmate."); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (finding a protected liberty interest because the plaintiff's prolonged solitary confinement was "'atypical' in relation to the ordinary incidents of prison life, and . . . subject[ed] him to conditions that differ significantly from 'routine' prison conditions in Pennsylvania state institutions"). This inquiry requires an evaluation of the totality of the conditions to which a prisoner is subjected, including, among other factors, the amount and quality of out-of-cell time, the lack of social interaction, the unavailability of programming, the effects of the conditions on the incarcerated person's psychological well-being, and whether the duration of the conditions is indefinite. *See Wilkinson*, 545 U.S. at 223–24; *Williams*, 848 F.3d at 562–64, 569. The purported reasons for individuals' placement in restrictive conditions have no bearing on the liberty interest analysis; rather, "it is the conditions themselves that determine whether a liberty interest is implicated." *Id.* at 565–66.

Mr. Williams's twenty-six years in solitary confinement clearly give rise to a due process liberty interest. There is "wide consensus that prolonged and indefinite solitary confinement gives rise to a due process liberty interest." *Porter*, 974 F.3d at 449–50 (collecting cases). Indeed, this Court has held stints in solitary confinement much shorter than Mr. Williams's sufficient to trigger due process protections. *See Williams*, 848 F.3d at 561 (six years and eight years); *Shoats*, 213 F.3d at 144 (eight years); *see also Talley*, 851 F. App'x at 306–07, 309–10 (thirteen months for an individual with mental illness).

Mr. Williams's complaint also adequately alleges that he was not provided with the review the Due Process Clause requires when an individual has been deprived of a protected liberty interest. For incarcerated people in prolonged solitary confinement, the Due Process Clause requires "'regular and meaningful review of [their] continued placement . . .' including 'a statement of reasons for the continued placement,' 'meaningful opportunity to respond to the reasons provided,' and a hearing.'" *Porter*, 974 F.3d at 440 (quoting *Williams*, 848 F.3d at 576).

Construing Mr. Williams's complaint liberally and in the light most favorable to him, and drawing all reasonable inferences in his favor, as is required, his complaint is properly understood as alleging that he was kept in indefinite solitary confinement pursuant to a blanket policy of the DOC that was applied to him "automatic[ally]," that he never received an administrative hearing regarding his ongoing solitary confinement, and that his prolonged solitary confinement was not based on any individualized assessment of the appropriateness of that placement for

him. JA048; JA046; JA049. Put simply, there was no review at all of Mr. Williams's indefinite solitary confinement, and there was no way for him to get out except death. His *pro se* complaint stated a viable procedural due process claim on which he should have been permitted to proceed to discovery.

### D.    In the alternative, the District Court should have granted Mr. Williams leave to amend.

Even if the Court disagrees and finds that Mr. Williams's due process claim was deficient, the District Court still committed reversible error by not granting him leave to file an amended complaint. When a district court dismisses a claim under § 1915(e)(2) or other provisions of the Prison Litigation Reform Act, it is required to grant leave to amend "unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108, 110 (3d Cir. 2002); *see Dooley*, 957 F.3d at 376. This requirement applies even when a plaintiff does not seek leave to amend. *Grayson*, 293 F.3d at 108. While the determination of whether to grant leave to amend generally lies within the discretion of the district court, "outright refusal to grant the leave ***without any justifying reason***, *i.e.*, inequity or futility, is not an exercise of discretion; it is merely abuse of that discretion." *Dooley*, 957 F.3d at 376 (cleaned up) (emphasis in original).

Here, the District Court dismissed Mr. Williams's Fourteenth Amendment claim with prejudice, made no finding that amendment would be inequitable or futile, and failed to grant him leave to file an amended complaint. JA005. This was an abuse of discretion. If this Court finds that Mr. Williams's complaint did not adequately state a procedural due process claim, it should reverse and remand the case to the

District Court with instructions to allow Mr. Williams to replead his Fourteenth Amendment claim in an amended complaint.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's entry of summary judgment on Mr. Williams's Eighth Amendment and ADA claims, reverse its dismissal of his Fourteenth Amendment claim, and remand the case for further proceedings.

Respectfully submitted,

*s/ Matthew A. Feldman*
Matthew A. Feldman (PA 326273)
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA19106
215-925-2966
mfeldman@pilp.org

Dated: January 20, 2023

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g) and L.A.R. 31.1(c), I certify that this brief:

(i)    complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,983 words, excluding the parts exempted by Fed. R. App. P. 32(f);

(ii)    was scanned for viruses prior to submission and no virus was detected; and

(iii)    is identical to the paper copies that I will cause to be delivered to the Court within the required time.

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to L.A.R. 28.3(d), I certify that I am a member in good standing of the bar of the Third Circuit.

*s/ Matthew A. Feldman*
Matthew A. Feldman
PENNSYLVANIA INSTITUTIONAL LAW PROJECT

Dated: January 20, 2023

## CERTIFICATE OF SERVICE

I certify that on January 20, 2023, this brief and accompanying appendix was served on counsel for Appellees, Anthony Kovalchick, using the Court's CM/ECF system.


*s/ Matthew A. Feldman*
Matthew A. Feldman
PENNSYLVANIA INSTITUTIONAL LAW PROJECT


Dated: January 20, 2023

**APPENDIX**

# APPENDIX TABLE OF CONTENTS

**Volume I**

Notice of Appeal (ECF No. 37):                                    JA001

Order of April 1, 2021 (ECF No. 7):                              JA004

Order of July 21, 2022 (ECF No. 35):                            JA008

Summary Judgment Opinion (ECF No. 34):                    JA009

Judgment (ECF No. 36):                                              JA037

**Volume II**

District Court Docket:                                                JA038

Verified Complaint (ECF No. 2):                                  JA043

    Complaint, Ex. B: Declaration/Affidavit
    of Dr. Barry Crown (ECF No. 2-1 at 48–51):          JA051

    Complaint, Ex. B: Affidavit/Declaration
    of Dr. Robert Fox (ECF No. 2-1 at 52–58):            JA055

    Complaint, Ex. C: DOJ Findings Letter,
    Feb. 24, 2014 (ECF No. 2-1 at 60–87):                JA062

Deposition of Roy Lee Williams (ECF No. 24-1):            JA090

Declaration of Michael Zaken and
accompanying exhibits (ECF No. 24-3):                        JA157

    Ex.1: DOC Policy No. 6.5.8 GRN 01:
    Capital Case Administration, March 12, 2018:        JA160

    Ex. 2: DOC Policy No. 6.5.8:
    Capital Case Administration, Aug. 27, 2012:          JA164

    Ex. 3: DOC Policy No. 13.8.1:
    Access to Mental Health Care, March 2, 2015:        JA182

## APPENDIX TABLE OF CONTENTS – continued

DOC Policy 7.5.1: Administration of Specialized
Inmate Housing, Dec. 3, 2019 (ECF No. 24-5):                    JA206

Declaration of Keri Moore and
accompanying exhibits (ECF No. 24-8):                           JA223

    Ex. 1: Grievance # 898857:                                JA224

    Ex. 2: Grievance # 902000:                                JA235

    Ex. 3: Grievance # 916331:                                JA249

DOC Policy DC-ADM 804:
Inmate Grievance System (ECF No. 24-9):                        JA256

Plaintiff's Affidavit (ECF No. 27 at 4):                       JA291

Plaintiff's Motion to Supplement and
Summary of Psychiatric Records (ECF No. 28):                   JA292

Date Filed: 01/20/2023 . Page: 64   Document: 18   Case: 22-2399

IN THE
# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Roy Lee Williams**, | ✧ | |
| Plaintiffs | ✧ | No. 21-CV-01248 |
| v. | ✧ | |
| **John E. Wetzel**, *et al.*, | ✧ | |
| Defendants. | ✧ | |

## Notice of Appeal

    Notice is hereby given that Roy Lee Williams, plaintiff in the above-captioned matter, appeals to the United States Court of Appeals for the Third Circuit from the final judgment entered in this action on July 21, 2022.

### Appellant's Statement of Questions

Did the Court err in its actions, rulings, and treatment of this case prior to the entry of the Order dated July 21, 2022? Did the Court fail to comply with the applicable rules, case law and due process standards in its actions before entry of the Order dated July 21, 2022?

Respectfully submitted,

**Roy Lee Williams**, *pro se*
SCI Phoenix, #CF4784
1200 Mokychic Drive
Collegeville, PA 19426

7/26/2022
**Date**



**JA001**

IN THE
# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Roy Lee Williams**, | ✧ | |
| Plaintiffs | ✧ | No. 21-CV-01248 |
| v. | ✧ | |
| **John E. Wetzel**, *et al.*, | ✧ | |
| Defendants. | ✧ | |

## Notice of Appeal

Notice is hereby given that Roy Lee Williams, plaintiff in the above-captioned matter, appeals to the United States Court of Appeals for the Third Circuit from the final judgment entered in this action on July 21, 2022.

### Appellant's Statement of Questions

Did the Court err in its actions, rulings, and treatment of this case prior to the entry of the Order dated July 21, 2022? Did the Court fail to comply with the applicable rules, case law and due process standards in its actions before entry of the Order dated July 21, 2022?

Respectfully submitted,

_R. L. Williams_                           _7/26/2022_
**Roy Lee Williams**, *pro se*              **Date**
SCI Phoenix, #CF4784
1200 Mokychic Drive
Collegeville, PA 19426

**JA002**

PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL

neopost
07/27/2022
US POSTAGE $000.57⁰
ZIP 19426
041M12252211

sci- Phoenix
Name Roy L. Williams
Number CF 4784
1200 Mokychic Drive
Collegeville, PA 19426

CLERK
United States District Court
Phila, PA 19106-9865

Legal
Mail

**JA003**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROY LEE WILLIAMS,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 21-CV-1248** |
| | : | |
| **JOHN E. WETZEL,** | : | |
| **Defendant.** | : | |

## ORDER

AND NOW, this **1st** day of **April, 2021**, upon consideration of Plaintiff Roy Lee

Williams's Motion to Proceed *In Forma Pauperis* (ECF No. 5), Prisoner Trust Fund Account

Statement (ECF No. 6), and Complaint (ECF No. 2), it is **ORDERED** that:

1.      Leave to proceed *in forma pauperis* is **GRANTED**.

2.      Roy Lee Williams, #CF-4784, shall pay the full filing fee of $350 in installments,

pursuant to 28 U.S.C. § 1915(b), regardless of the outcome of this case.  The Court directs the

Superintendent of SCI Phoenix or other appropriate official to assess an initial filing fee of 20%

of the greater of (a) the average monthly deposits to Williams's inmate account; or (b) the

average monthly balance in Williams's inmate account for the six-month period immediately

preceding the filing of this case.  The Superintendent or other appropriate official shall calculate,

collect, and forward the initial payment assessed pursuant to this Order to the Court with a

reference to the docket number for this case.  In each succeeding month when the amount in

Williams's inmate trust fund account exceeds $10.00, the Superintendent or other appropriate

official shall forward payments to the Clerk of Court equaling 20% of the preceding month's

income credited to Williams's inmate account until the fees are paid.  Each payment shall refer

to the docket number for this case.

3.      The Clerk of Court shall **SEND** a copy of this Order to the Superintendent of SCI Phoenix.

4.      The Complaint is **DEEMED** filed.

5.      Williams's official capacity claim under § 1983 and his individual capacity claim alleging a violation of the Fourteenth Amendment against Defendant John E. Wetzel are **DISMISSED WITH PREJUDICE** for failure to state a claim, pursuant to 28 U.S.C. §1915(e)(2)(B)(ii). Williams may proceed on his § 1983 claim under the Eighth Amendment against Defendant Wetzel in his individual capacity.[1]

6.      Williams's individual capacity claims under Title II of the American with Disabilites Act ("ADA") against Defendant Wetzel are **DISMISSED WITH PREJUDICE** for failure to state a claim, pursuant to 28 U.S.C. §1915(e)(2)(B)(ii).  Williams's official capacity

---

[1] Williams filed this Complaint against Wetzel in his individual and official capacities. *See* ECF No. 2 at 5.  In so doing, Williams asserts that Wetzel is the Secretary of Corrections for the Pennsylvania Department of Corrections.  (*Id.*)  The official capacity claim under § 1983 against Wetzel for money damages may not proceed because the Eleventh Amendment bars suits against a state and its agencies in federal court that seek monetary damages.  *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984); *A.W. v. Jersey City Public Schs.*, 341 F.3d 234, 238 (3d Cir. 2003).  Suits against state officials acting in their official capacities are really suits against the employing government agency, and as such, are also barred by the Eleventh Amendment.  *A.W.*, 341 F.3d at 238; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989).  As the Commonwealth has not waived its Eleventh Amendment immunity for lawsuits filed in federal court, *see* 42 Pa. Cons. Stat. § 8521-22, it and its departments, as well as their officials sued in their official capacities, are immune from suits filed in federal court.  Accordingly, the official capacity claim pursuant to § 1983 is dismissed with prejudice.  In addition, although Williams does allege a policy in paragraph 16 of the Complaint, the claim cannot go forward.

Finally, because Williams is a convicted inmate, the Eighth Amendment, as opposed to the Fourteenth Amendemnt, governs his claims.  *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  Accordingly, any claims alleging a violation of the Fourteenth Amendment are dismissed with prejudice.

claims under Title II of the ADA are **DEEMED** to be claims against the Pennsylvania Department of Corrections.[2]

7.    The Clerk of Court shall issue a summons. Service of the summons and the Complaint (ECF No. 2), along with a copy of this Order, shall be made upon the Defendant by the U.S. Marshals Service. Williams will be required to complete USM-285 forms so that the Marshals can serve the Defendant. Failure to complete those forms may result in dismissal of this case.

8.    All original pleadings and other papers submitted for consideration to the Court in this case are to be filed with the Clerk of Court. Copies of papers filed in this Court are to be served upon counsel for all other parties (or directly on any party acting *pro se*). Service may be made by mail. Proof that service has been made is provided by a certificate of service. The certificate of service should be filed in the case along with the original papers and should show the day and manner of service. An example of a certificate of service by mail follows:

> "I, (name), do hereby certify that a true and correct copy of the foregoing (name of pleading or other paper) has been served upon (name(s) of person(s) served) by placing the same in the U.S. mail, properly addressed, this (day) of (month), (year).
>
> _____
> (Signature)"

---

[2] Title II of the ADA prohibits only "public entit[ies]" from excluding or discriminating against individuals with disabilities. 42 U.S.C. § 12132. Although Title II of the ADA applies to state prisons and departments of corrections, *see Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210–212 (1998), the proper defendant in a Title II claim is the public entity or an official acting in his official capacity. *Glenn v. McGrady*, Civ. A. No. 13-325, 2014 WL 939507, at *4 (M.D. Pa. Mar. 11, 2014). Because an individual sued in his individual capacity is not considered a "public entity," Williams's individual liability claim against Wetzel is not permitted under Title II of the ADA. *See Powell v. Wetzel*, Civ. A. No. 12-2455, 2015 WL 1513888, at *2 (M.D. Pa. Mar. 27, 2015) (citations omitted). Williams's official capacity claim against Wetzel, however, is viable and may proceed. *Glenn*, 2014 WL 939507, at *4 (citing *United States v. Georgia,* 546 U.S. 151, 159 (2006), and noting that the Supreme Court has held that Title II of the ADA "validly abrogates state sovereign immunity" for "conduct that actually violates the Fourteenth Amendment").

3

**JA006**

9.      Any request for court action shall be set forth in a motion, properly filed and served.  The parties shall file all motions, including proof of service upon opposing parties, with the Clerk of Court.  The Federal Rules of Civil Procedure and Local Rules are to be followed.  Williams is specifically directed to comply with Local Civil Rule 7.1 and serve and file a proper response to all motions within fourteen (14) days.  Failure to do so may result in dismissal.

10.     Williams is specifically directed to comply with Local Rule 26.1(f) which provides that "[n]o motion or other application pursuant to the Federal Rules of Civil Procedure governing discovery or pursuant to this rule shall be made unless it contains a certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute."  Williams shall attempt to resolve any discovery disputes by contacting Defendant's counsel directly by telephone or through correspondence.

11.     No direct communication is to take place with the United States District Judge or United States Magistrate Judge with regard to this case.  All relevant information and papers are to be directed to the Clerk of Court.

12.     In the event a summons is returned unexecuted, it is Williams's responsibility to ask the Clerk of Court to issue an alias summons and to provide the Clerk with the Defendant's correct address, so service can be made.

13.     The parties should notify the Clerk's Office when there is an address change.  Failure to do so could result in court orders or other information not being timely delivered, which could affect the parties' legal rights.

BY THE COURT:

*/s/ Eduardo C. Robreno*
**EDUARDO C. ROBRENO, J.**

4

**JA007**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LEE WILLIAMS,                    :    CIVIL ACTION
                                     :    NO. 21-1248
        Plaintiff,                   :
                                     :
    v.                               :
                                     :
JOHN E. WETZEL, et al.,              :
                                     :
        Defendants.                  :

## O R D E R

**AND NOW**, this **21st** day of **July, 2022**, after considering Defendants' motion for summary judgment and the response thereto, it is hereby **ORDERED** as follows:

1. Plaintiff's motion to supplement the record [ECF No. 28] is **GRANTED** as unopposed;

2. Defendants' motion for summary judgment [ECF No. 23] is **GRANTED** for the reasons stated in the accompanying memorandum.


**AND IT IS SO ORDERED.**

*/s/ Eduardo C. Robreno*
**EDUARDO C. ROBRENO, J.**

1

**JA008**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LEE WILLIAMS,                    :    CIVIL ACTION
                                     :    NO. 21-1248
          Plaintiff,                 :
                                     :
     v.                              :
                                     :
JOHN E. WETZEL, et al.,              :
                                     :
          Defendants.                :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                         July 21, 2022


**I. INTRODUCTION**

This is a pro se prisoner civil rights action. Plaintiff
Roy Williams ("Plaintiff") brings this action against Defendant
John E. Wetzel, the former Secretary of Corrections, in his
individual capacity and against Defendant George Little[1] in his
official capacity as the Secretary of the Department of
Corrections (collectively, "Defendants"), alleging Defendants
violated the Americans with Disabilities Act ("ADA") and
Plaintiff's Eighth Amendment rights. Plaintiff contends that his
placement in indefinite solitary confinement following his

---

[1]   Plaintiff's ADA claim was originally brought against John Wetzel in his
official capacity as the Secretary of Corrections. Since Plaintiff filed
suit, Wetzel retired from his position as the Secretary of Corrections and
George Little has become the acting Secretary of Corrections. Pursuant to
Federal Rule of Procedure 25(d), any official capacity claims should be
deemed to be against the acting official. Accordingly, the Court has deemed
Plaintiff's ADA claim to be against George Little in his official capacity as
the Secretary of Corrections. See Ords., ECF Nos. 32-33.

conviction for capital murder violated his rights in light of his history of depression and suicidal ideation.

Defendants have filed a motion for summary judgment. For the following reasons, the Court will grant Defendant's motion.

## II.  BACKGROUND
### A.  Plaintiff's Conviction and Mental Health History

In 1992, Plaintiff was convicted of murder in Pennsylvania state court and sentenced to death.[2] Following his conviction, Plaintiff was placed in custody at the State Corrections Institution Graterford ("SCI-Graterford"). In the mid-1990's, Plaintiff was transferred to the State Corrections Institution Greene ("SCI-Greene") and in July 2020, he was transferred to the State Corrections Institution Phoenix ("SCI-Phoenix"). Plaintiff has since remained at SCI-Phoenix.

In 1979, over a decade before his conviction, Plaintiff was involuntarily committed to the Philadelphia Psychiatric Center (the "PPC") for approximately 60 days after making suicidal threats and exhibiting violent behavior towards his family. Plaintiff was diagnosed with depression and suicidal ideation. The PPC also noted that Plaintiff's "most striking problem was the control of his angry feelings." Defs.' Statement of Material Facts ("SOMF") ¶ 41 (internal quotation marks and citation

---

[2]    Plaintiff has since appealed his conviction and sought to obtain post-conviction relief. Plaintiff's appeals have not been successful and his capital sentence remains in place.

2

omitted). After his release from the PPC, Plaintiff was voluntarily committed for an additional 90 days, though it is not apparent if he received any other diagnoses at that time.

Plaintiff's mental health was again evaluated after his conviction. In 1996, Plaintiff's criminal defense attorney hired two external mental health professionals, Barry Crown Ph.D and Robert A. Fox, M.D., to conduct clinical examinations of Plaintiff. In September 1996, following their evaluations of Plaintiff, both Dr. Crown and Dr. Fox prepared declarations with their reports.[3] Dr. Crown indicated that Plaintiff suffers from "cerebral dysfunction" and "brain damage." Ex. A., ECF No. 2-1 at 48-49 ¶¶ 3-4. Dr. Crown also noted that records from Plaintiff's 1979 involuntary commitment at the PPC "are consistent with [Plaintiff's] brain damage and psychological impairments, and show that he suffered from these impairments from an early age." Id. at 49 ¶ 6. Dr. Crown explained that Plaintiff has "neuropsychological and psychological deficiencies" which include "emotional problems and cognitive dysfunction." Id. at 50 ¶ 8. In his declaration, Dr. Fox noted that Plaintiff has "ingrained psychological and emotional

---

[3]    Plaintiff initially attached these declarations to his Complaint. As Plaintiff refers to these declaration in response, the Court has considered them here.

3

**JA011**

impairments" including depression and suicidal ideation. Id. at 53 ¶ 3; 55 ¶ 9.

It is not clear whether Dr. Crown and/or Dr. Fox provided copies of their declarations to the Department of Corrections (the "DOC"). Since his conviction, Plaintiff has been housed in the Capital Case Unit (the "CCU"). Plaintiff's placement and treatment in the CCU at SCI-Graterford and SCI-Greene were governed by the DOC's policy concerning Capital Case Administration. When inmates enter the CCU they are given a psychological evaluation "to screen for intellectual, personality, and emotional stability." Defs.' SOMF ¶ 18. "[A]ny inmate with evidence of mental illness receives a more comprehensive assessment" and subsequent mental health treatment. Defs.' SOMF ¶ 20. While Plaintiff was at SCI-Graterford and SCI-Greene, psychology staff visited inmates in the CCU at least five times per week to assess inmates for risk of suicide. See Defs.' SOMF ¶ 23. Inmates were additionally able to request appointments to speak with mental health professionals. Id. Any CCU inmates showing signs that they may harm themselves or others were referred to the mental health department for evaluation. The record shows that Plaintiff was never diagnosed with a mental illness or mental impairment by an internal DOC staff member.

4

**JA012**

Plaintiff has provided summaries of his DOC mental health records.[4] The summaries show that in January 1996, Plaintiff was referred to an internal psychiatrist but did not show any signs of "mental decomposition or emotional problems." See Ex. A, ECF No. 28. On July 3, 1996, Plaintiff was referred to DOC mental health professionals following a suicide attempt. Id. According to Plaintiff's deposition testimony, while at SCI-Graterford, he attempted to commit suicide while in the CCU and was placed in a psychiatric observation cell for mental health professionals to monitor and evaluate him. Plaintiff was evaluated for 48-72 hours and "was released after he told doctors that he faked the suicide attempt to get out of his cell to make a phone call." Defs.' SOMF ¶ 31. Plaintiff testified that he did not fake the attempt but was "telling [the mental health professionals] anything just to get out of the cell . . . ." Pl. Dep. 25:14-15, ECF No. 24-1. The mental health professionals, believing Plaintiff's claim, deemed Plaintiff "not depressed" and, in their records, noted that Plaintiff was attempting to "manipulate the system." See Ex. A, ECF No. 28. Plaintiff did not personally request additional treatment from mental health

---

[4]    Plaintiff did not provide the original mental health records. Instead, Plaintiff filed a motion to supplement his response and included summaries of the mental health records prepared by his counsel at the Defender Association of Philadelphia. See Mot., ECF No. 28. As Defendants have not opposed Plaintiff's motion to supplement, the Court has relied on the summaries of the records here.

professionals after that incident and "dealt with everything on [his] own." Pl. Dep. 25:22-23. Whenever he interacted with the mental health staff, Plaintiff would inform the staff he was feeling fine.

In 2008, Plaintiff was referred to mental health staff for out-of-cell appointments following an incident in which Plaintiff suffered a case of heat exhaustion and developed headaches. Plaintiff was seen by two mental health professionals on five separate occasions. There is no evidence in the record showing that these mental health professionals diagnosed Plaintiff with a mental illness.

Plaintiff did not receive assistance from mental health professionals on any other occasion. Additionally, Plaintiff does not believe that he was ever diagnosed with a mental illness by a DOC professional while in the CCU. Pl. Dep. 36:13-16.

**B.    The Solitary Confinement Class Action and Updated DOC Policies**

In January 2018, a class action lawsuit was filed in the Middle District of Pennsylvania on behalf of CCU inmates alleging that the conditions in the CCU amounted to "solitary confinement" in violation of the inmates' Eighth and Fourteenth Amendment rights. See Reid v. Wetzel, No. 18-0176 (M.D. Pa.). In November 2019, the parties executed a settlement agreement in

6

**JA014**

which the DOC agreed to implement a policy creating more socialization opportunities for CCU inmates (the "Reid Settlement"). See Ex. D, ECF No. 24-4.

Following the Reid Settlement, on December 3, 2019, the DOC issued a new policy reflecting updated conditions for CCU confinement. See Ex. E, ECF No. 24-5. The new CCU policy took effect on December 10, 2019. Defendants aver that SCI-Greene began updating its internal policy with respect to CCU confinement as early as March 12, 2018, which allowed SCI-Greene to increase socialization opportunities for CCU inmates. Defs.' SOMF ¶¶ 10-12. Plaintiff does not recall the date in which these policy changes were implemented at SCI-Greene, but Plaintiff remembers that the official DOC policy outlining changes to CCU confinement was issued on December 3, 2019. See Pl. Dep. 12:1-9.

### C.  Plaintiff's Grievances

Following the Reid Settlement, Plaintiff filed three grievances in connection with his treatment in the CCU. Plaintiff filed his first grievance on November 13, 2020,[5] after he was transferred to SCI-Phoenix, claiming that he has a mental disability that has been exacerbated by his prolonged isolation in the CCU (Grievance No. 898857) (the "first grievance"). Plaintiff filed his second grievance on November 30, 2020 making

---

[5]    During his deposition, Plaintiff recalled filing his first grievance in December, but the DOC's records indicate this grievance was filed on November 13, 2020. See Ex. H, ECF No. 24-8 at 9.

the same claims but adding more details about his mental health history (Grievance No. 902000) (the "second grievance"). Plaintiff filed his third grievance on February 24, 2021, again making the same claims but adding more information about his mental health (Grievance No. 916331) (the "third grievance").

The DOC has a policy that applies to inmate grievances. Under the policy, "an inmate must file a grievance within 15 working days after the event upon which the claim is based." Defs.' SOMF ¶ 51 (internal quotation marks and citation omitted). After receiving a response, "the inmate may file an appeal within 15 working days to the Facility Manager" where the inmate is housed. Id. ¶ 52. Following receipt of the Facility Manager's appeal, the inmate may file a final review appeal to the Secretary's Office of Inmate and Grievance Appeals (the "SOIGA"). If an inmate appeals to SOIGA, the inmate is required to include all relevant documentation with the appeal. Id. ¶ 54.

On February 17, 2021, SOIGA issued a final appeal decision notice dismissing Plaintiff's first grievance due to Plaintiff's failure to provide SOIGA with all required documentation. On March 15, 2021, SOIGA issued a final appeal notice dismissing Plaintiff's second grievance due to Plaintiff's untimely filing of the grievance beyond the 15-day deadline. On April 20, 2021, SOIGA issued a notice regarding Plaintiff's third grievance

8

**JA016**

indicating that plaintiff failed to submit an appeal or indicate what action Plaintiff sought from SOIGA.

### D.  Procedural History

On March 3, 2021, Plaintiff filed this action. Plaintiff brought claims under 42 U.S.C. § 1983 alleging that Defendant Wetzel, in his official capacity, violated Plaintiff's Eighth and Fourteenth Amendment rights and an individual capacity claim under Title II of the ADA. In April 2021, the Court entered an order dismissing Plaintiff's Fourteenth Amendment claims with prejudice. See Ord. ¶ 5, ECF No. 7. The Court's order dismissed the official capacity Eighth Amendment claim against Defendant Wetzel, but permitted Plaintiff to proceed with an individual capacity Eighth Amendment claim against Defendant Wetzel. Id. The Court has also deemed the ADA claim to be against the acting Secretary of Corrections in his official capacity. See Ord. ¶ 3, ECF No. 29. The acting Secretary of Corrections is George Little. Accordingly, the remaining claims are: (1) an Eighth Amendment claim under section 1983 against Defendant Wetzel in his individual capacity and (2) an ADA claim against Defendant Little in his official capacity. Defendants have filed a motion for summary judgment. Plaintiff has since responded and the motion is now ripe before the Court.[6]

_____

[6]     Pursuant to the Court's scheduling orders, Defendant was granted leave to depose Plaintiff by December 13, 2021 and to file a motion for summary judgment by January 28, 2022. See Ord., ECF Nos. 18, 21. The Court's Second

## III. LEGAL STANDARD

Summary judgment is "appropriate only when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Physicians Healthsource, Inc. v. Cephalon, Inc.</u>, 954 F.3d 615, 618 (3d Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A fact is material "if it 'might affect the outcome of the suit under the governing law.'" <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). A factual dispute is genuine "if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Id.</u> (quoting <u>Anderson</u>, 477 U.S. at 248).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. If the movant meets this obligation, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250. At the summary judgment stage, the Court must view the facts "in the light most favorable to" the nonmoving party and "draw all reasonable inferences in favor" of that party. <u>Young v. Martin</u>, 801 F.3d 172, 174 n.2 (3d Cir. 2015).

---

Scheduling Order provided that if Defendant files a motion for summary judgment, Plaintiff may respond <u>or</u> submit an affidavit pursuant to Federal Rule of Civil Procedure 56(d) indicating that he is unable to present facts essential to justify his opposition and additional discovery is needed. <u>See</u> Ord., ECF No. 21. Plaintiff submitted a response to Defendants' motion and did not indicate that additional discovery is needed. Accordingly, Defendants' motion is ripe for disposition.

A document filed pro se is to be "liberally construed" and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). In addition, when considering a motion in a pro se plaintiff's proceedings, a court must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." Holley v. Dep't of Veteran Affairs, 165 F.3d 244, 247–48 (3d Cir. 1999). However, on a motion for summary judgment, "a pro se plaintiff is not relieved of his obligation under Rule 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." Ray v. Fed. Ins. Co., No. 05-2507, 2007 WL 1377645, at *3 (E.D. Pa. May 10, 2007) (Robreno, J.). "[M]erely because a non-moving party is proceeding pro se does not relieve him of the obligation under Rule 56(e) to produce evidence that raises a genuine issue of material fact." Boykins v. Lucent Techs., Inc., 78 F.Supp.2d 402, 408 (E.D. Pa. 2000) (Robreno, J.).

## IV. DISCUSSION

Defendants move for summary judgment arguing that (A) the action should be dismissed because Plaintiff has failed to exhaust his administrative remedies, (B) Plaintiff's claims are

11

barred by the statute of limitations, (C) Defendant Wetzel is
protected by qualified immunity, and (D) Plaintiff cannot point
to evidence to support his ADA claim against Defendant Little.[7]
These arguments will be addressed in turn.

### A.    Exhaustion of Administrative Remedies

Defendants first argue that Plaintiff's claims must fail
because Plaintiff failed to exhaust the administrative remedies
available to him under the Prison Litigation Reform Act (the
"PLRA"). The PLRA provides that "[n]o action shall be brought
with respect to prison conditions under section 1983 of this
title, or any other Federal law, by a prisoner confined in any
jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted." 42
U.S.C. § 1997e(a) (amended by Pub. L. 104–134, Title I, S101(a),
110 Stat. 1321–71 (1996)) (emphasis added). A prisoner must also
exhaust administrative remedies for claims brought under the
ADA. See Cobb v. Weyandt, 359 F. App'x 285, 287 (3d Cir. 2009)
(noting that the district court properly rejected the argument
that administrative exhaustion was unnecessary for claims
brought under the ADA). "Exhaustion is mandatory in cases
covered by the PLRA." Dawson v. Cook, 238 F. Supp. 3d 712, 718

---

[7]    Defendants also argue that Plaintiff's Fourteenth Amendment claim
fails. See Defs.' Mot. at 15–20, ECF No. 23. Because the Court already
dismissed this claim with prejudice, see Ord. ¶ 5, ECF No. 7, the Court need
not address this argument here.

(E.D. Pa. 2017) (Robreno, J.) (citing <u>Porter v. Nussle</u>, 534 U.S. 516, 524, 532 (2002)).

Failure to exhaust administrative remedies is an affirmative defense which Defendants have the burden of pleading and proving. <u>Rinaldi v. United States</u>, 904 F.3d 257, 268 (3d Cir. 2018) (citing <u>Ray v. Kertes</u>, 285 F.3d 287, 295 (3d Cir. 2002)); <u>see also</u> <u>Brown v. Croak</u>, 312 F.3d 109, 111 (3d Cir. 2002) (same). "[O]nce the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." <u>Rinaldi</u>, 904 F.3d at 268 (citing <u>Tuckel v. Grover</u>, 660 F.3d 1249, 1253 (10th Cir. 2011)).

"[T]o properly exhaust administrative remedies prisoner must 'complete the administrative review process in accordance with the applicable procedural rules.'" <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007) (quoting <u>Woodford v. Ngo</u>, 548 U.S. 81, 88 (2006)). Such rules are "defined not by the PLRA, but by the prison grievance process itself." <u>Id.</u> "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." <u>Woodford</u>, 548 U.S. at 90-91. To complete the process, the inmate-plaintiff must substantially comply with the prison's grievance procedure. <u>Small v. Camden</u>

13

Cnty., 728 F.3d 265, 272 (3d Cir. 2013); Spruill v. Gillis, 372
F.3d 218, 232 (3d Cir. 2004). The inmate-plaintiff is barred
from bringing suit if he fails to properly pursue his grievance
through the prescribed process. Spruill, 372 F.3d at 231-32;
Potts v. Holt, No. 09-1805, 2010 WL 2080106, at *6 (M.D. Pa.
Apr. 8, 2010).[8]

The DOC has a policy, DC-ADM-804, which sets forth specific
instructions for filing prisoner grievances. Defendants argue
that Plaintiff failed to exhaust his administrative remedies
because he did not submit his grievances by the requisite
deadline. DC-DM-804 requires that inmates submit their grievance
to the Facility's Grievance Coordinator/Designee within 15 days
of when the claim is based. See Ex. I, DC-ADM-804, § 1.A.8, ECF
No. 24-9. Defendants contend that Plaintiff's claims are based
on conditions he experienced in the CCU before SCI-Greene
relaxed its policies on March 12, 2018, so Plaintiff must have
filed his grievance within 15 days of March 12, 2018;

---

[8]     In fact, the Third Circuit has noted that policy considerations favor
strictly enforcing these exhaustion requirements. These considerations
include:

> (1) avoiding premature interruption of the administrative process
> and giving the agency a chance to discover and correct its own
> errors; (2) conserving scarce judicial resources, since the
> complaining party may be successful in vindicating his rights in
> the administrative process and the courts may never have to
> intervene; and, (3) improving the efficacy of the administrative
> process. Each of these policies, which Congress seems to have had
> in mind in enacting the PLRA, is advanced by the across-the-board,
> mandatory exhaustion requirement in § 1997e(a).

Nyhuis v. Reno, 204 F.3d 65, 75 (3d Cir. 2000).

14

alternatively, Plaintiff's grievances must have been filed within 15 days of December 3, 2019, the date when the DOC implemented the new CCU policy with respect to solitary confinement.

Here, Plaintiff's first grievance did not specify a time period for Plaintiff's complaints. In his grievance, Plaintiff generally complained that "his mental disability has [been] exacerbated due to the effects of prolonged isolation." See Ex. H, ECF No. 24-8 at 9. Though Plaintiff testified that he acknowledged the new CCU policy was implemented on December 3, 2019, it is not clear if Plaintiff believes the alleged violations ended on that date. See Pl. Dep: 12:1-24; 13:1; 54:8-13. Additionally, the DOC did not dismiss Plaintiff's first grievance for failing to comply with the 15-day deadline. Thus, the Court finds that Defendants have not met their burden of showing Plaintiff failed to exhaust his administrative remedies here.

Defendants also argue that Plaintiff failed to exhaust his administrative remedies with respect to the first grievance because Plaintiff did not properly appeal the first grievance to SOIGA. As noted, if an inmate's initial grievance is rejected, the inmate may appeal it to the Facility Manager/Designee "within 15 working days from the date of the initial review response/rejection." Ex. I, DC-ADM-804, § 2.A.1, ECF No. 24-9.

15

**JA023**

Plaintiff's first grievance was rejected because the Facility Grievance Coordinator found that Plaintiff was not "personally affected by a Department or facility action or policy." Ex. H ECF No. 24-8 at 10. Plaintiff appealed the initial rejection to the Facility Manager and it was again rejected because Plaintiff was not "personally affected by a Department or facility action or policy." Id. at 11. Consistent with DC-ADM-804, Plaintiff then appealed the dismissal to SOIGA. See Ex. I. at §§ 2.B.1.b; 2.B.1.i, ECF No. 24-9.

An appeal to SOIGA must include the following documents:

(1) a legible copy of the Initial Grievance;

(2) a copy of the initial review response/rejection and/or remanded initial review response/rejection;

(3) a legible copy of the Inmate Appeal to the Facility Manager;

(4) a copy of the Facility Manager/designee's decision and/or remanded Facility Manager/designee's decision;

(5) a written appeal to the SOIGA;

(6) failure to provide any of the documentation noted above may result in the appeal being dismissed; and

(7) the copies of the initial review response/rejection and the Facility Manager/designee's decision cannot be handwritten.

Id. at § 2.B.1.k.

Plaintiff's appeal to SOIGA was dismissed as incomplete because Plaintiff failed to provide the requisite documentation.

16

**JA024**

Plaintiff specifically failed to provide "a legible copy of [the] appeal to [the] Facility Manager." See Ex H, ECF No. 24-8 at 8. The record shows that on January 4, 2021, a notice was issued to Plaintiff indicating Plaintiff was directed to provide all completed documents necessary within 15 working days of the notice and "[a] failure to provide the missing information (identified [in the notice]) within this time period may result in a dismissal of [the] appeal." Id. The record shows that on January 11, 2021, Plaintiff responded and included legible copies of his appeal to the Facility Manager. Id. at 6-7. Despite this, on January 19, 2021, Plaintiff received another notice indicating that his appeal was defective because he had not provided legible copies of his appeal to the Facility Manager. Id. at 5. Plaintiff did not respond, and on February 17, 2021, his grievance was dismissed.

It seems there was an error on the part of SOIGA as Plaintiff did in fact submit a copy of the required documents on January 11, 2021. See id. at 6-7. It is not apparent why SOIGA did not consider Plaintiff's submission and subsequently dismissed Plaintiff's appeal, but it appears that Plaintiff otherwise complied with the appeals process. Thus, the Court finds that Defendants have not met their burden of showing

Plaintiff failed to exhaust his administrative remedies[9] and finds that Defendants are not entitled to summary judgment on this ground.[10]

**B.  Statute of limitations**

Defendants next argue that Plaintiff's claims are barred by the statute of limitations. "Because 42 U.S.C. § 1983 does not contain a statute of limitations, courts look to 42 U.S.C. § 1988, which requires use of the statute of limitations for the state where the federal court sits, unless its application would conflict with the Constitution or with federal law." Jackson v. Se. Pa. Transp. Auth., 260 F.R.D. 168, 183 (E.D. Pa. 2009) (quoting Lake v. Arnold, 232 F.3d 360, 368 (3d Cir. 2000)). Courts typically apply the underlying state's statute of limitations for personal injury claims to determine the statute of limitations for section 1983 claims. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 599 (3d

---

[9]     Plaintiff contends that grievance procedures were not available to him because the policy provides that "issues concerning . . . the reasons for placement in administrative custody will not be addressed through the Inmate Grievance System" and must be addressed through DC-ADM-802, the policy governing "Administrative Custody procedures." Ex. I, DC-ADM-804, § 1.A.7, ECF No. 24-9. The Court need not reach this argument. Because Defendants have not met their burden of proving Plaintiff failed to exhaust his administrative remedies, the burden does not shift to Plaintiff to show the remedies were not available to him. Rinaldi, 904 F.3d at 268.

[10]    Defendants also argue that Plaintiff failed to exhaust his administrative remedies with respect to the second and third grievances. However, the Court need not reach these arguments. Plaintiff has still preserved his claims because all three grievances address the same underlying issues—all three allege that Plaintiff has mental disability that was exacerbated by his prolonged isolation in the CCU.

18

**JA026**

Cir. 1998); <u>Padilla v. Twp. of Cherry Hill</u>, 110 F. App'x 272,
276 (3d Cir. 2004); <u>Jackson</u>, 260 F.R.D. at 183. Under
Pennsylvania law, there is a two-year statute of limitation for
personal injury actions, <u>see</u> 42 Pa. C.S. § 5524, so "the same
two-year period is applicable to Plaintiff's section 1983
claims." <u>Jackson</u>, 260 F.R.D. at 183. Courts apply this statute
of limitations to ADA claims as well. <u>See</u> <u>Disabled in Action of</u>
<u>Pa. v. Se. Pa. Transp. Auth</u>., 539 F.3d 199, 208 (3d Cir. 2008).

    "A section 1983 cause of action accrues when the plaintiff
knew or should have known of the injury upon which its action is
based." <u>Sameric</u>, 142 F.3d at 599. The same is true for cases
arising under the ADA, but for ADA cases, "the focus is on when
the discriminatory act occurs, not when the consequences of the
act become painful." <u>Bukhart</u>, 70 F. App'x at 53 (quoting <u>Chardon</u>
<u>v. Fernandez</u>, 454 U.S. 6, 8 (1981)).

    A statute of limitations may be tolled under the continuing
violations doctrine. "[W]hen defendant's conduct is part of a
continuing practice, an action is timely so long as the last act
evidencing the continuing practice falls within the limitations
period; in such an instance, the court will grant relief for the
earlier related acts that would otherwise be time barred."
<u>Cowell v. Palmer Twp.</u>, 263 F.3d 286, 292 (3d Cir. 2001)
(quoting <u>Brenner v. Local 514, United Bhd. of Carpenters and</u>
<u>Joiners of Am.</u>, 927 F.2d 1283, 1295 (3d Cir. 1991)). Under the

19

**JA027**

doctrine, "equity demands that so long as the most recent offensive utterance or adverse action occurred within the limitations period, the entire scope of that continuing violation may be considered." Tearpock-Martini v. Borough of Shickshinny, 756 F.3d 232, 236 (3d Cir. 2014) (citation omitted).

"In order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is more than the occurrence of isolated or sporadic instances." Cowell, 263 F.3d at 292 (quotation marks and citation omitted).[11] The Third Circuit has "cautioned, however, that equitable relief from the statutory limitations period is appropriate only where the alleged violation is 'occasioned by continual unlawful acts, not continual ill effects from an original violation.'" Tearpock, 756 F.3d at 236 (quoting Cowell, 263 F.3d at 293). "Under this doctrine, 'when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing

---

[11]     The Third Circuit has held that:

Courts should consider at least three factors: (1) subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency—whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence—whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

Cowell, 263 F.3d at 292.

the continuing practice falls within the limitations period.'"
<u>Cibula v. Fox</u>, 570 F. App'x 129, 133 (3d Cir. 2014)
(quoting <u>Cowell</u>, 263 F.3d at 292).

Here, Defendants do not contest that the doctrine applies.
Instead, Defendants argue that even when applying the doctrine,
Plaintiff has brought his claims outside of the requisite
limitations period. Defendants argue that because Plaintiff's
claims relate to the isolation policies at the CCU, and because
officials at SCI-Greene began loosening restrictions related to
CCU inmates early as March 12, 2018, the last act evidencing
continuous practices was March 12, 2018. Defendants aver that
because Plaintiff filed his complaint on March 3, 2021, this was
past the expiration of the statute of limitations so his claims
must be dismissed.

However, Plaintiff testified that his claims relate to his
isolation in the CCU from the time of his initial placement in
the CCU until, at least, December 3, 2019, when the new DOC
policy was issued. Pl. Dep: 12:1-24; 13:1; 54:8-13. Though
Defendants point to evidence that SCI-Greene instituted changes
in March 2018, <u>see</u> Defs.' SOMF ¶¶ 11-12, Plaintiff maintains
that he did not benefit from any policy changes until January
2022. <u>See</u> Pl. Affidavit, ECF No. 27 at 4. Viewing the evidence
in the light most favorable to Plaintiff, it is not clear that
this was the <u>last</u> act evidencing a continuing practice.

21

**JA029**

Here, the Court finds that there is a question of fact as to the date of the last act evidencing a continuing practice and declines to grant summary judgment on this ground.

### C. Qualified Immunity-Defendant Wetzel

Defendants next argue that Plaintiff's claim alleging violations of Plaintiff's Eighth Amendment rights against Defendant Wetzel must be dismissed because Defendant Wetzel is entitled to qualified immunity.[12]

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, (1982). Government officials are entitled to immunity in their individual capacities unless "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the alleged constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001).

---

[12]    Plaintiff brings this claim against Defendant Wetzel in his individual capacity. This defense is "available only for governmental officials when they are sued in their personal, and not in their official, capacity." Melo v. Hafer, 912 F.2d 628, 636 (3d Cir. 1990) (collecting cases).

The Supreme Court has emphasized that "the clearly established right must be defined with specificity." City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019). Although this specificity is "particularly important in excessive force cases," in any type of case in which qualified immunity is raised, the Court must be careful to avoid "clearly established law at a high level of generality." Id. (quoting Kisela v. Hughes, 138 S.Ct. 1148, 1152 (2018)) (internal quotation marks omitted). "[T]here does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate." Dist. of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018) (internal quotation marks and citation omitted). But, "there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." Id. (internal quotation marks and citation omitted).

As Defendants point out, the Third Circuit has recently held that in a case where a death row inmate challenged the conditions of his solitary confinement under the Eighth Amendment, DOC officers were entitled to qualified immunity. Porter v. Pennsylvania Dep't of Corrections, 974 F.3d 431, 450 (3d Cir. 2020). The Third Circuit held that Eighth Amendment rights with respect to conditions of solitary confinement on death row are not "clearly established." Id. at 450-451; see

23

also <u>Johnson v. Pennsylvania Dep't of Corrections</u>, 846 F. App'x
123, 129 (3d Cir. 2021) (finding that the Third Circuit was
bound by its "holding in <u>Porter</u> that the Eighth Amendment right
in this context was not clearly established at the time of
Porter's (and Johnson's) solitary confinement, so the Defendants
can assert a qualified immunity defense" at the summary judgment
stage). Thus, the Court is bound by <u>Porter</u> here. Accordingly,
the Court will grant Defendants' motion with respect to the
section 1983 claim against Defendant Wetzel.[13]

### D. ADA Claim Against Defendant Little

Defendants contend that Plaintiff cannot maintain his ADA
claim against Defendant Little in his capacity as the Secretary
of Corrections.[14] As a preliminary matter, the claim may be
barred by Eleventh Amendment immunity. But, Defendants have not
raised this argument or briefed this issue, and it is not
necessary for the Court to consider it. "When subject matter
jurisdiction is at issue, a federal court is generally required
to reach the jurisdictional question before turning to the

---

[13]   In response, Plaintiff argues that the defense is waived because
Defendants did not raise this as an affirmative defense in their Amended
Answer. Pursuant to Federal Rule of Civil Procedure 15, the Court has since
granted Defendants leave to file a Second Amended Answer. <u>See</u> Ord. ¶ 2, ECF
No. 29. On July 12, 2022, Defendants filed a Second Amended Answer and
included the defense of qualified immunity. Thus, Plaintiff's argument is now
moot.

[14]   As noted, this claim is deemed to be against Defendant Little in his
official capacity. <u>See</u> Ord. ¶ 3, ECF No. 29; Ord., ECF No. 33.

merits." In re Hechinger Inv. Co. of Delaware Inc., 335 F.3d
243, 249 (3d Cir. 2003) (Alito, J.) (first citing Steel Co. v.
Citizens for a Better Env't, 523 U.S. 83, 93-93 (1998); then
citing Larsen v. Senate of the Commw., 152 F.3d 240, 245 (3d
Cir. 1998)). However, the Third Circuit has held that courts are
not required to resolve issues related to Eleventh Amendment
immunity before proceeding to the merits of a case. Id.; see
also, e.g., Lombardo v. Pa. Dep't of Public Welfare, 540 F.3d
190, 197 n.6 (3d Cir. 2008) (noting that federal courts are not
required to raise Eleventh Amendment immunity issues sua
sponte). Thus, the Court may consider the merits of Plaintiff's
claim here.

To bring a claim under the ADA, a plaintiff "must
demonstrate: (1) he is a qualified individual; (2) with a
disability; (3) [who] was excluded from participation in or
denied the benefits of the services, programs, or activities of
a public entity, or was subjected to discrimination by any such
entity; (4) by reason of his disability." Haberle v. Trozell,
885 F.3d 170, 178-79 (3d Cir. 2018) (quoting Bowers v. Nat'l
Collegiate Athletic Ass'n, 475, F.3d 524, 533 n.32 (3d Cir.
2007)) (alterations in original).

Defendants argue that Plaintiff cannot prove the second
element of his claim because the record does not show that
Plaintiff "has a severe mental illness or intellectual

25

**JA033**

disability." Defs.' Mot. at 21, ECF No. 23. Under the ADA, disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment (as described in paragraph (3))" of the statute. 42 U.S.C. § 12102(1). Without referring to the statute, Defendants seem to argue that there is no evidence that Plaintiff had a qualified disability under the ADA.

Though Defendants acknowledge that Plaintiff was diagnosed with depression and suicidal ideation prior to coming into the custody of the DOC, Defendants aver that Plaintiff did not actively seek treatment from mental health professionals while at the DOC. According to summaries of Plaintiff's mental health records, in January 1996, Plaintiff was referred to a DOC psychiatrist but did not show any signs of "mental decomposition" or emotional problems. See Ex. A, ECF No. 28. Though Plaintiff maintains he attempted suicide in July 1996, the DOC's records show that Plaintiff indicated he faked the attempt and the DOC's mental health staff reported that Plaintiff was "not depressed." Id. After that incident, Plaintiff did not seek additional mental health treatment. In fact, Plaintiff does not believe that he was ever diagnosed with a mental illness by a DOC mental health professional. Pl. Dep. 36:13-16.

26

**JA034**

However, Plaintiff still maintains that DOC staff had
record of Plaintiff's diagnoses of depression and suicidal
ideation. See Pl. Dep: 15:3-20. In fact, in 1996, Plaintiff was
referred by his criminal attorney for evaluation by external
mental health professionals. The mental health professionals,
Dr. Fox and Dr. Crown, prepared declarations on Plaintiff's
behalf and noted that Plaintiff suffers from emotional problems
and mental impairments including depression and suicidal
ideation. See Ex. A., ECF No. 2-1 at 50 ¶ 8; 53 ¶ 3; 55 ¶ 9.
Though it is not clear if/when the DOC staff received these
records, there is at least an issue of fact as to whether the
DOC had record of Plaintiff's mental health diagnoses.[15] Thus,
there is an issue of fact with regard to whether, under the
ADA's definition, Plaintiff has a disability.

Regardless, Plaintiff's claim still fails because he cannot
show evidence of intentional discrimination. Plaintiff seeks to
recover compensatory damages here, a remedy which is not
available under the ADA "absent proof of 'intentional
discrimination.'" Haberle, 885 F.3d at 181 (quoting S.H. ex rel.
Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 261 (3d Cir.
2013)). To prove intentional discrimination, the plaintiff must

---

[15]    Plaintiff does not argue that he has a physical or mental impairment
that substantially limits one or more major life activities of such
individual," or that he was "regarded as having such an impairment." 42
U.S.C. § 12102(1).

show "at least deliberate indifference and to plead deliberate indifference, a claimant must allege '(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge.'" Id. (quoting Lower Merion Sch. Dist., 729 F.3d at 265) (internal citation omitted).

Defendants contend that there is no evidence that the Secretary of Corrections, or any other DOC staff member, acted with deliberate indifference towards Plaintiff. Plaintiff fails to point to any evidence to contest this argument. Accordingly, Plaintiff cannot maintain his ADA claim, so Defendants' motion will be granted with respect to this claim.

**V. CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's motion. An appropriate order follows.

**JA036**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LEE WILLIAMS,                      :    CIVIL ACTION
                                       :    NO. 21-1248
          Plaintiff,                   :
                                       :
     v.                                :
                                       :
JOHN E. WETZEL, et al.,                :
                                       :
          Defendants.                  :

## J U D G M E N T

      **AND NOW**, this **21st** day of **July, 2022**, in accordance with the Court's Order of this same date, it is hereby **ORDERED** that **JUDGMENT** is **ENTERED** in favor of Defendants John E. Wetzel and George Little and against Plaintiff Roy Lee Williams.

      The Clerk of Court shall mark the case **CLOSED.**


      **AND IT IS SO ORDERED.**

                       */s/ Eduardo C. Robreno*
                       **EDUARDO C. ROBRENO, J.**

**JA037**