**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

**No. 22-2399**

---

ROY LEE WILLIAMS,

Plaintiff-Appellant,

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS and JOHN E. WETZEL,

Defendants-Appellees.

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:21-cv-1248)
District Judge: Honorable Eduardo C. Robreno

---

**VOLUME II OF THE APPENDIX (JA038–JA295)**

---

Matthew A. Feldman
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA19106
215-925-2966
mfeldman@pilp.org

*Counsel for Appellant*

January 20, 2023

# APPENDIX TABLE OF CONTENTS

**Volume I**

Notice of Appeal (ECF No. 37):                                    JA001

Order of April 1, 2021 (ECF No. 7):                              JA004

Order of July 21, 2022 (ECF No. 35):                            JA008

Summary Judgment Opinion (ECF No. 34):                      JA009

Judgment (ECF No. 36):                                          JA037

**Volume II**

District Court Docket:                                          JA038

Verified Complaint (ECF No. 2):                                JA043

    Complaint, Ex. B: Declaration/Affidavit
of Dr. Barry Crown (ECF No. 2-1 at 48–51):                     JA051

    Complaint, Ex. B: Affidavit/Declaration
of Dr. Robert Fox (ECF No. 2-1 at 52–58):                      JA055

    Complaint, Ex. C: DOJ Findings Letter,
Feb. 24, 2014 (ECF No. 2-1 at 60–87):                          JA062

Deposition of Roy Lee Williams (ECF No. 24-1):                 JA090

Declaration of Michael Zaken and
accompanying exhibits (ECF No. 24-3):                          JA157

    Ex.1: DOC Policy No. 6.5.8 GRN 01:
Capital Case Administration, March 12, 2018:                   JA160

    Ex. 2: DOC Policy No. 6.5.8:
Capital Case Administration, Aug. 27, 2012:                    JA164

    Ex. 3: DOC Policy No. 13.8.1:
Access to Mental Health Care, March 2, 2015:                   JA182

## APPENDIX TABLE OF CONTENTS – continued

DOC Policy 7.5.1: Administration of Specialized Inmate Housing, Dec. 3, 2019 (ECF No. 24-5): JA206

Declaration of Keri Moore and accompanying exhibits (ECF No. 24-8): JA223

Ex. 1: Grievance # 898857: JA224

Ex. 2: Grievance # 902000: JA235

Ex. 3: Grievance # 916331: JA249

DOC Policy DC-ADM 804: Inmate Grievance System (ECF No. 24-9): JA256

Plaintiff's Affidavit (ECF No. 27 at 4): JA291

Plaintiff's Motion to Supplement and Summary of Psychiatric Records (ECF No. 28): JA292

Query Reports Utilities Help Log Out

RECAP Actions

CLOSED,APPEAL,PSO

# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:21-cv-01248-ER

WILLIAMS v. WETZEL
Assigned to: HONORABLE EDUARDO C. ROBRENO
Case in other court: US COURT OF APPEALS, 22-02399
Cause: 42:1983 Civil Rights Act

Date Filed: 03/11/2021
Date Terminated: 07/21/2022
Jury Demand: Plaintiff
Nature of Suit: 555 Prisoner Petitions: Prison Condition
Jurisdiction: Federal Question

**Plaintiff**

**ROY LEE WILLIAMS**

represented by **ROY LEE WILLIAMS**
CF-4784
SCI-PHOENIX
1200 MOKYCHIC DRIVE
COLLEGEVILLE, PA 19426
PRO SE

V.

**Defendant**

**JOHN E. WETZEL**
*individually, in his official capacity as Secretary, Pa Dept. of Corrections*

represented by **KATHY LE**
OFFICE OF THE ATTORNEY GENERAL
1600 Arch Street
3RD FLOOR
PHILADELPHIA, PA 19103
215-560-2141
Email: le.a.kathy@gmail.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**GEORGE LITTLE**
*THE SECRETARY OF CORRECTIONS*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/11/2021 | 1 | APPLICATION to Proceed in forma pauperis filed by ROY LEE WILLIAMS..(bw, ) (Entered: 03/17/2021) |

| | | |
|---|---|---|
| 03/11/2021 | 2 R | COMPLAINT against JOHN E. WETZEL, filed by ROY LEE WILLIAMS. (Attachments: # 1 R Exhibit, # 2 R Exhibit)(bw, ) (Entered: 03/17/2021) |
| 03/11/2021 | 3 | PRO SE NOTICE RE:GUIDELINES (bw, ) (Entered: 03/17/2021) |
| 03/11/2021 | | DEMAND for Trial by Jury by ROY LEE WILLIAMS. (bw, ) (Entered: 03/17/2021) |
| 03/17/2021 | | PLEADING #3 MAILED TO PRO SE (JL ) (Entered: 03/17/2021) |
| 03/17/2021 | 4 | ORDER THAT WILLIAMS'S MOTION TO PROCEED IN FORMA PAUPERIS IS DENIED WITHOUT PREJUDICE. IF WILLIAMS SEEKS TO PROCEED IN FORMA PAUPERIS HE SHALL WITHIN 30 DAYS OF THE DATE OF THIS ORDER FILE A CERTIFIED COPY OF HIS PRISONER ACCOUNT STATEMENT AS OUTLINED HEREIN. IF WILLIAMS IS ULTIMATELY GRANTED LEAVE TO PROCEED IN FORMA PAUPERIS HE WILL BE OBLIGATED TO PAY THE $350 FILING FEE IN INSTALLMENTS. SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 3/17/21.3/17/21 ENTERED AND COPIES NOT MAILED TO PRO SE. (amas, ) (Entered: 03/17/2021) |
| 03/17/2021 | | COPY OF ORDER 4 MAILED TO PRO SE. (fdc) (Entered: 03/17/2021) |
| 03/29/2021 | 5 | PLAINTIFF ROY LEE WILLIAMS MOTION TO PROCEED IN FOMRA PAUPERIS.(jpd, ) (Entered: 03/30/2021) |
| 03/29/2021 | 6 | Prisoner Trust Fund Account Statement by ROY LEE WILLIAMS. (jpd, ) (Entered: 03/30/2021) |
| 04/01/2021 | 7 | ORDER THAT LEAVE TO PROCEED IN FORMA PAUPERIS IS GRANTED. ROY LEE WILLIAMS SHALL PAY THE FULL FILING FEE OF $350 IN INSTALLMENTS. THE CLERK OF COURT SHALL SEND A COPY OF THIS ORDER TO THE SUPERINTENDENT SCI PHOENIX. THE COMPLAINT IS DEEMED FILED. THE CLERK OF COURT SHALL ISSUE SUMMONS.. SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 4/1/21.4/1/21 ENTERED AND COPIES NOT MAILED TO PRO SE.(mbh, ) (Entered: 04/01/2021) |
| 04/01/2021 | | Summons Issued as to JOHN E. WETZEL. E-mailed to US Marshal on 4/1/21 (mbh, ) (Entered: 04/01/2021) |
| 04/01/2021 | 8 | Status Report on Request for USM 285 Form (amas, ) (Entered: 04/01/2021) |
| 04/07/2021 | 9 | ORDER THAT THE UNITED STATES MAGISTRATE JUDGE ASSIGNED TO THE ABOVE-CAPTIONED CASE IS THE HONORABLE RICHARD A. LLORET; ETC.. SIGNED BY CLERK OF COURT KATE BARKMAN, CLERK OF COURT ON 4/7/21. 4/7/21 ENTERED AND MAILED TO PRO SE.(JL ) (Entered: 04/07/2021) |
| 04/13/2021 | | COPY OF DOC. NOS. 7 AND 9 HAVE BEEN MAILED TO PRO SE, WILLIAMS. (bw, ) (Entered: 04/13/2021) |
| 05/11/2021 | 10 | SUMMONS Returned Executed by ROY LEE WILLIAMS re: US MARSHALS served Summons and Complaint upon JOHN E. WETZEL by PERSONAL. JOHN E. WETZEL served on 5/6/2021, answer due 5/27/2021. (amas, ) (Entered: 05/11/2021) |

| | | |
|---|---|---|
| 06/03/2021 | 11 R | MOTION for Default Judgment against JOHN E. WETZEL filed by ROY LEE WILLIAMS.DECLARATION AND PROOF OF SERVICE. (amas, ) (Entered: 06/03/2021) |
| 06/16/2021 | 12 R | MOTION for Partial Summary Judgment, WITH CERTIFICATE OF SERVICE, filed by ROY LEE WILLIAMS.(amas, ) (Entered: 06/16/2021) |
| 06/22/2021 | 13 | ANSWER to 2 R Complaint by JOHN E. WETZEL.(LE, KATHY) (Entered: 06/22/2021) |
| 06/22/2021 | 14 | NOTICE: A telephone pretrial conference will be held on July 12, 2021 at 10:00 a.m. before the HONORABLE EDUARDO C. ROBRENO. **Kathy Le, Esquire shall make the appropriate arrangements to make available Plaintiff/Pro Se Prisoner, Roy Lee Williams, etc.** Call-in instructions are outlined herein. Copies mailed to Pro Se Plaintiff on June 22, 2021 by Chambers. (nds) (Entered: 06/22/2021) |
| 06/24/2021 | 15 R | MEMORANDUM OF LAW IN SUPPORT OF REQUEST FOR DAMAGES, WITH CERTIFICATE OF SERVICE, FILED BY ROY LEE WILLIAMS. (amas, ) (Entered: 06/24/2021) |
| 07/12/2021 | 16 | Minute Entry for proceedings held before HONORABLE EDUARDO C. ROBRENO Pretrial Conference held on 7/12/21 (amas, ) (Entered: 07/12/2021) |
| 07/15/2021 | 17 | ORDER THAT PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT (DOC. NO. 11 R ) IS DENIED. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 12 R ) IS DENIED WITHOUT PREJUDICE AS PREMATURE. SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 7/12/21.7/15/21 ENTERED AND COPIES NOT MAILED TO PRO SE; E-MAILED.(amas, ) (Entered: 07/15/2021) |
| 07/15/2021 | 18 | FIRST SCHEDULING ORDER THAT ALL ATTORNEYS APPEARING BEFORE JUDGE ROBRENO MUST BE REGISTERED ON ECF. DEFENDANT IS AFFORDED UNTIL 7/22/21, TO FILE AN AMENDED ANSWER. DEFENDANT SHALL PROMPTLY SERVE COPIES OF THE ANSWER AND ANY AMENDED ANSWER TO PLAINTIFF. DEFENDANT IS GRANTED LEAVE TO DEPOSE PLAINTIFF BY 12/13/21. DEFENDANT IS AFFORDED UNTIL 1/10/22, TO FILE ANY MOTIONS FOR SUMMARY JUDGMENT. IF A MOTION FOR SUMMARY JUDGMENT IS FILED, PLAINTIFF HAS UNTIL 3/14/22, TO EITHER FILE A RESPONSE TO THAT MOTION OR TO SUPPLY THE COURT WITH AN AFFIDAVIT. SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 7/12/21. 7/15/21 ENTERED AND COPIES NOT MAILED PRO SE; E-MAILED.(amas, ) (Entered: 07/15/2021) |
| 07/16/2021 | | COPY OF DOC. NOS. 17 AND 18 HAVE BEEN MAILED TO PRO SE, WILLIAMS. (bw, ) (Entered: 07/16/2021) |
| 07/22/2021 | 19 | *First Amended* ANSWER to 2 R Complaint by JOHN E. WETZEL.(LE, KATHY) (Entered: 07/22/2021) |
| 01/06/2022 | 20 | MOTION for Extension of Time to File *Dispositive Motions* filed by JOHN E. WETZEL. Certificate of Service.(LE, KATHY) (Entered: 01/06/2022) |
| 01/07/2022 | 21 R | SECOND SCHEDULING ORDER. ORDER THAT THE FIRST SCHEDULING ORDER 18 IS MODIFIED AS FOLLOWS: ALL ATTORNEYS APPEARING BEFORE JUDGE ROBRENO MUST BE REGISTERED ON ECF. DEFENDANT |

JA040

| | | |
|---|---|---|
| | | IS AFFORDED UNTIL 1/28/22, TO FILE ANY MOTIONS FOR SUMMARY JUDGMENT. IF A MOTION FOR SUMMARY JUDGMENT IS FILED, PLAINTIFF HAS UNTIL 4/4/22, TO EITHER FILE A RESPONSE TO THAT MOTION OR TO SUPPLY THE COURT WITH AN AFFIDAVIT PURSUANT TO FRCP 56(D). SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 1/7/22. 1/7/22 ENTERED & E-MAILED. NOT MAILED TO WILLIAMS. (fdc) (Entered: 01/07/2022) |
| 01/10/2022 | | DOC. #21 MAILED TO PRO SE ROY LEE WILLIAMS (tomg) (Entered: 01/10/2022) |
| 01/25/2022 | 22 | ROY LEE WILLIAMS MOTION FOR JUDGMENT ON THE PLEADINGS, CERTIFICATE OF SERVICE..(JL ) (Entered: 01/25/2022) |
| 02/01/2022 | 23 R | MOTION for Summary Judgment filed by JOHN E. WETZEL.MEMORANDUM, CERTIFICATE OF SERVICE.(LE, KATHY) (Entered: 02/01/2022) |
| 02/01/2022 | 24 R | Statement *of Material Facts in Support of Defendant's Motion for Summary Judgment* by JOHN E. WETZEL. (Attachments: # 1 R Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(LE, KATHY) (Entered: 02/01/2022) |
| 02/16/2022 | 25 R | RESPONSE TO MOVANT'S STATEMENT OF UNDISPUTED FACTS, WITH CERTIFICATE OF SERVICE, FILED BY ROY LEE WILLIAMS. (amas) (Entered: 02/18/2022) |
| 03/02/2022 | 26 | NOTICE OF RECEPTION, WITH CERTIFICATE OF SERVICE, FILED BY ROY LEE WILLIAMS. (amas) (Entered: 03/03/2022) |
| 03/14/2022 | 27 R | Memorandum OF LAW by ROY LEE WILLIAMS. CERTIFICATE OF SERVICE. AFFIDAVIT. (bw) (Entered: 03/16/2022) |
| 04/20/2022 | 28 R | MOTION TO SUPPLEMENT, WITH CERTIFICATE OF SERVICE, FILED BY ROY LEE WILLIAMS.(amas) (Entered: 04/21/2022) |
| 06/28/2022 | 29 | ORDER THAT DEFENDANT SHALL RESPOND TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS BY 7/12/22. DEFENDANT SHALL ALSO FILE A SECOND AMENDED ANSWER BY 7/12/22. THE SIXTH PARAGRAPH OF THE COURT'S 4/1/21 ORDER (DOC. NO. 7 ) IS CLARIFIED AS OUTLINED HEREIN. SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 6/28/22. 6/28/22 ENTERED AND COPIES MAILED TO PRO SE; E-MAILED.(amas) (Entered: 06/29/2022) |
| 07/12/2022 | 30 | *Second Amended* ANSWER to Complaint by JOHN E. WETZEL.(LE, KATHY) (Entered: 07/12/2022) |
| 07/12/2022 | 31 | RESPONSE in Opposition re 22 MOTION for Judgment on the Pleadings filed by JOHN E. WETZEL. (LE, KATHY) (Entered: 07/13/2022) |
| 07/14/2022 | 32 | ORDER THAT PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. NO. 22 ) IS DENIED. SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 7/14/22.7/14/22 ENTERED AND COPIES MAILED TO PRO SE; E-MAILED.(amas) (Entered: 07/14/2022) |
| 07/20/2022 | 33 | ORDER THAT THE CLERK SHALL UPDATE THE DOCKET OF THIS MATTER AND INCLUDE GEORGE LITTLE, THE SECRETARY OF CORRECTIONS, AS A DEFENDANT. SIGNED BY HONORABLE EDUARDO |

| | | |
|---|---|---|
| | | C. ROBRENO ON 7/20/22. 7/20/22 ENTERED AND COPIES E-MAILED, NOT MAILED TO PRO SE.(bw) (Entered: 07/20/2022) |
| 07/21/2022 | | Order #33 mailed to Williams. (fdc) (Entered: 07/21/2022) |
| 07/21/2022 | 34 R | MEMORANDUM AND/OR OPINION SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 7/21/22. 7/21/22 ENTERED AND COPIES E-MAILED, NOT MAILED TO PRO SE.(bw) (Entered: 07/21/2022) |
| 07/21/2022 | 35 R | ORDER THAT THE DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND THE RESPONSE THERETO, IT IS HEREBY ORDERED AS FOLLOWS: PLAINTIFFS MOTION TO SUPPLEMENT THE RECORD [ECF NO. 28] IS GRANTED AS UNOPPOSED; DEFENDANTS MOTION FOR SUMMARY JUDGMENT [ECF NO. 23] IS GRANTED FOR THE REASONS STATED IN THE ACCOMPANYING MEMORANDUM. SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 7/21/22. 7/21/22 ENTERED AND COPIES E-MAILED, NOT MAILED TO PRO SE.(bw) (Entered: 07/21/2022) |
| 07/21/2022 | 36 R | JUDGMENT ORDER in favor of GEORGE LITTLE, JOHN E. WETZEL against ROY LEE WILLIAMS SIGNED BY HONORABLE EDUARDO C. ROBRENO ON 7/21/22. 7/21/22 ENTERED AND COPIES E-MAILED, NOT MAILED TO PRO SE.(bw) (Entered: 07/21/2022) |
| 07/22/2022 | | DOCS 34, 35, 36 MAILED TO PRO SE (rf, ) (Entered: 07/22/2022) |
| 07/27/2022 | 37 | NOTICE OF APPEAL as to 36 R Order (Memorandum and/or Opinion), Judgment by ROY LEE WILLIAMS. IFP GRANTED. Copies to Judge, Clerk USCA, Appeals Clerk.(amas) (Entered: 08/01/2022) |
| 08/01/2022 | 38 | NOTICE of Docketing Record on Appeal from USCA re 37 Notice of Appeal filed by ROY LEE WILLIAMS. USCA Case Number 22-2399 (amas) (Entered: 08/02/2022) |
| 08/17/2022 | 39 | USCA ORDER AS TO 37 NOTICE OF APPEAL, FILED BY ROY LEE WILLIAMS, THAT THE MOTION TO PROCEED IN FORMA PAUPERIS IS GRANTED. APPELLANT IS A PRISONER AND SEEKS TO PROCEED IN FORMA PAUPERIS ON APPEAL. APPELLANT IS REQUIRED TO PAY THE FULL $505.00 FEE IN INSTALLMENTS REGARDLESS OF THE OUTCOME OF THE APPEAL, ETC. (amas) (Entered: 08/17/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 01/06/2023 16:03:47 | | | |
| **PACER Login:** | PilpPacer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-01248-ER |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

IN THE
UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

**Roy Lee Williams**, *Plaintiff*,
S.C.I. Phoenix, #CF4784
1200 Mokychic Drive
Collegeville, PA 19426

*versus*

**John E. Wetzel**, *Defendant*,
individually, in his official capacity as
Secretary, Pa. Dept. of Corrections,
1920 Technology Parkway
Mechanicsburg, PA 17050

CIVIL ACTION

No. ____________________

Jury Trial Demanded

# Verified Complaint

This jury-demand action challenges the policies and practices of the Commonwealth of Pennsylvania that held a mentally and intellectually disabled death-condemend prisoner in permanent, degrading, and inhumane solitary confinement without rationale for 27 years.

## Preliminary Statement

1. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of service, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

2. Title II extends to all the prison's services, programs, and activities, including classification, housing, recreation, and medical and mental health treatment, among

others, for which prisoners are otherwise qualified. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10, 213 (1998) (finding, without exception, that Title II "unmistakably includes State prisons and prisoners within its coverage").

3. Both serious mental illness and intellectual disabilities ("SMI/ID") qualify as disabilities under the ADA. 42 U.S.C. § 12102 (including "mental" impairments under definition of "disability" where they substantially limit major life activities).

4. Plaintiff is a individual certified with SMI/ID; after an involuntary 304 admission to Philadelphia Psychiatric Center when Plaintiff was 14 years old, he was diagnosed with significant depression and suicidal ideation. *See* Philadelphia Psychiatric Center's Hospital Records, 4/19/1979 (attached as ex. A pursuant to Fed.R.E. 803).

5. In September 1996, after two clinicial examinations Plaintiff was diagnosed with depression, suicidal ideation, paranoia, lack of insight, problems with self-expression, difficulties with abstract thinking, information-processing deficits, emotional lability, impulse-control problems, and an assessment that placement in a structured, supportive environment and with consistent and intensive psychotherapy. *See* Declaration of Dr. Robert A. Fox, 9/24/96; Declaration of Dr. Barry Crown 9/20/96 (both attached as ex. B pursuant to Fed.R.E. 803).

6. The regulation implementing Title II of the ADA requires public entities to "administer services, programs, and acitivites in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.13(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); *See also Olmstead v. L.C.*, 527 U.S. 581, 592, 597 (1999) ("Unjustified isolation, we hold, is

properly regarded as discrimination on the basis of disability.").

7. Under the ADA, a prison must "take certain proactive measures to avoid discrimination." *Chisolm v. McManimon,* 275 F.3d 315, 324-26 (3d Cir. 2001), and the prison is required to reasonably modify its policies, practices, and procedures when necessary, as here, to avoid discrimination against prisoners with SMI/ID. 28 C.F.R. § 35.130(b)(7). Thus, prisoners with active death-sentences with SMI/ID cannot be automatically placed in indefinite solitary confinement without showing that it is necessary to make an exception. *See id.* § (b)(3)(I)(iii); *Investigation of the Pa. Dep't of Corr. Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities,* US Department of Justice Civil Rights Division Report, 2/24/14 ("DOJ Report" attached as ex. C pursuant to Fed.R.E. 803).

8. Solitary confinement of death-sentenced prisoners with SMI/ID violates internationally recognized human rights law. The United States is party to international treaties bearing on prolonged solitary confinement. The United States has ratified the International Covenant on Civil and Political Rights (ICCPR) (1992) and the Convention Against Torture and Other Cruel, Inhuman, or Degrading Punishment (CAT) (1994), both of which prohibit torture and other cruel, inhuman, or degrading treatment or punishment.

9. In a 2011 report to the General Assembly, the United Nations Special Rapporteur on torture, Juan Mendez, wrote: "No prisoner, including those serving life and prisoners on death row, shall be held in solitary confinement merely because of the gravity of the crime." *See* Juan E. Mendez's Expert Report in *Shoatz v. Wetzel*, No. 2:13-cv-00657-CRE, 7/15/15 (attached as ex. D pursuant to Fed.R.E. 803).

10. Additionally, in 2015, the U.N. General Assembly adopted the U.N. Standard Minimum Rules for the Treatment of Prisoners, known as the "Nelson Mandela Rules." The Rules specifically disallow the use of solitary confinement when, as here, it would exacerbate a prisoner's pre-existing mental or physical disabilities. *Id.* R. 45 at 14. *See* Declaration of Craig Haney, PH.D, J.D. in *Reid v. Wetzel,* 1:18-cv-00176-JEJ, 3/29/18 at ¶¶ 77-83 (noting "the exacerbation of mental illness that occurs in isolated confinement comes about as a result of the critically important role that social contact and social interaction play in maintaining psychological equilibrium.") (attached as ex. E pursuant to Fed.R.E. 803).

11. In its Periodic Report to the U.N. Committee Against Torture, the United States confirmed that persons with a "serious mental illness" cannot be held in solitary confinement because it violates the Eighth Amendment's prohibition on cruel and unusual punishment. It further confirmed that subjecting a prisoner to solitary confinement without an administrative hearing is a violation of the Fourteenth Amendment's guarantee of due process. Periodic Report of the United States of America, Art. 16 ¶ 209, 8/12/13 (available at www.state.gov/j/drl/rls/213055.htm.)

**Jurisdiction and Venue**

12. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act, and the Eighth and Fourteenth Amendments to the United States Constitution.

13. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

14. Venue is proper under 28 U.S.C. § 1391(b) because this district is where the events giving rise to the claims herein occured.

## Parties

15. Plaintiff Roy Lee Williams is a 56-year-old mentally and intellectually disabled prisoner who has spent the past 27 years in solitary confinement.

16. Defendant John E. Wetzel is the Secretary of Corrections for the Pennsylvania Department of Corrections. In this capacity, Defendant Wetzel is responsible for the overall management and operation of the entire adult corrections system in the Commonwealth and for protecting the constitutional rights of all individuals in the custody of the DOC including death-sentenced prisoners with SMI/ID. Defendant Wetzel authorized and condoned the unconstitutional policy of housing all SMI/ID death-sentenced prisoners in solitary confinement indefinitely, as described herein.

17. At all times relevant, Defendant Wetzel was acting under color of state law and as an official representative of the DOC. Wetzel is sued in his official and individual capacities for compensatory and punitive relief.

## First Cause of Action

Violation of U.S. Constitution, Amendments XIII and XIV

18. Plaintiff brings this claim on his own behalf against the defendant.

19. The manner in which the DOC used solitary confinement violated his rights under the Eighth Amendment's prohibition against punishments that are "cruel and unusual." There is no static test for determining whether conditions are "cruel and unusual." Instead, the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

20. The DOJ found that subjecting prisoners with SMI/ID to prolonged periods of

solitary confinement under harsh conditions that are not necessary for legitimate security-related reasons, the DOC exposes them to an excessive and obvious risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 828; *Hope v. Pelzer*, 536 U.S. 730, 738-745 (2002) (holding that prison officials show deliberate indifference where they disregard obvious risks to prisoner safety). DOJ Report at 6-14.

21. Moreover, the DOJ's expert consultants observed that, as a direct result of these practices, prisoners with SMI have suffered serious psychological and physical harms, including psychosis, trauma, severe depression, serious self-injury, and suicide. *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) ("The touchstone is the health of the inmate. While the prison administration may punish, it must not do so in a manner that threatens the physical safety and mental health of prisoners.")

22. Additionally, an actual controversy exists regarding the constitutionality of Defendant's practices and policies regarding Plaintiff's automatic placement in indefinite solitary confinement. A Jury Demand on this issue will guide that portion of the controversy between the parties.

**Second Cause of Action**

Violations of 42 U.S.C. §§ 12131 and 12143 (Title II of the Americans with Disabilities Act) and the Fourteenth Amendment to the United States Constitution

23. Plaintiff brings this claim on his own behalf, against the Defendant.

24. Here, the way in which the DOC used solitary confinement on Plaintiff violated Title II of the ADA in a variety of ways. *See* 42 U.S.C. § 12132. The DOC unjustifiably denied the Plaintiff the opportunity to participate in and benefit from correctional services and activities, such as classification, security, housing, and mental health services. *See* 28 C.F.R. § 35.130(b)(1)(i)-(iv).

25. Here, the DOC unlawfully placed plaintiff in solitary confinement, without either individually assessing the risk he may actually and objectively pose for others. 28 C.F.R. §§ 25.130(d); 35.139, or otherwise justifying the need for isolations, *id.* §§ 35.130(b)(8), (h).

26. Here, the DOC also failed to reasonably modify policies, practices, and procedures necessary for the DOC to avoid discrimination on the basis of disability. *Id.* § 35.130(b)(7). *See* DOJ Report at 17-22.

27. Additionally, an actual controversy exists regarding the constitutionality of Defendant's practices and policies regarding the Plaintiff's automatic placement in indefinite solitary confinement. A Jury Demand on this issue will guide that portion of the controversy between the parties.

28. The Plaintiff hereby verifies, subject to penalties under 28 U.S.C. § 1746 that the foregoing facts are true to the best of his knowledge, information, and belief.

WHEREFORE, Plaintiff prays for nominal, compensatory, and punitive damages against the Defendant, attorney fees and costs, and any other relief the Court deems proper and just.

Respectfully submitted,

R. L. Williams 3/10/2021

Roy Lee Williams, #CF-4784
SCI Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

Date

PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL

neopost
03/10/2021
US POSTAGE $009.05⁰
PRIORITY MAIL
ZIP 19426
041M12252211

ROY LEE WILLIAMS
S.C.I. Phoenix, #CF4784
1200 Mokychic Drive
Collegeville, PA 19426

U.S.M.S.
X-RAY

KATE BARKMAN, Clerk
Federal Courthouse,
601 Market Street
Philadelphia, PA 19106-1797

UNITED STATES POSTAL SERVICE®
NEOPOST™
USPS TRACKING #
9488 8178 9820 3207 3007 84
Label 888-NP, Nov. 2014

PRIORITY MAIL
TRACKED
INSURED
UNITED STATES POSTAL SERVICE®
For Domestic and International Use
Label 107R, May 2014

DECLARATION/AFFIDAVIT OF DR. BARRY CROWN PURSUANT TO 28 U.S.C. § 1746 AND 18 Pa.C.S. § 4904

Dr. Barry Crown, pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904, swears, affirms and deposes that the following is true and correct:

1. My name is Barry Crown. I am a licensed and certified psychologist and neuropsychologist. I have extensive forensic experience. I have been qualified as an expert witness in psychology and neuropsychology on numerous occasions in state and federal court. I have testified as such in both civil and criminal matters, including capital cases. In criminal matters I have testified for both the prosecution and defense. I am familiar with the mitigating circumstances in the Pennsylvania capital sentencing statute. All opinions expressed in this affidavit are stated to a reasonable degree of certainty.

2. I conducted a clinical examination and tested Roy Williams. I note that the tests I administered to Mr. Williams were available prior to and at the time of the proceedings resulting in his conviction and death sentence. In addition to the clinical interview and testing, I reviewed numerous records regarding Mr. Williams, his background and the capital trial and sentencing proceedings.

3. Roy Williams suffers from organic brain damage. His cerebral dysfunction has severely impaired his mental state and functioning throughout his life. His impairments adversely affected him prior to the offense and at the time of the offense, and continue to affect him today. His impairments are reflected in his performance on testing.

4. Intelligence testing of Mr. Williams is consistent with his brain damage. For example, Mr. Williams had significant deficits in several subtests of the Wechsler intelligence testing and this testing showed overall deficits consistent with his brain damage.

Neuropsychological testing of Mr. Williams demonstrates that he suffers from brain damage with serious left-hemisphere deficiencies. I administered numerous neuropsychological testing instruments to Mr. Williams. They were consistent in demonstrating impairments and deficiencies consistent with his brain damage. My testing and evaluation of Mr. Williams, and his history, also demonstrate that he has suffered and continues to suffer from significant psychological impairments.

5. Mr. Williams' cerebral dysfunction/brain damage and psychological impairments are consistent with his history of childhood trauma. Mr. Williams' childhood history includes serious abuse (including beatings), neglect, consistent put-downs and rejection, an inability to function and an inability to reason. Mr. Williams' history highlights his left-hemisphere dysfunction and inability to comprehend, reason and function. Mr. Williams' history is also consistent with emotional problems resulting from his traumatic childhood and brain damage.

6. Mr. Williams was involuntarily committed due to his mental health difficulties while he was still a youngster. Records from that involuntary commitment and other contacts with mental health professionals preceding the offense are consistent with Mr. Williams' brain damage and psychological impairments, and show that he suffered from these impairments from an early age. The records also describe some of the abuse and rejection that Mr. Williams suffered as a child. The records describe a seriously disturbed and impaired youngster. These records clearly show that a forensic mental health evaluation was necessary during the capital proceedings.

7. Mr. Williams is a mentally impaired and deficient individual and was so prior to and at the time of the offense. Due to his neuropsychological dysfunction, he lacks language

skills, reasoning capacity and the ability to think rationally. He suffered and suffers from emotional lability, impaired judgment, impaired impulse control and impaired cognition, and is deficient in several areas of functioning. Due to his psychological and neuropsychological deficiencies, Mr. Williams can be easily lead and manipulated by others. He is easily confused due to his mental health problems. Mr. Williams, like other brain damaged individuals, does better in a structured environment, as is reflected in records about Mr. Williams predating the offense. Regrettably, he did not have a structured, or even stable, environment during much of his life, further complicating his mental health deficiencies.

8. Mr. Williams' neuropsychological and psychological deficiencies, including his emotional problems and cognitive dysfunction, provided several mitigating factors which could have been presented at the capital trial, as does his history of childhood mistreatment. The history and mental health factors outlined in this affidavit also provide defenses which could have been presented at the guilt or innocence phase of the trial. For example, Mr. Williams' brain damage and other mental health problems demonstrate that he suffered from a diminished capacity, as a defense at the guilt or innocence phase. Mr. Williams' brain damage, mental health impairments and cognitive impairments, and the effects of his childhood mistreatment, significantly diminish his capacity to premeditate and form a specific intent to kill.

9. In addition to the mental health mitigation discussed in the above paragraphs, Mr. Williams' brain damage and other deficiencies establish that at the time of the offense he suffered from a substantially impaired capacity to appreciate the criminality of conduct and conform conduct to the requirements of law, and suffered from extreme mental and emotional disturbances. In addition, Mr. Williams' deficits are such that he functions at a level much below

his chronological age, thus making his mental/functional age a mitigating consideration in this case.

10. I hereby certify that the statements set forth above are true and correct to the best of my personal knowledge, information and belief, pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904.

BARRY CROWN, Ph.D.

Dated: 9/20/96

**AFFIDAVIT/DECLARATION OF DR. ROBERT A. FOX PURSUANT TO 28 U.S.C. § 1746 AND 18 Pa.C.S. § 4904**

Robert A. Fox, M.D., pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904, swears, affirms and deposes that the following is true and correct:

My name is Robert A. Fox. I am a medical doctor and a psychiatrist. I am a Diplomate of the National Board of Medical Examiners and the American Board of Psychiatry and Neurology, and a member of several medical and mental health professional organizations. I have extensive experience in forensic psychiatry, and have served as an expert in numerous cases involving forensic issues in the state and federal courts. I am familiar with the mitigating circumstances in Pennsylvania capital cases.

2. I have reviewed numerous materials about Roy Williams, his history and his case, and I have met with and evaluated Mr. Williams. The opinions given in this affidavit are given to a reasonable degree of certainty.

3. Roy Williams is, and was at the time of the offense, severely psychologically, cognitively and emotionally impaired.

4. It is generally accepted among mental health professionals that mental illness is correlated with both genetic and environmental factors. In Mr. Williams' case, both types of predictors for mental illness are present -- there is a history of mental illness in Mr. Williams family, and he has been subjected to the type of environment that is likely to result in mental illness.

5. From his earliest infancy, Roy's home life was marked by extraordinary violence from Roy's father. The father's violence was directed against both Roy and his mother, and was

extreme as the father was a very large man and was a heavyweight boxer. The adverse mental health effects of being subjected to such a violent home environment both as the target of the violence and as a witness to the violence have been well known to mental health professionals for many years. The abused child develops deficits in his self-image and in his relationships with others and the world. These deficits include low self-esteem; depression; feelings of guilt for failing to protect others (e.g., his mother) from the violence; feelings of anger because others failed to protect him; difficulties in understanding cause and effect; paranoia; fear and distrust of others and their motives; a tendency to misinterpret and misunderstand others and the environment and to attribute malevolence and danger to benign actions or events; hypersensitivity to signs of danger. These traits begin as coping mechanisms in the violent home, but develop into ingrained psychological and emotional impairments. That Roy suffered and suffers such impairments is clear from the accounts of those who knew him in his youth, from the mental health records describing his interactions with mental health professionals and from my evaluation of him.

6. When Roy and his mother fled from the father's violence, and were staying with Roy's grandmother, another traumatic event occurred in Roy's life -- his grandmother fell down a flight of stairs and died, cutting her throat when a glass she was carrying shattered. Roy's experiencing this sudden, violent and bloody death of a loved one is the type of stressor that produces post-traumatic stress disorder ("PTSD"). The symptoms of PTSD in children often overlap with and are similar to the adverse effects of the type of trauma and violence Roy witnessed and suffered from his father, as described above.

7. After the traumatic death of Roy's grandmother, the environmental attacks on

Roy's mental health continued when Roy moved with his mother into a hostile and racially [illegible] oppressive neighborhood. Roy's experience of living in [illegible] environment can be compared to the experience of a soldier living in a war zone — the child never feels safe and is subject to danger and attack at any time. People in stressful situations often cope with the experience by relying upon and bonding with their fellows-in-arms. Roy, however, saw himself as alone in a hostile world. The effects of such an environment on a child like Roy, who was already vulnerable because of his other experiences and deficits, are traumatic. Living in this hostile neighborhood could only enhance Roy's mental problems, by magnifying and reinforcing the deficits created by the violent, abusive childhood -- e.g., insecurity and lack of self esteem; paranoia and suspicion of others; hypersensitivity to signs of aggression or violence from others; misinterpreting ambiguous or benign environmental cues as signs of danger.

8. A constant and harmful theme running through Mr. Williams' life is the extreme, unrelenting and irrational rejection by his father. The father's rejection of Roy goes beyond all reason, and suggests, along with other evidence, that the father himself suffered from mental illness. This type of extreme parental rejection was another adverse influence on Roy's development, especially when coupled with the rejection and isolation from Roy's childhood peers and all of Roy's other psychological and emotional problems. The father's rejection, absence and criminal and violent behavior also deprived Roy of a positive male role model.

9. It is clear -- and not surprising, given his traumatic life history -- that Roy Williams suffered from severe psychological and emotional problems from a very early age. He was involuntarily committed to a mental hospital at age fourteen, and records indicate that he was suffering from mental health problems for some years before that. The records from Roy's

Case: 22-2399 Document: 19 Page: 23 Date Filed: 01/20/2023

involuntary hospitalizations and other mental health records from Roy's youth show that Roy has been significantly psychologically and emotionally impaired since (and before) the offense. Prominent in the records are the lack of appropriate role models, social isolation, low self-esteem, racial and gender identity problems, depression, suicidal ideation, paranoia, lack of insight, problems with self-expression, difficulties with abstract thinking, information processing deficits, emotional lability and impulse control problems. These records document Mr Williams' mental illness.

10. The records also indicate that Mr. Williams does significantly better when he is placed in a structured, supportive environment and is given intensive psychiatric treatment. It is clear that Roy needed consistent and intensive psychotherapy. Unfortunately, he was not allowed to remain in the hospital, and did not receive the intensive psychotherapy (including medication) that he desperately needed.

11. Mr. Williams' mental illness was exacerbated by his mother's behavior toward him. Roy's mother clearly did not know how to cope with her son's serious mental problems. She was inconsistent in the way she treated Roy; she was resistant to family counseling, which Roy needed; she was slow to seek help for Roy when he needed it, she removed Roy from the supportive and therapeutic environment he needed, against the advice of the mental health professionals who were treating Roy All of these actions were damaging to a boy who was seriously mentally ill. Roy needed consistent and intensive psychiatric care.

12. The mother's use of severe physical punishment -- administered by men, including Roy's violent, disturbed father -- was also very unfortunate and harmful to Roy's mental health. Violent discipline is not an effective way to deal with mental illness. To the contrary, it is quite

[illegible] harmful and traumatic to the mentally ill individual. Roy's behavior is shaped by his mental illness and therefore was often beyond his control and was frightening and confusing to him. Being violently punished for that behavior just added to Roy's confusion, fear and depression, and made him more paranoid and distrustful of others. That this violent punishment was inflicted at his mother's request and by his father -- a man who otherwise ignored and rejected Roy and whose extreme violence Roy's mother feared -- could only intensify its debilitating effects.

13. Mr. Williams' background is highly significant from a mental health viewpoint. The violence, neglect and complete rejection from Roy's father; the traumatic death of Roy's grandmother; Roy's confusion about his racial identity; the neighborhood rejection, isolation and terror; the ambivalence and inconsistent parenting from Roy's mother; the lack of positive role models in Roy's life; the violent punishments to which Roy was subjected when he was in need of sustained and intense mental health treatment, the history of mental illness in Roy's family; the gunshot wound that Roy suffered less than a year before the offense -- are all psychologically significant. This background and Mr. Williams' mental health impairments had a profound and damaging impact upon his development and provide significant mental health mitigation.

14 Mr. Williams' history -- including the father's violence toward Roy's mother when she was pregnant with Roy, the father's continuing violence after Roy was born, the violent punishment's inflicted on Roy in a misguided attempt to deal with his mental illness, and Roy's youthful boxing injuries -- is also replete with the kind of prenatal and childhood trauma that may give rise to organic brain damage. The mental health records from Roy's youth are consistent with his suffering from brain damage at least by the time that he was fourteen years old. Given Mr. Williams' history, an appropriate mental health evaluation should include testing for brain

Case: 22-2399 Document: 19 Page: 26 Date Filed: 01/20/2023

damages. The history and records clearly show that there was a need for such [illegible] of trial and sentencing.

15. Dr. Barry Crown, a psychologist and neuropsychologist, has performed such testing. Dr. Crown's testing of Mr. Williams shows that Mr. Williams does suffer from organic brain damage. Brain damage such as that suffered by Mr. Williams creates many serious and debilitating cognitive and psychological impairments, as are described in Dr. Crown's affidavit. Because of his brain damage, Mr. Williams suffers from a lack of language skills; he has an impaired capacity for reasoning; he us unable to think rationally; he is emotionally labile; his judgment and impulse control are impaired; he is easily led and manipulated by others; he is easily confused. From his history, it is clear that he suffered from all of these deficits at the time of the offense.

16. Mr. Williams' impairments are, and were at the time of the offense, extreme mental and emotional disturbances. They substantially impaired his capacity to appreciate the consequences of conduct or to conform conduct to the requirements of law. They provide other substantial mental health mitigation. Moreover, Mr. Williams' brain damage, mental health impairments and cognitive impairments, significantly diminish his capacity to premeditate and form a specific intent to kill.

17. The mental health information discussed herein could have been developed and presented at the time of Mr. Williams' trial and sentencing. Any competent mental health professional would recognize that Mr. Williams' background presents significant indicia of mental illness and organic brain dysfunction, and calls for a complete evaluation of Mr. Williams' mental health.



I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. § [illegible]

ROBERT A. FOX, M.D

Dated: 9/24/96



**U.S. Department of Justice**

Civil Rights Division

*Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington, DC 20530*

FEB 24 2014

The Honorable Tom Corbett
Governor's Office
225 Main Capitol Building
Harrisburg, PA 17120

Re: Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities

Dear Governor Corbett:

The Civil Rights Division has completed its investigation of the Pennsylvania Department of Corrections' ("PDOC") use of solitary confinement on prisoners with serious mental illness ("SMI") and intellectual disabilities ("ID"). The investigation was conducted pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. CRIPA authorizes the Department of Justice to seek equitable relief where conditions in state correctional facilities violate the rights of prisoners protected by the Constitution or laws of the United States.

We opened this systemwide investigation after having found that one of Pennsylvania's prisons—the State Correctional Institution at Cresson—routinely subjected prisoners with SMI/ID[1] to solitary confinement under conditions that violated their constitutional rights and their rights under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C §§ 12131-12134. We notified you of both our findings concerning Cresson and our decision to conduct a systemwide investigation in a letter dated May 31, 2013 ("Cresson Findings Letter"). *See* www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf.

Our systemwide investigation found that the Commonwealth uses solitary confinement in ways that violate the rights of prisoners with SMI/ID. However, it is important to note that in the months since we issued our Cresson Findings Letter, the overall number of prisoners with SMI/ID that PDOC subjects to solitary confinement has gone down. Moreover, PDOC's leadership has been developing new policies that, if adopted and implemented, would further reduce the number of prisoners with SMI/ID in solitary and improve mental health services for prisoners with SMI. Nonetheless, much more needs to be done. Throughout the PDOC system, hundreds of prisoners with SMI/ID remain in solitary confinement for months and sometimes

[1] We use the shorthand "SMI/ID" in this letter, but note that, while there is some overlap, most prisoners with SMI do not have ID and vice versa.

years, with devastating consequences to their mental health, in violation of their rights under the Eighth Amendment and the ADA.

In our review, we looked at the totality of the conditions confronting prisoners in solitary and the presence or absence of mechanisms to mitigate harms arising from those conditions. To reach our investigative findings, it was necessary to assess the conditions in which prisoners were held, the practices of PDOC, the duration of confinement, the decisions made relating to security reasons and penological concerns, the available programs and services, and the precise harms found by our expert-consultants. We concluded that these conditions collectively violated the constitutional and statutory rights of prisoners with serious mental illness and intellectual disabilities.[2]

Throughout our investigation, Secretary John Wetzel and his staff have provided us with exceptional cooperation. We look forward to collaborating with them in the coming months to fashion an agreement between the United States and the Commonwealth that effectively addresses our shared concerns.

## I. SUMMARY OF FINDINGS

PDOC has begun reforming the way in which it uses solitary confinement on prisoners with SMI/ID. In recent months, PDOC has implemented new procedures for the disciplinary process. It has also implemented new protocols for the treatment of prisoners with SMI in certain specialized housing units. These reforms have led to a reduction in the number of prisoners with SMI subjected to solitary confinement. Moreover, PDOC is in the process of drafting policies geared toward further reducing the number of prisoners with SMI/ID housed in isolation units and improving mental health care for prisoners with SMI. While the Commonwealth has made important improvements, much more work needs to be done to ensure sustained compliance with the mandates of the Constitution and the ADA. Below we summarize our factual determinations and our ongoing concerns:

- **The manner in which PDOC subjects prisoners with SMI to prolonged periods of solitary confinement involves conditions that are often unjustifiably harsh and in which these prisoners routinely have difficulty obtaining adequate mental health care:** In the one-year period between May 2012 and May 2013, PDOC confined more than 1,000 prisoners on its active mental health roster in solitary confinement for more than 90 days.[3] Nearly 250 of those prisoners were in solitary for more than a year. There are still roughly 115 prisoners PDOC identifies as having SMI who are in solitary. Our expert-consultants have concluded that the 115 number grossly understates the number of prisoners with SMI currently subjected to solitary confinement, estimating that there are hundreds more.[4] The

[2] In making these findings, the Department of Justice does not intend to suggest that every use of solitary confinement on persons with SMI/ID is a *per se* violation of the Eighth Amendment or the ADA.

[3] PDOC separates its active mental health roster into two categories: (1) those prisoners designated as having "the most serious need for mental health services;" and (2) those designated as having a "present mental health need."

[4] PDOC has newly revised its active mental health roster. It designates only those in the first category as having SMI. However, after reviewing medical records and interviewing prisoners, we and our expert-consultants in mental health have concluded that a very significant number of the prisoners currently designated as not having SMI

conditions that prisoners with SMI face while in solitary confinement are harsh. They are routinely confined to their cells for 23 hours a day; denied adequate mental health care; and subjected to punitive behavior modification plans, forced idleness and loneliness, unsettling noise and stench, harassment by correctional officers, and the excessive use of full-body restraints.

- **The manner in which PDOC uses solitary confinement on prisoners with SMI results in serious harm:** PDOC uses isolation on prisoners with SMI in a way that exacerbates their mental illness and leads to serious psychological and physiological harms. Indeed, our expert-consultants interviewed and reviewed the records of more than two dozen prisoners whom they concluded were seriously harmed by solitary confinement in various ways, including severe mental deterioration, psychotic decompensation, and acts of self-harm. For instance, even though only a small fraction of the prisoners at the prisons we toured were housed in solitary confinement units, most of the suicide attempts occurred in those units. Specifically, more than 70% of the documented suicide attempts between January 1, 2012 and May 31, 2013 occurred in the solitary confinement units.

- **Numerous systemic deficiencies contribute to PDOC's extensive use of solitary confinement on prisoners with SMI:** PDOC routinely resorts to using prolonged solitary confinement on those with SMI primarily because systemic deficiencies interfere with its ability to provide adequate mental health treatment. When we initiated our investigation in May, prisoners with SMI were placed in solitary confinement at twice the rate of prisoners without SMI. Too often, instead of providing appropriate mental health care, PDOC's response to mental illness is to warehouse vulnerable prisoners in solitary confinement cells.

- **The manner in which PDOC uses solitary confinement also harms prisoners with ID:** PDOC uses solitary confinement on a significant number of prisoners with ID, as defined below. Prisoners with ID are especially susceptible to the harmful effects of PDOC's use of solitary confinement. They have limited coping mechanisms and their mental health is prone to deteriorating when subjected to the stressors present in PDOC's solitary confinement units. We believe PDOC is not adequately addressing such concerns.

- **The manner in which PDOC uses solitary confinement often discriminates against prisoners with SMI/ID:** PDOC often unnecessarily and inappropriately places prisoners in solitary confinement because they have SMI/ID. Isolating prisoners on the basis of their SMI/ID without adequate justification constitutes impermissible discrimination and unjustifiably denies them access to services and programs provided to most other prisoners. PDOC has failed to make reasonable modifications to its policies, procedures, and practices to meet the needs of prisoners with SMI/ID in the most integrated setting appropriate to their needs and consistent with legitimate safety requirements. Instead, it has routinely elected to segregate these prisoners unnecessarily in its solitary confinement units.

PDOC's solitary confinement practices violate the Eighth Amendment's prohibition against "cruel and unusual punishments." Embodying "broad and idealistic concepts of dignity,

---

and thus are assigned to PDOC's second category indeed have SMI. We also identified other prisoners with SMI who are left off PDOC's active mental health roster entirely.

civilized standards, humanity, and decency," *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), the Amendment prohibits officials from disregarding conditions of confinement that subject prisoners to an excessive risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 843 (1994). PDOC's use of a harsh form of solitary confinement for extended periods of time on hundreds of prisoners with SMI/ID constitutes precisely the type of indifference to excessive risk of harm the Eighth Amendment prohibits.

The practices described in this letter also violate the ADA. The ADA prohibits prisons from discriminating against prisoners with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). It generally obligates prisons to provide qualified prisoners with disabilities the opportunity to participate in and benefit from prison services, programs, and activities, and, absent legitimate justification, to do so in the most integrated setting appropriate to individual prisoners with disabilities. *See* 28 C.F.R. §§ 35.130(a), (d), 35.150, 35.152; *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Chisolm v. McManimon*, 275 F.3d 315, 324-25 (3d Cir. 2001). PDOC uses solitary confinement in a way that is at odds with these requirements.

## II. METHODOLOGY, DEFINITIONS, AND BACKGROUND

### A. Methodology

In August 2013, we conducted on-site inspections of six PDOC prisons.[5] We conducted the tours with the assistance of two expert-consultants in mental health treatment, suicide prevention, and the effects of solitary confinement. We interviewed PDOC leadership, administrative staff members, security staff members, medical and mental health staff members, and prisoners. We reviewed documents related to the use of solitary confinement at all 26 of the Commonwealth's prisons before, during, and after our site visits. These include policies and procedures, medical and mental health records, cell histories, incident reports, disciplinary reports, suicide reviews, and unit logs. We also observed prisoners in various settings throughout the facilities. Consistent with our commitment to providing technical assistance and conducting a transparent investigation, we conducted exit conferences after each of our on-site inspections.

### B. Definitions

Terms we use throughout this letter are defined as follows:

- **"Isolation" or "solitary confinement"** means the state of being confined to one's cell for approximately 23 hours per day or more.
- "**Solitary confinement unit**" or "**isolation unit**" means a unit where either all or most of those housed in the unit are subjected to solitary confinement.
- **"Serious mental illness"** or "SMI" means "a substantial disorder of thought or mood that significantly impairs judgment, behavior, [or] capacity to recognize reality or cope with the ordinary demands of life." Pa. Dep't of Corr., *Access to Mental Health Care,*

[5] One of the prisons we toured—SCI Greene—is the facility using solitary confinement on the greatest number of prisoners by far. We also toured SCI-Fayette, SCI-Smithfield, SCI-Rockview, SCI-Muncy, and SCI-Dallas.

*Policy 13.8.1., Section 2-Delivery of Mental Health Services* § A.1.a.(2) (2013) (we note that for this letter we have adopted PDOC's own definition of SMI).

- **"Intellectual disability" or "ID"** means a disability characterized by both a significant impairment in cognitive functioning, and deficits in adaptive functioning, such as communication, reasoning, social skills, personal care, and organizing school or work tasks. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013). An intellectual disability begins before the age of 22 and is chronic. As a substantial number of inmates may have some lesser form of ID, for the purposes of this letter, ID will refer to having a highly significant impairment of functioning, generally indicated by an IQ score of 70 or below, that would be adversely impacted by prolonged placement in a solitary confinement unit.

## C. Background

PDOC operates 26 facilities, housing approximately 50,000 prisoners. PDOC subjects at least 2,800 of those prisoners—roughly 6% of the system's prisoners—to solitary confinement.

Roughly 2,400 of those in solitary are housed in Restricted Housing Units ("RHU"). Prisoners are housed in RHUs for violating prison rules (disciplinary segregation) or to protect the security of the prison or the individual prisoner (administrative segregation). Prisoners in the RHUs are usually confined to their cells for roughly 23 hours a day.

Another 400 prisoners are housed in one of the following types of solitary confinement units: a unit of Psychiatric Observation Cells ("POC") (for prisoners who are mentally decompensating to the point of being considered a danger to themselves, other prisoners, and/or property); the Capital Case Unit ("CCU") (for prisoners who have been sentenced to death); the Special Management Unit ("SMU") (for prisoners who exhibit behavior that presents a risk to the orderly running of the prison); and the Secure Threat Group Management Unit ("STGMU") (for prisoners who pose a risk to the prison because of their affiliation with, and active involvement in, gangs).[6]

Until recently, PDOC used solitary confinement on many of the approximately 70 prisoners housed in its Secure Special Needs Units ("SSNUs"). The SSNUs were used to house prisoners with SMI who had a history of disciplinary infractions. Within the last couple of months, PDOC has eliminated its SSNUs, replacing them with Secure Residential Treatment Units ("SRTUs"). PDOC has represented to us that it does not intend to use solitary confinement on any of the prisoners housed in its new SRTUs.

[6] Until this summer, prisoners in the CCU were confined to their cells for roughly 23 hours a day. In recent months CCU prisoners have been permitted one additional hour of recreation time per day. Prisoners in POC are confined to their cells for approximately 24 hours per day. Most prisoners housed in SMUs and STGMUs spend at least 23 hours a day in their cells. A small minority of the prisoners housed in SMUs and STGMUs are allowed a few additional hours of out-of-cell time per week after progressing to the least-restrictive part of these units' step-down programs.

## III. DISCUSSION

### A. PDOC has begun to address the way in which it uses solitary confinement on prisoners with SMI and to improve its mental health care practices.

In recent months, PDOC has been reforming its solitary confinement practices. Currently, PDOC is preparing draft policies that, if correctly implemented, may reduce the number of prisoners with SMI subjected to prolonged isolation and improve the mental health care for this population. Moreover, during the summer, PDOC started to implement changes even though policies have not been finalized or adopted. Those changes include: (1) involving mental health staff members in the disciplinary process when the prisoner has SMI; (2) training a significant number of staff members in crisis intervention; (3) converting SSNUs that functioned like isolation units into SRTUs that provide more treatment, out-of-cell activities, and positive incentives; and (4) training and using peer specialists in some PDOC facilities to provide additional support to prisoners with SMI housed in general population.

These initial reform efforts are already producing positive results. Over a three month period this summer, PDOC reduced the number of prisoners with SMI in solitary confinement by well over 100.[7] Our expert-consultants found that these changes have dramatically improved the mental health of those removed from solitary. For example, one prisoner who had spent many months in an RHU and is now housed in an SRTU told us that "he came to hate himself" when he was in solitary, and that he now feels much better because he can more regularly get out of his cell. He also noted that he has greatly benefited from group therapy in the SRTU, where he can talk to prisoners facing similar difficulties. Line-staff members have also noted the positive changes. For instance, a staff psychologist commented on how she has recently seen a marked reduction in negative behaviors by prisoners as out-of-cell activities have increased.

Although progress has been made, there is still work to be done. Many of our major findings concerning the way in which Cresson misused solitary confinement still apply with equal force to the PDOC system as a whole. In the following sections, we discuss these serious, ongoing problems with the manner in which PDOC uses solitary confinement on prisoners with SMI. We also discuss the systemic failures that remain in place and contribute to PDOC's excessive reliance on solitary confinement as a control tool.[8]

### B. The manner in which PDOC continues to use solitary confinement on prisoners with SMI violates their rights under the Eighth Amendment to the U.S. Constitution.

Despite the progress that has been made in recent months, we find that the manner in which PDOC continues to use solitary confinement on prisoners with SMI violates the Eighth Amendment's prohibition against punishments that are "cruel and unusual." There is no static test for determining whether conditions are "cruel and unusual." Instead, the Eighth Amendment

---

[7] As we noted in the Summary of Findings section, PDOC has identified roughly 115 prisoners with SMI presently housed in solitary confinement units. Our expert-consultants have concluded that this number grossly underestimates the actual number of prisoners with SMI/ID still in solitary.

[8] In December 2013, PDOC officials reported to us progress they felt had been made since our August inspections. These efforts included beginning to review serious injurious behaviors, establishing suicide prevention committees at each facility, accelerating crisis intervention training schedules for officers, and drafting a proposal to have an independent organization conduct a segregation reduction project on all prisoners regardless of their vulnerabilities.

"must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

By subjecting prisoners with SMI to prolonged periods of solitary confinement under harsh conditions that are not necessary for legitimate security-related reasons, PDOC exposes them to an excessive and obvious risk of serious harm. *See Farmer*, 511 U.S. at 828; *Hope v. Pelzer*, 536 U.S. 730, 738-745 (2002) (holding that prison officials show deliberate indifference where they disregard obvious risks to prisoner safety). Moreover, our expert-consultants observed that as a direct result of these practices, prisoners with SMI have suffered serious psychological and physical harms, including psychosis, trauma, severe depression, serious self-injury, and suicide. *Cf. Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) ("The touchstone is the health of the inmate. While the prison administration may punish, it must not do so in a manner that threatens the physical and mental health of prisoners.").

1. **PDOC subjects prisoners with SMI to prolonged periods of solitary confinement under harsh conditions where they routinely have difficulty obtaining adequate mental health care, which in combination pose an excessive risk to the mental health of prisoners.**

The manner in which PDOC uses solitary confinement involves a number of factors that in combination violate the Eighth Amendment. *See Peterkin v. Jeffes*, 855 F.2d 1021, 1024-25 (3d Cir. 1988) (holding that the district court appropriately considered the "totality of conditions" when assessing the constitutionality of Pennsylvania's death row unit, where prisoners were confined to their cells for approximately 22 hours per day). We did not consider any individual factor to be determinative. Instead, we assessed the constellation of conditions in PDOC's solitary confinement units and the harms found by our expert-consultants that resulted from these conditions and practices.

In reaching our conclusion, we considered the following factors:

(1) the length of time prisoners with SMI spent in solitary confinement;

(2) the extent to which the use of solitary confinement on prisoners with SMI interfered with staff members' ability to provide adequate mental health care; and

3) the unjustifiable harshness of the conditions that attended PDOC's use of solitary confinement on prisoners with SMI.

**First, the manner by which PDOC routinely subjects prisoners with SMI to lengthy periods of solitary confinement involves conditions that our expert-consultants found subjected prisoners to harm or an unreasonable risk of harm and contributes to the Constitutional violation.** As one court noted, long periods of isolation for those with SMI can be "the mental equivalent of putting an asthmatic in a place with little air to breathe." *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995); *see also* Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012) ("Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."); *Morris v. Travisono*, 499 F. Supp. 149, 160 (D.R.I. 1980) (noting that "[e]ven if a person is confined to an air conditioned suite at the Waldorf Astoria,

denial of meaningful human contact for . . . an extended period of time may very well cause severe psychological injury"); *United States v. Bout*, 860 F. Supp. 2d 303, 308 (S.D.N.Y. 2012) ("It is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee.").

From May 2012 to May 2013, over 1,000 prisoners identified on PDOC's active mental health roster spent three or more continuous months in solitary confinement. Nearly 250 of these prisoners have been in solitary confinement for more than a year. Most of these prisoners were held in an RHU or one of the other solitary confinement units.

For many with SMI, PDOC's use of prolonged isolation is mentally taxing because they can see no end point to it. We interviewed many prisoners with SMI who told us they believed they would never get out of solitary. Some told us that they had accumulated years of disciplinary time in the RHU and feared they would never be returned to general population. Others explained that they had lost all faith in their ability to conform their conduct to the prison's rules in a way that would allow them out of their isolation cell.

**Second, the manner in which PDOC uses solitary confinement interferes with its ability to provide adequate mental health treatment to prisoners with SMI and contributes to the Constitutional violation.** *See Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (adopting the magistrate judge's conclusion that "inmates are denied access to necessary mental health care while they are housed in [solitary confinement]"). Appropriate mental health treatment for prisoners with SMI should involve much more than medication. Nat'l Comm'n on Corr. Health Care, *Standards for Mental Health Services in Correctional Facilities*, § MH-G-02 (2008). Prisoners with SMI must also have, among other things, "programming or appropriate therapies (or both) to meet the mental health needs of patients." *Id.*[9] Unfortunately, for much of last year, hundreds of prisoners with SMI spent months in solitary confinement receiving only medication and occasional "cell-side" visits from mental health staff members, even though our expert-consultants found more care was needed for those inmates.[10]

Recently, staff psychologists at many of the prisons have started to conduct at least one out-of-cell therapy session per month for prisoners with SMI currently housed in an isolation unit. This approach constitutes a significant improvement over past practices.

However, PDOC continues to use practices that fail to ensure that prisoners with SMI in solitary confinement receive the mental health treatment they need. *Cf. Casey v. Lewis*, 834 F. Supp. 1477, 1547-49 (D. Ariz. 1993) (describing the inappropriate use of isolation for prisoners

[9] According to our consultants, prisoners with SMI may also need regular and meaningful counseling from mental health staff members, peer and other counseling skill building, and structured and unstructured activities. Activities may include eating out of cell, outdoor recreation, and showers. They explain that these types of activities provide opportunities for both socializing and organizing one's life in the facility in a way that is therapeutic and important to the health of prisoners with SMI.

[10] A cell-side visit typically involves a member of the mental health staff standing outside a prisoner's cell, attempting to speak to the prisoner through a food tray slot or cracks in a doorframe amid the commotion on the unit. Such a visit typically lasts for only a few minutes at a time, lacks confidentiality, and cannot be equated with a face-to-face, out-of cell consultation/therapy session. As one staff member explained, "You can't do therapy in a hallway."

with serious mental illness because "[d]uring lockdown, inmates are provided improper mental health care or no mental health care").

PDOC also uses solitary confinement in a way that interferes with staff members' ability to identify prisoners who are mentally deteriorating in their cells. The problem is particularly acute for under-diagnosed prisoners not on the mental health roster. One former staff psychologist explained that he found it difficult to appropriately assess the condition of prisoners in solitary confinement. He emphasized that his manager discouraged him from doing anything other than cursory cell-side assessments of prisoners' mental health. He noted that for inmates who were inactive and in their cells most of the time, it was next to impossible to fully assess the condition of prisoners from cell-side without an out-of-cell visit.

**Third, unjustifiably harsh conditions often attend PDOC's use of prolonged solitary confinement on prisoners with SMI. In combination, these conditions are dehumanizing and cruel and contribute to the Constitutional violation.** *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (holding that when conditions of confinement combine to "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need," they violate the Eighth Amendment); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir. 1982) ("[T]he court must consider the effect of each condition in the context of the prison environment, especially when the ill effects of particular conditions are exacerbated by other related conditions."). While conditions for those housed in PDOC's solitary confinement units vary somewhat by prison, there are consistent themes. PDOC's prisons consistently subject prisoners with SMI to not just prolonged isolation, but also unnecessarily harsh and disorienting housing conditions, punitive behavior modification plans, and the excessive use of full-body-restraints. These conditions serve only to exacerbate their mental illness. We discuss these conditions below:

*Harsh conditions*: Although by its nature solitary confinement typically includes aspects that would be considered harsh in the ordinary sense of the word, the particular use of solitary confinement on inmates with SMI in the PDOC system, when examined under the totality of the circumstances, includes unjustifiably harsh conditions, even though some of these conditions, standing alone, might not be inappropriate in other circumstances. Every prisoner placed in solitary confinement must spend almost his entire day confined to a cell that is less than 100 square feet in size—about the size of an average American bathroom. The cell contains a metal bed frame, a thin plastic mattress, metal sink, metal toilet, and metal desk with an attached metal seat, and sometimes a small shelf. At some of the prisons, the cell will also have a small exterior-facing window, but at many of the prisons, the cell has no exterior window and no natural light coming directly into it. Usually, the prisoner is locked in his cell behind a solid metal door. The door has a narrow slot (used for passing food trays and for handcuffing the prisoner before he can leave the cell), and a small plastic window with a view to either a hallway or the housing unit's common area.

The lighting in the cell can be dimmed, but it can never be turned off, even at night. The noise level can be high, even at night, because of the yelling and banging of neighboring prisoners. The prisoner with SMI in solitary confinement in PDOC has limited out-of-cell time. Typically, he is allowed, at most, one hour in an empty and caged outdoor pen, five times a week, and a 15-minute shower three times a week. Recently, conditions for the prisoner PDOC has identified as having SMI also often includes one out-of-cell therapy session per month with a staff psychologist.

Before he can leave his cell, a prisoner must first submit to a strip search. Further, to get from his cell to an out-of-cell activity, the prisoner is at all times escorted by correctional officers and has his arms and legs shackled together. Many prisoners we spoke to told us that they rarely leave their cells because of these procedures. They explained that being strip searched, handcuffed, and led by tether by two corrections officers made them feel like animals. The female prisoners told us that the strip searches remind them of past sexual abuses.

Our expert-consultants found that in the solitary confinement units, conditions for the prisoner with SMI also routinely involve unnecessarily forced idleness and loneliness, where the idleness was unjustified by legitimate penological goals and not mitigated. For instance, looking at the totality of the circumstances, the prisoner with SMI in disciplinary custody at an RHU generally has no access to television or radio; has only limited access to reading materials; cannot make telephone calls (with the exception of emergency calls approved by management); is denied contact visitation privileges; is denied any opportunity to have non-contact visits with friends; and, at most, can only have one non-contact visit per month with an immediate family member, lasting for no longer than an hour.[11]

Living conditions in the RHU routinely involve a mix of disorienting and uncomfortable sensory experiences. For example, the air quality is often poor because of inadequate sanitation and ventilation. At one of the solitary confinement units we visited where the sanitation was especially bad, prisoners complained *en masse* to us about the smell of the place. A prisoner there explained, "The smell is terrible. When a prisoner smears feces on the walls, it's often left like that for days and the entire pod reeks of shit and makes you want to vomit."

*Punitive responses to symptoms of mental illness*: In most of the solitary confinement units we toured (which were mainly RHUs), staff members routinely respond to the prisoner exhibiting symptoms of his mental illness by making his living conditions even more inhospitable. Prisoners with SMI in the solitary confinement units frequently engage in behaviors that may be signals of mental illness instead of intentional misbehavior, such as smearing fecal matter on their cell walls or repeatedly failing to comply with prison rules, including minor infractions like where to stand in the cell when receiving meals. All too often corrections officers respond to behaviors that signal mental illness not by seeking to ensure that the inmate received adequate mental health treatment, but instead by imposing additional restrictions on the conditions of the prisoners' confinement. Restrictions can include harsh measures, such as unjustifiably requiring the prisoner to remain confined to his cell 24/7; denying the prisoner bedding material or running water and taking away the prisoner's clothes. Corrections officers are empowered to impose these restrictions for up to seven days at a time without conferring with mental health staff members and with nothing other than the approval of the unit's shift commander.

Corrections staff members also use housing assignments within the solitary confinement units as a way to punish prisoners for conduct related to their mental illness. For instance, in one of the RHUs, we found an unusually narrow cell that had no furniture in it other than a bed. When we asked about the cell, the corrections staff members at the unit assured us that prisoners

[11] We do note, however, that it is appropriate for a correctional system to remove privileges as a part of the disciplinary process.

were never assigned to the cell for more than a couple of days at a time, and then only for their own safety. However, our records review confirmed the allegations of the prisoners on the unit who had told us that a prisoner with SMI had been housed in the cell for nearly half a year.

At all of the facilities we toured, prisoners with SMI in the solitary confinement units complained of officers verbally abusing them. Some prisoners alleged that officers had encouraged them to kill themselves. For instance, one prisoner with SMI alleged that as recently as July 2013, when he tied a bedsheet to his vent and stood on his toilet preparing to kill himself, a group of officers encouraged him to go through with it. According to the prisoner, the officers told him that they "wanted to see his feet dangling," and chanted, "1 . . . 2 . . . 3 . . . kill yourself," repeatedly.[12]

Prisoners also alleged that officers working the solitary confinement units intentionally provoke prisoners with SMI into acting out. The prisoners claimed that the officers "push the buttons" of prisoners with SMI so as to have a basis for imposing additional restrictions on their conditions.

*Unnecessary and excessive use of restraints*: Excessive uses of full-body restraints often attend the use of solitary confinement on prisoners with SMI. Full-body restraints are a type of restraint that should only be used in exigent circumstances, and only for the briefest time necessary to ensure the safety of the prisoner or those around him. *See Cresson Findings Letter* at 16-18. According to our consultants, corrections officers should rarely have to use a full-body restraint on a prisoner for anywhere close to seven hours. Nonetheless, of the more than 260 full-body restraint incidents between January 2012 and June 2013, almost 75% lasted longer than 7 hours, and 15% lasted longer than 12 hours. This data, along with our review of the records related to PDOC's uses of restraints, indicate that corrections officers routinely use full-body restraints for far longer than is needed to avoid harm. Instead, they often appear interested in using the restraints as a means to discipline prisoners by causing discomfort or pain.

In sum, we have identified three factors indicating that PDOC uses solitary confinement in a way that poses an excessive and obvious risk of harm to prisoners with SMI. First, PDOC often uses solitary confinement on vulnerable prisoners with SMI for prolonged periods of time. Second, PDOC uses solitary confinement on prisoners with SMI in a way that frequently interferes with its ability to provide them with the mental health care they need. And third, extreme conditions—such as the excessive use of full-body restraints—routinely attend PDOC's use of solitary confinement on prisoners with SMI.

**2. The way in which PDOC uses solitary confinement on prisoners with SMI has resulted in serious harm.**

The way PDOC uses solitary confinement on prisoners with SMI has led to serious harm. At the prisons we visited, a disproportionate amount of the self-harm continues to occur in the isolation units, just as it did in Cresson. Between January 1, 2012 and May 31, 2013, although only a small fraction of PDOC's prisoners were housed in one of the solitary confinement units, 206 of the 288 documented suicide attempts occurred there. Our expert-consultants interviewed and/or reviewed records of more than two dozen prisoners who they have concluded were

[12] Prisoners housed in nearby cells provided accounts of the incident that were substantially consistent with what this prisoner had told us.

directly harmed by their conditions in solitary confinement in various ways, including mental deterioration, increased psychosis, and acts of self-harm and suicide.

Below we discuss the experiences of two of the individuals our expert-consultants interviewed in greater detail to illustrate the types of harms prisoners are suffering as a consequence of the way in which PDOC uses solitary. The first case involves a prisoner PDOC initially identified as having SMI, who PDOC held in solitary confinement for roughly ten months. The expert-consultant who interviewed the prisoner and reviewed his records concluded that the way in which solitary confinement was used on him led to a deterioration in his mental health and to suicide attempts.

The second case involves a prisoner who went into solitary confinement without SMI. According to a former staff psychologist we spoke to, PDOC failed to identify him as someone in need of treatment mainly because PDOC uses solitary confinement in a way that interferes with its ability to effectively screen for mental illness. Now, after many years in solitary, this prisoner has schizophrenia and has difficulty speaking in complete sentences. According to the expert-consultant who interviewed this prisoner and reviewed his records, this prisoner's decompensated state is principally attributable to his experiences in solitary confinement.

Example 1 – Prisoner AA[13]

In February 2013, Prisoner AA—who has a mood disorder, an IQ of 66, and is on PDOC's mental health roster—attempted to hang himself after more than five months in solitary confinement in the facility's RHU. After his suicide attempt, staff moved him to a POC for one day, and then returned him to the RHU. After another roughly five months in solitary confinement in the RHU, Prisoner AA again attempted to hang himself. Fortunately, a week before we toured the facility, Prisoner AA was transferred to the SRTU. Conditions there are markedly better. Prisoner AA is no longer subjected to solitary confinement. He receives much more mental health care treatment, and his mental health has improved considerably.

According to one of our expert-consultants who interviewed Prisoner AA and reviewed his medical records, at the time of his suicide attempts, Prisoner AA exhibited symptoms consistent with a type of delirium that can result from subjecting a prisoner with SMI to prolonged isolation under certain conditions. Prisoner AA had told our consultant that while in the RHU, he became hypersensitive to sights and sounds. He also experienced visual hallucinations. For instance, he recalled sometimes seeing his deceased brother encouraging him to cut himself and "come join me." Prisoner AA also told our expert-consultant that when he experienced visual hallucinations of his brother, guards laughed at him and walked away, instead of referring him to psychology. He explained that in the RHU he became really depressed, and that his feelings of hopelessness made him want to kill himself and act out against the guards.

Finally, while Prisoner AA was in solitary, staff failed to pay sufficient attention when Prisoner AA expressed his intent to kill himself. For instance, records establish that before his second suicide attempt, Prisoner AA told staff he wanted to kill himself because they were ignoring his requests for a change in medication. The record also shows that just prior to his suicide attempt, Prisoner AA also "asked to see Psychiatry for a week and a half and . . . was

[13] To protect the identity of prisoners, we use coded initials.

tired of waiting to be seen." Notably, the facility did not have a full-time psychiatrist at the time.

Example 2 – Prisoner BB

Prisoner BB has been imprisoned in PDOC for approximately 25 years. For almost all of that time he has been housed in solitary confinement. BB had no mental illness when he entered the prison system. On his initial evaluation, he was described as friendly, motivated to engage in educational activities (he was functionally illiterate), and unlikely to be a problem while incarcerated. After spending years in solitary, his mental health has badly deteriorated. Prisoner BB is floridly psychotic, disorganized, and unable to take care of his own personal hygiene and nutrition. He is locked in a cycle of chaotic behavior, mental deterioration, and disciplinary infractions.

According to our expert-consultant who interviewed Prisoner BB and reviewed his medical records, he has received virtually no mental health treatment while in solitary. Twice (in 2008 and 2012) his condition so deteriorated that he was admitted to an off-site inpatient unit that provides intensive mental health treatment. On admission, the records reflected that he had bizarre speech, disorganized behavior, extremely poor hygiene, and was responding to hallucinations. On both occasions, he improved dramatically while receiving the intensive care at the off-site inpatient unit. Instead of recognizing that his improvement confirmed that solitary confinement was harming his mental functioning, PDOC viewed it as evidence that he had faked or "malingered" mental illness while in solitary. After each of his brief stays at the off-site inpatient unit, Prisoner BB was returned to solitary.

As recently as April 2013, Prisoner BB was not on PDOC's active mental health roster and remained in solitary confinement. Fortunately, a week prior to our tour he was placed on the roster and recommended for admission to a psychiatric unit "to gain a better understanding of what mental illness, if any is present."

When we first encountered Prisoner BB in the RHU, we noted that the floor of his cell was covered in food. When our expert-consultant interviewed him, he mumbled that he was fine. Yet quite clearly he was not. He appeared disheveled and confused, trembled in fear, and was almost incoherent.

To compound matters, we were told by multiple prisoners that BB is often harassed by corrections officers because of his delusions and incoherence. According to our consultant, an environment such as this makes it more difficult to develop an alliance for medication compliance.

One psychologist we spoke to told us that when he had earlier raised the issue of BB's mental instability with his supervisor, the supervisor had "turned a blind eye" to the situation. The psychologist told us that he was very concerned about Prisoner BB's mental deterioration, but that his supervisor was of the view that the monthly cell-side check-in psychologists provided to all prisoners in Prisoner BB's solitary confinement unit would constitute adequate mental health care for this prisoner.

These examples speak to the harm that has been directly caused by the specific manner in which PDOC uses solitary confinement on prisoners with SMI.

Though many of the prisoners with SMI have become too ill to describe their mental suffering while in solitary, many others were eager to tell us how solitary had harmed them. One prisoner told us, "I feel like it's hard for me to breathe here. I feel claustrophobic . . . I feel trapped . . . I feel angry inside . . . I feel like giving up. I'm helpless behind the door." Another simply told us, "It's just a black hole. They put you back here and leave you." A prisoner with SMI who is now doing well in general population told us that in solitary he used to think a lot about "pounding [his] head against the wall." Another prisoner with SMI still in solitary told us, "The only way you can talk to someone or get something done is if you try to kill yourself."

### C. Systemic deficiencies undermining PDOC's mental health program pose an excessive risk of harm to prisoners and contribute to PDOC's overreliance on solitary confinement as a means of controlling prisoners with SMI.

Instead of having systems in place to ensure adequate mental health care throughout its facilities, PDOC uses isolation to control prisoners with mental illness as they become more ill and less stable. The structural deficiencies plaguing PDOC's mental health care system include inadequate: (1) continuity and coordination of care; (2) standing for mental health staff members; (3) criteria for assessing mental illness; (4) treatment capacity; and (5) oversight tools. These deficiencies lead to the unconstitutional use of isolation on prisoners with SMI, and pose a serious and obvious risk of harm to prisoners. *See Estelle*, 429 U.S. at 103-05; *Inmates of Allegheny County v. Pierce*, 612 F.2d 754, 761-63 (3d.Cir. 1979) (holding that the Eighth Amendment prohibits deliberate indifference to prisoners' serious mental health care needs).

#### 1. Poor coordination and continuity of care leads to inadequate mental health care treatment and the use of solitary confinement on prisoners with SMI.

Systemwide problems concerning coordination and continuity of care among staff members have impeded PDOC's ability to provide adequate mental health care. Poor continuity of care leads to more prisoners becoming mentally unstable. It also means that PDOC staff members are less able to identify how mental instability contributes to prisoners' conduct and more likely to resort to the use of solitary confinement as a control tool.

PDOC's mental health staff members routinely fail to coordinate with each other. This can result in confusion over diagnoses and a failure to follow treatment plans. For example, in one record we reviewed, a psychiatrist prescribed a medication for a prisoner only to have a different psychiatrist discontinue it at the next meeting and prescribe another medication with no explanation for the abrupt change. On at least one occasion, when we asked staff members about a treatment mistake that had led to harm, they each disavowed responsibility and blamed one another.

Poor recordkeeping also hampers continuity and coordination of mental health care. Prisoner records are regularly missing vital mental health information, including information concerning diagnoses, prior treatment, medications, and family history of psychiatric disorders. Moreover, the mental health information PDOC does have is routinely scattered in different places not readily accessible to mental health staff members.

Our consultants identified many instances where inadequate continuity of care resulted in harm to prisoners. In one example, a staff member's failure to consider medications that had worked in the past for a prisoner led to the prisoner acting out in ways characteristic of bipolar disorder. PDOC staff members responded to the prisoner's behavior by disciplining him with time in the RHU. In solitary, he decompensated badly and attempted suicide.

2. **Inadequate consideration given to the views of mental health staff members often leads to assignment of prisoners with SMI to solitary confinement units.**

Systemwide, PDOC must do more to expand the role of mental health staff members in determining the conditions of confinement for prisoners with SMI. For instance, while we applaud PDOC's recent effort to enhance mental health staff members' role in the disciplinary process, that role is limited and not always credited in determining whether to house prisoners with SMI in solitary confinement units. For prisoners with SMI, mental health clinicians should have a large role in housing decisions because they have the clearest sense of how such prisoners will be affected by a particular housing placement.

Some mental health staff members we interviewed expressed frustration and resentment at the lack of respect shown to them by security staff members. They complained about the extent to which security staff members feel at liberty to ignore their recommendations.

3. **Difficulties in recognizing how mental illness may cause maladaptive behaviors leads to the inappropriate use of solitary confinement on prisoners with SMI.**

If PDOC is to avoid subjecting prisoners to solitary confinement for engaging in conduct related to their illness, it will have to ensure that its staff members, especially mental health staff members, can recognize the effects of mental illness when they see them. Our review of mental health records reveals a disturbing tendency by many of PDOC's clinicians to describe almost all disruptive conduct as purely willful and behavioral, and to overlook the role of the prisoner's mental instability in causing the conduct. Our consultants found cases of maladaptive behavior rooted in mental instability that PDOC's mental health staff members incorrectly characterized as "manipulative" or "malingering" behavior.

4. **PDOC needs to commit more resources to mental health services in both general population and its specialized housing units to avoid warehousing prisoners with SMI in solitary.**

PDOC holds large numbers of prisoners with SMI in solitary, in part, because it devotes insufficient resources to mental health care. If PDOC had more staff members to provide adequate care in general population, fewer prisoners would deteriorate to the point of having to be placed in isolation. PDOC must have an adequate number of mental health staff members and therapeutic beds to provide prisoners with the care they need.

Inadequate staffing is a problem throughout PDOC's mental health system. Our mental health expert-consultants found that at each of the facilities they visited, clinicians had large, unmanageable caseloads due to understaffing. For example, one facility we toured is supposed

to have seven full-time psychologists, but has only four.[14] An experienced psychologist we interviewed there expressed the belief that, even if the facility filled all seven slots, at least three more staff members would be needed to provide adequate care given the needs at this particular facility.

Resource constraints also prevent prisons from transferring prisoners to settings with more intensive mental health treatment. Mental health staff members we spoke to told us that they sometimes hold back on recommending transfers to such units because of a perception that bed space is limited. Further, delays occur because already-stretched mental health staff members must complete lengthy referrals for PDOC's review before transfers to therapeutic units can occur. If approved, prisoners must then wait for a bed to become available. Each delay adds to the time prisoners wait in solitary confinement without the mental health care they need. *Cf. Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011) (recognizing that prolonged isolation may result in inappropriate delays in the provision of mental health care).

The need for more mental health staff members will only increase if PDOC follows through with its plans to have mental health staff members conduct more out-of-cell sessions in the solitary confinement units. Plans to expand the amount of mental health services provided in the new SRTUs will also require more staff.

**5. PDOC lacks essential oversight tools to identify harms caused by inadequate mental health care and its overreliance on solitary confinement.**

PDOC continues to lack key oversight mechanisms that would identify and address the harmful effects of solitary confinement and ensure the provision of adequate mental health care. We detailed at length in our Cresson Findings Letter how these essential oversight mechanisms did not exist and how this contributes to the system's dangerous use of solitary confinement. *See Cresson Findings Letter* at 26-31. PDOC's plans to begin tracking and analyzing mental health-related information remain aspirational. Currently, PDOC does not track the number of prisoners with SMI in solitary confinement units; does not examine the role of solitary confinement in causing suicides; does not track self-injurious behavior; does not critically review serious self-injuries; and does not track or analyze the additional punitive responses that prisoners with SMI experience in solitary confinement units, including, for example, use of force, food loaf, and hardened cells. This flawed oversight system prevents PDOC from identifying and correcting harms to prisoners.

**D. PDOC's use of solitary confinement also poses an excessive risk of serious harm to prisoners with ID.**

In the course of our investigation, we encountered prisoners with ID housed in PDOC's solitary confinement units. Most of these prisoners also have SMI. According to our expert-consultants, some of these prisoners are especially susceptible, because of their limited coping mechanisms, to the harsh conditions of solitary confinement at PDOC. For example, we spoke to a prisoner who felt especially empty and lonely while in solitary because reading was the only

[14] In the past year, this same facility went eight months without a full-time psychiatrist. During that time, a part-time psychiatrist and two part-time psychiatric nurse practitioners tried to piece together enough hours to meet prisoners' psychiatry needs.

distraction he was allowed, and his intellectual disability had rendered him functionally illiterate. Prisoners with ID also consistently described the solitary confinement units as places where the officers were more hostile than in the other units, and complained about the officers taunting them and calling them names, such as "retards."

PDOC should have better systems in place to assess whether prisoners with ID who are held in solitary confinement for extended periods have limited coping mechanisms that must be addressed to ensure proper mental health care. For instance, PDOC does not screen for ID. Instead, it screens for prisoners with low IQs—a flawed proxy for ID, as it is only one of several factors used in making a diagnosis of ID. Until PDOC fixes this problem, it will have difficulty keeping prisoners with ID out of solitary.

### E. The way in which PDOC uses solitary confinement on prisoners with SMI/ID also violates Title II of the ADA.[15]

PDOC's solitary confinement practices also violate Title II in a variety of ways. *See* 42 U.S.C. § 12132. PDOC unjustifiably denies many of its prisoners with disabilities, including those with SMI and/or ID, the opportunity to participate in and benefit from correctional services and activities, such as classification, security, housing, and mental health services, or unnecessarily provides prisoners with psychiatric and intellectual disabilities unequal, ineffective, and different or separate opportunities to participate in or benefit from PDOC's classification, security, housing, and mental health services. *See* 28 C.F.R. § 35.130(b)(1)(i)-(iv). PDOC unlawfully segregates and warehouses prisoners with SMI and/or ID in isolation units, without either individually assessing each such prisoner concerning the risk the prisoner may actually and objectively pose to others, 28 C.F.R. §§ 35.130(d); 35.139, or otherwise justifying the need for segregation, *id.* §§ 35.130(b)(8), (h). PDOC also fails to reasonably modify policies, practices, and procedures where necessary for PDOC to avoid discrimination on the basis of disability. *Id.* § 35.130(b)(7).

As discussed above, our factual determinations concerning PDOC's misuse of solitary confinement on those with SMI/ID largely mirror the determinations we made in the Cresson investigation. Systemwide, PDOC's practices violate Title II because the prison: (1) unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies and practices; (2) fails to either properly assess prisoners on an individual basis to determine whether segregation in an isolation unit is appropriate housing or otherwise justify their segregation; and (3) unnecessarily denies opportunities to participate in and benefit from services, programs, or activities to prisoners with SMI/ID who have to be segregated from general population but should not be isolated in their cells.

---

[15] The Department of Justice is charged with enforcing and implementing Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134. The Department may conduct investigations and compliance reviews of public entities, enter into voluntary compliance agreements, and enforce compliance through litigation. *See* 28 C.F.R. pt. 35, subpt. F.

**1. PDOC unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies and practices.**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II extends to all of the prison's services, programs, and activities, including classification, housing, recreation, and medical and mental health treatment, among others, for which prisoners are otherwise qualified. *See Pa. Dep't of Corr.*, 524 U.S. at 209-10, 213 (finding, without exception, that Title II "unmistakably includes State prisons and prisoners within its coverage" and discussing "recreational activities" and "medical services" as covered under Title II to find a motivational boot camp to be a covered entity).

Both serious mental illness and intellectual disabilities, as defined here, qualify as disabilities under the ADA. 42 U.S.C § 12102 (including "mental" impairments under definition of "disability" where they substantially limit major life activities).

The regulation implementing Title II of the ADA requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); *see also Olmstead v. L.C.*, 527 U.S. 581, 592, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination on the basis of disability."). The Justice Department explained in the 1991 Preamble to the Title II regulation: "Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services relegates persons with disabilities to second-class status." 28 C.F.R. pt. 35, App. B. Moreover, a covered entity, such as PDOC, may not provide unequal services to qualified individuals with disabilities, *id.* § 35.130(b)(1)(ii), and may not provide different or separate services to qualified individuals with disabilities unless the different or separate services are necessary to provide benefits that are as effective as those provided to others. *Id.* § 35.130(b)(1)(iv). A covered entity also may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability. *Id.* § 35.130(b)(3)(i).

Under the ADA, a prison must "take certain proactive measures to avoid discrimination." *Chisolm*, 275 F.3d at 324-26 (holding that facility may have violated the ADA and discriminated against a deaf prisoner when it gave the prisoner pencil and paper instead of an American Sign Language interpreter, and failed to provide the prisoner a device to allow him to place telephone calls in private). The Title II regulation requires the Prison to reasonably modify its policies, practices, and procedures when necessary, as here, to avoid discrimination against prisoners with serious mental illness and intellectual disabilities. 28 C.F.R. § 35.130(b)(7). Prisoners with disabilities thus cannot be automatically placed in restrictive housing for mere convenience. If prisoners with SMI/ID can be housed in general population by being provided adequate care, the prison may not house such prisoners in segregated housing without showing that it is necessary to make an exception. *See id.* § 35.130(b)(3)(i)-(ii) (prohibiting the prison from utilizing "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; . . . [or] have the purpose

or effect of defeating or substantially impairing accomplishments of the entity's program with respect to individuals with disabilities").

PDOC unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies, practices, and procedures where necessary to avoid discrimination on the basis of disability. We found that PDOC is twice as likely to use solitary on prisoners with SMI and that over 1,000 prisoners identified on PDOC's active mental health roster spent three or more continuous months in solitary from May 2012 to May 2013. What we have learned from our tours of the facilities, our prisoner interviews, and our record reviews is that there is an overreliance at PDOC on isolation of prisoners with SMI (many of whom also have ID), and that PDOC has a practice of routinely warehousing prisoners with SMI/ID in solitary on account of their disabilities.

The practice of segregating prisoners in solitary confinement units where reasonable modifications would permit those with disabilities to remain integrated in the prison's general population conflicts with the mandates of the ADA. PDOC typically fails to identify prisoners who have SMI/ID that makes them susceptible to harm in solitary confinement and therefore fails to consider whether reasonable modifications are needed for such prisoners before deciding to house them in solitary confinement. Even when PDOC has identified that a prisoner's behavior is caused by SMI, it fails to consider reasonable modifications to either avoid confining the prisoner to solitary confinement, or if solitary confinement is necessary, to adjust the conditions of the solitary confinement to avoid harm to the prisoner. As described above, PDOC could enable many more of its prisoners with SMI/ID to remain in general population by increasing coordination and continuity of care, expanding the roles of mental health staff in determining the conditions of confinement, providing more resources to mental health services in general population, and improving its screening mechanisms for identifying prisoners with ID. *See supra* pp. 14-16. Because PDOC fails to do so, prisoners with SMI/ID are unnecessarily and impermissibly segregated and isolated.

PDOC must ensure that qualified prisoners with SMI/ID have as equal an opportunity as other prisoners to participate in and benefit from its housing and classification services, programs, and activities, and the benefits that flow from them, such as out of cell time, interaction with other prisoners, and movement outside of confined environments, consistent with legitimate safety and security concerns.[16]

---

[16] The American Correctional Association Standards similarly provide:

> The institution may be required to take remedial action, when necessary, to afford program beneficiaries and participants with disabilities an opportunity to participate in and enjoy the benefit of services, programs, or activities. Remedial action may include, but is not limited to: . . . making reasonable modifications to policies, practices, or procedures.

ACA, Standards for Adult Correctional Institutions § 4-4429 (4th ed. 2003 and Supp. 2010).

**2. PDOC fails to properly assess prisoners on an individual basis to determine whether segregation is appropriate housing.**

PDOC may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities, including classification, housing, and mental health services. 28 C.F.R. § 35.130(h). But PDOC "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.*; *cf. Defreitas v. Montgomery Cnty. Corr. Facility*, 525 Fed. App'x 170, 179 (3d Cir. 2013) (holding that "courts should ordinarily defer to [a prison's] judgment" so long as the "officials have [not] exaggerated their response to these considerations"). Similarly, PDOC may only impose or apply eligibility criteria that screen out or tend to screen out individuals with disabilities or any class or individuals with disabilities from fully and equally enjoying any service, program, or activity if such criteria are necessary for the provision of the service, program, or activity being offered. 28 C.F.R. § 35.130(b)(8). Based on information available to us during the investigation, PDOC's practices do not qualify under either of these standards.

Finally, Title II does not require a public entity "to permit an individual to participate in or benefit from . . . services, programs, or activities . . . when the individual poses a direct threat to the health and safety of others." 28 C.F.R. § 35.139; *see Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 278-88 (1987) (finding direct threat under Section 504, which was codified at 28 C.F.R. § 35.139 for Title II, requires a showing of a "significant risk" to the health or safety of others that cannot be eliminated or reduced to an acceptable level by the public entity's modification of its policies, practices, or procedures).

PDOC cannot categorically deny qualified prisoners with SMI/ID the opportunity to participate in and benefit from housing, classification, and mental health services. In order to establish direct threat, Title II requires PDOC to make individualized assessments of prisoners with SMI/ID, and their conduct, relying on current medical or best available objective evidence, to assess: (1) the nature, duration, and severity of the risk; (2) the probability that the potential injury will actually occur; and (3) whether reasonable modifications of policies, practices, or procedures will mitigate or eliminate the risk. 56 Fed. Reg. 35,694, 35,701 (July 26, 1991); 75 Fed. Reg. 56,180 (Sept. 15, 2010); *Arline*, 480 U.S. at 287-88. The Department explained in the preamble to the original Title II regulation in 1991 that "[s]ources for medical knowledge include guidance from public health authorities." 56 Fed. Reg. 35,701; *see also Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) (explaining that, while not necessarily conclusive in all circumstances, "the views of public health authorities, such as the U.S. Public Health Service, CDC, and National Institutes of Health, are of special weight and authority").

Applying the *Arline* factors, the individualized assessment should, at minimum, include a determination of whether the individual with a disability continues to pose a risk, whether any risk is eliminated after mental health treatment (e.g., whether the individual was denied medications, which resulted in the threat in the first place), and whether the segregation is medically indicated.[17]

---

[17] *See, e.g.*, Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), http://www.psychiatry.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf ("Placement of inmates with a serious mental illness in these settings can be contraindicated because of

Fundamentally, the individualized assessment should consider the views of mental health providers as to the prisoners' mental health needs and the appropriateness of the placement. *See* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ."); *cf. Purcell v. Pa. Dep't of Corr.*, No. 50-181J, 2006 WL 891449, at *13 (W.D. Pa. Mar. 31, 2006) (finding that a genuine issue of material fact existed as to whether a "reasonable accommodation" was denied when the DOC refused to circulate a memo to the staff concerning a prisoner's disability (Tourette's Syndrome) that explained that some of his behaviors were related to his condition, not intentional violations of prison rules).

To be sure, a public entity may, however, impose neutral rules or criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary for the safe operation of the program, provided that safety requirements must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities.

PDOC has recently begun to include mental health staff members when making individual assessments of prisoners with SMI during disciplinary proceedings. However, the policy requiring participation of mental health staff members in disciplinary proceedings is currently only in draft form, and is not being consistently applied throughout PDOC's facilities. Further, mental health staff members are not involved in a review of prisoners who received disciplinary time *before* these policy changes occurred. These prisoners continue to remain in solitary. Also, at present, mental health staff members are not involved in administrative segregation decisions. For this reason, prisoners with SMI/ID are still being automatically placed in RHUs without an individualized assessment. Finally, PDOC does not and cannot conduct an individualized assessment of prisoners with ID when placing them into isolation, because it does not screen prisoners properly, as described above. *See supra* p.19.

Accordingly, PDOC must continue to modify its policies and practices to ensure it is not unjustifiably and automatically placing prisoners with SMI/ID in segregation. Unfortunately, at present, PDOC often fails to meet the requirements of the ADA. Pursuant to the direct threat defense, each individualized analysis must evaluate whether the prisoner poses a health or safety risk to others, based on objective and medical evidence, including treating mental health professionals, and whether modifications that do not result in automatic segregation will eliminate or reduce the risk to an acceptable level.

**3. PDOC denies participation in and benefit from services, programs, or activities to qualified prisoners with SMI/ID who have to be segregated from general population but should not be isolated in their cells.**

PDOC fails to ensure that prisoners placed in segregated housing for legitimate nondiscriminatory reasons can participate in and benefit from prison activities, programs, and services. For those prisoners with SMI/ID who cannot be integrated into the general population, the Facility still has an obligation to provide qualified prisoners with the opportunity to

---

the potential for the psychiatric conditions to clinically deteriorate or not improve. Inmates with a serious mental illness who are a high suicide risk or demonstrating active psychotic symptoms should not be placed in segregation housing as previously defined and instead should be transferred to an acute psychiatric setting for stabilization.").

participate in and benefit from mental health services and activities, and other services, programs, and activities to which prisoners without disabilities have access. *See* 28 C.F.R. § 35.130(b). While we applaud PDOC's efforts to provide prisoners with SMI/ID housed in its new SRTUs with access to equivalent activities, services, and programs, those who remain in the solitary confinement units do not have access to anything remotely equivalent to what is provided to prisoners in the general population. *See supra* pp. 8-11.

## IV. MINIMUM REMEDIAL MEASURES

To remedy PDOC's unconstitutional and unlawful use of solitary confinement on prisoners with SMI/ID, its failure to provide constitutionally adequate mental health care to prisoners, and the violations of Title II and its implementing regulation, the Commonwealth should promptly implement the minimum remedial measures set forth below.

The remedies proposed in this letter are narrowly tailored to remedy the conditions that we found throughout the Pennsylvania prison system and are closely tied to our factual and legal conclusions. These proposals are remedial in nature, and seek to address the policies, practices, training, supervision and accountability systems changes necessary for Pennsylvania to overcome existing deficiencies and to come into compliance with the Constitution and the ADA. We note there may be different remedial approaches that would be adequate to address these types of issues.

### A. Prolonged Isolation

PDOC shall ensure that:

1. PDOC's policies, practices, and procedures are reasonably modified and maintained so prisoners with SMI/ID are not unnecessarily segregated and/or isolated.

2. If a prisoner shows credible signs of decompensation in isolation, the prisoner's mental health needs are addressed promptly, and if the prisoner shows credible signs of decompensation and the possibility of removing the prisoner from isolation is considered. Whenever a prisoner manifests signs of decompensating, a mental health professional shall assess the prisoner's credibility.

3. PDOC properly assesses prisoners with SMI/ID on an individualized basis to determine appropriate housing.

4. The disciplinary or administrative segregation placement process accounts for the risk of self-harm from placement into isolation. Specifically, PDOC shall ensure that prisoners with SMI/ID can effectively participate in disciplinary proceedings, including the provision of appropriate auxiliary aids and services where necessary for effective communication and reasonable modifications where necessary to ensure a prisoner's meaningful participation in disciplinary proceedings. PDOC shall also develop and implement policies and procedures to assess whether to divert from isolation those prisoners whose SMI/ID contributed to their misconduct.

5. PDOC reports and reviews data regarding lengths of stay in isolation, particularly with respect to prisoners with SMI/ID, and shall take appropriate corrective action.

6. For inmates with SMI/ID who have to be segregated from general population, that such prisoners have the opportunity to participate in and benefit from services, programs, and activities available to prisoners without disabilities consistent with legitimate safety and security concerns.

## B. Suicide Prevention and Protection from Harm

PDOC shall ensure that:

1. Prisoners are protected from suicide, suicide attempts, and self-harm.

2. Placement into the POC is short-term with intensive treatment and that prisoners are not discharged from POC to the RHU or other isolation without accounting for the risk of self-harm from such isolation.

3. All staff members are properly trained regarding appropriate responses to suicide attempts or self-harm, are trained on de-escalation techniques, notify mental health staff when time permits, and do not resort to force prematurely.

4. Staff members are properly trained and supervised regarding rounds in the isolation units; that rounds entail a meaningful observation of each prisoner's condition; and that signs of decompensation, risk of self-harm, or suicidal ideation are immediately addressed.

5. Suicides, suicide attempts, and self-injurious behavior are thoroughly documented and reviewed for implications to both security operations and mental health treatment, especially regarding the impact of isolation, and appropriate corrective action is taken.

6. PDOC shall develop an effective risk management system that adequately screens for suicidal or self-injurious behavior and monitors prisoners at risk for these types of harm.

## C. Mental Health Treatment

PDOC shall ensure that:

1. Prisoners with SMI receive adequate mental health treatment and that such treatment is provided in a manner that ensures confidentiality.

2. Prisoners are properly screened and assessed for potential mental illness upon intake into the prison. All reasonable efforts to obtain a prisoner's prior mental health records are taken and that this information, along with all screenings, is incorporated into a prisoner's charts.

3. Prisoners on the mental health caseload receive a timely treatment plan that is periodically reviewed and updated.

4. Prisoners with SMI in segregated placements are offered adequate therapeutic and recreational out-of-cell treatment, consistent with their security levels and treatment needs, which is appropriately documented.

5. Prisoners with SMI have adequate access to more intensive mental health care units.

6. There are sufficient mental health staffing levels, taking into consideration the concentration of specialized units and the mental health population at the prison.

7. All staffing components coordinate with each other to ensure that prisoners have access to necessary mental health care and are informed of the practices and procedures on other units.

8. Mental health staff members have sufficient standing at PDOC facilities, especially with regard to housing determinations.

9. Staff members assigned to the specialized units are trained regarding the needs of, and appropriate responses to, the mental health population and prisoners with intellectual disabilities.

10. Documentation of prisoners' mental health contacts and treatment is uniform, comprehensive, organized, and legible.

11. A meaningful quality assurance system for the mental health treatment program is in place and a range of data is collected, aggregated, and reviewed for appropriate corrective action.

**D. Use of Force**

PDOC shall ensure that:

1. The restraint chair, and other uses of force are not used as punishment or as a substitute for mental health interventions and are instead used only in instances where a prisoner poses a physical threat.

2. Staff members are trained on crisis intervention and de-escalation techniques and that mental health staff members are called in the case of a mental health-related crisis or a planned use of force for a prisoner with mental illness or an intellectual disability.

3. Data is provided and reviewed to assess whether the restraint chair is being overused and as part of an early warning system to identify staff members in need of additional training.

## V. CONCLUSION

Like other state correctional systems, PDOC increasingly has been called upon to take on the task of serving as the state's primary caregiver for those with SMI. Many of these prisoners also have significant intellectual disabilities. However, PDOC's unenviable burden of having to take care of these prisoners cannot excuse its all too routine practice of using a harsh form of solitary confinement to control those with SMI and/or ID instead of providing them with the mental health care treatment they need.

Now is the time to put a stop to these harmful solitary confinement practices and to meaningfully improve the mental health services PDOC provides. We look forward to working

collaboratively with Secretary Wetzel and his staff to address the violations of law we have identified in the context of settlement discussions.

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website. The lawyers assigned to this investigation will be contacting PDOC counsel to discuss this matter in further detail. If you have any questions, please feel free to contact Jonathan Smith, the Chief of the Special Litigation Section, at (202) 514-6255, Special Litigation Counsel Avner Shapiro, at (202) 305-1840, or the lead attorney on the matter, Kyle Smiddie, at (202) 305-6581.

Sincerely,

Jocelyn Samuels
Acting Assistant Attorney General
United States Department of Justice
Civil Rights Division

David J. Hickton
United States Attorney
United States Attorney's Office
Western District of Pennsylvania

cc:     John E. Wetzel
        Secretary
        Pennsylvania Department of Corrections

        Nancy Giroux
        Superintendent
        State Correctional Institution at Albion

        David Pitkins
        Acting Superintendent
        State Correctional Institution at Benner Township

Joyce Wilkes
Superintendent
State Correctional Institution at Cambridge Springs

Laurel Harry
Superintendent
State Correctional Institution at Camp Hill

John C. Thomas
Superintendent
State Correctional Institution at Chester

Vincent Mooney
Superintendent
State Correctional Institution at Coal Township

Jerome Walsh
Superintendent
State Correctional Institution at Dallas

Brian Coleman
Superintendent
State Correctional Institution at Fayette

Michael Overmyer
Superintendent
State Correctional Institution at Forest

Brenda Tritt
Superintendent
State Correctional Institution at Frackville

Michael Wenerowicz
Superintendent
State Correctional Institution at Graterford

Louis Folino
Superintendent
State Correctional Institution at Greene

Kenneth Cameron
Superintendent
State Correctional Institution at Houtzdale

Tabb Bickell
Superintendent
State Correctional Institution at Huntingdon

Trevor Wingard
Superintendent
State Correctional Institution at Laurel Highlands

John Kerestes
Superintendent
State Correctional Institution at Mahanoy

Brian Thompson
Superintendent
State Correctional Institution at Mercer

Robert Smith
Superintendent
State Correctional Institution at Muncy

Eric Bush
Superintendent
State Correctional Institution at Pine Grove

Mark Capozza
Superintendent
State Correctional Institution at Pittsburgh

Kenneth Cameron
Superintendent
Quehanna Boot Camp

Theresa DelBalso
Superintendent
State Correctional Institution at Retreat

Steve Glunt
Superintendent
State Correctional Institution at Rockview

Jon Fisher
Superintendent
State Correctional Institution at Smithfield

Gerald Rozum
Superintendent
State Correctional Institution at Somerset

Wayne Gavin
Superintendent
State Correctional Institution at Waymart

Theron Perez
Chief Counsel
Governor's Office of General Counsel

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ROY LEE WILLIAMS                    :
                                    :
          vs.                       :
                                    :
JOHN WETZEL                         : NO: 2:21-CV-1248


                    -   -   -
             Collegeville, Pennsylvania
             Thursday, December 9, 2021
                    -   -   -


         ORAL DEPOSITION of ROY LEE WILLIAMS,
taken pursuant to notice, held virtually,
commencing at 11:33 a.m., before Angela M. King,
RPR, Court Reporter - Notary Public there being
present.

                    -   -   -


             STREHLOW & ASSOCIATES
        FULL SERVICE COURT REPORTING AGENCY
           54 FRIENDS LANE, SUITE 116
           NEWTOWN, PENNSYLVANIA 18940
                (215) 504-4622
             SERVING NJ, PA, NY & DE

A P P E A R A N C E S

(All Via Video)

OFFICE OF ATTORNEY GENERAL
BY: KATHY A. LE, Esquire
The Phoenix Building
1600 Arch Street
Philadelphia, Pennsylvania 19103
Phone: (215) 560-2141
Email: kle@attorneygeneral.gov
Representing the Defendant

I N D E X

| WITNESS | PAGE |
|---|---|
| ROY LEE WILLIAMS(Sworn) | 4 |
| | |
| EXAMINATION | |
| BY: MS. LE | 4 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|

(At this time, no exhibits were marked by the court reporter.)

- - -

THE STENOGRAPHER: Good morning. My name is Angela King, your court reporter. We are taking this deposition via Zoom with all parties in remote locations.

- - -

ROY LEE WILLIAMS, having been duly sworn, was examined and testified as follows:

- - -

THE STENOGRAPHER: Just state your full name for the record, please.

THE WITNESS: Roy Lee Williams.

THE STENOGRAPHER: Thank you.

THE WITNESS: You're welcome.

- - -

EXAMINATION

- - -

BY MS. LE:

Q. Mr. Williams, I will introduce myself again on the record. My name is Kathy Le. And I am representing the defendant in this case that you have filed against Secretary Wetzel.

I want to ask you, have you ever been deposed

before?

A. No.

Q. Okay. So, I will give you a few ground rules that will tell you how it's going to go. And hopefully, that will make the morning go a little more smoothly.

So in the deposition, I will ask you a series of questions. And all I ask is that you answer those questions to the best of your memory and your knowledge. If the ask you something and you don't remember, it's okay to tell me you don't remember. Do your best to try to remember. But if the answer is you don't know or you don't remember it, that's fine.

I understand that, you know, you don't have anything in front of you. So again, this is -- it's not a memory test. It's just to the best that you can do, okay?

A. Okay.

Q. And when I ask you a question, please, this is for the sake of the record because there will be a written transcript of this afterwards. Please, answer all of my questions verbally.

So for example, when I ask you a question, if

the answer is yes, instead of just nodding your head or saying uh-huh, actually say yes.

A. Okay.

Q. And the same goes if it's no, don't just shake your head or say uh-uh, say no. And we all do it, so I will remind you if needed.

When I ask you a question, if you don't understand the question or you need me to clarify, you can ask me to do so. But if you answer the question, I will assume that you understood it.

Is that fair?

A. Yes.

Q. During the course of the deposition, I ask that you, please, allow me to completely finish my question, finish talking before you start answering. And I will, likewise, allow you to completely finish saying your answer, completely finish before I ask my next question.

And again, this is for the sake of the record because the court reporter can't write down, you know, two people talking over each other.

Is that fair?

A. Yes. Yes.

Q. Okay. All right. So, let's get started.

Mr. Williams, again, this deposition relates to the case that you have filed in the Eastern District of Pennsylvania, the US Court. I -- the complaint, obviously, I have reviewed.

But if you could, please, explain to me what exactly -- I understand that your lawsuit relates to the confinement of capital case inmates in what you consider a solitary confinement.

What exactly are you looking to be the remedy out of this? What do you want out of this lawsuit that you are filing?

Are you looking for a change in your housing status? Are you looking for a change in some other status? Are you looking for monetary relief?

I am trying to just understand what exactly it is that you are seeking with this lawsuit.

A. Okay. Monetary relief.

Q. Okay. What is your current housing status, Mr. Williams?

Is it accurate for me to represent that you are currently housed at SCI Phoenix?

A. Yes.

Q. Okay. And what is your housing status at SCI

Phoenix?

A. Right now, in terms of like we -- I guess we are still considered Level 5. We are just -- in terms of, like, how much out cell time that we have you mean?

Is that your question?

Q. However you understand --

A. Can you re --

Q. Yes. So you are -- what housing unit are you housed in.

A. Okay.

Q. And then, we will get into the details of that. But just, what is your status?

A. Okay. Okay. We are -- I'm housed in P Unit on the east side.

Q. Did you say P as in Peter?

A. Yes. And Paul, yes, P. PB, that's my pod, B. I'm in cell 1014. And I work for activities, the Activities Department.

In January -- well, now we are allowed out cell time. We're out cell time. In January, they are going to let us out for out -- jobs off the unit. So, I applied for a -- to work in a barber shop to get my barber's license.

So, that's pretty much it as far as --

Q. Okay. And it's my understanding, Mr. Williams, that as of December 3, 2019, that the Department of Corrections altered the administration of the Capital Case Units to allow more -- for it to perform more like a general population unit. That's my understanding.

Is that accurate?

A. Yes.

Q. Okay. And is that the current unit that you are -- your current situation, is that you are housed in this Capital Case Unit but with the additional liberties, I guess, the less restrictive movements?

A. Yes. Yes. The less restrictive movements, exactly.

Q. Okay. So then, I would like to clarify -- well, actually, let me back up.

So prior to this change, this alteration to the Capital Case Unit, were you housed in the Capital Case Unit under the greater restrictions where it operated more like a -- the restricted housing unit?

A. Yes. They call it maximum administrative

custody, yes.
Q. And do you remember -- actually, let me back again. I know that prior to your arrival at SCI Phoenix, you were previously housed at -- you were previously living at SCI Greene; is that right?
A. Yes, ma'am.
Q. When did you transfer from SCI Greene to SCI Phoenix?
A. I believe it was in 1996 or '97. I think July of '97 from Graterford. It was either '96 or '97.
Q. Okay. I'm sorry. Let me clarify my question.
Are you saying that in '96 or '97 you went to Greene from the former SCI Graterford?
A. Yes.
Q. Okay. My -- so you were briefly at SCI Graterford, is my understanding, from when you were still, you know, having your trial and before you were fully sentenced? No?
A. No.
Q. How long were you at SCI Graterford back before you transferred to Greene in '96 or 97?
A. I went to SCI Graterford from the county -- from the county jail in 1993. December of 1993.
Q. Okay.

A. And I stayed there until I was transferred to SCI Greene.
Q. Okay. Thanks.
Do you remember when you were convicted and sentenced? What year?
A. Yes. 199 -- February of 1992.
Q. Okay. And so in roughly '96 or '97, you transferred from SCI Graterford to SCI Greene?
A. Yes.
Q. And then, when did you transfer from SCI Greene to SCI Phoenix?
A. July 2020.
Q. So between the time that you were initially transferred to SCI Greene in roughly '96 or '97 until July of 2020, you were housed at SCI Greene the entire time?
A. Yes, ma'am.
Q. Okay. And during the time that you were at SCI Greene from roughly the time that you started there until the time that you left, were you housed in the Capital Case Unit?
A. Yes. This was L Unit.
Q. And so, you were at Greene until July of 2020 housed in the Capital Case Unit.

At what point, if at all while you were at SCI Greene, did the Capital Case Unit open up the restrictions that we discussed earlier?

A. I'm not -- I would go by the policy. The date of the policy, which would be December 3, 2019.

Q. Yes. That's the date the policy was issued, yes. So roughly, around then?

A. Yes.

Q. So while you were at Greene, you experienced the relaxing of the restrictions?

A. Yes.

Q. So I would like to clarify, Mr. Williams, is your -- my understanding of your complaint is with regard to the -- what you describe as the very restrictive nature of the Capital Case Unit.

Is your -- are your complaints limited to the time before December 2019 when the Capital Case Unit was -- you know, some of the restrictions were lifted? Or are you complaining about the current restrictions on the Capital Case Unit, as well?

A. No. It's not complaining about the current restrictions. It's from -- my initial enter into the Department of Corrections in 1993 until

December 3, 2019.
Q. Okay. When you were at SCI Graterford prior to your transfer to SCI Greene, were you also during that entire period where you were at SCI Graterford, I believe you said, from roughly '93 until '96 or '97, were you also in the Capital Case Unit during that entire time?
A. Yes, J Block.
Q. J Block. So is it accurate for me to say then, Mr. Williams, that the period of time that you are complaining about is from the time that you entered SCI Graterford until, roughly, when the restrictions were lifted in December of 2019?
A. Yes, ma'am.
Q. Okay. All right.
So then we will -- I will try to focus on that time period. Obviously, it's still a very lengthy time period. At least that clarifies for me, that you are not talking about the current situation.
We are --
A. Right.
Q. -- focused on the situation prior to the lifting of the restrictions.
A. Yes. Yes.

Q. Okay. A part of your complaint relates to your -- your contention that you have been diagnosed with severe mental -- mental health issues?

A. Yes.

Q. Okay. And in your complaint, you refer to and attach some documents relating to a -- an episode in 1979 where you were admitted to the Philadelphia Psychiatric Center for suicidal ideations?

A. Yes.

Q. How long were you admitted to the Philadelphia Psychiatric Center on that occasion?

A. For 90 days.

Q. Okay.

A. On that occasion, 90 days.

Q. And did you, to your understanding, receive a diagnosis of a mental health issue during that 90 days?

A. Yes.

Q. And what is your understanding of what your mental health diagnosis was?

A. That I was having -- severe depression and suicidal ideation. And I think it was, also, you

know, placement in the, like, a structured environment would be helpful, too.

Q. You, also, wrote a reference in your complaint as diagnosis or a clinical examination, two as a matter of fact, in September of 1996.

Were those two examinations performed as a result of -- well, let me rephrase.

Were those two examinations from 1996, did those arise out of your criminal proceedings?

A. Yes, ma'am. For my PCRA proceedings.

Q. Your PCRA proceedings?

A. Yes, ma'am.

Q. Were those examinations ordered by your legal counsel? I'm not asking anything about --

A. No, no, no.

Q. -- conversations. Were they ordered by the court?

A. No. I don't believe they were ordered by the Court. I believe my current counsel hired them to do a clinical evaluation.

Q. Okay. Great. Obviously, I don't want to know anything about your conversations with counsel or anything like that. I just wanted to clarify where those exams came from. Okay.

Between the time that you were admitted to the Philadelphia Psychiatric Center in 1979 and the examinations that you had in 1996, did you have any other examinations by psychiatric professionals?

A. Yes.

Q. Okay. Can you list for me, to the best of your ability, your memory, what other psychiatric treatments or examinations you had between 1979 and the 1996 examinations?

A. Sure. I was still a juvenile at the time. It was at Friends -- I believe it was called Friends. It's in Northeast Philadelphia, it's for adolescents. But I don't remember the doctor's name or anything like that. But I know that I went there for treatment. And I guess --

Q. Do you remember -- I'm sorry. I didn't mean to cut you off.

A. That's okay.

Q. Do you remember approximately when -- you know, what year that was?

A. Probably around the same time frame. So what was that, '79. So it probably -- it might even have been before that. It was all around the same

time. It might have been '80. Might have been '78. So, it's all around the same time frame. I would say, maybe, between '77 and '80, maybe.

Q. Okay. And you said it was called Friends?

A. Yes, Friends. It's on Roosevelt Boulevard, like, right around Sears -- Sears and Roebuck on the Roosevelt Boulevard before you get to the Oxford Circle.

Q. Did it have any additional words in the name, like, Friends Institute or something like that?

A. No. But I could -- I could -- I could call up my mom and get that information to you if that's all right.

Q. Okay. Great. That would be great.

A. Actually, I -- I'm sorry. Actually, I could get my lawyer. My lawyers probably have all that information.

Q. Okay.

A. Matter of fact -- okay.

Q. That's fine. I will -- we will get that information, okay?

A. Okay.

Q. All right. So, you said this was probably roughly between '77 and '80 -- it was happening

around the same time as the -- when you were admitted to the Philadelphia Psychiatric Center in April of '79.

Did you -- what type of facility was Friends? Was it a mental health hospital? A juvenile detention center? What was it?

A. It wasn't a juvenile detention center. It wasn't a mental hospital. It was, like, an outpatient. Like, you would just go there for therapy.

My mom would take me there. We would talk to the doctor. Have, like, therapy -- you know, family therapy. Yeah, just like that.

Q. Got it. So when you said it was, you know, maybe roughly between '77 and '80, did you mean that you were routinely going to Friends for therapy?

A. Yes, ma'am.

Q. Okay. And how often were you attending therapy at Friends?

A. That's a good question. That's a good question. I don't remember. I don't know. Maybe -- that's a long time ago. Maybe once a week. I know I went there quite a few times.

Q. Okay. And were you attending therapy, you know, individual therapy? Or I know you mentioned family therapy?
A. Yes, it was family.
Q. Family therapy?
A. I'm sorry. Yes, ma'am.
Q. Okay. So, were you attending with your mom?
A. Yes.
Q. Is it possible -- does this job your memory, let me ask it that way.
If the therapy sessions at Friends resulted from, you know, the doctors' recommendation when your admitted at Philadelphia Psychiatric Center? Because I recall in those records they mention something about family therapy.
Does that ring a bell that maybe that's how that came about? If you don't remember, you don't remember. That's okay. Just trying to see if it jogs any memories.
A. I'm not actually sure --
Q. Okay.
A. -- which came first.
Q. That's fine. So, do you believe that you attended therapy at Friends for -- over the course

of several years?

A. No. It wasn't several years. It wasn't that long I don't think.

Q. Do you remember, roughly, what the time frame might be that you were attending sessions there?

A. I would say maybe a year at the most. One year at the most. I don't remember it being over a year. It couldn't have been over a year.

Q. Okay. And do you remember if you received any actual diagnosis during the time that you were in therapy at Friends?

A. No. No, I don't.

Q. All right. So between the time that you concluded your therapy sessions at Friends and prior to, you know -- between that time which you dated as maybe between '77 and '80 for about a year at most until 1996 when you had those two clinical examinations, can you remember any other, you know, treatment or examinations that you had with a psychiatrist, psychologist, mental health professionals?

A. No.

Q. Okay.

A. No.

Q. So after -- after the therapy at Friends and this 90-days commitment at the Philadelphia Psychiatric Center, nothing -- you don't recall anything else until your two examinations in 1996.

Is that accurate?

A. No. I went back -- I went back there again.

Q. You went back where again?

A. PPC, Philadelphia Psychiatric Center.

Q. Okay.

A. I went back there for another 90 days on a voluntary.

Q. So the first -- the first visit that you had there was involuntary?

A. Yes.

Q. And is that the one that took place in April of 1979, the records of which you included in your complaint?

A. Yes.

Q. Okay. When -- to the best of your memory, when did you return to PPC?

A. Would have had to have been several months after that. I would say within three to six months after that, that I was -- yeah. Yeah.

Q. Within three to six months of your first

visit?
A. Yes, ma'am.
Q. Okay. And how long did you stay voluntarily at PPC on that second occasion?
A. I believe it was 90 days again.
Q. And do you recall if you received any diagnosis during that time period on your second visit?
A. No. I would have to check --
Q. Um --
A. I'm sorry. Go ahead.
Q. No. I --
A. I was going to say, I have it in -- I have the records. I would have to look at the records to see what the diagnosis was.
Q. That's fine. Do you have the records in your possession? Or would you need to request them?
A. No, I have them.
Q. Okay. Great. So, I will go ahead and say it on the record. But I'll send you -- I will say it now because the mail -- trying to get mail to you back and forth is always so slow.
But if you could, please, send me whatever records you have relating to, you know, your

mental health status.

A. I can send you everything. I can get that right to you.

Q. Great. That would be very helpful. Thank you, sir.

Okay. All right. So, do you recall any other psychiatric treatment you received outside of those two PPC visits and then the therapy at Friends that we just discussed?

A. No.

Q. Okay. After you were admitted -- no, excuse me. After you were entered DOC custody, your first institution was SCI Graterford, I believe, correct?

A. Yes.

Q. Okay. When you were at SCI Graterford -- when you first entered SCI Graterford, excuse me, did you initially see somebody in the mental health unit?

A. In the initial, I don't remember that. I'm quite sure I did, but I don't remember. Like, the first day you go, you talk to a lot of people. But maybe one of them was from the mental health staff, but I don't remember. I talked to a lot of

people the first that I that, you know.
Q. Did you --
A. But after --
Q. I'm sorry. Go ahead.
A. No, go ahead. Go ahead. I'm sorry.
No, I was going to say, afterwards, I did talk to the mental health staff.
Q. Okay. During the time that you were at SCI Graterford, did you routinely get to, you know, speak to the mental health staff?
A. Routinely, no. Routinely, no.
Q. Okay. How frequently were you -- did you speak with the mental health staff when you were at SCI Graterford? I know I'm trying to isolate some period of time.
A. Sure.
Q. It was so long ago. But again, to the best of your memory?
A. Well, there was one occasion that I requested to see the Mental Health Department staff because I was having some bad thoughts. And after that, I had a -- shortly after that I had a suicide attempt.
And they put me in a POC cell, it's like an

isolation cell where they take all your clothes. And for, I forgot how long it was. Either 48 hours or 72 hours. I'm not sure how long it was. Then I got out. And that's when I seen the mental health staff, that I really remember talking to the mental health doctor for the first time.

At that time -- so, I tried to commit suicide. I made a noose out of a sheet. And when the put me in the cell, I told them that I was just faking because I wanted to get out of the cell. That -- not that I was faking, that I was -- I told them that I was trying to get to another unit to make a phone call just to get out the cell.

Basically, I was telling them anything just to get out of the cell, the POC cell. And that I was okay. That it was nothing wrong with me. And then, they put me on DC status for, like, six months for trying to commit suicide for making a noose.

And basically after that, I never really had any contact with the Mental Health Department. After that, I just dealt with everything on my own as far as you know how I was feeling, depression and --

Q. So after -- after your suicide attempt, you said you were placed in a POC cell?

A. Yes, ma'am.

Q. Is that a -- does POC stand for psychiatric observation cell?

A. Yes.

Q. And after that, you said you spoke to staff from the mental health staff. And afterwards, you were placed on DC status?

A. Right. Before that, I told them that nothing was wrong with me. That I was okay. You know, just I wanted to get back to the unit just to get out the cell. That's what I told the doctor.

And he asked me -- I'm sorry. Go ahead.

Oh. And he asked me, did I want to get on Prozac. And I said, no, I didn't want to take any medication. And yeah, that was pretty much it. It was really quick. It wasn't that long of an interview.

And then, yes, I was placed on DC status for making the noose. And DC status is where they take all your property out of your cell, like, your TV and radio. And you only get to go to the yard by yourself. So basically, you're isolated

on top of being isolated. But you are still on the unit with everybody else. You don't go to a separate unit.

That's how Graterford was back then. You still stayed in your cell. They just took all your property out of your cell.

Q. I see. So while you were on -- the time you were on DC status, you were returned to the -- your regular housing unit, but they removed all your possessions out of the cell?

A. Yes, ma'am.

Q. Okay. And that lasted for roughly six months you believe?

A. Yes.

Q. And I believe you said that after that incident, you -- you no longer sought assistance from the mental health staff?

A. Yes.

Q. Okay. So then, the rest of your time at SCI Graterford outside of that incident, you didn't speak to anyone in the mental health staff?

A. Not that I remember, no.

Q. And then, what about when you transferred to SCI Greene in whatever year it was '96/'97?

Did you -- did you at -- during your time at SCI Greene, do you remember speaking to the mental health staff?

A. Yes.

Q. And I know that your time there was long, so I'm asking for a very long period of time.

What do you remember were your interactions with the mental health staff? Did you have, you know, routine checkups with them? Or was it, you know, sporadic based on incidence?

A. So, there was staff that would come around every now and then just -- you know, just doing like a walk by. How you doing? So, that was the mental health staff, I guess, doing their, you know, weekly rounds or something like that. But no out-of-cell interviews or anything like that.

Then I had a case of -- well, during that time, we weren't allowed to bring water out in the yard. You can get misconduct for bringing water out in the yard. I had a minor case of heat exhaustion. And based off of that, they sent me to the Mental Health Department. They referred me to the Mental Health Department.

So, that's when I remember talking to the

mental health staff after my case of heat exhaustion.

Q. Do you remember approximately when that was?

A. Let me think. Took me a year to recover from that. It was really bad. I couldn't -- it was really bad. I had a headache for, like, six months straight. I had to sleep sitting up. I couldn't lay down. I would get real dizzy when I laid down. The sun would make me dizzy if I went out to the sun.

So heat exhaustion, it was -- it affected me. Took me a year to recover from it. So I would say, maybe around 2008 or 9 maybe or maybe even later than that. I'm not sure. It was a while ago. But I could check the records and get that to you.

Q. Okay.

A. I could have my -- I'm sorry.

Q. No. I was just saying okay.

A. Oh, okay.

Q. So that incident with the heat exhaustion, that was the first time you had an actual one-on-one session with mental health staff?

A. Yes.

Q. Okay. And then, what about after that incident?

A. After the restrictions were -- the relaxed restric --

Q. No, I'm sorry. After the incident with the heat exhaustion where they then sent you to -- referred you to mental health staff.

Did you then -- did you only have one session with them? Or did you then, you know, start having routine sessions with them?

What happened after that is what I'm asking?

A. I believe his name is Dr. Khan. He came to see me at least three or four times on the unit.

Q. Could you repeat that name again?

A. I believe it was Dr. Khan. I'm not sure. I know he was Arab and he was Muslim. I'm not -- his name might have been Dr. Khan.

Q. Got it. Okay.

So Dr. Khan -- we will assume that's his name for these purposes -- saw you to the best of your recollection three or four times on the unit following the incident with the heat exhaustion?

A. Yes. And it was one other doctor other than that. I believe he came to see me twice. I don't

remember his name, but he was an Indian doctor. Not Native American, but Indian from India.

Q. Understood.

A. Okay.

Q. And this -- so this second doctor also came to see you, you said, two times on the unit?

A. Yes.

Q. And that was in conjunction with when Dr. Khan was seeing you?

A. Yes, ma'am.

Q. Now, were those two doctors seeing you together, or were they seeing you separately?

A. Separately.

Q. And do you recall if Dr. Khan or this other doctor made any kind of diagnosis with regards to your mental health?

A. No, I do not.

Q. After those visits with Dr. Khan and the Indian doctor, do you remember any other interactions with the mental health staff while you were at Greene?

A. Yes, ma'am. Yes.

Q. Okay. If you can relate those to me to the best of your recollection.

A. Sure. After those relaxed restrictions, we had a mental health staff on the unit during the daylight hours. I forgot his name. And I talked to him -- you know, I would talk to him when he would do his rounds. He was a really nice guy.

I would just talk to him. He helped me get the DSM-5. That's like a mental health book, the DSM-5. And I wanted to be in the CPS program, enrolled in the CPS program, but they already had full enrollment at the time. And you had to be at least a C or a B roster -- on the mental health roster.

And he checked. And he said, yes, I was a C at one time, but I was downgraded to B roster. And yeah, that was pretty much -- you know, I would speak to him from time to time. He was really nice. But not as far as on therapy, just in general.

Q. Do you remember that person's name?

A. No.

Q. Okay.

A. No, I don't remember.

Q. And you mentioned that you were trying to get onto something, but it was full. What was that

again?
A. CPS.
Q. And what is --
A. Certified peer specialist.
Q. So you were -- you wanted to be, I don't know if qualified is the right word, as a certified peer specialist? Or you wanted to be assigned to a certified peer specialist?
A. No, qualified. To actually be a certified peer specialist.
Q. Got it. And what is a certified peer specialist?
A. I know they have to take a lot of classes. I guess, they usually make rounds, you know, check on the prisoners to make sure they are doing all right. Speak to them, listen to whatever they got going on. You know, just trying to help them out.
Q. Got it. But this all was after you said the restrictions were relaxed?
A. Yes.
Q. Okay. And you said after the restrictions were relaxed, they -- the institution then had mental health staff sitting in the unit every day during the daylight hours?

A. Yes. They had their own office, yes.
Q. Got it. And anybody was able to go and visit them in their office during those hours?
A. Yes. Yes.
Q. And prior to that, the mental health staff would, I believe you said, come on the block and, you know, do a round -- like, walk around the cells and ask you -- maybe poke their head in and ask you how you are feeling. But they didn't have an office on the block.
Is that accurate?
A. Yes, ma'am. Yes.
Q. Prior to DOC relaxing the restrictions and allowing the mental health staff to have an office on the unit, were you able to have a one-on-one session with the mental health staff if you requested it?
A. Yes.
Q. So if they asked you during their rounds, you know, how are you feeling and then you related to them, you know, maybe I'm not feeling so great, you know, could I talk to you one-on-one, would they then sit with you one-on-one or schedule you for an appointment?

How would that work?

A. I believe they would schedule me for an appointment. Or maybe they might just -- I guess, they would schedule me for an appointment. Or maybe they might even -- depending on the seriousness of it, they might even just take you out the cell and put you in an office and maybe, you know, see what's going on depending on what you say, yeah.

Q. But during that time, you didn't -- you never requested to have a one-on-one session with them or anything?

A. No, ma'am.

Q. Okay. During the times when they were walking around doing their check-ins with people, did you ever relate to them, you know, I'm not feeling too good? I'm feeling kind of down?

A. No. I would always say I'm okay.

Q. Do you remember if at any time you requested assistance from the mental health unit or expressed, you know, to the guards that you were feeling down or, you know, suicidal and they didn't -- you know, they didn't give you assistance? They didn't make an appointment for

you at the mental health?

A. No. I never -- that never happened at Greene, just at Graterford with the suicide and asking for help then. But at Greene, no.

Q. Okay.

A. But would they -- would they -- you're asking would they just ignore that?

Q. No. I was just asking if you remember any time where you had -- where they had ignored you?

A. Oh, no, no, no.

Q. In your time at SCI -- well, actually, let me rephrase my question.

During your time with the DOC, to your knowledge, has any mental health professional given you any kind of diagnosis?

A. No, not that I'm aware of. But that doesn't mean that they haven't because I was on a C roster for a while. And so, I just haven't seen the records to see what I was diagnosed with from their doctors, from the department's doctors.

It's kind of hard to get those records.

Q. Yeah.

A. They won't let me see the mental health records.

Q. Okay. But you are aware that you were on the C Roster for some period of time?
A. Yes. That was -- yes. They told me that I was on the C Roster for some period of time, yes.
Q. Okay. Do you know if you are -- let me back up. Are you made aware of what your status is, whether it -- you know, whether you are A, B or C?
A. Just from that conversation with the doctor at Greene when I was trying to be a CPS. And he said I was downgraded to a B Roster.
Q. So you -- at this point in time, you have no idea what your roster is?
A. Status is, no.
Q. Your status, okay. But based on that conversation with that therapist or doctor, we're not sure what he was at Greene, he did tell you at that time that at some point you were the C Roster and then you had been switched to a B Roster?
A. Yes, ma'am.
Q. Okay. Are there any -- let me back up.
Other than that incident at SCI Graterford that you described to me earlier where you were placed on DC status after your suicide attempt, during the time where you were at SCI Greene, were

you ever placed on DC status to your memory?

A. Yes. Oh, yes.

Q. Do you remember when that was or --

A. No. But I could tell you what they were for, but I don't remember. It was --

Q. Sure.

A. Shadowboxing the yard. One was for -- they had the cable on in the cell. And I -- and I had like a wire hooked up instead of like real cable. So, they got me for cable theft one time. So, I got like 30 or 15 days for that.

And maybe, like, in our yard -- I don't know if you've ever seen how the yards is, but like cages, small cages.

Q. I have seen it, yes.

A. Okay. So at that time, after a while, they let us have basketballs but with no basketball hoop or anything. So what we would do, we take, like, a string, tie it up in the corner to make, like, a little triangle basketball hoop. So, I got misconduct for that.

But I beat that one, but I did get a misconduct for that, for tying it up. But I didn't get DC for that.

Let me see what else.

Oh, at Graterford -- you want to know at Greene -- well, Graterford, I was a little -- I was going through because I had just came through. I was a little rough. And yeah, it was a little rough. And staff was a little, you know, hard on us.

So one time I -- the guard -- I was praying because I'm a Muslim and I was praying. It was at breakfast time. And my tray was still on the slot. And they just threw my tray in the trash. So, I got a little upset. And I broke my chair and took the wood and slung it at him.

But it didn't hit him, but I got a misconduct for that. And I think that's why I got transferred to Greene based off of that incident. And actually, Officer Harris became our -- he got transferred to Greene. And he was, actually, our counselor at Greene.

So yeah, it wasn't a problem, you know, after that. It was just a quick incident. But I believe that separation -- when I was talking to the mental health staff at Greene when I wanted to be CPS and they -- you know, he was going over my

record. And that was still on my record that incident with Officer Harris when I broke my chair.

But other than that, at Greene it was all, you know, just some minor stuff. But I would say when I broke the chair and tried to hit Officer Harris with the chair, a piece of the wood of the chair, that was, you know, probably the worst thing.

Q. If you could just describe to me, Mr. Williams. You know, we discussed already that the treatment that you're complaining about is during the time that you were -- prior to when the prison relaxed the Capital Case Unit.

A. I'm not actually complaining about the treatment. That's not my complaint.

Q. Okay. Yes. So I'm going to -- the question I am leading up to is, if you can just describe to me in your own words, clarify what conditions or, what have you, are you focused on in terms of your litigation?

A. Okay, good. I'm talking about failure to accommodate, like, with programs that they had available for us. Like, out of cell program, psychotherapy out of cell, group therapy, anger

manager. It's a thing called WRAP. It's a wellness -- that's an acronym for it. But it's wellness -- I forgot the name of it, but it's called WRAP. And they have a lot of programs, like, music therapy, art therapy.

So, all those things that the department -- all these services that they had, these mental health services, we weren't allowed to have because of our status of our capital sentence.

So basically, that's what I am saying. It's a failure to accommodate claim.

Q. Okay. And this is, again, just as regards to the time period before the Capital Case Unit was relaxed.

Is that accurate?

A. Yes, ma'am.

Q. At this time, do you feel that you do have access to those services?

A. No. They haven't started any of that, any of those type of programs yet. There is -- going to be starting in January.

Q. Okay.

A. Like all the -- I'm sorry.

Q. No. No. Go ahead.

A. No. Like, as far as the anger management programs, you know, anything off the unit. Like I mentioned earlier that I was -- I applied for -- be in the barber program to get my barber's license. So in January, they are going to be opening it up.

And now, we just have out-of-cell time. But we are not -- we don't have access to any program services yet.

Q. Okay. So is your complaint -- so, you said your complaint relates to the failure to accommodate for out-of-cell programs. And you mentioned these therapy programs, various therapy programs.

Is that -- is that the sole focus? Or are there other services or programs that you feel that the DOC, you know, failed to provide to you that are part of your complaint?

A. Yes. Any -- I'm saying, anything that they have -- not just mental health programs, any programs that we were entitled to have.

But yeah, I would say it's more geared towards the mental health programs. And by definition, solitary confinement wouldn't allow that. Maximum

administrative custody wouldn't allow for any programs because you were locked in. So they wouldn't bring -- yeah, they wouldn't do anything.

So we decide to, you know.

Q. Are you -- does your complaint encompass any other restrictions of the Capital Case Unit other than various, sounds like, group programs is a thing that you've related to my earlier, mental health ones, but other types of programs, as well?

You know, are you encompassing any other type of, you know, restrictions --

A. Yes.

Q. -- that were placed on the Capital Case Unit?

A. Yeah. Like, the program services other than mental health. Like, being able to give off-the-unit job, like -- as far as like my barber's license. So I would say, vocational programs, as well.

Q. Okay.

A. And educational programs, you know, off the unit. I know they did have a GED in-cell program. But anything, you know, that was -- that similarly situated non-Capital prisoners with non-health issues had access to, that's what, you know, my

complaint is geared towards.

Did I say that right? Is that okay?

Q. Yeah. Yeah. I'm -- absolutely. You are doing great.

A. Okay.

Q. All my questions are just designed to help me understand --

A. Okay.

Q. -- specifically what your complaint is about. And that will help me answer it.

A. Okay.

Q. Did you -- do you remember any specific programs that you ask to be -- to have access to?

A. No. Only time they were -- it was requested, was from the ACLU requested, you know -- the Department of Corrections, you know, wrote a letter to Secretary Wetzel. I think it was in 2017 based off of the -- their reforms that they made, you know, based off their 2014 Department of Justice Report on how the department was using solitary confinement on prisoners with mental health and intellectual disabilities.

And based off the Disabilities Rights Settlement Agreement with the Department of

Corrections, they made reforms for non-Capitals and changed their policies and, you know, gave them access to the program. But they didn't do it for the Capitals. So -- and yeah, that was the only time that it was requested not by me personally, but requested through the ACLU.

And the Department's response was that they were going to continue their Capital Case Housing Policy as administrative -- Maximum Administrative Custody. Which, in turn, brought about Reed v. Wetzel. And based off of Reed v. Wetzel, now that's how we got the relaxed restrictions. And now, we are going to be able to have access to program services.

But my complaint is geared toward those past violations of failure to accommodate.

Q. And what do you -- if you can clarify, what do you mean by that? These -- you said your complaint is geared towards these past violations.

What do you mean?

A. Like when I first came in. When I first had the issue with the suicide attempt. And know they had suicide prevention and all those things. And they never -- their response was punitive based

off of my suicide attempt. So, that really turned me away from the mental health department. And I withdrew and just dealt with, you know, whatever I was feeling myself.

Yeah. So, yeah. So I'm saying -- I guess I'm saying that they had -- they had these programs and these services available. I don't believe that it's -- relies on a request. Solitary confinement in -- by its definition doesn't allow for it, for any of those programs. Yeah, so -- yeah. And yeah, it just doesn't allow for any of those programs.

Can I say one thing?

Q. Of course.

A. It's not -- I remember Jennifer Bangel asking me a question, so maybe I could just -- that it's not -- I'm not challenging solitary confinement. It's not a face -- it's how they apply solitary confinement to a person, to an inmate who has mental health -- mental health disability, how they applied it to me.

Q. Okay --

A. I'm not challenging -- I'm sorry.

Q. I was going to clarify. So, you're saying

that your complaint is -- is -- is an as-applied challenge with regards to the application of solitary confinement to you, Mr. Williams?

A. Yes, ma'am.

Q. Because of your mental health status?

A. Yes, ma'am.

Q. And I didn't mean to cut you off when you were about to say something else.

Did you want to clarify something else?

A. I don't even remember what I was going to say. I'm sorry.

Q. That's fine.

A. That's okay. It might pop up.

Q. It's the nature of these, you know, remote --

A. Delays.

Q. -- depositions. Yeah, exactly. I mean, they're a great tool in many ways. But inevitably, there is at least a little bit of a slight lag.

And, Mr. Williams, did you ever, you know, file or submit a grievance or anything like that during the time, you know, all these years over the years, did you ever file a grievance or anything related to your inability to have access

to any programs or what have you?

A. Yes.

Q. Do you remember -- well, let me ask you this.

Do you still have copies of those grievances that you filed?

A. Yes.

Q. Okay, great. So, I will ask you for copies of those? Do you --

A. Well, I don't -- I'm sorry. Go ahead.

I don't have -- what do I have? I have the numbers.

Q. Oh, yeah. If you have the numbers, go ahead and give me the numbers.

A. I can give them to you now. Do you want the numbers now?

Q. Sure. Happy to write them down.

A. All right. One is 916331. Okay. And the other one is -- I don't have the other one, but I can get that to you.

Q. Okay. That's not problem?

A. Sorry. I didn't bring that with me.

Q. No problem. Do you remember roughly when you filed the grievances?

A. Okay. One -- okay. Sure.

So the first one -- the one that you have the number for was 2/24/2021 -- February 24, 2021. And the first one was December 21, 2020.

Q. Sorry. Hold on. There's helicopter flying by or something. Just give me a second.

Okay. Could you repeat that again?

A. Sure. So, the first one was 12/21/2020. So, I actually filed two grievances.

Q. Great. Okay. And other than those two grievances, do you recall filing other grievances related to these issues?

A. No, ma'am.

Q. Okay.

A. I did not file any other grievances related to these issues.

Q. Okay. And the grievances, I will get copies of those grievances. So, you don't have to tell me verbatim.

But just while we are sitting here, the two grievances that you filed, one in December of 2020 and then another in February of 2021, did they relate to -- do they relate to things that are happening now? Or did they -- are they related to, you know, the things that we've been

discussing from -- you know, that happened in the past?

A. Happened in the past.

Q. Okay. Is it say for me to assume that what you put in those grievances are the things that we have discussed here today?

A. Yes.

Q. And don't worry, like I said, I will get copies of those grievances.

A. Yeah. Okay.

Q. Is there anything in those grievances that we haven't discussed yet that you want to tell me about?

A. Oh, it does actually -- sorry. It does actually name -- it 1994, it mentions Dr. Spector. I got that from my attorney. So, that would be Dr. Jay Spector.

It mentions that that doctor diagnosed me with -- I put in here, psychiatric disability. So, it may have been another diagnosis. It may have been -- it may have been depression or, I forgot what it was. But I characterize it as a psychiatric disability.

So what you have is like -- like -- like just

as far as in the criminal side, your lawyers would ask you this -- you know, file a release form so they can have all your mental health records and do the mitigating investigation and all that.

So, but they have an agreement with the Department of Corrections not to give you copies of the mental health records. But they will tell you what's in them over the phone or give you an idea of what --

Q. Hold on. Hold on, Mr. Williams. I don't want you to accidently tell me anything about discussions you've had with your lawyers.

A. No, no, No. Okay. I'm sorry.

Q. I just --

A. Okay.

Q. I want to protect your attorney/client privilege with your lawyers.

A. Okay.

Q. I don't want to accidentally take you down that road or for you to accidentally reveal anything.

A. Okay.

Q. I understand, but you don't need to tell me anything more.

A. Thank you.
Q. Obviously, you're psychiatric records will be obtained and, you know, they will speak for themselves. Don't worry about that.
A. Okay. I'm sorry.
Q. No, no. Don't apologize to me. I just want to make sure you don't accidentally say anything that will waive your privilege.
Okay. Well, sir -- is there anything, Mr. Williams, that I haven't already asked you, you know, that we haven't already discussed that you -- you know, is a part of your complaint and that you want to discuss with me?
You know, is there anything we haven't, like, already discussed that you want to tell me?
A. In the answer, there was two defenses: Failure to exhaust administrative remedies and statute of limitations. But as far as the administrative remedies, we -- prisoners, as far as the 804 Policy, that's the grievance policy -- we are not allowed to -- that's not an available grievance -- let me say this correctly.
It's not an available avenue to complain or challenge your conditions of confinement. So

there is no -- you can't challenge -- under the 804, you can't challenge the Secretary's decision of placing Capitals in Maximum Administrative Custody.

And so if you are asking for accommodations, you can't -- reasonable accommodations, you really -- there is no avenue that -- to request that based off of conditions of confinement complaint. There is no way to -- there is no way to grieve it. Even the -- they have a form called Reasonable Accommodations Form, like, mental health disabilities -- or, excuse me, just disabilities, not mental health. Just Disabilities Accommodation Form 006.

And that, you can't -- prisoners can't -- it's not an available means to challenge conditions of confinement by being placed in a maximum administrative custody and a failure to accommodate. Like you say, okay, I'm in administrative custody and I want these programs. That's not even an available avenue through that policy that determines that. So, the only way we can challenge is through the Secretary of the Department of Corrections.

And the ACLU did make that request, and they denied that request. And there was a lawsuit, Reed v. Wetzel, which brought about our relaxed restrictions. And now my complaint is geared towards monetary damages for the failure to accommodate for all the years prior to that. Yeah. Basically, that's pretty much it.

And it's a -- as far as the statute of limitations is coming, alleging continual violations doctrine, that it was a continual -- that the last act was December 3, 2019. And then, I filed within two years of that date, of that last prior act.

Would you like some -- I'm sorry. I'm sorry. Go ahead.

Q. No, sir. I was just going to thank you. I don't have any further questions.

A. Oh, okay.

Q. Yes. So, I was going to wrap up because I don't have any further questions. And just, you know, again, ask you if there is -- I appreciate all your answers today and all the information you provided.

Is there anything else you want to let me

know? Or otherwise, I am going -- finished for the day?

A. So that's it? That's all you need from me?

Q. That's all I need from you, sir. The nature of these deposition is simply to really understand what your allegations and your complaints are.

You know, this one is --

A. So, how do you see it?

Q. Well, I can't really answer that. You will -- my assessment of the case.

A. I will see that --

Q. My feelings about the case will be in the motion, of course. But, you know, the deposition is a discovery too just so I can really, truly understand what it is your allegations are.

And I think that, you know --

A. Okay. I do have one other thing to say.

Q. Sure.

A. Basically, similar to the Palakovic -- have you heard of Palakovic vs. Wetzel?

It was guy -- Jason[sic] Palakovic. He committed suicide at SCI Correction at around the time that the Department of Justice was doing their first initial investigation. And so, his

family sued the Department.

And what the Court found was that they were aware that Brandon had suicidal ideation. He was on the mental health roster. And despite all that, they kept him in solitary for, like, 60 days here and 60 days there, something like that. And while he was in solitary, he committed suicide.

So, they wind up settling, you know, after that. But yeah, so basically that's what my complaint. They were aware that I was on the mental health roster. They were aware of my disability. And despite that knowledge and the risk and the harm, they kept me in solitary and failed to accommodate me with any type of programs or anything.

And that's the end of that. That's pretty much it. Oh, the DOC did acknowledge. And based off -- there were some cases like, as far as, the failure to exhaust and no available administrative re -- they have actually admitted that what I'm -- in other cased like in Johnston and in Powell vs. Fisher, that the 804 Policy, a person challenging, you know, administrative custody can -- you know, that's not an available means.

And so, Furgess vs. Pennsylvania Department of Corrections, it's a recent 2019 case where a guy was put in RHU. He was denied a shower for about 90 days. And Third Circuit Court of Appeals held that it didn't matter why he was in RHU. That the prisoners -- how did he say it? A prisoner's right to reasonable accommodations isn't stripped because he's placed in administrative custody or RHU. And the Prison's obligation to comply with ADA and the RA, they have -- excuse me, they have an obligation to -- no matter -- regardless of the reasons why a prisoner is housed in administrative custody.

So basically, that's the claim. They failed to accommodate a person with a mental health disability, but they accommodate people with physical -- prisoners with physical disabilities, like, accommodating with an accessible shower, a wheelchair. So, these other similar-situated prisoners, their physical disabilities is equivalent to a person -- prisoner who has a mental health disability. They fail to accommodate as far as Capital, yeah.

So basically, that's -- basically, that's it.

It's a failure to accommodate claim.

Q. Okay.

A. And that's it.

Q. Okay. Your complaint also states that you're bringing it under the 8th and 14th amendments. Is that part of your complaint? Or really, is your complaint under the Americans with Disabilities Act?

A. It's under both. It's under both. It's under both.

Q. That's fine. Okay, sir. Well, thank you. I really appreciate your time today. If you could, please, just send me a copy of the materials that you have.

A. The mental health records?

Q. Yes. Whatever it is that you actually have in your possession, I'm not asking you to go and request it from anybody else. But if you already have copies of any of -- anything that you think is related to your claims, if you already have copies in your possession, if you can send those to me.

I know we discussed today the mental health records and the grievance records. If you have

copies already in your possession, please, go ahead and send that to me. I'm not asking you again to, you know, ask somebody else.

Okay?

A. Okay. Yes, ma'am.

Q. All right, sir. Well, again --

A. I have on --

Q. -- I appreciate your time.

A. I have one other thing to say.

Q. Yeah.

A. I seen -- this in nothing dealing with the case. This is just on a personal thing.

I was watching TV the other day. And I saw a lot of Asian-American community, like, at a rally protesting Asian hate. And I just want to say that I'm sorry that the Asian community is going through that now. When I was coming up, we didn't feel that way. My generation didn't feel that way about Asians. We looked up to them, like, all the martial arts and movie stars.

So, I just want to say I'm sorry for what they are going through. And things will get better. And keep your head up.

Q. Thank you, sir. That's very kind of you.

Thank you.
A. Okay.
Q. Same to you.
A. Okay.
Q. Thank you. Thank you again for your time today.
A. You're welcome.
Q. Okay.
A. Thank you.
Q. Okay, sir. Bye, bye. Thank you.
A. You have a nice day.
Q. You, too.

(At this time, the deposition concluded at 1:04 p.m.)

C E R T I F I C A T I O N

I, hereby certify that the proceedings and evidence noted are contained fully and accurately in the stenographic notes taken by me in the foregoing matter, and that this is a correct transcript of the same.

--------------------------
ANGELA M. KING, RPR,
Court Reporter, Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

**A**

**a.m** 1:14
**ability** 16:8
**able** 34:2,15 43:15 45:13
**absolutely** 44:3
**access** 41:18 42:8 43:24 44:13 45:3 45:13 47:24
**accessible** 57:18
**accidentally** 51:19,20 52:7
**accidently** 51:11
**accommod...** 40:22 41:11 42:12 45:16 53:19 54:6 56:14 57:15,16,23 58:1
**accommod...** 57:18
**Accommod...** 53:14
**accommod...** 53:5,6,11 57:7
**accurate** 7:21 9:8 13:9 21:5 34:11 41:15
**accurately** 61:5
**acknowledge** 56:17
**ACLU** 44:15 45:6 54:1
**acronym** 41:2
**act** 54:11,13 58:8
**activities** 8:18,19
**actual** 20:10 29:22
**ADA** 57:10
**additional** 9:13 17:9
**administra...** 9:5
**administra...** 9:24 43:1 45:9,9 52:17,19 53:3,18,20 56:19,23 57:8,12
**admitted** 14:8,12 16:1 18:2 19:13 23:11 56:20
**adolescents** 16:14
**AGENCY** 1:19
**ago** 18:23 24:17 29:15
**agreement** 44:24 51:5
**ahead** 22:11 22:19 24:4 24:5,5 26:14 41:24 48:9 48:12 54:15 59:2
**allegations** 55:6,15
**alleging** 54:9
**allow** 6:14,16 9:5 42:24 43:1 46:9 46:11
**allowed** 8:20 28:18 41:8 52:21
**allowing** 34:14
**alteration** 9:19
**altered** 9:4
**amendments** 58:5
**American** 31:2
**Americans** 58:7
**and/or** 61:18
**Angela** 1:14 4:3 61:11
**anger** 40:24 42:1
**answer** 5:8 5:13,23 6:1 6:9,17 44:10 52:16 55:9
**answering** 6:16
**answers** 54:22
**anybody** 34:2 58:18
**apologize** 52:6
**Appeals** 57:4
**application** 47:2
**applied** 8:23 42:3 46:21
**apply** 46:18 61:15
**appointment** 34:24 35:3 35:4,24
**appreciate** 54:21 58:12 59:8
**approxima...** 16:20 29:3
**April** 18:3 21:15
**Arab** 30:16
**Arch** 2:6
**arrival** 10:3
**art** 41:5
**arts** 59:20
**as-applied** 47:1
**Asian** 59:15 59:16
**Asian-Ame...** 59:14
**Asians** 59:19
**asked** 26:14 26:15 34:19 52:10
**asking** 15:14 28:6 30:11 36:3,6,8 46:15 53:5 58:17 59:2
**assessment** 55:10
**assigned** 33:7
**assistance** 27:16 35:20,24
**ASSOCIA...** 1:19
**assume** 6:10 30:19 50:4
**attach** 14:7
**attempt** 24:23 26:1 37:23 45:22 46:1
**attended** 19:24
**attending** 18:19 19:1 19:7 20:5
**attorney** 2:5 50:16
**attorney/cli...** 51:16
**available** 40:23 46:7 52:21,23 53:16,21 56:19,24
**avenue** 52:23 53:7,21
**aware** 36:16 37:1,6 56:3 56:10,11

**B**

**B** 3:11 8:17 32:11,14 37:7,10,18
**back** 9:18 10:2,20 21:6,6,7,10 22:22 26:12 27:4 37:5,20
**bad** 24:21 29:5,6
**Bangel** 46:15
**barber** 8:23 42:4
**barber's** 8:24 42:4 43:17
**based** 28:10 28:21 37:14 39:16 44:18,19,23 45:11,24 53:8 56:17
**basically** 25:14,20 26:24 41:10 54:7 55:19 56:9 57:14,24,24
**basketball** 38:17,20
**basketballs** 38:17
**beat** 38:22
**believe** 10:9 13:5 15:18 15:19 16:12 19:23 22:5 23:13 27:13,15 30:12,15,24 34:6 35:2 39:22 46:7
**bell** 19:16
**best** 5:9,12 5:17 16:7 21:19 24:17 30:20 31:24
**better** 59:22
**bit** 47:18
**block** 13:8,9 34:6,10
**book** 32:7
**Boulevard** 17:5,7
**Brandon** 56:3
**breakfast** 39:10
**briefly** 10:15
**bring** 28:18 43:3 48:21
**bringing** 28:19 58:5
**broke** 39:12 40:2,6
**brought** 45:10 54:3
**Building** 2:6
**bye** 60:10,10

**C**

**C** 2:2 32:11 32:13 36:17 37:2 37:4,7,17 61:1,1
**cable** 38:8,9 38:10
**cages** 38:14 38:14
**call** 9:24 17:11 25:13
**called** 16:12 17:4 41:1,4 53:10
**capital** 7:7 9:5,12,20 9:21 11:21 11:24 12:2 12:15,17,20 13:6 40:13 41:9,13 43:6,13 45:8 57:23
**Capitals** 45:4 53:3
**case** 4:22 7:2 7:7 9:5,12 9:20,21 11:21,24 12:2,15,17 12:20 13:7 28:17,20 29:1 40:13 41:13 43:6 43:13 45:8 55:10,12 57:2 59:12
**cased** 56:21
**cases** 56:18
**cell** 8:4,18,21 8:21 24:24 25:1,9,10 25:13,15,15 26:2,5,13 26:22 27:5 27:6,10 35:7 38:8 40:23,24
**cells** 34:8
**center** 14:9 14:13 16:2 18:2,6,7 19:13 21:3 21:8
**certification** 61:13
**certified** 33:4 33:6,8,9,11
**certify** 61:3
**certifying** 61:19
**chair** 39:12 40:3,6,7,7
**challenge** 47:2 52:24 53:1,2,16 53:23
**challenging** 46:17,23 56:22
**change** 7:12 7:13 9:19
**changed** 45:2
**characterize** 50:22
**check** 22:9 29:15 33:14
**check-ins** 35:15
**checked** 32:13
**checkups** 28:9
**Circle** 17:8
**Circuit** 57:4
**claim** 41:11 57:14 58:1
**claims** 58:20
**clarifies** 13:18
**clarify** 6:8 9:17 10:11 12:12 15:23 40:18 45:17 46:24 47:9
**classes** 33:13
**clinical** 15:4 15:20 20:18
**clothes** 25:1
**Collegeville** 1:9
**come** 28:11 34:6
**coming** 54:9 59:17
**commencing** 1:14
**commit** 25:7 25:18
**commitment** 21:2
**committed** 55:22 56:7
**community** 59:14,16
**complain** 52:23
**complaining** 12:19,22 13:11 40:11,14
**complaint** 7:4 12:13 14:1,6 15:3 21:17 40:15 42:10,11,18 43:5 44:1,9 45:15,19 47:1 52:12 53:9 54:4 56:10 58:4 58:6,7
**complaints** 12:16 55:6
**completely** 6:14,17,17
**comply** 57:9
**concluded** 20:14 60:14
**conditions** 40:18 52:24 53:8 53:16
**confinement** 7:7,8 42:24 44:21 46:9 46:17,19 47:3 52:24

Roy Williams
December 9, 2021

53:8,17
**conjunction** 31:8
**consider** 7:8
**considered** 8:3
**contact** 25:21
**contained** 61:4
**contention** 14:2
**continual** 54:9,10
**continue** 45:8
**control** 61:17
**conversation** 37:8,15
**conversatio...** 15:16,22
**convicted** 11:4
**copies** 48:4,7 49:16 50:9 51:6 58:19 58:21 59:1
**copy** 58:13
**corner** 38:19
**correct** 23:14 61:7
**Correction** 55:22
**Corrections** 9:4 12:24 44:16 45:1 51:6 53:24 57:2
**correctly** 52:22
**counsel** 15:14 15:19,22
**counselor** 39:19
**county** 10:22 10:23
**course** 6:13 19:24 46:14 55:13
**court** 1:1,15 1:19 3:14 4:3 6:20 7:3 15:17 15:19 56:2 57:4 61:11
**CPS** 32:8,9 33:2 37:9 39:24
**criminal** 15:9 51:1
**current** 7:19 9:10,11 12:20,22 13:19 15:19
**currently** 7:22
**custody** 10:1 23:12 43:1 45:10 53:4 53:18,20 56:23 57:8 57:13
**cut** 16:18 47:7

**D**

**D** 3:1
**damages** 54:5
**date** 12:4,6 54:12
**dated** 20:16
**day** 23:22 33:23 55:2 59:13 60:11
**daylight** 32:3 33:24
**days** 14:14,16 14:19 21:10 22:5 38:11 56:5 56:6 57:4
**DC** 25:17 26:9,20,21 27:8 37:23 38:1,24
**DE** 1:21
**dealing** 59:11
**dealt** 25:22 46:3
**December** 1:9 9:3 10:23 12:5 12:17 13:1 13:13 49:3 49:20 54:11
**decide** 43:4
**decision** 53:2
**defendant** 2:8 4:22
**defenses** 52:16
**definition** 42:23 46:9
**Delays** 47:15
**denied** 54:2 57:3
**department** 8:19 9:4 12:24 24:20 25:21 28:22,23 41:6 44:16 44:19,20,24 46:2 51:6 53:24 55:23 56:1 57:1
**department's** 36:20 45:7
**depending** 35:5,8
**deposed** 4:24
**deposition** 1:12 4:4 5:7 6:13 7:1 55:5,13 60:13
**depositions** 47:16
**depression** 14:23 25:23 50:21
**describe** 12:14 40:9 40:17
**described** 37:22
**DESCRIP...** 3:12
**designed** 44:6
**despite** 56:4 56:12
**details** 8:12
**detention** 18:6,7
**determines** 53:22
**diagnosed** 14:3 36:19 50:18
**diagnosis** 14:18,22 15:4 20:10 22:7,15 31:15 36:15 50:20
**direct** 61:17
**disabilities** 44:22,23 53:12,13,14 57:17,20 58:7
**disability** 46:20 50:19,23 56:12 57:16,22
**discovery** 55:14
**discuss** 52:13
**discussed** 12:3 23:9 40:10 50:6 50:12 52:11,15 58:23
**discussing** 50:1
**discussions** 51:12
**District** 1:1,2 7:3
**dizzy** 29:8,9
**DOC** 23:12 34:13 36:13 42:17 56:17
**doctor** 18:12 25:6 26:13 30:23 31:1 31:5,15,19 37:8,15 50:18
**doctor's** 16:14
**doctors** 31:11 36:20,20
**doctors'** 19:12
**doctrine** 54:10
**documents** 14:7
**doing** 28:12 28:13,14 33:15 35:15 44:4 55:23
**downgraded** 32:14 37:10
**Dr** 30:12,15 30:17,19 31:8,14,18 50:15,17
**DSM-5** 32:7 32:8
**duly** 4:8

**E**

**E** 2:2,2 3:1,11 61:1
**earlier** 12:3 37:22 42:3 43:8
**east** 8:15
**Eastern** 1:2 7:2
**educational** 43:20
**either** 10:10 25:2
**Email** 2:8
**encompass** 43:5
**encompassi...** 43:10
**enrolled** 32:9
**enrollment** 32:10
**enter** 12:23
**entered** 13:12 23:12,17
**entire** 11:16 13:4,7
**entitled** 42:21
**environment** 15:2
**episode** 14:7
**equivalent** 57:21
**Esquire** 2:5
**evaluation** 15:20
**everybody** 27:2
**evidence** 61:4
**exactly** 7:6,9 7:16 9:16 47:16
**examination** 3:6 4:17 15:4
**examinations** 15:6,8,13 16:3,4,9,10 20:18,19 21:4
**examined** 4:9
**example** 5:24
**exams** 15:24
**excuse** 23:11 23:17 53:12 57:10
**exhaust** 52:17 56:19
**exhaustion** 28:21 29:2 29:11,21 30:6,22
**exhibits** 3:13
**experienced** 12:9
**explain** 7:5
**expressed** 35:21

**F**

**F** 61:1
**face** 46:18
**facility** 18:4
**fact** 15:5 17:19
**fail** 57:22
**failed** 42:17 56:14 57:14
**failure** 40:21 41:11 42:11 45:16 52:17 53:18 54:5 56:19 58:1
**fair** 6:11,22
**faking** 25:9 25:11
**family** 18:13 19:3,4,5,15 56:1
**far** 9:1 25:23 32:17 42:1 43:16 51:1 52:18,19 54:8 56:18 57:23
**February** 11:6 49:2 49:21
**feel** 41:17 42:16 59:18,18
**feeling** 25:23 34:9,20,21 35:16,17,22 46:4
**feelings** 55:12
**file** 47:21,23 49:14 51:2
**filed** 4:23 7:2 48:5,23 49:8,20 54:12
**filing** 7:11 49:10
**fine** 5:14 17:20 19:23 22:16 47:12 58:11
**finish** 6:14,15 6:17,18
**finished** 55:1
**first** 19:22 21:12,12,24 23:13,17,22 24:1 25:6 29:22 45:21,21 49:1,3,7 55:24
**Fisher** 56:22
**flying** 49:4
**focus** 13:16 42:15
**focused** 13:22 40:19
**following** 30:22
**follows** 4:9
**foregoing** 61:6,13
**forgot** 25:2 32:3 41:3 50:22
**form** 51:2 53:10,11,14
**former** 10:13
**forth** 22:22
**found** 56:2
**four** 30:13,21
**frame** 16:22 17:2 20:4
**frequently** 24:12
**Friends** 1:20 16:12,12 17:4,5,10 18:4,16,20 19:11,24 20:11,14 21:1 23:9
**front** 5:16
**full** 1:19 4:12 32:10,24
**fully** 10:18 61:4
**Furgess** 57:1
**further** 54:17 54:20

**G**

**geared** 42:22 44:1 45:15 45:19 54:4
**GED** 43:21
**general** 2:5 9:6 32:18
**generation** 59:18
**give** 5:3 35:23 43:15 48:13,14 49:5 51:6,8
**given** 36:15
**go** 5:4,5 12:4 18:9 22:11 22:19

23:22 24:4 24:5,5 26:14,23 27:2 34:2 41:24 48:9 48:12 54:15 58:17 59:1
**goes** 6:4
**going** 5:4 8:22 18:16 22:13 24:6 33:17 35:8 39:4,24 40:16 41:20 42:5 45:8,13 46:24 47:10 54:16,19 55:1 59:16 59:22
**good** 4:2 18:21,21 35:17 40:21
**Graterford** 10:10,13,16 10:20,22 11:8 13:2,5 13:12 23:13,16,17 24:9,14 27:4,20 36:3 37:21 39:2,3
**great** 15:21 17:14,14 22:19 23:4 34:21 44:4 47:17 48:7 49:9
**greater** 9:21
**Greene** 10:5 10:7,13,21 11:2,8,11 11:14,15,19 11:23 12:2 12:9 13:3 27:24 28:2 31:21 36:2 36:4 37:9 37:16,24 39:3,16,18 39:19,23 40:4
**grievance** 47:21,23 52:20,22 58:24
**grievances** 48:4,23 49:8,10,10 49:14,16,17 49:20 50:5 50:9,11
**grieve** 53:10
**ground** 5:3
**group** 40:24 43:7
**guard** 39:8
**guards** 35:21
**guess** 8:2 9:13 16:16 28:14 33:14 35:3 46:5
**guy** 32:5 55:21 57:2

**H**

**H** 3:11
**happened** 30:11 36:2 50:1,3
**happening** 17:24 49:23
**Happy** 48:16
**hard** 36:21 39:6
**harm** 56:13
**Harris** 39:17 40:2,6
**hate** 59:15
**head** 6:2,5 34:8 59:23
**headache** 29:6
**health** 14:3 14:18,22 18:5 20:20 23:1,18,23 24:7,10,13 24:20 25:5 25:6,21 26:8 27:17 27:21 28:3 28:8,14,22 28:23 29:1 29:23 30:7 31:16,20 32:2,7,11 33:23 34:5 34:14,16 35:20 36:1 36:14,23 39:23 41:8 42:20,23 43:9,15 44:22 46:2 46:20,20 47:5 51:3,7 53:12,13 56:4,11 57:15,22 58:15,23
**heard** 55:20
**heat** 28:20 29:1,11,21 30:6,22
**held** 1:13 57:4
**helicopter** 49:4
**help** 33:17 36:4 44:6 44:10
**helped** 32:6
**helpful** 15:2 23:4
**hired** 15:19
**hit** 39:14 40:6
**Hold** 49:4 51:10,10
**hooked** 38:9
**hoop** 38:18 38:20
**hopefully** 5:5
**hospital** 18:5 18:8
**hours** 25:3,3 32:3 33:24 34:3
**housed** 7:22 8:10,14 9:12,20 10:4 11:15 11:21,24 57:12
**housing** 7:12 7:19,24 8:9 9:23 27:9 45:8

**I**

**idea** 37:12 51:9
**ideation** 14:24 56:3
**ideations** 14:10
**ignore** 36:7
**ignored** 36:9
**in-cell** 43:21
**inability** 47:24
**incidence** 28:10
**incident** 27:16,20 29:21 30:2 30:5,22 37:21 39:16,21 40:2
**included** 21:16
**India** 31:2
**Indian** 31:1,2 31:19
**individual** 19:2
**inevitably** 47:18
**information** 17:12,17,21 54:22
**initial** 12:23 23:20 55:24
**initially** 11:13 23:18
**inmate** 46:19
**inmates** 7:7
**Institute** 17:10
**institution** 23:13 33:22
**intellectual** 44:22
**interactions** 28:7 31:20
**interview** 26:19
**interviews** 28:16
**introduce** 4:20
**investigation** 51:4 55:24
**involuntary** 21:13
**isolate** 24:14
**isolated** 26:24 27:1
**isolation** 25:1
**issue** 14:18 45:22
**issued** 12:6
**issues** 14:4 43:24 49:11,15

**J**

**J** 13:8,9
**jail** 10:23
**January** 8:20 8:21 41:21 42:5
**Jason[sic** 55:21
**Jay** 50:17
**Jennifer** 46:15
**job** 19:9 43:16
**jobs** 8:22
**jogs** 19:19
**JOHN** 1:6
**Johnston** 56:21
**July** 10:9 11:12,15,23
**Justice** 44:20 55:23
**juvenile** 16:11 18:5 18:7

**K**

**Kathy** 2:5 4:21
**keep** 59:23
**kept** 56:5,13
**Khan** 30:12 30:15,17,19 31:8,14,18
**kind** 31:15 35:17 36:15,21 59:24
**King** 1:14 4:3 61:11
**kle@attorn...** 2:8
**know** 5:13,15 6:21 10:3 10:17 12:18 15:1 15:21 16:15,21 18:12,14,22 18:24 19:2 19:2,12 20:15,19 22:24 24:1 24:9,14 25:23 26:11 28:5 28:9,10,12 28:15 30:9 30:16 32:4 32:15 33:5 33:13,14,17 34:7,20,21 34:22 35:8 35:16,21,22 35:23 37:5 37:7 38:12 39:2,6,20 39:24 40:5 40:8,10 42:2,17 43:4,10,11 43:20,21,22 43:24 44:15,16,19 45:2,22 46:3 47:14 47:20,22 49:24 50:1 51:2 52:3 52:11,12,14 54:21 55:1 55:7,13,16 56:8,23,23 58:23 59:3
**knowledge** 5:10 36:14 56:12

**L**

**L** 11:22
**lag** 47:19
**laid** 29:9
**LANE** 1:20
**lasted** 27:12
**lawsuit** 7:6 7:10,17 54:2
**lawyer** 17:16
**lawyers** 17:16 51:1 51:12,17
**lay** 29:8
**Le** 2:5 3:7 4:19,21
**leading** 40:17
**Lee** 1:4,12 3:4 4:8,13
**left** 11:20
**legal** 15:13
**lengthy** 13:17
**let's** 6:24
**letter** 44:17
**Level** 8:3
**liberties** 9:13
**license** 8:24 42:5 43:17
**lifted** 12:19 13:13
**lifting** 13:23
**likewise** 6:16
**limitations** 52:18 54:9
**limited** 12:16
**list** 16:7
**listen** 33:16
**litigation** 40:20
**little** 5:5 38:20 39:3 39:5,5,6,12 47:18
**living** 10:5
**locations** 4:6
**locked** 43:2
**long** 10:20 14:12 18:23 20:3 22:3 24:17 25:2,3 26:18 28:5 28:6
**longer** 27:16
**look** 22:14
**looked** 59:19
**looking** 7:9 7:12,13,14
**lot** 23:22,24 33:13 41:4 59:14

**M**

**M** 1:14 61:11
**ma'am** 10:6 11:17 13:14 15:10,12 18:18 19:6 22:2 26:3 27:11 31:10,22 34:12 35:13 37:19 41:16 47:4 47:6 49:12 59:5
**mail** 22:21,21
**making** 25:18 26:21
**management** 42:1
**manager** 41:1
**marked** 3:13
**martial** 59:20
**materials** 58:13
**matter** 15:5 17:19 57:5 57:11 61:6
**maximum** 9:24 42:24 45:9 53:3 53:17
**mean** 8:5 16:17 18:15 36:17 45:18,20 47:7,16
**means** 53:16 56:24 61:16
**medication** 26:17

**memories** 19:19
**memory** 5:9 5:17 16:8 19:9 21:19 24:18 38:1
**mental** 14:3,3 14:18,22 18:5,8 20:20 23:1 23:18,23 24:7,10,13 24:20 25:4 25:6,21 26:8 27:17 27:21 28:2 28:8,14,22 28:23 29:1 29:23 30:7 31:16,20 32:2,7,11 33:23 34:5 34:14,16 35:20 36:1 36:14,23 39:23 41:7 42:20,23 43:8,15 44:21 46:2 46:20,20 47:5 51:3,7 53:11,13 56:4,11 57:15,22 58:15,23
**mention** 19:14
**mentioned** 19:2 32:23 42:3,13
**mentions** 50:15,18
**minor** 28:20 40:5
**misconduct** 28:19 38:21,23 39:14
**mitigating** 51:4
**mom** 17:12 18:11 19:7
**monetary** 7:14,18 54:5
**months** 21:21 21:23,24 25:18 27:12 29:7
**morning** 4:2 5:5
**motion** 55:13
**movements** 9:14,15
**movie** 59:20
**music** 41:5
**Muslim** 30:16 39:9

**N**

**N** 2:2 3:1 61:1
**name** 4:3,12 4:21 16:15 17:9 30:12 30:14,17,19 31:1 32:3 32:19 41:3 50:15
**Native** 31:2
**nature** 12:15 47:14 55:4
**need** 6:8 22:17 51:23 55:3 55:4
**needed** 6:6
**never** 25:20 35:10 36:2 36:2 45:24
**NEWTOWN** 1:20
**nice** 32:5,17 60:11
**NJ** 1:21
**nodding** 6:1
**non-Capital** 43:23
**non-Capitals** 45:1
**non-health** 43:23
**noose** 25:8,19 26:21
**Northeast** 16:13
**Notary** 1:15 61:11
**noted** 61:4
**notes** 61:5
**notice** 1:13
**number** 3:12 49:2
**numbers** 48:11,12,13 48:15
**NY** 1:21

**O**

**O** 61:1
**obligation** 57:9,11
**observation** 26:5
**obtained** 52:3
**obviously** 7:4 13:17 15:21 52:2
**occasion** 14:13,16 22:4 24:19
**off-the-unit** 43:16
**office** 2:5 34:1,3,10 34:14 35:7
**Officer** 39:17 40:2,6
**Oh** 26:15 29:20 36:10 38:2 39:2 48:12 50:14 54:18 56:17
**okay** 5:3,11 5:18,19 6:3 6:24 7:18 7:19,24 8:11,14,14 9:2,10,17 10:11,15,24 11:3,7,18 13:2,15 14:1,6,15 15:21,24 16:7,19 17:4,14,18 17:19,21,22 18:19 19:1 19:7,18,21 20:9,23 21:9,19 22:3,19 23:6,11,16 24:8,12 25:16 26:11 27:12,19 29:17,19,20 30:1,18 31:4,23 32:21 33:21 35:14,18 36:5 37:1,5 37:14,20 38:16 40:16,21 41:12,22 42:10 43:19 44:2 44:5,8,11 46:22 47:13 48:7 48:17,20,24 48:24 49:6 49:9,13,16 50:4,10 51:13,15,18 51:22 52:5 52:9 53:19 54:18 55:17 58:2 58:4,11 59:4,5 60:2 60:4,8,10
**once** 18:23
**one-on-one** 29:23 34:15,22,23 35:11
**ones** 43:9
**open** 12:2
**opening** 42:6
**operated** 9:22
**ORAL** 1:12
**ordered** 15:13,16,18
**out-of-cell** 28:16 42:7 42:12
**outpatient** 18:9
**outside** 23:7 27:20
**Oxford** 17:8

**P**

**P** 2:2,2 8:14 8:16,17
**p.m** 60:14
**PA** 1:21
**PAGE** 3:3,12
**Palakovic** 55:19,20,21
**part** 14:1 42:18 52:12 58:6
**parties** 4:5
**Paul** 8:17
**PB** 8:17
**PCRA** 15:10 15:11
**peer** 33:4,7,8 33:10,11
**Pennsylvania** 1:2,9,20 2:7 7:3 57:1
**people** 6:21 23:22 24:1 35:15 57:16
**perform** 9:6
**performed** 15:6
**period** 13:4 13:10,17,18 22:7 24:15 28:6 37:2,4 41:13
**person** 46:19 56:22 57:15,21
**person's** 32:19
**personal** 59:12
**personally** 45:6
**Peter** 8:16
**Philadelphia** 2:7 14:9,12 16:2,13 18:2 19:13 21:2,8
**Phoenix** 2:6 7:22 8:1 10:4,8 11:11
**phone** 2:7 25:13 51:8
**physical** 57:17,17,20
**piece** 40:7
**place** 21:15
**placed** 26:2,9 26:20 37:23 38:1 43:13 53:17 57:8
**placement** 15:1
**placing** 53:3
**please** 4:12 5:20,22 6:14 7:5 22:23 58:13 59:1
**POC** 24:24 25:15 26:2 26:4
**pod** 8:17
**point** 12:1 37:11,17
**poke** 34:8
**policies** 45:2
**policy** 12:4,5 12:6 45:9 52:20,20 53:22 56:22
**pop** 47:13
**population** 9:7
**possession** 22:17 58:17,21 59:1
**possessions** 27:10
**possible** 19:9
**Powell** 56:21
**PPC** 21:8,20 22:4 23:8
**praying** 39:8 39:9
**present** 1:16
**pretty** 9:1 26:17 32:15 54:7 56:16
**prevention** 45:23
**previously** 10:4,5
**prior** 9:19 10:3 13:2 13:22 20:15 34:5 34:13 40:12 54:6 54:13
**prison** 40:13
**Prison's** 57:9
**prisoner** 57:12,21
**prisoner's** 57:6
**prisoners** 33:15 43:23 44:21 52:19 53:15 57:6 57:17,20
**privilege** 51:17 52:8
**probably** 16:22,23 17:16,23 40:8
**problem** 39:20 48:20,22
**proceedings** 15:9,10,11 61:3
**professional** 36:14
**professionals** 16:5 20:21
**program** 32:8,9 40:23 42:4 42:8 43:14 43:21 45:3 45:14
**programs** 40:22 41:4 41:20 42:2 42:12,13,14 42:16,20,21 42:23 43:2 43:7,9,18 43:20 44:13 46:6 46:10,12 48:1 53:20 56:14
**property** 26:22 27:6
**protect** 51:16
**protesting** 59:15
**provide** 42:17
**provided** 54:23
**Prozac** 26:16
**psychiatric** 14:9,13 16:2,4,8 18:2 19:13 21:3,8 23:7 26:4 50:19 50:23 52:2
**psychiatrist** 20:20
**psychologist** 20:20
**psychother...** 40:24
**Public** 1:15 61:11
**punitive** 45:24
**purposes** 30:20
**pursuant** 1:13
**put** 24:24 25:8,17 35:7 50:5 50:19 57:3

**Q**

**qualified** 33:6,9
**question** 5:20 5:24 6:7,8 6:10,15,18 8:6 10:11 18:21,22 36:12 40:16 46:16
**questions** 5:8 5:9,23 44:6

54:17,20
**quick** 26:18 39:21
**quite** 18:24 23:21

**R**

**R** 2:2 61:1
**RA** 57:10
**radio** 26:23
**rally** 59:14
**real** 29:8 38:9
**really** 25:5,20 26:18 29:5 29:6 32:5 32:17 46:1 53:7 55:5,9 55:14 58:6 58:12
**reasonable** 53:6,11 57:7
**reasons** 57:12
**recall** 19:14 21:3 22:6 23:6 31:14 49:10
**receive** 14:17
**received** 20:9 22:6 23:7
**recollection** 30:21 31:24
**recommen...** 19:12
**record** 4:12 4:21 5:21 6:19 22:20 40:1,1
**records** 19:14 21:16 22:14,14,16 22:24 29:15 36:19,21,24 51:3,7 52:2 58:15,24,24
**recover** 29:4 29:12
**Reed** 45:10 45:11 54:3
**refer** 14:6
**reference** 15:3
**referred** 28:22 30:7
**reforms** 44:18 45:1
**regard** 12:14
**regardless** 57:11
**regards** 31:15 41:12 47:2
**regular** 27:9
**relate** 31:23 35:16 49:22,22
**related** 34:20 43:8 47:24 49:11,14,23 58:20
**relates** 7:1,6 14:1 42:11
**relating** 14:7 22:24
**relaxed** 30:3 32:1 33:19 33:22 40:13 41:14 45:12 54:3
**relaxing** 12:10 34:13
**release** 51:2
**relief** 7:15,18
**relies** 46:8
**remedies** 52:17,19
**remedy** 7:9
**remember** 5:11,12,12 5:14 10:2 11:4 16:14 16:17,20 18:22 19:17,18 20:4,7,9,18 23:20,21,24 25:5 27:22 28:2,7,24 29:3 31:1 31:19 32:19,22 35:19 36:8
38:3,5 44:12 46:15 47:10 48:3 48:22
**remind** 6:6
**remote** 4:5 47:14
**removed** 27:9
**repeat** 30:14 49:6
**rephrase** 15:7 36:12
**Report** 44:20
**reporter** 1:15 3:14 4:4 6:20 61:11 61:19
**REPORTI...** 1:19
**represent** 7:21
**representing** 2:8 4:22
**reproduction** 61:15
**request** 22:17 46:8 53:7 54:1,2 58:18
**requested** 24:19 34:17 35:11,19 44:14,15 45:5,6
**response** 45:7 45:24
**rest** 27:19
**restric** 30:4
**restricted** 9:22
**restrictions** 9:21 12:3 12:10,18,20 12:23 13:13,23 30:3 32:1 33:19,21 34:13 43:6 43:11 45:12 54:4
**restrictive** 9:14,15
12:15
**result** 15:7
**resulted** 19:11
**return** 21:20
**returned** 27:8
**reveal** 51:20
**reviewed** 7:4
**RHU** 57:3,5 57:9
**right** 6:24 8:2 10:5 13:15 13:21 17:6 17:13,23 20:13 23:3 23:6 26:10 33:6,16 44:2 48:17 57:7 59:6
**Rights** 44:23
**ring** 19:16
**risk** 56:13
**road** 51:20
**Roebuck** 17:6
**Roosevelt** 17:5,7
**roster** 32:11 32:12,14 36:17 37:2 37:4,10,12 37:17,18 56:4,11
**rough** 39:5,6
**roughly** 11:7 11:14,19 12:7 13:5 13:12 17:24 18:15 20:4 27:12 48:22
**round** 34:7
**rounds** 28:15 32:5 33:14 34:19
**routine** 28:9 30:10
**routinely** 18:16 24:9 24:11,11
**Roy** 1:4,12 3:4 4:8,13
**RPR** 1:15 61:11
**rules** 5:3

**S**

**S** 2:2 3:11
**sake** 5:21 6:19
**saw** 30:20 59:13
**saying** 6:2,17 10:12 29:19 41:10 42:19 46:5 46:6,24
**schedule** 34:23 35:2 35:4
**SCI** 7:22,24 10:3,5,7,7 10:13,15,20 10:22 11:2 11:8,8,10 11:11,14,15 11:19 12:1 13:2,3,4,12 23:13,16,17 24:8,14 27:19,24 28:2 36:11 37:21,24 55:22
**Sears** 17:6,6
**second** 22:4,7 31:5 49:5
**Secretary** 4:23 44:17 53:23
**Secretary's** 53:2
**see** 19:18 22:15 23:18 24:20 27:7 30:13,24 31:6 35:8 36:19,23 39:1 55:8 55:11
**seeing** 31:9 31:11,12
**seeking** 7:17
**seen** 25:4
36:18 38:13,15 59:11
**send** 22:20,23 23:2 58:13 58:21 59:2
**sent** 28:21 30:6
**sentence** 41:9
**sentenced** 10:18 11:5
**separate** 27:3
**separately** 31:12,13
**separation** 39:22
**September** 15:5
**series** 5:7
**seriousness** 35:6
**SERVICE** 1:19
**services** 41:7 41:8,18 42:9,16 43:14 45:14 46:7
**SERVING** 1:21
**session** 29:23 30:8 34:16 35:11
**sessions** 19:11 20:5 20:14 30:10
**Settlement** 44:24
**settling** 56:8
**severe** 14:3 14:23
**Shadowbox...** 38:7
**shake** 6:4
**sheet** 25:8
**shop** 8:24
**shortly** 24:22
**shower** 57:3 57:18
**side** 8:15 51:1
**similar** 55:19
**similar-situ...** 57:19
**similarly** 43:22
**simply** 55:5
**sir** 23:5 52:9 54:16 55:4 58:11 59:6 59:24 60:10
**sit** 34:23
**sitting** 29:7 33:23 49:19
**situated** 43:23
**situation** 9:11 13:19 13:22
**six** 21:22,24 25:17 27:12 29:6
**sleep** 29:7
**slight** 47:19
**slot** 39:11
**slow** 22:22
**slung** 39:13
**small** 38:14
**smoothly** 5:6
**sole** 42:15
**solitary** 7:8 42:24 44:21 46:8 46:17,18 47:3 56:5,7 56:13
**somebody** 23:18 59:3
**sorry** 10:11 16:17 17:15 19:6 22:11 24:4 24:5 26:14 29:18 30:5 41:23 46:23 47:11 48:9 48:21 49:4 50:14 51:13 52:5 54:14,14 59:16,21
**sought** 27:16
**sounds** 43:7
**speak** 24:10 24:13
27:21 32:16 33:16 52:3
**speaking** 28:2
**specialist** 33:4,7,8,10 33:12
**specific** 44:12
**specifically** 44:9
**Spector** 50:15,17
**spoke** 26:7
**sporadic** 28:10
**staff** 23:24 24:7,10,13 24:20 25:5 26:7,8 27:17,21 28:3,8,11 28:14 29:1 29:23 30:7 31:20 32:2 33:23 34:5 34:14,16 39:6,23
**stand** 26:4
**stars** 59:20
**start** 6:15 30:9
**started** 6:24 11:19 41:19
**starting** 41:21
**state** 4:11
**states** 1:1 58:4
**status** 7:13 7:14,19,24 8:13 23:1 25:17 26:9 26:20,21 27:8 37:6 37:13,14,23 38:1 41:9 47:5
**statute** 52:18 54:8
**stay** 22:3
**stayed** 11:1 27:5

**STENOGR...** 4:2,11,14
**stenographic** 61:5
**straight** 29:7
**Street** 2:6
**STREHLO...** 1:19
**string** 38:19
**stripped** 57:7
**structured** 15:1
**stuff** 40:5
**submit** 47:21
**sued** 56:1
**suicidal** 14:9 14:24 35:22 56:3
**suicide** 24:22 25:7,18 26:1 36:3 37:23 45:22,23 46:1 55:22 56:7
**SUITE** 1:20
**sun** 29:9,10
**supervision** 61:18
**sure** 16:11 19:20 23:21 24:16 25:3 29:14 30:15 32:1 33:15 37:16 38:6 48:16,24 49:7 52:7 55:18
**switched** 37:18
**sworn** 4:9

**T**

**T** 3:11 61:1,1
**take** 18:11 25:1 26:16 26:22 33:13 35:6 38:18 51:19
**taken** 1:13 61:5
**talk** 18:11 23:22 24:6 32:4,6 34:22
**talked** 23:24 32:3
**talking** 6:15 6:21 13:19 25:5 28:24 39:22 40:21
**tell** 5:4,11 37:16 38:4 49:17 50:12 51:7 51:11,23 52:15
**telling** 25:14
**terms** 8:2,4 40:19
**test** 5:17
**testified** 4:9
**thank** 4:14 23:4 52:1 54:16 58:11 59:24 60:1 60:5,5,9,10
**Thanks** 11:3
**theft** 38:10
**therapist** 37:15
**therapy** 18:10,12,13 18:17,20 19:1,2,3,5 19:11,15,24 20:11,14 21:1 23:8 32:17 40:24 41:5 41:5 42:13 42:13
**thing** 40:8 41:1 43:8 46:13 55:17 59:9 59:12
**things** 41:6 45:23 49:22,24 50:5 59:22
**think** 10:9 14:24 20:3 29:4 39:15 44:17 55:16 58:19
**Third** 57:4
**thoughts** 24:21
**three** 21:22 21:24 30:13,21
**threw** 39:11
**Thursday** 1:9
**tie** 38:19
**time** 3:13 8:4 8:21,21 11:13,16,18 11:19,20 12:17 13:7 13:10,11,17 13:18 16:1 16:11,22 17:1,2 18:1 18:23 20:4 20:10,13,15 22:7 24:8 24:15 25:6 25:7 27:7 27:19 28:1 28:5,6,18 29:22 32:10,14,16 32:16 35:10,19 36:9,11,13 37:2,4,11 37:17,24 38:10,16 39:8,10 40:12 41:13,17 42:7 44:14 45:5 47:22 55:23 58:12 59:8 60:5,13
**times** 18:24 30:13,21 31:6 35:14
**today** 50:6 54:22 58:12,23 60:6
**told** 25:9,11 26:10,13 37:3
**tool** 47:17
**top** 27:1
**transcript** 5:22 61:7 61:14
**transfer** 10:7 11:10 13:3
**transferred** 10:21 11:1 11:8,14 27:23 39:16,18
**trash** 39:11
**tray** 39:10,11
**treatment** 16:16 20:19 23:7 40:11,15
**treatments** 16:9
**trial** 10:17
**triangle** 38:20
**tried** 25:7 40:6
**truly** 55:14
**try** 5:12 13:16
**trying** 7:16 19:18 22:21 24:14 25:12,18 32:23 33:17 37:9
**turn** 45:10
**turned** 46:1
**TV** 26:23 59:13
**twice** 30:24
**two** 6:21 15:4 15:6,8 20:17 21:4 23:8 31:6 31:11 49:8 49:9,19 52:16 54:12
**tying** 38:23
**type** 18:4 41:20 43:10 56:14
**types** 43:9

**U**

**uh-huh** 6:2
**uh-uh** 6:5
**Um** 22:10
**understand** 5:15 6:8 7:6,16 8:7 44:7 51:23 55:5,15
**understand...** 9:2,7 10:16 12:13 14:17,21
**understood** 6:10 31:3
**unit** 8:9,14 8:23 9:7,10 9:12,20,21 9:23 11:21 11:22,24 12:2,15,18 12:20 13:7 23:19 25:12 26:12 27:2 27:3,9 30:13,21 31:6 32:2 33:23 34:15 35:20 40:13 41:13 42:2 43:6,13,21
**UNITED** 1:1
**Units** 9:5
**upset** 39:12
**usually** 33:14

**V**

**v** 45:10,11 54:3
**various** 42:13 43:7
**verbally** 5:23
**verbatim** 49:18
**Video** 2:3
**violations** 45:16,19 54:10
**virtually** 1:13
**visit** 21:12 22:1,8 34:2
**visits** 23:8 31:18
**vocational** 43:17
**voluntarily** 22:3
**voluntary** 21:11
**vs** 1:5 55:20 56:21 57:1

**W**

**waive** 52:8
**walk** 28:13 34:7
**walking** 35:14
**want** 4:24 7:10 15:21 26:15,16 39:2 47:9 48:14 50:12 51:10,16,19 52:6,13,15 53:20 54:24 59:15,21
**wanted** 15:23 25:10 26:12 32:8 33:5,7 39:23
**wasn't** 18:7,8 20:2,2 26:18 39:20
**watching** 59:13
**water** 28:18 28:19
**way** 19:10 53:9,9,22 59:18,18
**ways** 47:17
**we're** 8:21 37:15
**we've** 49:24
**week** 18:24
**weekly** 28:15
**welcome** 4:15 60:7
**wellness** 41:2 41:3
**went** 10:12 10:22 16:16 18:24 21:6 21:6,7,10 29:9
**weren't** 28:18 41:8
**Wetzel** 1:6 4:23 44:17 45:11,11 54:3 55:20
**wheelchair** 57:19
**Williams** 1:4 1:12 4:8,13 4:20 7:1,20 9:3 12:12 13:10 40:10 47:3 47:20 51:10 52:10
**WILLIAM...** 3:4
**wind** 56:8
**wire** 38:9
**withdrew** 46:3
**WITNESS** 3:3 4:13,15
**wood** 39:13 40:7
**word** 33:6
**words** 17:9 40:18
**work** 8:18,23 35:1
**worry** 50:8 52:4
**worst** 40:8
**wouldn't** 42:24 43:1 43:3,3
**wrap** 41:1,4 54:19
**write** 6:20 48:16
**written** 5:22
**wrong** 25:16 26:11
**wrote** 15:3 44:16

**X**

**X** 3:1,11

**Y**

**yard** 26:24 28:19,20 38:7,12
**yards** 38:13
**yeah** 18:13 21:23,23 26:17 32:15 35:9 36:22 39:5 39:20 42:22 43:3 43:14 44:3 44:3 45:4 46:5,5,10 46:11,11 47:16 48:12 50:10 54:7 56:9 57:23 59:10
**year** 11:5 16:21 20:6 20:7,8,8,17 27:24 29:4 29:12
**years** 20:1,2 47:22,23 54:6,12

**Z**

**Zoom** 4:5

**0**

**006** 53:14

**1**

**1:04** 60:14
**1014** 8:18
**11:33** 1:14
**116** 1:20
**12/21/2020** 49:7
**14th** 58:5
**15** 38:11
**1600** 2:6
**18940** 1:20
**19103** 2:7
**1979** 14:8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY LEE WILLIAMS, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| JOHN E. WETZEL, | : | |
| Defendant. | : | NO. 21-1248 |

**DECLARATION**

1. I, Michael Zaken, have served as the Superintendent at Pennsylvania Department of Corrections State Correctional Institute Greene ("SCI-Greene") since March 2020. Prior to that, I served as Deputy Superintendent of Facilities Management at SCI-Greene since 2014.

2. Beginning in or around January of 2018, as a part of a larger Department of Corrections initiative, I lead the process of restructuring the administration of the Capital Case Housing Unit at SCI-Greene, in order to provide enhanced socialization opportunities to capital case inmates.

3. As a part of this process, I drafted a "Plan of Approval" that was submitted, on January 31, 2018, for approval by the Department of Corrections Western Regional Deputy Secretary. This Plan of Approval set forth a plan to provide 20 hours of out-of-cell opportunities to capital case inmates, to be implemented by March 2018.

4. In accordance with the Plan of Approval, beginning on March 12, 2018, SCI-Greene implemented changes to the administration of the Capital Case Housing Unit and began to offer a minimum of 20 hours of out-of-cell opportunities to capital case inmates. These changes are detailed in Policy No. 6.5.8 GRN 01, a copy of which is attached as Exhibit 1 to this Declaration.

5. As detailed in Policy No. 6.5.8 GRN 01, beginning on March 12, 2018, the following changes were made to the Capital Case Housing Unit to allow more out-of-cell and socialization opportunities:

a. Outdoor Exercise

i. Prior to March 12, 2018, capital case inmates were offered two hours of outdoor exercise time five days per week. This exercise time occurred in outdoor enclosures that kept inmates separated individually.

ii. Starting on March 12, 2018, capital case inmates were offered at least two hours of outdoor exercise seven days per week. Beginning in June of 2018, after completion of the reconfiguration of the old yard enclosures, outdoor exercise occurred in an open area that allowed capital case inmates from the same pod to congregate and exercise together.

    b.   Dayroom Activity

        i.  Prior to March 12, 2018, capital case inmates were not provided with dayroom activity time.

        ii.  Starting on March 12, 2018, capital case inmates were offered at least one hour of open dayroom activity time seven days per week. This was an opportunity for capital case inmates from the same pod to congregate at tables for game playing, television watching, and other socializing.

    c.   Law library

        i.  Prior to March 12, 2018, capital case inmates visited the law library individually in separate enclosures.

        ii.  Starting on March 12, 2018, up to four capital case inmates from the same pod were allowed to visit the law library at a time, allowing inmates to congregate.

    d.   Meal Time

        i.  Prior to March 12, 2018, capital case inmates were served meals in their cells.

        ii.  Starting on March 12, 2018, meals were served to capital case inmates outside of their cells and they were allowed to eat their meals together with other inmates at the dayroom tables or return to their own cells to eat on a rotating basis.

    e.   Movement

        i.  Prior to March 12, 2018, all out-of-cell movement of a capital case inmate required a strip search, restraints, and a two-to-one corrections officer escort.

        ii.  Starting on March 12, 2018, during open times on the unit, such as described above, capital case inmates were no longer strip searched every time they were removed from cell, restrained and escorted two-on-one.

6.     Following the initial changes in March of 2018, SCI-Greene continued to implement more changes to the Capital Case Housing Unit in order to provide increased socialization opportunities.

7.     At this time, the housing unit for capital case inmates at SCI-Greene operates comparably to the general population housing units with respect to out-of-cell time and socialization opportunities.

8. Prior to changes to the administration of the Capital Case Housing Unit, inmates in that unit had access to mental health services in accordance with Policy No. 6.5.8, “Capital Case Administration,” attached hereto as Exhibit 2, and Policy No. 13.8.1, “Access to Mental Health Care,” attached hereto as Exhibit 3. A professional from the mental health unit staffed an office on each unit everyday. Everyday a mental health professional made rounds of the unit, visiting each inmate’s cell to speak with the inmate about their mental health status. At that time, inmates were able to request an appointment to speak with a mental health professional. Inmates with an active mental health diagnosis were scheduled for treatment as required by a mental health professional.

I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

1/28/22
Date

Michael Zaken
Superintendent, SCI-Greene

Exhibit 1



**PROCEDURES MANUAL**
**Commonwealth of Pennsylvania • Department of Corrections**
**SCI-GREENE**

| Policy Subject: | | Policy Number: |
|---|---|---|
| **Capital Case Administration** | | **6.5.8 GRN 01** |
| **Date of Issue:** | **Authority:** | **Effective Date:** |
| **March 12, 2018** | **Robert Gilmore, Superintendent** | **March 12, 2018** |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

## Section 1 – Phase 1 Inmates

### A. General Information

The following opportunities are being provided to the Capital Case population in order to provide at a minimum of 20 hours of out-of-cell (OCC) activity each week.

### B. General Security Procedures

General Security Procedures for restraints, two-on-one hands-on escorts and strip searches for inmates exiting their assigned cells has been **eliminated**—unless identified otherwise through the Capital Case Security Assessment.

Procedures for movement off of the housing unit will remain unchanged to include security procedures regarding restraints, escorting, non-contact visits, consistent with level 5 inmates.

### C. Exercise

1. A Phase 1 inmate shall be permitted a two (2) hour outdoor exercise period a minimum of **seven (7) days per week**, weather permitting for a total of 14 hours out-of-cell activity. Movements to the yard are controlled line movements under direct supervision.

2. A Phase 1 inmate shall be permitted **one (1) hour of "open" dayroom** activity at a minimum of **seven (7) days per week** for a total of 7 hours out-of-cell activity. One hour dayroom periods are being given by tier with a maximum of 16 inmates in dayroom per pod and a maximum of two pods operating a dayroom at one time. Dayroom consists of inmates congregating at the tables for game playing, socialization and television watching together.

### D. Library

Inmates may participate in congregate Law Library with other inmates from their same pod. Inmates who reside in separate pods will not be permitted to congregate in the Law Library. Inmates who are not on any type of restriction are eligible to participate in congregate Law Library. Computer stations will be available in the Law Library with access to the reference book section. One (1) computer station will remain in the secure Law Library enclosure for Phase 2 inmates, inmates on restrictions, or inmates who do not wish to congregate. A maximum of four (4) inmates will be permitted in the secure Law Library area at the same time.

### E. Meals

Inmates may participate in meals with other inmates on the same tier and pod. There will be a rotation between top and bottom tiers for breakfast and dinner. Inmates who are not on any type of restriction are eligible to participate. Cell doors will be opened on the designated tier that is to receive the congregate meal. Meal will be passed out beginning with A Pod and continue through B, C, and D pods. Inmates will come out of their cells and retrieve a food tray. The inmates may

elect to sit at a dayroom table to eat or return to their cells and eat. Inmates are not permitted to eat in another inmate's cell. Inmates are permitted to bring out condiment items, utensils, and cups. No Commissary food items except condiments are permitted at the dayroom tables. This includes chips, snacks, soups, etc. Inmates who elect to eat in their cell will return their meal tray when finished. Inmates who do not wish to participate, leave their cells, or are on restrictions will have their meal tray delivered and picked up by unit staff. Upon completion of the meal, all inmates will return to their cells and be secured inside.

**F. Showers**

Capital Case inmates have the opportunity to shower three (3) days per week. Inmates will be permitted to move to and from the showers unrestrained. Unit staff will continue to escort inmates from their cells to the showers. The shower doors will be secured while the inmate remains in the shower. Movement to and from showers will allow no more than two (2) inmates to be unrestrained on a pod at a time.

# Exhibit 2

**POLICY STATEMENT**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | | Policy Number: |
|---|---|---|
| Capital Case Administration | | 6.5.8 |
| **Date of Issue:** August 27, 2012 | **Authority:** Signature on File John E. Wetzel | **Effective Date:** August 28, 2012 |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections.

## III. POLICY

It is the policy of the Department to:

A. administer all Capital Cases in a secure and humane manner consistent with applicable law;

B. ensure that all Phase I Capital Case inmates are governed by the same general policies applicable to all Administrative Custody inmates with the few exceptions described in specific policies;

C. ensure that all Phase I Capital Case inmates in Administrative Custody status have access to educational and leisure programs;

D. allow Capital Case inmates in Phase I and/or Phase II access to legal materials;

E. provide a safe, secure and humane process of administering a Capital Punishment sentence as required by applicable laws and statutes of the Commonwealth of Pennsylvania;

F. make reasonable accommodations for and respond appropriately to the needs of the representatives of the news media in their coverage immediately before, during and after an execution, while preserving the good order and security of the institution; and

G. provide appropriate accommodations for preparing registered victims who have chosen to serve as witnesses to an execution.

## IV. PROCEDURES

All applicable procedures are contained in the procedures manual that accompanies this policy document.

## V. SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII. RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A. Release of Information

1. Policy

   This policy document is public information and may be released upon request.

2. Confidential Procedures (if applicable)

   Confidential procedures for this document, if any, are not public information and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

**B. Distribution of Policy**

1. General Distribution

The Department of Corrections' policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2. Distribution to Staff

It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII. SUPERSEDED POLICY AND CROSS REFERENCE

**A. Superseded Policy**

1. Department Policy

6.5.8, Capital Case Administration, issued November 14, 2002 by former Secretary Jeffrey A. Beard, Ph.D.

2. Facility Policy and Procedures

This Policy and the accompanying Procedures Manual supersedes all prior versions of these documents.

**B. Cross Reference(s)**

1. Administrative Manuals

a. DC-ADM 007, Access to Provided Legal Services;

b. DC-ADM 009, News Media Relations;

c. DC-ADM 801, Inmate Disciplinary and Restricted Housing Procedures;

d. DC-ADM 802, Administrative Custody Procedures;

e. DC-ADM 812, Visiting Privileges;

f. DC-ADM 815, Commissary Privileges;

g. DC-ADM 816, Inmate Compensation System;

h. DC-ADM 818, Automated Inmate Telephone System;

i. DC-ADM 819, Religious Activities;

j. 6.3.1, Facility Security;

k. 6.5.1, Administration of Security Level 5 Housing Units; and

l. 13.1.1, Management and Administration of Health Care.

2. ACA Standards

   a. Administration of Correctional Agencies: None

   b. Adult Correctional Institutions:

   c. Adult Community Residential Services: None

   d. Correctional Training Academies: None

3. Other

   Act of June 18, 1998, P.L. 622 (61 P.S. 3003)

**PROCEDURES MANUAL**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: Capital Case Administration | | Policy Number: 6.5.8 |
|---|---|---|
| **Date of Issue:** August 27, 2012 | **Authority:** Signature on File John E. Wetzel | **Effective Date:** August 28, 2012 |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

## Section 1 – Phase I Inmates

A. Housing ........ 1-1
B. Inmate Custody Status ........ 1-1
C. General Security Procedures ........ 1-1
D. Work Assignments ........ 1-1
E. Visiting ........ 1-2
F. Telephone Privileges ........ 1-2
G. Television and Radio ........ 1-2
H. Exercise ........ 1-3
I. State Issued Clothing ........ 1-3
J. Personal Property, Cell Furniture, and Commissary Items ........ 1-3
K. Facility Programming ........ 1-4
L. Religious Activities ........ 1-5
M. Access to Legal Materials ........ 1-5
N. Access to Reading Materials ........ 1-6
O. Transfer of Phase I Inmates ........ 1-7
P. Placement in Disciplinary Custody (DC) Status ........ 1-7
Q. Psychiatric Treatment of a Capital Case Inmate ........ 1-7
R. News Media ........ 1-8
S. Modification of Sentence ........ 1-9
T. Conversion to Phase II ........ 1-9

### Attachments

Capital Case Approved Master Commissary List ........ Attachment 1-A

## Section 2 – Phase II Inmates

A. Handling of an Execution Warrant ........ 2-1
B. Mental Health Observation ........ 2-2
C. Documentation Procedures ........ 2-3
D. Attorney(s) of Record ........ 2-3
E. Authorized Property ........ 2-3
F. Access to Legal Materials ........ 2-4
G. Exercise ........ 2-4
H. Commissary ........ 2-4
I. Visiting ........ 2-4
J. Telephone ........ 2-4
K. News Media ........ 2-5
L. Identification and Notification of Spiritual Advisor ........ 2-5
M. Identification of Immediate Family Members ........ 2-5
N. Disposition of the Inmate's Remains ........ 2-6
O. Disposition of the Inmate's Personal Property ........ 2-6
P. Phase II Documentation to be sent to the Capital Facility ........ 2-7
Q. Transportation Procedures to the Capital Facility for Phase II Inmates ........ 2-7
R. Stay of Execution ........ 2-9

**Attachments**

Execution Warrant Notification to Chief of Security ........ Attachment 2-A
Execution Warrant Notification to Facility Manager of Capital Facility ........ Attachment 2-B
Execution Warrant Notification to Facility Manager of Home Facility ........ Attachment 2-C
Execution Warrant Notification to PSP Headquarters ........ Attachment 2-D
Execution Warrant Notification to Inmate ........ Attachment 2-E
Conversion of Phase I Inmate to Phase II Checklist ........ Attachment 2-F
Attorney Notification ........ Attachment 2-G
Stay of Execution ........ Attachment 2-H

**Section 3 – Phase 3 Inmates**

A. Capital Facility ........ 3-1
B. Capital Facility Documentation ........ 3-1
C. Reception ........ 3-1
D. Security ........ 3-3
E. Selection of Personnel at the Capital Facility ........ 3-4
F. Housing of a Phase III Inmate ........ 3-6
G. Orientation of Phase III Inmate ........ 3-8
H. Visiting ........ 3-8
I. Medications ........ 3-14
J. Meals ........ 3-14
K .Telephone Privileges ........ 3-15
L. Radio Privileges ........ 3-16
M. Television Privileges ........ 3-17
N. Capital Facility Medical Department Responsibilities ........ 3-17
O. Mental Health Observation ........ 3-17
P. Stay of Execution Notification ........ 3-17
Q. Conscientious Relief ........ 3-18
R. Execution Procedures ........ 3-18

**Attachment**

Phase 3 Transfer Checklist ........ Attachment 3-A

**Section 4 – Execution Procedures**

A. General ........ 4-1
B. Pre-Execution Procedures ........ 4-3
C. Execution Procedures ........ 4-22
D. Post-Execution Procedures ........ 4-29

**Attachments**

Execution Complex Floor Plan ........ Attachment 4-A
Capital Facility Special Security Squad Roster ........ Attachment 4-B

***6.5.8, Capital Case Administration Procedures Manual***
***Table of Contents***

Confidential Memorandum....Attachment 4-C
Pharmaceutical Order Request....Attachment 4-D
Checklist of Lethal Injection Procedures....Attachment 4-E
Instructions to Witnesses....Attachment 4-F
Inventory Checklist for Lethal Injection Equipment and Supplies....Attachment 4-G
Controlled/Non-Controlled Substances Disposition Record....Attachment 4-H
Certificate of Execution....Attachment 4-I

Glossary of Terms

JA172

## Section 1 – Phase I Inmates

### A. Housing

1. A male Capital Case inmate shall be housed at the State Correctional Facilities at Graterford and Greene. Any exceptions must be approved by the Secretary/designee.

2. A female Capital Case inmate shall be housed at the State Corrections Facility at Muncy.

3. In the event that a Capital Case inmate is to be housed at a facility other than a Capital Case facility, a copy of this manual shall be provided to that facility.

### B. Inmate Custody Status

1. A Capital Case inmate in Phase I shall be housed in Capital Case (CC) status unless he/she is placed in Disciplinary Custody (DC) status in accordance with Department policy **DC-ADM 801, "Inmate Discipline."**

2. The Unit Officer shall assess the Capital Case inmate, upon being processed into his/her designated housing unit, using the **DC-510, Suicide Risk Indicators Checklist** in accordance with Department policy **13.8.1, "Access to Mental Health Care", Section 1, Psychological Services**.

3. After completing the **DC-510** the Unit Officer shall contact the Medical/Psychology Department. The Medical/Psychology Department shall determine whether the inmate requires an Individual Treatment Plan (ITP) or another form(s) of therapy or intervention.

4. A copy of the **DC-510** shall be placed in the inmate's **DC-14, Cumulative Adjustment Record** and in the psychiatric section of the medical record.

### C. General Security Procedures

All general security procedures (i.e., opening of cell doors, use of the handcuff/feeding apertures, inmate movement, etc.) shall be in accordance with Department policy **6.5.1, "Administration of Security Level 5 Housing Units."**

### D. Work Assignments

An inmate in Phase I is permitted a work assignment as follows:

1. within the housing unit approved by the Program Review Committee (PRC) or Unit Management Team and as defined in Department policy **DC-ADM 816, "inmate Compensation System"**; or

2. work in the areas adjacent to, but inside the enclosure of, the unit (e.g., grounds keeping, snow removal, etc.). Such an assignment requires the approval of the Facility Manager/designee.

## E. Visiting

1. All visits shall be non-contact unless otherwise directed by court order or approved by the Secretary/designee.
2. Each inmate shall be allowed one visit per week.
3. Visits shall be no longer than one hour in duration and shall occur during regularly scheduled visiting hours. Longer periods may be allowed depending upon the available space.[1]
4. Legal and spiritual advisor visits are not counted, against the one visit per week, however they are to be non-contact.
5. Special requests for a contact visit by an attorney must be forwarded to the Office of Chief Counsel for review. The Regional Deputy Secretary shall approve/disapprove all contact visit requests.
6. Attorney/client confidentiality privileges are to be maintained and each inmate must be given the opportunity to have confidential conversations with the Attorney of Record.
7. The Facility Manager/designee may approve additional and/or extended visits in accordance with Department policy **DC-ADM 812, "Inmate Visiting Privileges."**

## F. Telephone Privileges

1. Each inmate shall be given the opportunity to place three 15-minute telephone calls per week in accordance with Department policy **DC-ADM 818, "Automated Inmate Telephone System."**
2. Telephone calls to the inmate's Attorney of Record shall be permitted, but restrictions may be imposed if abuse of the privileges occurs.
3. Telephone calls to an attorney shall be handled in accordance with Department policy **DC-ADM 818, "Automated Inmate Telephone System."** Telephone calls to the inmate's Attorney of Record shall not be counted against the inmate's one telephone call per week.

[1] 3-4443

## G. Television and Radio

Personal televisions and radio/tape/compact disk players are permitted for Phase I inmates. The purchase of these items shall be in accordance with **DC-ADM 815, "Personal Property, Basic/State Issued Items and Commissary/Outside Purchases."**

## H. Exercise

1. A Phase I inmate shall be permitted two hours of outdoor exercise a minimum of five days per week, weather permitting.
2. Up to two inmates may be permitted to exercise together in an outside exercise area, taking into account separation and security concerns.
3. A tennis ball, basket ball, playing cards, and board games are permitted. These items shall be provided by the facility for use only while in the exercise unit.

## I. State Issued Clothing

1. A Phase I inmate is permitted the following state issued property:
   a. RHU jumpsuit;
   b. canvas slide footwear;
   c. three pair of socks; and
   d. three pair of underwear (includes three undershirts for males and three bras for females).
2. The home facility shall maintain canvas sneakers for a Phase I inmate to use for out-of-cell exercise. The home facility shall supply appropriate clothing and footwear for all other out-of-cell activities and for inclement weather.
3. The inmate may retain the shoes issued by the home facility in his/her cell.

## J. Personal Property, Cell Furniture, and Commissary Items

1. Personal Property

   A Phase I inmate is permitted the following personal items:

   a. one cocoa brown sweat suit (top and bottom) except for a DCC inmate;
   b. one pair of brown sweat shorts;

c. three pair of underwear and three pair of socks (total of five including state issued pairs);

d. one bathrobe;

e. one pair of long underwear (based on medical need);

f. one pair of pajamas;

g. one toothbrush (in accordance with Department policy **DC-ADM 815, "Personal Property, Basic/State Issued Items and Commissary/Outside Purchases"**;

h. one pair of shower clogs or slides;

i. an inmate who chooses to purchase his/her own sneakers, may do so. Such purchases shall be in accordance with Department policy **DC-ADM 815**. The inmate may retain one pair of personal sneakers in his/her cell.

j. a Capital Case inmate shall be permitted to retain any combination of written materials and commissary items that will fit into the cell's storage cabinet and either two standard-sized, records-center boxes or one footlocker. If the Capital Case cell is not equipped with a storage cabinet, the inmate may retain two records-center boxes and one footlocker.

2. Cell Furniture

a. An armchair or desk type piece of furniture is also permitted provided it is of a material that does not pose a security threat.

b. An inmate of the Muslim faith is permitted one prayer rug in addition to the one permitted rug, however it must be rolled up when not in use.

3. Commissary

A Phase I inmate is permitted to purchase commissary items listed in the **Capital Case Master Commissary List (Attachment 1-A)** and Department policy **DC-ADM 815**.

**K. Facility Programming**

Educational programming and leisure activities shall be made available to interested Phase I inmates housed in Administrative Custody (AC) status.

1. Educational Programming

The Education Director shall ensure that:

Case: 22-2399 Document: 19 Page: 142 Date Filed: 01/20/2023

a. all Phase I inmates are made aware of available educational opportunities, and the procedures for requesting participation;

b. educational materials are available and are provided as needed. The Education Director shall also ensure that tutoring is provided as needed;

c. only materials deemed appropriate for each level are used;

d. available educational programs are:
   (1) Adult Basic Education (ABE);

   (2) General Equivalency Diploma (GED); and

   (3) individual/self study programs.

e. the programs will be at no cost to the inmate;

f. post-secondary opportunities may be made available at the inmate's expense; and

g. in-cell work programs may be considered. If developed and approved, appropriate pay shall be afforded to the inmate in accordance with Department policy **DC-ADM 816**.

2. Leisure Activities

The Activities Manager shall ensure that:

a. Phase I inmates are made aware of recreational opportunities and procedures for requesting participation; and

b. only selected and approved arts and crafts materials, authorized by the Facility Manager/designee, are used.

**L. Religious Activities**

Religious activities shall be permitted in accordance with Department policy **DC-ADM 802, "Administrative Custody Procedures"** and **DC-ADM, "Religious Activities,"** with the following exceptions:

1. an inmate may request religious audiotapes on a weekly basis; and

2. an inmate may not retain more than two religious audiotapes at any one time.

**M. Access to Legal Materials**

1. Each housing unit in which Capital Case inmates are housed, shall contain a designated area to contain a mini law library in accordance with Department policy **DC-ADM 007, "Access to Provided Legal Services."**

2. Each mini law library shall provide adequate lighting, seating for two individuals, desk space adequate for a work area, and shelving that is secure.

3. A Capital Case inmate shall be given written instructions containing a current list of materials available in the mini law library, the procedures to request use of the mini law library, and the hours the mini law library is available to. Each home facility shall also ensure that a typewriter is kept in the mini law library for the Capital Case inmate to use.

4. The mini law library shall be available to a Capital Case inmate during the time the housing unit is considered to be "open" (shower and exercise periods).

5. The Officer-in-Charge of the housing unit shall schedule use of the mini law library.

6. A Capital Case inmate may request two hour blocks of time to work in the mini law library. If no one is scheduled to use the mini law library after the two hour block of time, a request for continued time may be considered.

7. Two Phase I inmates may work together in the mini law library providing there is no security concern.

8. A Capital Case inmate is not permitted to work together with a non-Capital Case inmate.

9. A Capital Case inmate may request to be put on an "on call" list to use the mini law library if no one is scheduled to use it during the period the housing unit is "open".

10. A logbook shall be maintained recording inmate use of the mini law library including each inmate's name and number, date of use, length of time used and whether the inmate worked with another inmate.

11. At least twice a week the facility law librarian/designee, shall deliver requested legal materials from the facility's general population law library and pick up requests for legal materials from the Level 5 Housing Unit.

12. The facility Librarian will inventory the mini law library on a monthly basis to ensure that the materials are in place and up to date. A record of the inventory shall be maintained.

13. If an inmate does not have representation by an attorney and is illiterate or non-English speaking, he/she may be permitted to exchange legal information, with the approval of the Facility Manager/designee, with another Capital Case inmate who is acting as legal advisor. Custody staff are not to pass legal materials from one inmate to another.

14. A search of the materials in the inmate's possession shall be conducted upon exiting the mini law library to ensure that no pages were torn from the books in an attempt to remove them from the library.

15. A Capital Case inmate shall be permitted to exchange legal materials from his/her cell with legal materials being held in storage once every 30 days. The PRC may authorize more frequent exchanges based upon demonstrated need. Such additional exchanges may not exceed one per week.

**N. Access to Reading Materials**

1. Library materials shall be made available through established local procedures.
2. A Capital Case inmate shall be allowed to retain non-legal reading materials in accordance with **Subsection J.1.j.** above.
3. Newspapers shall be permitted on a one-for-one exchange basis.

**O. Transfer of Phase I Inmates**

If a Phase I Capital Case inmate participating in a facility program is transferred, progress records and the materials being used shall be transferred with the inmate to ensure continuity or participation at the next facility.

**P. Placement in Disciplinary Custody (DC) Status**

When a Phase I Capital Case inmate is transferred to DC status, the inmate will be suspended from program participation until returned to AC status in accordance with Department policy **DC-ADM 802**. The Office of the Secretary shall be notified via fax of any change in status of a Capital Case inmate. The notification is to include a brief summary of the events regarding the change in status.

**Q. Psychiatric Treatment of a Capital Case Inmate**

1. Anytime a staff member observes a Capital Case inmate showing signs of mental decomposition to the point where the inmate might pose a risk to him/herself or others, the observing staff shall:

   a. notify the Facility Manager/designee, the Deputy Superintendent for Facilities Management (DSFM), and the Medical and Psychology Departments in order to arrange for the inmate to be evaluated; and

   b. the Unit Manager or Officer-in-Charge of the housing unit shall assess the inmate with the **DC-510**. The staff member conducting the **DC-510** shall assist the Medical/Psychiatric Departments in evaluating the inmate.

2. After the facility's Medical/Psychiatric Department has evaluated the inmate, the Medical/Psychiatric Department shall consult with the Chief of Psychiatry/Medical Director at the Bureau of Health Care Services (BHCS), Central Office. A **DC-566, Individual Treatment Plan (ITP)** shall be prepared, if indicated.

3. Any restrictions of state issued or personal property, and/or the need for staff observation of the inmate shall be in accordance with the inmate's ITP.

4. If it is determined that the Capital Case inmate should be transferred to a Mental Health Unit (MHU) or Forensic Treatment Center (FTC) the facility's Medical/Psychiatric Department shall coordinate the transfer of the inmate to the treatment center with the following people:

   a. Office of the Secretary/designee;

   b. BHCS Chief of Psychiatry/Medical Director

   c. Chief of the Central Office Security Division;
   d. Bureau of Inmate Services (BIS);

   e. ***Office of Population Management; and***

   f. Office of Chief Counsel.

5. The Office of Chief Counsel shall notify the following people that the Capital Case inmate is going to be moved to a MHU or FTC:

   a. Governor's Office; and

   b. General Counsel's Office.

6. The MHU and/or the FTC staff shall work in conjunction with the facility's Security Office and the Central Office Chief of Security to ensure that proper and adequate security measures are in place to allow the inmate to fully participate in his/her individual or group treatment.

7. When the MHU or FTC staff determine that the Capital Case inmate is stable and ready to be released, the staff shall contact the individual listed below to arrange the return of the Capital Case inmate to his/her home facility:

   a. Office of the Secretary/designee;

   b. BHCS Chief of Psychiatry/Medical Director;

   c. Central Office Chief of Security;

   d. Chief Counsel's Office; and

e. ***Office of Population Management.***

8. After the Capital Case inmate has been transported back to his/her home facility, the Office of Chief Counsel shall notify the following persons:

   a. Governor's Office; and

   b. General Counsel's Office.

**R. News Media**

1. Requests for interviews with a Phase I inmate shall be handled in accordance with Department policy **DC-ADM 009, "News Media Relations."**

2. All statutes, regulations, and policies that govern visits and telephone calls between a Capital Case inmate and the general public shall be used when responding to news media requests for interviews with a specific Capital Case inmate.

**S. Modification of Sentence**

1. In the event that an order is received modifying the sentence of a Capital Case inmate to life imprisonment due to a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, or as the result of a commutation, the facility Records Supervisor must determine whether the order is valid and whether the District Attorney intends to appeal the order.

2. If the District Attorney intends to appeal, the inmate shall not be moved from the Capital Case unit until the appeal is resolved. However, the inmate may be moved from the Capital Case unit, if the District Attorney does not file an appeal within 30 days.

3. If the District Attorney does not intend to appeal and if the inmate does not remain subject to an execution sentence as the result of a prosecution other than the sentence modified in the order, the inmate may be moved from the Capital Case housing unit.

4. Any questions concerning moving a Capital Case inmate from a Capital Case unit shall be referred to the appropriate Regional Deputy Secretary.

**T. Conversion to Phase II**

When an Execution Warrant is signed by the Governor, the inmate is to be converted to Phase II status. Phase II Capital Case inmate procedures shall be in accordance with **Section 2, Phase II**, of this manual.

# Exhibit 3

**POLICY STATEMENT**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: Access to Mental Health Care | | Policy Number: 13.8.1 |
|---|---|---|
| Date of Issue: March 2, 2015 | Authority: Signature on File John E. Wetzel | Effective Date: March 9, 2015 |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections, Department employees, volunteers, contract personnel, visitors and inmates.

## III. POLICY

It is the policy of the Department to deliver a broad continuum of mental health services to ensure that regardless of how major or minor the emotional disturbance, services are available to every inmate in the Department.[1]

A. screening for mental health problems on intake as approved by the mental health professional (refer to **Section 2 - Delivery of Mental Health Services** of this procedures manual);

B. outpatient services for the detection, diagnosis, and treatment of mental illness (refer to **Section 2** of this procedures manual);

---

[1] 4-4368

C. crisis intervention and the management of acute psychiatric episodes (refer to **Section 2** and **Section 3 - Delivery of Psychiatric Services** of this procedures manual);

D. stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting (refer to **Section 2, Section 3,** and **Section 5 - Residential Treatment Units [RTUs]** of this procedures manual);

E. preventive treatment (refer to **Section 1** and **Section 2** of this procedures manual);

F. provision for referral and admission to a licensed mental health unit/facility (refer to **Section 2 and Section 4 - Temporary Transfer of Mental Health Commitments** of this procedures manual);

G. facilities for an offender whose psychiatric needs exceed the treatment capability of the facility (refer to **Section 5**, **Section 7 – Special Assessment Unit**, **Section 10 – Intermediate Care Unit** of this procedures manual); and

H. procedures for obtaining and documenting informed consent (refer to **Section 2** of this procedures manual).

## IV. PROCEDURES

A. The systematic method of delivering psychological services to every inmate includes, but is not limited to, the below listed vehicles.

1. Intellectual, Academic and Mental Health Assessment

   The Department provides psychological and psychiatric assessments of levels of intellectual functioning, academic achievement, personality dynamics, and mental health needs to identify each inmate's strengths and weaknesses in order to make prescriptive program and treatment recommendations to help him/her develop the necessary skills for successful adjustment while incarcerated and upon release in the community.[2]

2. Individual Treatment and Program Planning

   The mental health treatment service needs of each inmate are addressed via his/her **DC-43, Integrated Correctional Plan (ICP)**, which is developed with participation of the inmate and is updated annually. In addition, the special needs of an inmate with mental illness are further addressed via the Individual Recovery Plan (IRP).

3. Mental Health Tracking

   An inmate with mental health problems is tracked on the automated Mental Health/Intellectual Disability (MH/ID) tracking system to ensure continuity of care.

---

[2] 4-4305

4. Outpatient Treatment Services

   Outpatient psychiatric and psychological services are provided upon an inmate's initial intake and as needed throughout his/her period of incarceration at every facility. Individual and group treatment services are developed to assist an inmate in emotional growth and/or prevention/management of mental illness, managing the behaviors that lead led to his/her offense(s), coping with the prison environment and external stressors, and preparing for reentry into the community as law abiding citizens.

5. Inpatient Treatment Mental Health Services

   Inpatient psychiatric services are provided in Mental Health Units (MHUs) and the Forensic Treatment Center (FTC) at Waymart. The MHUs are small inpatient units that are licensed by the Department of Human Service's Office of Mental Health and Substance Abuse Services (OMHSAS) and provide short-term treatment. The FTC is a psychiatric hospital licensed by OMHSAS, which provides long-term inpatient psychiatric services.

6. Special Needs Housing

   Specialized housing is available for inmates that require that level of care in a Special Needs Unit (SNU), Intermediate Care Unit (ICU), Special Assessment Unit (SAU), Residential Treatment Unit (RTU), Secure Residential Treatment Unit (SRTU), Behavior Management Unit (BMU), Diversionary Treatment Unit (DTU) and Special Observation Unit (SOU). SNUs are non-licensed living areas or blocks located where an inmate with special mental health or medical needs can receive additional or more intense treatment services, support and/or protection. The ICU at Waymart is a 93-bed living unit that accepts an inmate who has a history of serious mental illness, psychiatric hospitalizations, and SNU/RTU placements. The ICU prepares an inmate for living in a SNU/RTU. The SAU provides additional diagnostic and assessment services for an inmate with mental illness who displays serious behavioral problems. The SOU is an observation and assessment unit for newly committed inmates who are experiencing stress and are suspected of having mental health problems.[3]

7. Community Based Residential and Treatment Services

   CCCs for a mentally ill inmate are located in Philadelphia and Allegheny Counties to help these men and women transition back into community life.

B. All pertinent procedures for staff are contained in the procedures manual for this policy.

---

[3] 4-4305

## V. SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII. RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A. Release of Information

1. Policy

   This policy document is public information and may be released upon request.

2. Confidential Procedures (if applicable)

   Confidential procedures for this document, if any, are not public information and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

### B. Distribution of Policy

1. General Distribution

   The Department of Corrections' policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2. Distribution to Staff

   It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII. SUPERSEDED POLICY AND CROSS REFERENCE

### A. Superseded Policy

1. Department Policy

   13.8.1, Access to Health Care, issued May 24, 2004 by Secretary Jeffrey A. Beard, Ph.D.

2. Facility Policy and Procedures

   This document supersedes all facility policy and procedures on this subject.

### B. Cross Reference(s)

1. Administrative Manuals

   a. DC-ADM 003, Release of Information;

   b. DC-ADM 201, Use of Force;

   c. DC-ADM 801, Inmate Discipline;

   d. DC-ADM 802, Administrative Custody Procedures;

   e. 2.1.1, Planning, Research, Statistics and Grants;

   f. 4.1.1, Human Resources and Labor Relations;

   g. 5.1.1, Staff Development and Training;

   h. 6.3.1, Facility Security;

   i. 6.5.1, Administration of Security Level 5 Housing Units;

   j. 6.5.8, Capital Case Administration;

   k. 6.7.2, Special Response Teams;

   l. 11.2.1, Reception and Classification;

   m. 11.4.1, Case Summary;

   n. 11.5.1, Records Office Operations;

   o. 13.1.1, Management and Administration of Health Care; and

   p. 13.2.1, Access to Health Care

2. ACA Standards

   a. Adult Correctional Institutions: 4-4191, 4-4257, 4-4258, 4-4286, 4-4305, 4-4350, 4-4351, 4-4366, 4-4368, 4-4369, 4-4371, 4-4372, 4-4373, 4-4374, 4-4399, 4-4401, 4-4404, 4-4411, 4-4416

   b. Adult Community Residential Services: None

   c. Correctional Training Academies: None

3. PREA Standards

   None

**PROCEDURES MANUAL**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: Access to Mental Health Care | | Policy Number: 13.8.1 |
|---|---|---|
| **Date of Issue:** March 2, 2015 | **Authority:** Signature on File John E. Wetzel | **Effective Date:** March 9, 2015 |

Release of Information:

**Policy Document**: The Department of Corrections policy document on this subject is public information and may be released to members of the public, staff, legislative, judicial, law enforcement, and correctional agencies and/or inmates upon request.

**Procedure Manual**: The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

**Procedure Development**: All required procedures will be developed in compliance with the standards set forth in this manual and/or the governing policy. These standards may be exceeded, but in all cases these standards are the minimum standard that must be achieved. In the event a deviation or variance is required, a written request is to be submitted to the appropriate Regional Deputy Secretary and the Standards and Practices Unit for review and approval prior to implementation. Absent such approval, all procedures set forth in this manual must be met.

***13.8.1 Access to Mental Health Care Procedures Manual***
***Table of Contents***

## Section 1 – Psychological Services

A. Diagnostic Center ........ 1-1
B. Facility Functions and Procedures ........ 1-2
C. Treatment ........ 1-14
D. Procedure for Preparation of Commutation Psychological Evaluations ........ 1-15
E. Training, Consultation, and Peer Review ........ 1-15
F. Central Office Oversight, Quality Improvement, and Quality Assurance Activities ........ 1-16

DC-97, Mental Health Referral Form ........ Attachment 1-A
Guidelines for Department Psychological Evaluations for Parole and Other Assessments Required by Policy or Referral ........ Attachment 1-B
Procedure for Preparation of Commutation Psychological Evaluations ........ Attachment 1-C
PCRA and Psychological Evaluation for Parole ........ Attachment 1-D
Psychological Evaluation and Clinical Risk Assessment ........ Attachment 1-E
DC-510, Suicide Indicators Checklist ........ Attachment 1-F
DC-560, Mental Health Contact Note ........ Attachment 1-G
RHU C & D Roster Inmate Review Tracking Sheet ........ Attachment 1-H
DC-560A, Initial Reception Mental Health Questionnaire ........ Attachment 1-I
Format for Commutation Psychological Reports ........ Attachment 1-J
Psychological Screening Report Form ........ Attachment 1-K
Role of the Psychologist in Personnel Selection of COTS ........ Attachment 1-L

## Section 2 - Delivery of Mental Health Services

A. Identifying Mental Health Needs of Inmates ........ 2-1
B. Definition of Serious Mental Illness ........ 2-2
C. Clinical Guidelines for Functional Impairment ........ 2-4
D. Intellectual Disability (ID) ........ 2-4
E. Processing ........ 2-9
F. Mental Health Commitments ........ 2-11
G. Continuity of Care Procedures for Inmates with Mental Illness Being Transferred ........ 2-15
H. Continuity of Care Procedures for an Inmate with Mental Illness Being Discharged ........ 2-18
I. Limits of Confidentiality ........ 2-24
J. Guilty But Mentally Ill (GBMI) Inmates ........ 2-25
K. Dealing with a Potentially Suicidal Inmate and an Inmate Who Attempts Suicide ........ 2-30
L. Suicide Prevention Committee ........ 2-42
M. Mental Health Services Review Committee (MHSRC) ........ 2-43

Initial – Individual Recovery Plan ........ Attachment 2-A
Change of Status – Individual Recovery Plan ........ Attachment 2-B
Review – Individual Recovery Plan ........ Attachment 2-C
DC-551, Continuity of Care and Transfer Individual Treatment Plan ........ Attachment 2-D
MH 783, Application for Involuntary Emergency Examination & Treatment ........ Attachment 2-E
MH 783-A, Patient's Bill of Rights ........ Attachment 2-F
MH 784, Application for Extended Involuntary Treatment ........ Attachment 2-G
Voluntary Application for Mental Health Treatment (Section 201) ........ Attachment 2-H
MH 781-Z, Explanation of Voluntary Admission Rights ........ Attachment 2-I

***13.8.1 Access to Mental Health Care Procedures Manual***
***Table of Contents***

MH 781-A, Initial Evaluation ........ Attachment 2-J
DC-484, Mental Health Confidentiality Disclosure Statement-English & Spanish Attachment 2-K
Referral Procedure for Cromisa Project ........ Attachment 2-L

**Section 3 - Delivery of Psychiatric Services**

A. Documentation of Psychiatry Services ........ 3-1
B. Provisions of Psychiatric Services by a Certified Registered Nurse Practitioner – Psychiatric Services (PCRNP) ........ 3-3
C. Psychiatric Therapeutic Restraints ........ 3-5
D. Guidelines for Psychiatric Observations Cells (POC) ........ 3-5
E. Involuntary Administration of Psychotropic Medications ........ 3-14
F. Sleep Medications ........ 3-17
G. Benzodiazepines ........ 3-17
H. Psychiatric Medication Monitoring ........ 3-18

DC-472C, Outpatient Psychiatry Progress Notes ........ Attachment 3-A
DC-452D, Informed Consent for Psychotropic Medication ........ Attachment 3-B
DC-452D, Informed Consent for Psychotropic Medication (Spanish) ........ Attachment 3-C
DC-474A, POC Discharge Summary ........ Attachment 3-D
DC-447, Psychiatric Observation Cell Orders ........ Attachment 3-E
DC-483, Psychiatric Observation Monitoring Form ........ Attachment 3-F
DC-486C, Antipsychotic Medication Flow Sheet ........ Attachment 3-G
DC-486B, Lithium, Depakote, Trileptal, Tegretol Flow Sheet ........ Attachment 3-H

**Section 4 - Temporary Transfer of Mental Health Commitments**

A. General Considerations ........ 4-1
B. Eligibility Criteria for Intra-Facility Transfer ........ 4-1
C. Department Mental Health Unit Commitment Process ........ 4-2
D. Department Regional Mental Health Unit (MHU) Responsibilities ........ 4-3

Request for Temporary Transfer to a Mental Health Unit ........ Attachment 4-A
Inmate Property Approved for Transfer to a Mental Health Unit ........ Attachment 4-B

**Section 5 – Residential Treatment Units (RTUs)**

A. Program Mission ........ 5-1
B. Admission Criteria and Process for Transfer ........ 5-1
C. RTU Cell Assignment ........ 5-3
D. Individual Recovery Plans (IRPs) and Psychiatric Review Team (PRT) ........ 5-3
E. Treatment Team Meetings ........ 5-4
F. Treatment Programming ........ 5-4
G. Milieu/Unit Atmosphere ........ 5-8
H. Treatment Team Responsibilities ........ 5-10
I. Medications ........ 5-12
J. Razors ........ 5-13
K. Staff Training and Development ........ 5-13

L. Behavioral Adjustment Cell (BAC) .... 5-13
M. Discharge and Transfer Procedures .... 5-14

Involuntary Double-Celling Checklist .... Attachment 5-A
Initial Individual Recovery Plan (IRP) .... Attachment 5-B
Change of Status IRP .... Attachment 5-C
Review IRP .... Attachment 5-D
IRP Guidelines .... Attachment 5-E
Group Therapy Resources for RTU Inmates .... Attachment 5-F
RTU Program Schedule .... Attachment 5-G
Behavioral Adjustment Cell (BAC) Tracking Sheet .... Attachment 5-H

**Section 6 - Post Traumatic Stress Disorder Treatment Program**

A. Awareness and Education Phase .... 6-1
B. Evaluation .... 6-1
C. Treatment Program .... 6-2
D. Training .... 6-4
E. Program Discharge .... 6-4

DC-553, Military Veterans Scale .... Attachment 6-A
DC-552, Military Experience of Combat Veterans .... Attachment 6-B

**Section 7 - Special Assessment Unit (SAU)**

A. Mission/Purpose .... 7-1
B. Time Frame .... 7-1
C. Location .... 7-1
D. Admission Criteria .... 7-1
E. Process for Transfer to SAU .... 7-2
F. Transportation .... 7-4
G. Orientation .... 7-5
H. Admission Process .... 7-5
I. Assessment Process .... 7-5
J. Discharge Process .... 7-6

**Section 8 - Intermediate Care Unit (ICU)**

A. Admission Criteria and Custody Level Overrides .... 8-1
B. Process for Transfer .... 8-1
C. Transfers and Transportation .... 8-2
D. Bureau of Health Care Services (BHCS) Responsibilities .... 8-3
E. Orientation for an ICU Inmate .... 8-3
F. Treatment Programs/Levels of Treatment .... 8-3
G. Discharge Procedures .... 8-4

## Section 9 - Staffing and Security of Mental Health Units

A. Responsibilities .......... 9-1
B. Corrections Officer Staffing Levels and Inmate Custody Levels in the MHUs .......... 9-4
C. Tracking System Access .......... 9-6
D. Discharge Procedures .......... 9-6

## Section 10 – Secure Residential Treatment Unit (SRTU)

A. Program Mission .......... 10-1
B. Location .......... 10-1
C. Staffing .......... 10-1
D. Determination and Maintenance of Staffing Levels for the SRTUs .......... 10-6
E. Chain of Command .......... 10-7
F. Staff Training .......... 10-7
G. Admission Criteria .......... 10-8
H. Process for Transfers .......... 10-8
I. Transportation .......... 10-11
J. Admission and Orientation .......... 10-11
K. Transfers of Inmates in the SRTU System .......... 10-13
L. Treatment Programs/Levels of Treatment .......... 10-14
M. Accountability Status .......... 10-20
N. Structured Versus Unstructured Programming .......... 10-22
O. Phase Modification .......... 10-23
P. Incentive Program .......... 10-24
Q. Misconducts .......... 10-25
R. Changes in Status .......... 10-26
S. Release of SRTU Inmates .......... 10-26
T. Discharge Procedures .......... 10-28
U. Release via Sentence Complete (Formerly Final Discharge Maximum Expiration) .......... 10-30
V. Unit Operation Evaluation .......... 10-30

Institutions with SRTUs Listing .......... Attachment 10-A
SRTU Accepted/Refused Structured Out-of-Cell Program Log .......... Attachment 10-B
SRTU Accepted/Refused Unstructured Out-of-Cell Program Log .......... Attachment 10-C
SRTU Shift Pass Down Form .......... Attachment 10-D
STRU Program Review Sheet .......... Attachment 10-E
Definition of a Serious Mental Illness Outline .......... Attachment 10-F
SRTU Inmate Handbook Receipt Form .......... Attachment 10-G
SRTU Initial Annual Recovery Treatment Plan .......... Attachment 10-H
SRTU Property, Privileges, and Services Chart .......... Attachment 10-I
SRTU Recovery Treatment Plan Review .......... Attachment 10-J
SRTU Incentive Order Form .......... Attachment 10-K
SRTU Accountability Status Restriction Form .......... Attachment 10-L
SRTU Accountability Status – Individual Recovery Plan .......... Attachment 10-M
SRTU Group Participation Form .......... Attachment 10-N
Weekly Structured/Unstructured Out-of-Cell Program Report .......... Attachment 10-O
SRTU Weekly Point Summary .......... Attachment 10-P

***13.8.1 Access to Mental Health Care Procedures Manual***
***Table of Contents***

SRTU Monthly Point Summary .......... Attachment 10-Q
SRTU Semi-Annual Report .......... Attachment 10-R

**Section 11 - Sex Offender Treatment (SOT)**

A. Standards, Guidelines, and Theoretical Orientation for the Assessment and Treatment of Adult Sex Offenders .......... 11-1
B. Risk/Need Assessment .......... 11-1
C. Sex Offender Treatment (SOT) Programming .......... 11-6
D. Staff Qualifications and Minimum Training .......... 11-10
E. Multidisciplinary Treatment and Management of the Sex Offender .......... 11-11
F. Record Keeping .......... 11-13
G. Assistor/Peer Programs .......... 11-14
H. Managing Program Participants who Accrue Misconduct(s) .......... 11-15
I. Managing Inmates without a Sexual Conviction Who Sexually Assault During Incarceration .......... 11-15
J. Collaborating with the Sexual Offenders Assessment Board (SOAB) .......... 11-15

Standards and Guidelines for Assessment, Evaluation, and Treatment of Sex Offenders .......... Attachment 11-A
Theoretical Orientation .......... Attachment 11-B
Static 99 Coding Rules .......... Attachment 11-C
DC-577, Sex Offender Data Collection Instrument .......... Attachment 11-D
DC-578, Sex Offender Program Evaluation .......... Attachment 11-E
Table for Adjustments in Risk Based on Time Free .......... Attachment 11-F
Assessment Results for an Inmate Referred for Evaluation for Sex Offender Treatment due to a Technical Parole Violation or a Prior Sex Offense .......... Attachment 11-G
Procedure for Implementing Victim Scrapbook Process .......... Attachment 11-H
Four-Stage Model of Group Development .......... Attachment 11-I
Limits of Confidentiality .......... Attachment 11-J
Conditions of Participation .......... Attachment 11-K
Principles of Adult Learning .......... Attachment 11-L
DC-579, Summary of progress in Sex Offender Treatment` .......... Attachment 11-M

**Section 12 – Behavior Management Unit (BMU)**

A. Program Mission .......... 12-1
B. Location .......... 12-1
C. Staffing .......... 12-1
D. Determination and Maintenance of Staffing Levels for the BMUs .......... 12-6
E. Chain of Command .......... 12-7
F. Staff Training .......... 12-7
G. Admission Criteria .......... 12-7
H. Process for Transfers .......... 12-8
I. Transportation .......... 12-11
J. Admission and Orientation .......... 12-11
K. Transfers of Inmates in the BMU System .......... 12-13
L. Treatment Programs/Levels of Treatment .......... 12-14
M. Accountability Status .......... 12-20

***13.8.1 Access to Mental Health Care Procedures Manual***
***Table of Contents***

N. Structured Versus Unstructured Programming .......... 12-23
O. Phase Modification .......... 12-24
P. Incentive Program .......... 12-24
Q. Misconducts .......... 12-26
R. Change in Status .......... 12-26
S. Release of BMU Inmates .......... 12-27
T. Discharge Procedures .......... 12-28
U. Release via Sentence Complete (Formerly Final Discharge Maximum Expiration) .......... 12-29
V. Unit Operation Evaluation .......... 12-30

BMU Accepted/Refused Structured Out-of-Cell Program Log .......... Attachment 12-A
BMU Accepted/Refused Unstructured Out-of-Cell Program Log .......... Attachment 12-B
BMU Shift Pass Down Form .......... Attachment 12-C
BMU Program Review Sheet .......... Attachment 12-D
BMU Inmate Orientation Handbook Receipt Form .......... Attachment 12-E
BMU Initial Recovery Treatment Plan .......... Attachment 12-F
BMU Property, Privileges, and Services Chart .......... Attachment 12-G
BMU Recovery Treatment Plan Review .......... Attachment 12-H
BMU Incentive Order Form .......... Attachment 12-I
BMU Accountability Status Restriction Form .......... Attachment 12-J
BMU Accountability Status – Recovery Treatment Plan .......... Attachment 12-K
BMU Group Participation Form .......... Attachment 12-L
Weekly Structured/Unstructured Out-of-Cell Program Report .......... Attachment 12-M
BMU Weekly Point Summary .......... Attachment 12-N
BMU Monthly Point Summary .......... Attachment 12-O
BMU/SRTU Information Resolution Action Form .......... Attachment 12-P
BMU Semi-Annual Report .......... Attachment 12-Q

**Section 13 – Special Needs Unit (SNU)**

A. Facility Responsibilities .......... 13-1
B. Admission Guidelines and Process for Transfer .......... 13-1
C. SNU Cell Assignment .......... 13-3
D. Staffing .......... 13-4
E. SNU Yard and Activities .......... 13-4
F. Discharge and Transfer Procedures .......... 13-4

On-Unit Activities Schedule .......... Attachment 13-A

**Section 14 – Diversionary Treatment Units (DTU)**

A. General .......... 14-1
B. Admission Criteria .......... 14-1
C. General Procedures and Provisions .......... 14-1
D. Staff Training .......... 14-7
E. Unit Operation Evaluation .......... 14-7

Accepted/Refused Structured Out-of-Cell Program Log .......... Attachment 14-A

DTU Accepted/Refused Unstructured Out-of-Cell Program Log........................Attachment 14-B
Structured/Unstructured Out-of-Cell Program Report........................................Attachment 14-C
DTU Semi-Annual Report..........................................................................Attachment 14-D

**Section 15 – Certified Peer Specialist (CPS) Initiative**

A. General Considerations........................................................................................ 15-1
B. CPS Candidate Selection........................................................................................ 15-4
C. CPS Training Program........................................................................................ 15-5
D. Supervisory Staff........................................................................................ 15-7
E. General Conduct........................................................................................ 15-8
F. CPS Guidelines for Level 5 Housing........................................................................ 15-9
G. CPS Guidelines for Psychiatric Observation Cells ................................................ 15-9

CPS Confidentiality Acknowledgement Form ..............................................Attachment 15-A
CPR Orientation Checklist.........................................................................Attachment 15-B
CPS Continuing Education Certificate ........................................................Attachment 15-C
CPS Training Tracking Form ....................................................................Attachment 15-D
CPS Defined Power Point ........................................................................Attachment 15-E
Letter of Recommendation .......................................................................Attachment 15-F

## Section 1 – Psychological Services

### A. Diagnostic Center

1. Every inmate entering the Department shall be given a psychological evaluation conducted at the Diagnostic and Classification Center (DCC).[1] The DCC shall administer basic psychometric testing and interview the inmate upon reception. DCC will provide further assessments only for an inmate who evidences a need for more comprehensive evaluation, e.g., those inmates scoring 70 or below on the intellectual screening to rule out intellectual deficiency.

2. The purpose of this psychometric testing is to provide screening in the areas of intelligence, achievement, personality, and emotional stability. Whenever screening indicates a need for more in-depth study, such shall be provided. Basic Assessment will be conducted with results and recommendations made available to appropriate staff for the purpose of initial classification in accordance with Department policy **11.2.1, "Reception and Classification."**

    a. Personality Assessment Inventory (PAI)

    (1) The psychology staff will administer the PAI.

    (2) PAIs will be administered in an appropriate testing environment without interruption.

    (3) A recorded version of the PAI will be administered to an illiterate inmate.

    (4) The complete protocol and computer narrative will be reviewed the same day it is administered and forwarded to the receiving facility along with a completed clinical interview form and the **Pennsylvania Clinical Risk Assessment (PCRA)**. If the initial review reveals clinically indicated concerns, an interview will be conducted the next working day.

    b. **DCC-PCRA**: the psychology staff will complete the **DCC-PCRA** form and forward it to the receiving facility.

    c. Revised Beta III

    (1) The psychology staff will administer the Beta III to every inmate.

    (2) An inmate who scores 70 or below will receive additional assessment at the DCC to "rule out intellectual disability (ID)/development disabilities (DD)." ID/DD assessment will include intelligence testing on the Wechsler Abbreviated Scale of Intelligence (WASI), the Wechsler Adult Intelligence Scale, adaptive behavior

[1] 4-4286

testing measured by the Vineland and research to determine whether the condition occurred before the age of 18.

d. More Comprehensive Assessments

(1) Mental Illness: An inmate with evidence of mental illness will receive a more comprehensive assessment. The Psychiatrist/Certified Registered Nurse Practitioner – Psychiatric Services (PCRNP) will conduct a comprehensive psychiatric evaluation in each case of serious mental illness (SMI) and the Psychiatric Review Team (PRT) will generate an **Individual Recovery Plan (IRP)** within 20 days of determination that the inmate has an SMI. This **IRP** will accompany the inmate to the receiving facility. The inmate shall be offered an opportunity to attend this meeting and the **IRP** will include goals in the inmate's own words, the PRT's unique plan for the inmate addressing his/her goals including sentinel behaviors, e.g. self-injurious behavior (SIB) and interventions utilized to achieve goals. Inmates that are not identified immediately at reception, but demonstrate evidence of mental illness, will be referred to psychiatry via the **DC-97, Mental Health Referral Form (Attachment 1-A)** for non-emergent referrals and this process must occur within 14 days of the referral.

(2) Other cases: Assessment procedures will not be modified for juveniles adjudicated as adults, for capital cases, or for boot camp cases.

**B. Facility Functions and Procedures**

1. The functions of the psychology staff are to provide diagnostic, therapeutic, mental health, and consultative services. The facility psychology staff shall provide group and individual therapy, as well as supervision and training in counseling and treatment for other staff members who need or request it, serve as a resource and consultant for administrative, custodial and other staff, participate in the development of individualized treatment programs, and participate in various staffings. Social workers may perform duties consistent with their licensure. The facility psychology staff shall evaluate mental health cases for potential commitment to the mental health system, arrange and coordinate mental health commitment hearings, and provide appropriate testimony at such hearings, as required. Psychology staff may serve as the point of contact with the courts and mental health facilities and make appropriate arrangements for the transfer to and/or return of an inmate from a mental health facility. The psychology staff are responsible for advising the Regional Licensed Psychology Manager (RLPM) and the Central Office Chief of Psychology, of any problems, difficulties, or unusual occurrences involving mental health cases and/or the transfer procedures, and for keeping records of every transfer to/from the mental health system. The psychology staff also provides follow-up treatment and monitors every mental health case returned to the facility from one of the Mental Health Units (MHU), State Correctional Institution (SCI) Waymart Forensic Treatment Center (FTC), or a Department of Human Services facility.[2]

---

[2] 4-4368, 4-4369

2. Designated psychology staff members in the facility shall function as Mental Health Coordinators (MHC), coordinating treatment services for particular inmates, arranging mental health commitments, tracing of mental health commitments, and crisis intervention until needed services can be coordinated.[3]

a. Diagnostic Evaluations for Program Planning

Counselors and other staff members make frequent referrals to the psychology department for the following reasons:

(1) consideration for Community Work Program (CWP);

(2) consideration for outside clearance;

(3) difficulty adjusting to program and/or facility life;

(4) frequent or serious disciplinary infractions;

(5) offer of an in-person, out-of-cell assessment, of every active mental health roster inmate involved in the disciplinary process prior to appearing before the decision maker;

(6) potential mental health commitments;

(7) guilty but mentally ill (GBMI) commitments, including an annual psychological evaluation in PCRA format;

(8) parole evaluations in PCRA format for active mental health roster inmates (C and D Roster) or those convicted of violent offenses; and/or

(9) psychosocial evaluations for use by local and Central Office Gender Review Committee (GRC).

b. Procedures

The counselor or other staff member shall refer cases to the psychology department for comprehensive evaluation and treatment on the **DC-97**. Ideally, such referrals shall be discussed with the referring party. If this is not possible, it may be necessary to proceed on the basis of the written referral only. It may also be necessary for the psychology staff to train other facility staff on the appropriate way to ask referral questions and what types of cases are appropriate for referral. Once the psychology staff receives the referral, he/she shall review the request and determine what procedures are necessary to answer the referral question. A diagnostic interview may be sufficient or additional testing may be necessary. The appropriate procedures necessary to reach responsible conclusions shall be determined by the nature of the

[3] 4-4368, 4-4369

request, the information available in the record, and the psychology staff's own skills. Generally, some additional testing shall be necessary, employing objective and/or projective techniques. The psychology staff performing the evaluation shall select the instruments used, except where policy may specify instruments to be used. The evaluation will be completed within 14 days of the referral request date and include the following:[4]

(1) review of mental health screening and appraisal data to include requesting community treatment data with the **DC-108, Authorization for Release of Information** and the **DC-484, Mental Health Informed Consent Form** signed;

(2) direct observations of behavior;

(3) collection and review of additional data from individual diagnostic interviews and tests assessing personality, intellect, and coping abilities;

(4) compilation of the individual's mental health history; and

(5) development of an IRP/management plan with appropriate referral to include transfer to a mental health facility for inmates whose psychiatric needs exceed the treatment capability of the facility.

c. Specialized Evaluations

(1) Psychology staff frequently are called upon to perform specialized evaluations. These cases, which may be sent to outside agencies, require sophisticated and intensive evaluations. General guidelines for the completion of these reports are presented in the **Guidelines for Department Psychological Evaluations for Parole and Other Assessments Required by Policy or Referral (Attachment 1-B)**.

(2) The psychologist shall employ appropriate interview procedures and test instruments, which may include objective measures (Minnesota Multiphasic Personality Inventory [MMPI-2], PAI, and PCRA), mental status exam, the Montreal Cognitive Assessment and one or more projective tests, to provide the required information. When possible, these evaluations shall be performed by a licensed psychologist (LP). Only under exceptional circumstances shall the following reports be prepared by anyone at a level less than the Psychological Services Specialist (PSS). Reports prepared by unlicensed staff must be reviewed and signed by a LP. The examiner and/or the reviewer's PA license number and signature shall be affixed to the report.

(a) Commutation

[4] 4-4372

When possible, commutation evaluations shall be performed by a LP. If any commutation reports are prepared by other than a LP, the reports must be reviewed and signed by a LP, preferably the Licensed Psychologist Manager (LPM). The reviewing psychologist shall include his/her license number and signature. For further information on the preparation of commutation psychological evaluations, please refer to **Procedure for Preparation of Commutation Psychological Evaluations (Attachment 1-C)** and to Department policy **11.4.1, "Case Summary."**

(b) Court Requests for Special Evaluations

Occasionally the committing court requests a special psychological evaluation on an individual. These requests shall be honored as rapidly as possible.

(c) Parole Board Requests

Psychological evaluations for parole shall include a clinical interview, review of the relevant files, and administration of the **PCRA and Psychological Evaluation for Parole (Attachment 1-D)**. The PCRA is a list of risk factors that research suggests are related to re-offending. Specific directions for administration of the PCRA and format for the PCRA are presented in **Psychological Evaluation and Clinical Risk Assessment (Attachment 1-E)**.

(d) Evaluations for Mental Health Facility Placement

The psychologist may be requested to perform an evaluation on an inmate being considered for transfer to a Department MHU or state hospital. The psychologist shall choose the appropriate clinical instruments that provide the information needed to assist in such determinations.

(e) Evaluations Requested by Facility Psychiatrist/PCRNP

The facility Psychiatrist/PCRNP may occasionally refer an inmate for psychological evaluation. When possible, the psychologist shall discuss the referral with the Psychiatrist/PCRNP prior to performing the evaluation. It is also helpful if the findings of the psychological evaluation can be discussed with the referring Psychiatrist/PCRNP.

(f) Psychological Evaluation of Inmates Confined in a Security Level 5 (SL5) Unit

These units include the Restricted Housing Unit (RHU), Special Management Unit (SMU), and Security Threat Group Management Unit (STGMU).

i. Psychology staff shall visit the SL5 Unit five times per week.[5] All psychology staff entering the unit shall sign in/out on the **DC-702, SL5 Unit Log Book**.

ii. Psychology and/or nursing staff will assess every inmate placed in a SL5 Unit for suicide potential and review the **DC-510, Suicide Indicators Checklist (Attachment 1-F)**. These procedures are outlined in **Section 2** of this procedures manual.

iii. All assessments and written reports of SL5 inmates shall address suitability for continued placement in the SL5 and assess mental deterioration or lack thereof. It is expected that all assessments will also include risk for suicidality and include consideration of protective factors.

iv. The treating Psychiatrist/PCRNP shall continue to see inmates on the C Roster out-of-cell a minimum of every 90 days or more frequently based on their clinical discretion, and shall make recommendations to the Program Review Committee (PRC) regarding inmates in Administrative Custody (AC)/Disciplinary Custody (DC) status who may be released.

v. Psychology staff shall personally interview, assess, and make a written report utilizing the **DC-560, Mental Health Contact Note (Attachment 1-G)** to be filed in the medical record for all A and B Roster status inmates monthly. A brief **Inmate Cumulative Adjustment Record (ICAR)** entry indicating the contact occurred shall also be made. Psychology staff shall make recommendations to the PRC regarding inmates in AC/DC status who may be released.

vi. Psychology staff shall personally interview, assess, and make written reports utilizing the **DC-560** to be filed in the medical record for every C Roster inmate monthly. A brief **ICAR** entry indicating the contact occurred will also be made. Psychology staff shall make recommendations to the PRC regarding inmates in AC/DC status who may be released. C Roster inmates shall be offered out-of-cell contacts with psychology/Psychiatry/PCRNP on the unit at least every 90 days. The refusal and/or acceptance of these offers shall be documented in the **ICAR** and on the **DC-560** in the medical record. These out-of-cell contacts are contingent on behavioral compliance from the inmate. If behavior is demonstrated that would contraindicate out-of-cell contact, this shall be documented in the **DC-17X, Adjustment Record for SL5 Inmates**, **ICAR**, and the **DC-560**. The inmate shall be seen at the next available visit if behavior permits.

---

[5] 4-4258

vii. Psychology staff shall assess an inmate referred and/or approved for Secure Residential Treatment Unit (SRTU) or Behavioral Management Unit (BMU) programming (whether on transfer waiting list or time-out) at least every seven days and shall make recommendations to the PRC regarding the inmate. These assessments shall be documented as brief **ICAR** entries with a more detailed **DC-560** filed in the medical record. SRTU and BMU approved inmates shall be offered out-of-cell contacts with Psychiatry/PCRNP at least every 30 days on the unit and shall be reviewed by PRT on a monthly basis.

viii. An inmate continuously confined in a SL5 Unit for a period of one year shall be given, at a minimum, an annual psychological, and if indicated, psychiatric examination during his/her confinement addressing the suitability of continued confinement in the SL5 Unit, regardless of current Mental Health (MH)/ID roster status. It is the responsibility of the psychology staff to see that such an evaluation is conducted. These shall be documented as brief **ICAR** entries with a PCRA evaluation filed in the medical record. If the inmate refuses to submit to assessment, procedures in accordance with Department policy **13.1.1, "Management & Administration of Health Care,"** shall be followed.

ix. Psychology staff shall make recommendations to the PRC regarding inmates in long-term AC/DC status who may be released or possibly transferred to a SRTU, BMU, SMU, STGMU, or other specialized program.

x. Unless a specific need exists that the inmate must be removed from the unit, the inmate shall be visited in the unit. This is to restrict traffic and to avoid possible problems during escort or time out of the unit. The Shift Commander/designee must approve any move from the unit for a psychological/psychiatric visit or interview.

xi. The LPM/MHC will provide the Commissioned Officer-in-Charge of the SL5 Unit weekly with a listing of all inmates on the active mental health roster and those considered to display risk factors for suicidal behavior. This list is to be utilized by security staff to assist in their day-to-day interactions and decision-making processes. These postings should stay in the secured control bubble.

xii. The Unit Manager/Officer-in-Charge is responsible for coordinating visit/interview dates and times to ensure that security is provided during meetings between inmates and psychology/psychiatric staff. Any requests by mental health staff to interview an inmate out-of-cell shall be accommodated by security staff if possible, as they are to have unrestricted full access to inmates. At the same time, mental health staff should be sensitive to the activities on the unit and

whenever possible, attempt to coordinate in advance times that are convenient for security for out-of-cell contacts. For example, psychiatry and psychology are permitted to interview the same inmate together.

xiii. The **RHU C & D Roster Inmate Review Tracking Sheet (Attachment 1-H)** is to be utilized for tracking contacts with C Roster inmates housed in the RHU. It is intended to serve as a mechanism to ensure compliance with the required psychology/psychiatry contacts in accordance with **B.2.c.(2)(f)i.-xiii. above**. The Facility Manager shall designate a staff member to maintain the **RHU C & D Roster Inmate Review Tracking Sheet**. The tracking sheet shall be forwarded to the Facility Manager on a weekly basis and shall be reviewed during the quarterly inspection process.

(g) Psychological Evaluation of Inmates Housed in Specialized Housing Units

These units include Diversionary Treatment Units (DTUs), SRTUs, and BMUs.

i. Psychological services provided in the DTUs will be in accordance with **Section 14** of this procedures manual.

ii. Psychological services provided in the SRTUs will be in accordance with **Section 10** of this procedures manual.

iii. Psychological services provided in the BMUs will be in accordance with **Section 12** of this procedures manual.

(h) Gender Dysphoria Evaluation

This psychological evaluation should follow the below guidelines.

A psychological evaluation will be scheduled and completed by a LPM or LP, if available, and recommendations made for treatment or referral (i.e., this psychological evaluation shall not be completed by a psychological services associate [PSA]). A PSS may complete this report if an LPM or LP is not available. The purpose of this assessment is to gather a complete psychosocial and developmental history of this individual and to determine how this individual has adjusted to prison since arriving in the Department. This psychological assessment will include an assessment of the individual's need for psychological and psychiatric treatment. The psychology staff member completing this assessment will attempt to retrieve any existing prior psychological and psychiatric treatment records utilizing the **DC-108, Authorization for Release of Information**. This report will be utilized by Central Office Administrative GRC to make informed recommendations. Further information on the Central Office GRC

f. Monthly Report

The psychology staff shall keep an accurate record of the number of psychological evaluations (testing), number of psychological interviews for information gathering (other than testing), and any group testing sessions conducted. These records shall be submitted to the facility State Corrections Analysis Network (SCAN) Coordinator at the end of each month for inclusion in the facility's monthly SCAN report.

g. Mental Health Roster Status

(1) The mental health needs of an inmate shall be rated on a four-point nominal scale system according to the following:

(a) "A" Roster - inmate has no identified psychiatric/ID needs or history of psychiatric treatment.

(b) "B" Roster - inmate has identified history of psychiatric treatment, but no current need for psychiatric treatment; inmate is placed on inactive MH/ID roster.

(c) "C" Roster - inmate is currently receiving psychiatric treatment, but is not currently diagnosed with a SMI or functional impairment, and does not have an ID or is not GBMI.

(d) "D" Roster – inmate is currently diagnosed with a SMI, ID, credible functional impairment, or is GBMI. The PRT shall generate an IRP for him/her. An IRP for a newly incarcerated inmate shall be developed within 30 days of intake and updated every 120 days, or more frequently if clinically indicated. The Treatment Team shall generate a new IRP annually. The psychology staff shall coordinate with the education department to ensure that any inmate with an ID who is 21 years of age or younger receives an Individual Education Plan (IEP).

(2) The MHC (or other psychology staff member who enters data into the mainframe system) is required to enter any mental health roster status change within one working day of the change by the PRT.

h. Reclassification Summary Psychological Report – Prior Commitment-Parole Violation Cases Classification Summaries for Parole Violators (PVs) must be completed as quickly as possible after the inmate returns to the permanent facility. The primary purpose is to identify special risk factors for violence against self or others in order to help the facility make critical decisions about housing and treatment. In addition, facility staff may desire information that would be useful in making employment decisions. In many cases, the psychology staff can gather sufficient data to complete the summary by conducting a clinical interview, administering a Mental Status Exam, and reviewing the inmate's file.



POLICY STATEMENT
Commonwealth of Pennsylvania • Department of Corrections

| Policy Subject: | | Policy Number: |
|---|---|---|
| **Administration of Specialized Inmate Housing** | | **7.5.1** |
| **Date of Issue:** | **Authority:** | **Effective Date:** |
| **December 3, 2019** | **Signature on File**<br>**John E. Wetzel** | **December 10, 2019** |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections, Department employees, volunteers, contract personnel, visitors, and inmates.

## III. POLICY

It is the policy of the Department to:

A. properly house inmates to aid the secure operation of our facilities while ensuring the safety of the public, facility staff, and inmates; and

B. maintain specialized housing units to manage facility populations by appropriately housing inmates based on their individual needs. Specialized inmate housing is generally a specialized general population housing unit.

## IV. PROCEDURES

All applicable procedures are contained in the procedures manual that accompanies this policy document.

## V. SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII. RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A. Release of Information

1. Policy

   This policy document is public information and may be released upon request.

2. Confidential Procedures (if applicable)

   Confidential procedures for this document, if any, are not public information and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

### B. Distribution of Policy

1. General Distribution

   The Department of Corrections policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2. Distribution to Staff

   It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII. SUPERSEDED POLICY AND CROSS REFERENCE

### A. Superseded Policy

1. Department Policy

   This is a new policy section.

2. Facility Policy and Procedures

   This document supersedes all facility policy and procedures on this subject.

### B. Cross Reference(s)

1. Administrative Manuals

   a. DC-ADM 007, Access to Provided Legal Services

   b. DC-ADM 009, News Media Relations

   c. DC-ADM 801, Inmate Discipline

   d. DC-ADM 802, Administrative Custody Procedures

   e. DC-ADM 812, Inmate Visiting Privileges

   f. DC-ADM 815, Personal Property, State Issued Items, and Commissary/Outside Purchases

   g. DC-ADM 816, Inmate Compensation

   h. DC-ADM 818, Automated Inmate Telephone System

   i. DC-ADM 819, Religious Activities

   j. 6.5.1, Administration of Security Level 5 Housing Units

   k. 6.5.8, Capital Case Administration

   l. 7.3.1, Reentry and Transition

   m. 11.5.1, Records Office Operations

   n. 13.8.1, Access to Mental Health Care

2. ACA Standards

   a. Adult Correctional Institutions: None

b.  Adult Community Residential Services: None



PROCEDURES MANUAL
Commonwealth of Pennsylvania • Department of Corrections

| Policy Subject: | | Policy Number: |
|---|---|---|
| **Administration of Specialized Inmate Housing** | | **7.5.1** |
| **Date of Issue:** | **Authority:** | **Effective Date:** |
| **December 3, 2019** | **Signature on File**<br>**John E. Wetzel** | **December 10, 2019** |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

## Section 2 – Capital Case Unit (CCU) Phase I Inmates

A. Housing .................... 2-1
B. Inmate Custody Status .................... 2-1
C. General Security Procedures .................... 2-1
D. Work Assignments .................... 2-2
E. Visiting .................... 2-2
F. Telephone Privileges .................... 2-3
G. Tablets, Television, Radio, and Outside Vendor Purchases .................... 2-3
H. Exercise and Activity .................... 2-3
I. Personal Property/Commissary and Outside Purchases/Cell Content .................... 2-4
J. Facility Programming .................... 2-5
K. Religious Activities .................... 2-5
L. Access to Legal Materials .................... 2-6
M. Access to Reading Materials .................... 2-7
N. Transfer of Phase I Inmates .................... 2-7
O. Placement in Disciplinary Custody (DC) or Administrative Custody (AC) Status .................... 2-8
P. Psychiatric Treatment of a Capital Case Inmate .................... 2-8
Q. News Media .................... 2-10
R. Modification of Sentence and Transfer to Standard General Population .................... 2-11
S. Conversion to Phase II .................... 2-11

## Section 2 – Capital Case Unit (CCU) Phase I Inmates

### A. Housing

1. A male Capital Case inmate shall be housed at the State Correctional Institution (SCI) at Phoenix or Greene. Exceptions must be approved by the Secretary/designee.

2. A female Capital Case inmate shall be housed at SCI Muncy.

3. If a Capital Case inmate is to be housed at a facility other than a Capital Case facility, a copy of this manual shall be provided to that facility.

### B. Inmate Custody Status

1. A Capital Case inmate in Phase I shall be housed in Capital Case (CC) status unless he/she is placed in Disciplinary Custody (DC) or Administrative Custody (AC) status in accordance with Department policy **DC-ADM 801, "Inmate Discipline" or DC-ADM 802, "Administrative Custody Procedures."**

2. A registered nurse or licensed psychologist, depending upon the time of intake, shall assess the Capital Case inmate, upon being processed into his/her designated housing unit, using the **DC-510, Medical Health Care Screening** and **DC-510A, Restrictive Housing – Health Care Screening** in accordance with Department policy **13.8.1, "Access to Mental Health Care," Section 1, Psychological Services**.

3. The Medical/Psychology Department shall determine whether the inmate requires an **Individual Treatment Plan (ITP)** or another form(s) of therapy or intervention.

4. A copy of the **DC-510** and **DC-510A** shall be placed in the inmate's **DC-14, Counselor's File** and in the psychiatric section of the medical record.

### C. General Security Procedures

The Capital Case Unit (CCU) shall operate as a specialized general population housing unit that will house only inmates with CC status. The unit shall not be operated as a Security Level 5 Housing Unit and will not operate under Department policy **6.5.1, "Administration of Security Level 5 Housing Units."**

1. Because the CCU shall operate as a general population housing unit rather than a Security Level 5 unit, inmates confined there shall not be required to wear uniforms designating them as Security Level 5 inmates.

2. Inmates confined in the CCU shall not be required to change cells every 90 days unless an individualized determination has been made that the inmate is an escape risk, consistent with Department policy **6.5.1, Section 13** regarding escape risks.

3. Cells in the CCU shall also not be constantly illuminated during nighttime hours, though staff conducting nighttime rounds can utilize lighting implements to perform the required cell checks.

4. Inmates confined in the CCU shall not be subject to strip-searching, wrist restraints, or leg restraints, tethering or other physical restraints when exiting their cells or moving about the unit unless such security measures are required by officers responding to an urgent situation or as part of efforts to restore order during a security disturbance. Additionally, a particular inmate can be subjected to the aforementioned security restraints if an individualized determination made by the Facility Manager has concluded that the inmate represents a unique security risk.

5. Inmates confined in the CCU shall not be subject to strip-searching, wrist restraints, or leg restraints, tethering or other physical restraints when traveling outside the CCU unless an individualized determination has been made by the Facility Manager that a unique security concern necessitates those measures, or such measures are the standard procedure for all inmates in the applicable circumstances (e.g., search of inmate following contact visit or before traveling to outside hospital, etc.). CCU inmates may be escorted when traveling outside the CCU if such escorts would be employed for other general population inmates traveling through that particular area or if other security needs dictate the use of such escorts.

All individualized determinations made by the Facility Manager that additional security measures are required to be imposed upon a particular inmate, including the security restraints listed above, shall be reconsidered every three months and the reasons for extension shall be documented.

### D. Work Assignments

An inmate in Phase I is permitted a work assignment as follows:

1. within the housing unit approved by the Unit Management Team and as defined in Department policy **DC-ADM 816, "Inmate Compensation;"** or

2. in the areas outside but adjacent to the unit (e.g., grounds keeping, snow removal, grass mowing, nearby kitchen facilities, etc.). Such an assignment requires the approval of the Facility Manager/designee.

### E. Visiting

1. Visits shall be provided as otherwise permitted to general population inmates, including contact visits with attorneys of record, spiritual advisors and other visitors, however, visits may be restricted to non-contact only or entirely if, based upon an individualized determination by the Facility Manager that visits for a particular CCU inmate presents a serious security threat or a background check reveals that a particular visitor should not be permitted to participate in such visits. Non-contact visiting orders shall be

reconsidered by the Facility Manager every three months. Reasons for continuing the order beyond the three month period shall be documented in writing.

2. A capital case inmate housed in a capital case housing unit will be permitted to have visits in accordance with the visiting hours established by the facility. Visiting may be permitted every day of the year unless suspended by the Facility Manager.

3. A capital case inmate shall be provided with visits of at least one hour in duration and shall occur during regularly scheduled visiting hours. Longer periods may be allowed depending upon the available space.

4. Legal and spiritual advisor visits shall be permitted in accordance with Department policy **DC-ADM 812, "Inmate Visiting Privileges."**

5. Attorney/client confidentiality privileges are to be maintained and each inmate must be given the opportunity to have confidential conversations with the Attorney of Record, including the Attorney's staff, paralegals, investigators, etc.

6. The Facility Manager/designee may approve additional and/or extended visits in accordance with Department policy **DC-ADM 812.**

### F. Telephone Privileges

Each inmate shall be permitted to use the inmate telephone system on a daily basis for no less than 15 minutes per usage, and otherwise in accordance with Department policy **DC-ADM 818, "Automated Inmate Telephone System."** The number of authorized calls will be in accordance with the facility regulations related to telephone usage.

### G. Tablets, Television, Radio, and Outside Vendor Purchases

Tablets, personal televisions, radio/tape/compact disk players, and all other approved items available to inmates in standard general population from approved outside vendors are permitted for Phase I inmates. The purchase of these items shall be in accordance with Department policy **DC-ADM 815, "Personal Property, State Issued Items, and Commissary/Outside Purchases."**

### H. Exercise and Activity

A Phase I inmate shall be offered at least 42.5 out-of-cell (OOC) hours for activities and exercise per week. At least four hours of OOC activities/exercise shall be offered per day, seven days a week. OOC activities and exercise are to be offered during normal waking hours (7:00am to 9:00pm).

1. OOC offerings shall be scheduled during evenings and on weekends to achieve the minimum required weekly offering.

2. OOC offerings will maximize congregate socialization opportunities.

3. OOC offerings shall be logged and recorded on a tracking form for each inmate.

4. OOC offerings may include:

    a. yard/outdoor exercise;

    b. block-out time/indoor recreation;

    c. law library;

    d. congregate meals;

    e. treatment or counseling team meetings, to include meetings with counselors, psychology, mental health or medical treatment staff, etc;

    f. meetings with religious service staff, including congregate religious worship on the unit during dayroom periods or, if space and time permit, during separate, dedicated times;

    g. work assignments; and/or

    h. organized educational, treatment, or recreational programs or activities.

5. The required weekly offering of OOC time shall not include activities such as showers, medical appointments, attorney meetings, classification or disciplinary hearings, or court appearances.

6. All inmates in the CCU will be offered two hours of outdoor exercise per day weather permitting. Inmates will have access to water during outdoor yard time. Either the facility will permit inmates to take water to the yard or the facility will provide water.

7. Indoor block time will be offered when weather does not permit outdoor exercise.

8. All inmates in the CCU will be permitted to shower and shave daily.

**I. Personal Property/Commissary and Outside Purchases/Cell Content**

State-issued clothing, personal property allowances, handling of property, commissary orders, outside purchases, and gift pack program for CCU inmates in accordance with Department policy **DC-ADM 815** for general population inmates. Extra storage boxes for legal materials for active cases may also be requested in accordance with Department policy **DC-ADM 815**.

## J. Facility Programming

Inmates confined in a CCU shall have access to on-unit educational programming. Such programming shall include both OOC and in-cell options for Adult Basic Education (ABE), General Equivalency Diploma (GED) courses, and individual or self-study programs.

1. Educational Programming

   The Corrections School Principal shall ensure that:

   a. all Phase I inmates are made aware of available educational opportunities, and the procedures for requesting participation;

   b. educational materials are available and are provided as needed. The Principal shall also ensure that tutoring is provided as needed and tutors shall be admitted to the CCU to perform tutoring work with CCU inmates;

   c. only materials deemed appropriate for each level are used;

   d. available educational programs include:

      (1) ABE;

      (2) GED; and

      (3) individual/self-study programs.

   e. the programs will be at no cost to the inmate; and

   f. post-secondary opportunities may be made available at the inmate's expense.

2. On-Unit Leisure Activities

   The Activities Manager shall ensure that:

   a. Phase I inmates are made aware of recreational opportunities and procedures for requesting participation; and

   b. only selected and approved arts and crafts materials, authorized by the Facility Manager/designee, are used.

## K. Religious Activities

Religious activities shall be permitted in accordance with this policy and Department policy **DC-ADM 819, "Religious Activities,"** with the following exceptions:

1. a CCU inmate may not participate in activities that occur outside of the CCU;

2. CCU inmates may participate in congregate religious worship. On a weekly basis, a representative of each faith group, if available, will visit the CCU for the purpose of providing a congregate religious activity or worship opportunity. Permitted religious worship will occur during existing dayroom or "block out" periods or during a separate dedicated time if time and space permits;

3. an inmate may request religious audiotapes on a weekly basis; and

4. an inmate may not retain more than two religious audiotapes at any one time.

**L. Access to Legal Materials**

1. Each housing unit in which Capital Case inmates are housed shall contain a designated area to contain a mini law library in accordance with Department policy **DC-ADM 007, "Access to Provided Legal Services."**

2. Each mini law library shall provide adequate lighting, seating for no fewer than two people, desk space adequate for a work area, and shelving that is secure.

3. A Capital Case inmate shall be given written instructions containing a current list of materials available in the mini law library, the procedures to request use of the mini law library, and the hours the mini law library is available to be used. Each capital facility shall also ensure that a typewriter, computer, or word processor is kept in the mini law library for the Capital Case inmate to use. An associated printer must be included with a word processor or computer. Any attached printer shall not be located in the personal office of any staff member.

4. The mini law library shall be made available to Capital Case inmates during daily OOC time for a minimum of six hours per day, seven days a week.

5. The Officer-in-Charge of the housing unit shall schedule use of the mini law library.

6. A Capital Case inmate may request two hour blocks of time to work in the mini law library. If no one is scheduled to use the mini law library after the two hour block of time, the inmate shall be permitted to continue using the mini law library until such time as another inmate is scheduled to use the mini law library.

7. Two or more Phase I inmates may work together in the mini law library, provided that they agree to work together and that there is no security concern or facility space limitations.

8. A Capital Case inmate may request to be put on an "on call" list to use the mini law library if no one is scheduled to use it during the period the housing unit is "open."

9. A logbook shall be maintained recording inmate use of the mini law library including each inmate's name and number, date of use, length of time used, and whether the inmate worked with another inmate.

10. At least once a week, or more often if necessary, the facility law librarian/designee shall deliver requested legal materials from the facility's general population law library and pick up requests for legal materials from the CCU.

11. The facility Librarian shall be responsible for conducting an inventory of the mini law library to ensure that all legal materials required by policy to be maintained in the CCU law library are available. If any materials are destroyed or go missing, the Librarian shall be immediately notified by unit staff, or alternatively can be notified by a **DC-135, Inmate Request to Staff Member form**, and will initiate the replacement process. A record of the inventory shall be maintained.

12. If an inmate does not have representation by an attorney and is illiterate or non-English speaking, he/she may be permitted to exchange legal information with the approval of the Facility Manager/designee, with another Capital Case inmate. Inmates assisting one another with legal work shall be permitted to exchange legal materials directly, and custody staff are not to pass legal materials from one inmate to another.

13. A search of the materials in the inmate's possession shall be conducted upon exiting the mini law library to ensure that no pages were torn from the books in an attempt to remove them from the library.

14. A Capital Case inmate shall be permitted to exchange legal materials from his/her cell with legal materials being held in storage once every 30 days. The Unit Management Team may authorize more frequent exchanges based upon demonstrated need.

### M. Access to Reading Materials

1. Library materials shall be made available through established local procedures, provided that inmates confined in the CCU shall have access to the same non-legal reading materials as the inmates in the standard general population units.

2. A Capital Case inmate shall be allowed to retain non-legal reading materials in accordance with the same policies governing retention of non-legal reading materials for the standard general population units.

3. Newspapers shall be permitted on a one-for-one exchange basis.

### N. Transfer of Phase I Inmates

If a Phase I Capital Case inmate participating in a facility program is transferred, progress records and the materials being used shall be transferred with the inmate to ensure continuity or participation at the next facility.

## O. Placement in Disciplinary Custody (DC) or Administrative Custody (AC) Status

1. Inmates confined in the CCU shall be subject to the same disciplinary rules and procedures as inmates housed in standard general population units in accordance with Department policy **DC-ADM 801**.

2. A CCU inmate who is seriously mentally ill (SMI) shall be subject to the same disciplinary rules and procedures as other SMI inmates housed in the standard general population, including a required contact with psychology staff after issuance of the misconduct and diversion to the Diversionary Treatment Unit, if necessary.

3. When a Phase I Capital Case inmate is transferred to AC or DC status, the inmate will be suspended from program participation and transferred into a Restricted Housing Unit (RHU) or other appropriate housing unit in accordance with Department policy **DC-ADM 801** or **DC-ADM 802.** After the expiration of the sanction term, inmate shall be returned to the CCU.

## P. Psychiatric Treatment of a Capital Case Inmate

Psychiatric care of inmates confined in the CCU shall be rendered in accordance with Department policy **13.8.1, "Access to Mental Health Care,"** the frequency and acuity of which shall be determined by the inmate's roster status.

1. Inmates in CCU exhibiting signs of decompensation

   a. Anytime a staff member observes a Capital Case inmate showing signs of mental decompensation to the point where the inmate might pose a risk to him/herself or others, the observing staff shall immediately:

      (1) notify the Facility Manager/designee, the Deputy Superintendent for Facilities Management (DSFM), and the Medical and Psychology Departments to arrange for the inmate to be evaluated for emergency mental health treatment and a suicide indicator checklist screening; and

      (2) the Medical or Psychology staff shall assess the inmate with the **DC-510** and **DC-510A**. The staff member conducting the **DC-510** and **DC-510A** shall assist the Medical/Psychiatric Departments in evaluating the inmate.

   b. After the facility's Medical/Psychiatric Department has evaluated the inmate, the Medical/Psychiatric Department shall consult with the Chief of Psychiatry/Medical Director at the Bureau of Health Care Services (BHCS), Central Office. An ITP shall be prepared, if indicated. Inmates confined in the CCU shall have access to all Department of Corrections (DOC) health and health care units (including those at other DOC facilities), if their treatment needs require such housing.

c. Any restrictions of state issued or personal property, and/or the need for staff observation of the inmate shall be in accordance with the inmate's ITP or by psychiatric orders.

2. Transfer of CCU inmate to a Mental Health Unit (MHU) or Forensic Treatment Center (FTC)

a. If it is determined that the Capital Case inmate should be transferred to an MHU or FTC, the facility's Medical/Psychiatric Department shall coordinate the transfer of the inmate to the treatment center with the following people:

(1) Office of the Secretary/designee;

(2) BHCS Chief of Psychiatry/Medical Director;

(3) Central Office Deputy of Facility Security and Special Operations;

(4) Bureau of Treatment Services (BTS);

(5) Office of Population Management; and

(6) Office of Chief Counsel.

b. The Office of Chief Counsel shall notify the following people that the Capital Case inmate is going to be moved to an MHU or FTC:

(1) Governor's Office; and

(2) General Counsel's Office.

c. The MHU and/or the FTC staff shall work in conjunction with the facility's Security Office and the Central Office Deputy of Facility Security and Special Operations to ensure that proper and adequate security measures are in place to allow the inmate to fully participate in his/her individual or group treatment.

d. When the MHU or FTC staff determine that the Capital Case inmate is stable and ready to be released, the staff shall contact the individuals listed below to arrange the return of the Capital Case inmate to his/her home facility:

(1) Office of the Secretary/designee;

(2) BHCS Chief of Psychiatry/Medical Director;

(3) Central Office Deputy of Facility Security and Special Operations;

(4) Chief Counsel's Office; and

(5) Office of Population Management.

e. After the Capital Case inmate has been transported back to his/her home facility, the Office of Chief Counsel shall notify the following persons:

(1) Governor's Office; and

(2) General Counsel's Office.

3. Re-socialization Assistance

a. For CCU inmates on the active mental health roster, psychology staff and treatment teams shall ensure that each inmate's ITP includes elements designed to aid the inmate in re-socialization and transition from a segregated setting to a general population setting.

b. For any CCU inmate on the active mental health roster whose participation in OOC opportunities falls below 25 hours in two weeks of any four week period, that inmate's treatment team will engage the inmate in a confidential setting to encourage the inmate to accept more OOC opportunities and modify the ITP as needed to promote that goal. Treatment teams shall be responsible for creating a written action plan for achieving that goal.

c. For inmates not on the active mental health roster, if any inmate's acceptance of OOC opportunities falls below 25 hours in two weeks of any four week period, the individual responsible for tracking OOC time and creating OOC logs for the unit will initiate a **DC-97, Mental Health Referral Form** to psychology staff. Psychology staff shall respond to the referral by meeting with the inmate to ascertain the reason for non-participation in OOC activities, and develop an individualized written recovery plan to encourage greater participation if clinically indicated.

4. Audit of group programming

The Licensed Psychologist Manager shall conduct a programming audit of any group program offered in the CCU no less frequently than every 90 days, to analyze participation rates, continued appropriateness of the group or program subject matter, and other issues associated with the continued offering of a particular group or program. The audit will be written and provided to the Office of Chief Counsel.

## Q. News Media

1. Requests for interviews with a Phase I inmate shall be handled in accordance with Department policy **DC-ADM 009, "News Media Relations."**

2. All statutes, regulations, and policies that govern visits and telephone calls between a Capital Case inmate and the general public shall be used when responding to news media requests for interviews with a specific Capital Case inmate.

## R. Modification of Sentence and Transfer to Standard General Population

1. If DOC staff receive an order modifying the sentence of a Capital Case inmate to life imprisonment because of a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, or as the result of a commutation, the facility Records Supervisor must determine the validity of the order in accordance with Department policy **11.5.1, "Records Office Operations."** If the order is valid and effective, then the inmate may be moved from the Capital Case unit.

2. Any questions concerning moving a Capital Case inmate from a Capital Case unit shall be referred to the appropriate Executive Deputy Secretary for Institutional Operations (EDSI)/Regional Deputy Secretary.

## S. Conversion to Phase II

When an Execution Warrant is signed by the Governor, or a Notice of Execution is issued by the Secretary, the inmate is to be converted to Phase II status. Phase II Capital Case inmate procedures shall be in accordance with Department policy **6.5.8, "Capital Case Administration."**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY LEE WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>JOHN E. WETZEL,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br><br><br><br><br><br><br>NO. 21-1248 |

**DECLARATION**

1. I, Keri Moore, am presently an Assistant Chief with the Secretary's Office of Inmate Grievances & Appeals of the Pennsylvania Department of Corrections ("DOC").

2. The Secretary's Office of Inmate Grievances & Appeals ("SOIGA") receives and handles the final appeal of grievances filed by DOC inmates, in accordance with the DOC's policy and procedure on inmate grievances, DC-ADAM 804, Inmate Grievance System.

3. In connection with the above-captioned lawsuit, I was asked to search SOIGA's records for any grievance appeals filed by inmate Roy Lee Williams, Inmate No. CF-4784.

4. That search uncovered records of three total grievance appeals filed by inmate Williams.

5. The first grievance is Grievance No. 898857. A true and correct copy of all records from SOIGA related to Grievance No. 898857 is attached as Exhibit 1 to this Declaration

6. The second grievance is Grievance No. 902000. A true and correct copy of all records from SOIGA related to Grievance No. 902000 is attached as Exhibit 2 to this Declaration.

7. The third grievance is Grievance No. 916331. A true and correct copy of all records from SOIGA related to Grievance No. 916331 is attached as Exhibit 3 to this Declaration

I state under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

1/12/2022
Date

Keri Moore
Keri Moore

Exhibit 1



Case: 22-2399 Document: 19 Page: 191 Date Filed: 01/20/2023

PA

02/17/2021 09:53

# Final Appeal Decision Dismissal

Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

| **Inmate Name:** | WILLIAMS, ROY L | **DOC #:** | CF4784 |
|---|---|---|---|
| **SCI Filed:** | Phoenix | **Current SCI:** | Phoenix |
| **Grievance #:** | 898857 | | |

This serves to acknowledge receipt of your appeal to final review for the grievance identified above. In accordance with the provisions of DC-ADM 804, Inmate Grievance System Policy, this Office has reviewed all documents provided as part of the grievance record. Upon consideration of the entire record, it is the decision of this office to dismiss your appeal to final review due to a failure to comply with the provisions of the DC-ADM 804, as specified below.

**Decision:** Dismiss

Your grievance is being dismissed at the final appeal level for the reason(s) outlined below.

**Rationale:**

- You have not provided this Office with required and/or legible documentation for proper review.

**Response:**

You failed to provide a copy of your appeal to the Facility Manager. You are encouraged to review the DC ADM 804 in its entirety to familiarize yourself with the proper submission procedures.

| **Signature:** | Keri Moore for |
|---|---|
| **Name:** | D. Varner |
| **Title:** | Chief Grievance Officer |
| **Date:** | 02/17/21 |

cc: DC-15/Superintendent - Phoenix
Grievance Office

**DC-ADM 804, Inmate Grievance System Procedures Manual**

**Section 2 - Appeals, Attachment 2-G** Issued: 1/26/2016 Effective: 2/16/2016

CF4784 Grievance #:898857

WILLIAMS, ROY L Page1 of 1

**JA225**

3103
PHX

2020

**ACTION REQUIRED**
**Secretary's Office of Inmate Grievances & Appeals**
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

This serves to acknowledge receipt of information based on your intent to appeal the grievance noted below to final review. However, this information is being filed without action since you have failed to comply with one or more provisions outlined in DC-ADM 804, Inmate Grievance System Policy.

Secretary's Office
Inmate Grievances & Appeals
JAN 19 2021

| **Inmate Name:** | ROY WILLIAMS | **Inmate Number:** | CF4784 |
|---|---|---|---|
| **SCI Filed at:** | PHX | **Current SCI:** | PHX |
| **Grievance #:** | 898857 | | |
| **Action:** | **File Without Action/Pending** | | |

Review of the information you provided indicates that your appeal is incomplete. You are not permitted to appeal to this office unless you have complied with the procedures established in the DC-ADM 804 requiring that all documentation relevant to the appeal be provided upon appeal. Therefore, you have fifteen (15) working days from the date of this notice to provide this office with all completed documents necessary for conducting final review. A failure to provide the missing information (identified below) within this time period may result in a dismissal of your appeal. Further, any future appeals received that do not contain the required documents may result in an immediate dismissal. This notice is only a courtesy of this office and may not be provided again.

**PLEASE FORWARD A COPY OF THE DOCUMENTS CHECKED (*XX*) BELOW**

| | **Standard or Remanded Appeal to Final Review:** |
|---|---|
| | Legible copy of your initial grievance and/or resubmitted initial grievance (DC-804 Part 1 form) |
| | Initial review response and/or rejection |
| *XX* | Legible copy of your appeal to Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Remanded initial review response |
| | Legible copy of your 2nd appeal to Facility Manager, signed & dated |
| | Remanded Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |
| | **Appeal of Publication Denial or Unacceptable Correspondence:** |
| | IPRC decision to deny publication |
| | Legible copy of your appeal to Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |
| | **Appeal of Grievance Restriction:** |
| | Grievance Coordinator's notice of grievance restriction |
| | Legible copy of your appeal of grievance restriction to the Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |

**Please Note:**

- Photocopying Services - Each facility has established local procedures for photocopying services for inmates housed in general population, as well as for those inmates housed in specialized units. If you are not familiar with these procedures, refer to your Facility Inmate Handbook or ask your Unit Team. ***If you do not have the requested document(s) to make a photocopy, contact the Facility Grievance Coordinator, at the facility where the grievance was filed, for additional copies.*** Fees may be assessed, in accordance with the DC ADM 003.
- Indigent Inmate – If you meet the criteria for indigent status, please refer to DC ADM 803 for current guidelines regarding postage and copying charges.

| **Signature:** | Amanda West *A. West* | Grievance Review Officer | **Date:** | 01.04.2021 |
|---|---|---|---|---|

AMW

cc: DC-15/Superintendent – PHX
Grievance Office

Dear Ms. West

Please find enclosed legible copies inmate appeal to the facility manager regarding grievance's #898857 & #902000.

Thank You,

Roy Lee Williams DOC#CF-4784

SCI
INMATE APPEAL TO FACILITY MANAGER
GRIEVANCE

| Inmate Number | NAME | HOUSING UNIT | DATE | GRIEVANCE# |
|---|---|---|---|---|
| CF-4784 | ROY WILLIAMS | PB-1014 | 1/11/21 | 898857 |

I received my initial response from the Grievance Office/Coordinator on ____________ and have the following appeal issues.

Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions.

Please provide a BRIEF (no longer than two pages) appeal statement.

I clearly stated in the grievance how I was effected by a facility action.

INMATE SIGNATURE: R. L. Williams

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 2 – Appeals*
Issued: 1/26/2016
Effective: 2/16/2016

*Attachment 2-A*

**JA228**

2020

## ACTION REQUIRED

**Secretary's Office of Inmate Grievances & Appeals**
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

This serves to acknowledge receipt of information based on your intent to appeal the grievance noted below to final review. However, this information is being filed without action since you have failed to comply with one or more provisions outlined in DC-ADM 804, Inmate Grievance System Policy.

| **Inmate Name:** | ROY WILLIAMS | **Inmate Number:** | CF4784 |
|---|---|---|---|
| **SCI Filed at:** | PHX | **Current SCI:** | PHX |
| **Grievance #:** | 898857 | | |
| **Action:** | **File Without Action/Pending** | | |

Review of the information you provided indicates that your appeal is incomplete. You are not permitted to appeal to this office unless you have complied with the procedures established in the DC-ADM 804 requiring that all documentation relevant to the appeal be provided upon appeal. Therefore, you have fifteen (15) working days from the date of this notice to provide this office with all completed documents necessary for conducting final review. A failure to provide the missing information (identified below) within this time period may result in a dismissal of your appeal. Further, any future appeals received that do not contain the required documents may result in an immediate dismissal. This notice is only a courtesy of this office and may not be provided again.

**PLEASE FORWARD A COPY OF THE DOCUMENTS CHECKED (*XX*) BELOW**

| | **Standard or Remanded Appeal to Final Review:** |
|---|---|
| | Legible copy of your initial grievance and/or resubmitted initial grievance (DC-804 Part 1 form) |
| | Initial review response and/or rejection |
| *XX* | Legible copy of your appeal to Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Remanded initial review response |
| | Legible copy of your 2nd appeal to Facility Manager, signed & dated |
| | Remanded Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |
| | **Appeal of Publication Denial or Unacceptable Correspondence:** |
| | IPRC decision to deny publication |
| | Legible copy of your appeal to Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |
| | **Appeal of Grievance Restriction:** |
| | Grievance Coordinator's notice of grievance restriction |
| | Legible copy of your appeal of grievance restriction to the Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |

**Please Note:**

- Photocopying Services - Each facility has established local procedures for photocopying services for inmates housed in general population, as well as for those inmates housed in specialized units. If you are not familiar with these procedures, refer to your Facility Inmate Handbook or ask your Unit Team. ***If you do not have the requested document(s) to make a photocopy, contact the Facility Grievance Coordinator, at the facility where the grievance was filed, for additional copies.*** Fees may be assessed, in accordance with the DC ADM 003.
- Indigent Inmate – If you meet the criteria for indigent status, please refer to DC ADM 803 for current guidelines regarding postage and copying charges.

| **Signature:** | Amanda West *A. West* | Grievance Review Officer | **Date:** | 01.04.2021 |
|---|---|---|---|---|

AMW

cc: DC-15/Superintendent – PHX
Grievance Office

1127 PHX

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

FOR OFFICIAL USE
898857
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: PHX | DATE: 11/13/20 |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) ROY LEE WILLIAMS CF-4784 | SIGNATURE OF INMATE: R. L. Williams | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: PB 1014 | |

Secretary's Office
Inmate Grievances & Appeals
DEC 11 2020

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

DECLARATION/AFFIDAVIT OF ROY LEE WILLIAMS PURSUANT TO 28 U.S.C
28 U.S.C. §1746 and 18 Pa.C.S. §4904

I have a mental disability and have been placed in prolonged isolation in violation under Title II of the Americans with Disabilities Act 42 U.S.C. §§12131-12134 and under the Civil Rights of Institutional Persons Act 42 U.S.C. §1997.

My mental disability has exacerbated due to the effects of prolonged isolation.

I am seeking relief in the form of monetary damages and punitive damages.

The defendant is John E. Wetzel et al,.

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator

Date

WHITE Facility Grievance Coordinator Copy CANARY File Copy PINK Action Return Copy
GOLDEN ROD Inmate Copy

Superintendent's Office
SCI Phoenix
NOV 13 2020
Received

***DC-ADM 804, Inmate Grievance System Procedures Manual***
***Section 1 – Grievances & Initial Review***
Issued: 1/26/2016
Effective: 2/16/2016

***Attachment 1-A***

**JA230**

# Rejection Form

SCI Phoenix
1200 Mokychic Drive
Collegeville, PA, 19426

11/13/2020 11:28

| | | | |
|---|---|---|---|
| **Inmate Name:** | WILLIAMS, ROY L | **DOC #:** | CF4784 |
| **Facility:** | Phoenix | **Unit Location:** | P / B |
| **Grievance #:** | 898857 | | |

This serves to acknowledge receipt of your grievance to this office. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", I have reviewed all documents provided as part of the grievance. Upon consideration of the grievance, it is the decision of this office to reject your grievance due to a failure to comply with the provisions of the DC-ADM 804, as specified below:

**Rationale:**

- Grievance does not indicate that you were personally affected by a Department or facility action or policy.

**Response:**

| | |
|---|---|
| **Signature:** | |
| **Name:** | G. Orlando |
| **Title:** | Facility Grievance Coordinator |
| **Date:** | |

cc: Facility Grievance Coordinator
DC-15

**DC-ADM 804, Inmate Grievance System Procedures Manual**

**Section 1 - Grievances & Initial Review, Attachment 1-C** Issued: 1/26/2016 Effective: 2/16/2016

CF4784 Grievance #:898857

WILLIAMS, ROY L Page 1 of 1

**JA231**



# Facility Manager's Appeal Response

SCI Phoenix
1200 Mokychic Drive
Collegeville, PA, 19426

11/24/2020 11:59

| Inmate Name: | WILLIAMS, ROY L | DOC #: | CF4784 |
|---|---|---|---|
| Facility: | Phoenix | Unit Location: | P / B |
| Grievance #: | 898857 | | |

This serves to acknowledge receipt of your grievance appeal to the Facility Manager for the grievance noted above. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to me and any other documents submitted.

**Decision:Uphold Response**

It is the decision of this Facility Manager to uphold the initial response, uphold the inmate, dismiss, or Uphold in part/Deny in part. This response will include a brief rationale, summarizing the conclusion, any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.

**Response:**

I am in receipt of your grievance appeal in which you are issuing a declaration/affidavit of Roy L. Williams pursuant to 28 U.S.C. 28 U.S.C. 1746 and 18 PA C.S. 4904. You claim that you have a mental disability that has exacerbated due to the effects of prolonged isolation. You are seeking relief in the form of monetary damages and punitive damages. The defendant is John E. Wetzel et al.

In my investigation, I find that this grievance was rejected as grievance does not indicate that you were personally affected by a Department or facility action or policy. As per DC-ADM 804, Inmate Grievance System Procedures Manual, Section 1 – Grievances & Initial Review, A. Filing of an Initial Grievance, 20. If a grievance is rejected, the grievance may be re-submitted, using the same grievance number within five working days of the rejection notice date. A rejected grievance may only be re-submitted one time. You did not resubmit your grievance.

Additional information will not be addressed as it was not included.

I therefore, uphold the decision of the grievance officer and deny your appeal.

| Signature: | [signature] |
|---|---|
| Name | K. Sorber |
| Title: | Facility Manager |
| Date: | |

CC: DC-15
File

## INMATE APPEAL TO FINAL REVIEW
## GRIEVANCE

| INMATE NUMBER | NAME | FACILITY | DATE | GRIEVANCE# |
|---|---|---|---|---|
| CF-4784 | Roy Williams | Phoenix | 12/1/2020 | 898857 |

I received my appeal from the Superintendent on 11/30/2020 and have the following appeal issues.

Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions. Appeals must relate to the issue presented in the initial grievance and 1st level appeal.

Please provide a BRIEF (no longer than two pages) appeal statement.

DECLARATION/AFFIDAVIT OF ROY LEE WILLIAMS
PURSUANT TO U.S.C. §1746 AND 18 Pa.C.S. §4904

In 1994 J. Spector Ph.D., of the mental health staff at SCI Graterford diagnosed me with having a psychiatric disability, and I was placed on the prison mental health roster.

In 1996 Billy H. Nolas, Esq., hired Barry Crown Ph.D., and Robert A. Fox, M.D., to conduct clinical examinations.

In September of that same year after conducting their clinical examinations Dr. Barry Crown diagnosed me with a neuropsychological and psychological disability and Dr. Robert Fox diagnosed me with post-traumatic stress disorder.Thereafter, Mr. Nolas sent Dr. Crown's and Dr. Fox's declaration/findings to the prison's mental health staff.

The Pennsylvania Department of Corrections were deliberately indifferent to my neuro/psychological vulnerabilities by placing me in prolonged isolation, in violation of the Eighth Amendment and Title II of the Americans with Disabilities Act 42 U.S.C. §§12131-12134 and under the Civil Rights of Institutional Persons Act 42 U.S.C. §1997.

See Department of Justice May 31, 2013 Findings Letter, https://www.justice.gov/sites/default/files/crt/legacy/2013/06/03/cresson_findings_531-13.pdf, (finding, that the PDOC uses isolation in a way that violates the rights of prisoners with serious mental/intellectual disabilities).

continued,

INMATE SIGNATURE R. L. Williams

My disabilities have exacerbated due to the effects of the prolonged isolation.

I am seeking relief in the form of compensatory and punitive damages, with assistance from private consultant CRAIG HANEY, PH.D,J.D.

The defendant is John E. Wetzel, et al,.

I hereby certify that the statements set forth above are true and correct to the best of my personal knowledge, information and belief, pursuant to 28 U.S.C. §1746 and 18 Pa.C.S. §4904.

R. L. Williams
ROY LEE WILLIAMS

December 1, 2020

# Exhibit 2



03/15/2021 10:22

# Final Appeal Decision Dismissal

Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

| **Inmate Name:** | WILLIAMS, ROY L | **DOC #:** | CF4784 |
|---|---|---|---|
| **SCI Filed:** | Phoenix | **Current SCI:** | Phoenix |
| **Grievance #:** | 902000 | | |

This serves to acknowledge receipt of your appeal to final review for the grievance identified above. In accordance with the provisions of DC-ADM 804, Inmate Grievance System Policy, this Office has reviewed all documents provided as part of the grievance record. Upon consideration of the entire record, it is the decision of this office to dismiss your appeal to final review due to a failure to comply with the provisions of the DC-ADM 804, as specified below.

**Decision:** Dismiss

Your grievance was properly rejected at the facility level for the reason(s) outlined below.

**Rationale:**

- The grievance or appeal was not submitted within fifteen (15) working days after the events upon which claims are based.

**Response:**

This office finds the rejection and the facility manager's appeal response is appropriate. Therefore, your appeal to this office is dismissed.

| **Signature:** | Keri Moore for |
|---|---|
| **Name:** | D. Varner |
| **Title:** | Chief Grievance Officer |
| **Date:** | 03/15/21 |

cc: DC-15/Superintendent - Phoenix
Grievance Office

2021

## ACTION REQUIRED

**Secretary's Office of Inmate Grievances & Appeals**
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

Secretary's Office
Inmate Grievances & Appeals
JAN 29 2021

This serves to acknowledge receipt of information based on your intent to appeal the grievance noted below to final review. However, this information is being filed without action since you have failed to comply with one or more provisions outlined in DC-ADM 804, Inmate Grievance System Policy.

| **Inmate Name:** | ROY WILLIAMS | **Inmate Number:** | CF4784 |
|---|---|---|---|
| **SCI Filed at:** | PHX | **Current SCI:** | PHX |
| **Grievance #:** | 902000 | | |
| **Action:** | **File Without Action/Pending** | | |

Review of the information you provided indicates that your appeal is incomplete. You are not permitted to appeal to this office unless you have complied with the procedures established in the DC-ADM 804 requiring that all documentation relevant to the appeal be provided upon appeal. Therefore, you have fifteen (15) working days from the date of this notice to provide this office with all completed documents necessary for conducting final review. A failure to provide the missing information (identified below) within this time period may result in a dismissal of your appeal. Further, any future appeals received that do not contain the required documents may result in an immediate dismissal. This notice is only a courtesy of this office and may not be provided again.

**PLEASE FORWARD A COPY OF THE DOCUMENTS CHECKED (*XX*) BELOW**

| | **Standard or Remanded Appeal to Final Review:** |
|---|---|
| | Legible copy of your initial grievance and/or resubmitted initial grievance (DC-804 Part 1 form) |
| | Initial review response and/or rejection |
| *XX* | Legible copy of your appeal to Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Remanded initial review response |
| | Legible copy of your 2nd appeal to Facility Manager, signed & dated |
| | Remanded Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |
| | **Appeal of Publication Denial or Unacceptable Correspondence:** |
| | IPRC decision to deny publication / Notice of unacceptable correspondence form |
| | Legible copy of your appeal to Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |
| | **Appeal of Grievance Restriction:** |
| | Grievance Coordinator's notice of grievance restriction |
| | Legible copy of your appeal of grievance restriction to the Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |

**Please Note:**

- Photocopying Services - Each facility has established local procedures for photocopying services for inmates housed in general population, as well as for those inmates housed in specialized units. If you are not familiar with these procedures, refer to your Facility Inmate Handbook or ask your Unit Team. ***If you do not have the requested document(s) to make a photocopy, contact the Facility Grievance Coordinator, at the facility where the grievance was filed, for additional copies.*** Fees may be assessed, in accordance with the DC ADM 003.
- Indigent Inmate – If you meet the criteria for indigent status, please refer to DC ADM 803 for current guidelines regarding postage and copying charges.

| **Signature:** | Amanda West *A. West* | Grievance Review Officer | **Date:** | 01.19.2021 |
|---|---|---|---|---|

AMW

cc: DC-15/Superintendent – PHX
Grievance Office

SCI
INMATE APPEAL TO FACILITY MANAGER
GRIEVANCE

| Inmate Number | NAME | HOUSING UNIT | DATE | GRIEVANCE# |
|---|---|---|---|---|
| CF-4784 | Roy L. Williams | PB 1014 | 1/25/2021 | 902000 |

I received my initial response from the Grievance Office/Coordinator on 1/12/2021 and have the following appeal issues.

Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions.

Please provide a BRIEF (no longer than two pages) appeal statement.

DECLARATION/AFFIDAVIT OF ROY LEE WILLIAMS
PURSUANT TO U.S.C. §1746 AND 18 Pa.C.S. §4904

1. I Roy L. Williams aver that I have preexisting serious mental health problems that have been well documented by prison officials. Despite the known dangers, prison officials arbitrarily placed me in prolonged solitary confinement for over 25 years without any meaningful penological justification. See Porter v. Pa. Dep't of Corrs, 974 F.3d 431, 446-47 (2020).

2. In 1994 J. Spector PH.D., of the mental health staff at SCI Graterford diagnosed me with a psychiatric disability, and I was placed on the prison's mental health roster.

3. In 1996 the Federal Defenders Office (Billy H. Nolas, Esq.) hired Barry Crown Ph.D., and Robert A. Fox, M.D., to conduct clinical examintions. The doctors found that I suffered from neuropsychological and psychological disabilities and a vulnerability to suicide.

4. I allege that all of this information was set forth in my records, these facts, taken together, are sufficient to support a reasonable inference that prison officials and medical personal knew or should have known of my particular vulnerability to suicide. See Palakovic v. Wetzel, 854 F.3d 209, 231-32 (2017).

5. John E. Wetzel Sec'y Pa. Dep't of Corrs. and prison officials "deprived [me] of the minimal civilized measure of life's neccessities and acted with deliberate indifference in doing so, thereby exposing [me] to a substantial risk of serious damage to [my] future health." id. Palakovic 854 F.3d 225; Dep't of Justice May 31, 2013 Cresson Findings Letter, https://www.justice.gov.

INMATE SIGNATURE: R. L. Williams

**SCI**
**INMATE APPEAL TO FACILITY MANAGER**
**GRIEVANCE**

| Inmate Number | NAME | HOUSING UNIT | DATE | GRIEVANCE# |
|---|---|---|---|---|
| | | | | 902000 |

I received my initial response from the Grievance Office/Coordinator on ______________ and have the following appeal issues.

Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions.

Please provide a BRIEF (no longer than two pages) appeal statement.

6. My mental health problems have exacerbated due to the effects of 25 plus years of prolonged solitary confinement.

7. I am seeking relief in the amount of $1.000.000.00 in compensatory and punitive damages.

8. I hereby certify that the statements set forth above are true and correct to the best of my belief and knowledge pursuant to U.S.C. §1746 and 18 Pa.C.S. §4904.

R. L. Williams
Roy Lee Williams

Dated: January 25, 2021

INMATE SIGNATURE: R. L. Williams

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 2 – Appeals*
Issued: 1/26/2016
Effective: 2/16/2016

*Attachment 2-A*

# SCI
# INMATE APPEAL TO FACILITY MANAGER
# GRIEVANCE

| Inmate Number | NAME | HOUSING UNIT | DATE | GRIEVANCE# |
|---|---|---|---|---|
| CF-4784 | ROY WILLIAMS | PB-1014 | 1/11/21 | 902000 |

I received my initial response from the Grievance Office/Coordinator on ________________ and have the following appeal issues.

Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions.

Please provide a BRIEF (no longer than two pages) appeal statement.

Secretary's Office Inmate Grievances & Appeals
JAN 19 2021

DECLARATION/AFFIDAVIT OF ROY LEE WILLIAMS
PURSUANT TO U.S.C. §1746 AND 18 Pa.C.S. §4904

In 1994 J. Spector Ph.D., of the mental health staff at SCI Graterford diagnosed me with having a psychiatric disability, and I was placed on the prison mental health roster.

In 1996 Billy H. Nolas, Esq., hired Barry Crown Ph.D., and Robert A. Fox, M.D., to conduct clinical examinations.

In September of that same year after conducting their clinical examinations Dr. Barry Crown diagnosed me with a neuropsychological and psychological disability and Dr. Robert Fox diagnosed me with post-traumatic stress disorder.Thereafter, Mr. Nolas sent Dr. Crown's and Dr. Fox's declaration/findings to the prison's mental health staff.

The Pennsylvania Department of Corrections were deliberately indifferent to my neuro/psychological vulnerabilities by placing me in prolonged isolation, in violation of the Eighth Amendment and Title II of the Americans with Disabilities Act 42 U.S.C. §§12131-12134 and under the Civil Rights of Institutional Persons Act 42 U.S.C. §1997.

See Department of Justice May 31, 2013 Findings Letter, https://www.justice.gov/sites/default/files/crt/legacy/2013/06/03/cresson_findings_531-13.pdf, (finding, that the PDOC uses isolation in a way that violates the rights of prisoners with serious mental/intellectual disabilities).

INMATE SIGNATURE: R. L. Williams

SCI
INMATE APPEAL TO FACILITY MANAGER
GRIEVANCE

| Inmate Number | NAME | HOUSING UNIT | DATE | GRIEVANCE# 902000 |
|---|---|---|---|---|

I received my initial response from the Grievance Office/Coordinator on ____________ and have the following appeal issues.

Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions.

Please provide a BRIEF (no longer than two pages) appeal statement.

My disabilities have exacerbated due to the effects of the prolonged isolation.

I am seeking relief in the form of compensatory and punitive damages, with assistance from private consultant CRAIG HANEY, PH.D,J.D.

The defendant is John E. Wetzel, et al.

I hereby certify that the statements set forth above are true and correct to the best of my personal knowledge, information and belief, pursuant to 28 U.S.C. §1746 and 18 Pa.C.S. §4904.

R. L. Williams
ROY LEE WILLIAMS

December 21, 2020

INMATE SIGNATURE: R. L. Williams

2021

**ACTION REQUIRED**
**Secretary's Office of Inmate Grievances & Appeals**
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

This serves to acknowledge receipt of information based on your intent to appeal the grievance noted below to final review. However, this information is being filed without action since you have failed to comply with one or more provisions outlined in DC-ADM 804, Inmate Grievance System Policy.

| **Inmate Name:** | ROY WILLIAMS | **Inmate Number:** | CF4784 |
|---|---|---|---|
| **SCI Filed at:** | PHX | **Current SCI:** | PHX |
| **Grievance #:** | 902000 | | |
| **Action:** | **File Without Action/Pending** | | |

Review of the information you provided indicates that your appeal is incomplete. You are not permitted to appeal to this office unless you have complied with the procedures established in the DC-ADM 804 requiring that all documentation relevant to the appeal be provided upon appeal. Therefore, you have fifteen (15) working days from the date of this notice to provide this office with all completed documents necessary for conducting final review. A failure to provide the missing information (identified below) within this time period may result in a dismissal of your appeal. Further, any future appeals received that do not contain the required documents may result in an immediate dismissal. This notice is only a courtesy of this office and may not be provided again.

**PLEASE FORWARD A COPY OF THE DOCUMENTS CHECKED (*XX*) BELOW**

| | **Standard or Remanded Appeal to Final Review:** |
|---|---|
| | Legible copy of your initial grievance and/or resubmitted initial grievance (DC-804 Part 1 form) |
| | Initial review response and/or rejection |
| *XX* | Legible copy of your appeal to Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Remanded initial review response |
| | Legible copy of your 2nd appeal to Facility Manager, signed & dated |
| | Remanded Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |
| | **Appeal of Publication Denial or Unacceptable Correspondence:** |
| | IPRC decision to deny publication / Notice of unacceptable correspondence form |
| | Legible copy of your appeal to Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |
| | **Appeal of Grievance Restriction:** |
| | Grievance Coordinator's notice of grievance restriction |
| | Legible copy of your appeal of grievance restriction to the Facility Manager, signed & dated |
| | Facility Manager's appeal response |
| | Written appeal to final review, signed & dated |

**Please Note:**

- Photocopying Services - Each facility has established local procedures for photocopying services for inmates housed in general population, as well as for those inmates housed in specialized units. If you are not familiar with these procedures, refer to your Facility Inmate Handbook or ask your Unit Team. ***If you do not have the requested document(s) to make a photocopy, contact the Facility Grievance Coordinator, at the facility where the grievance was filed, for additional copies.*** Fees may be assessed, in accordance with the DC ADM 003.
- Indigent Inmate – If you meet the criteria for indigent status, please refer to DC ADM 803 for current guidelines regarding postage and copying charges.

| **Signature:** | Amanda West *A. West* | Grievance Review Officer | **Date:** | 01.19.2021 |
|---|---|---|---|---|

AMW

cc: DC-15/Superintendent – PHX
Grievance Office

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

FOR OFFICIAL USE
PHX 902000
GRIEVANCE NUMBER

2/12 PHX ✓

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: Phoenix | DATE: 11/30/2020 |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) Roy Lee Williams CF-4784 | SIGNATURE OF INMATE: R.L. Williams | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: PB 1014 | |

Secretary's Office
Inmate Grievances & Appeals
DEC 30 2020
12/23

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

DECLARATION/AFFIDAVIT OF ROY LEE WILLIAMS
PURSUANT TO U.S.C. §1746 AND 18 Pa.C.S. §4904

In 1994 J. Spector Ph.D., of the mental health staff at SCI Graterford diagnosed me with having a psychiatric disability, and I was placed on the prison mental health roster.

In 1996 Billy H. Nolas, Esq., hired Barry Crown Ph.D., and Robert A. Fox, M.D., to conduct clinical examinations.

In September of that same year after conducting their clinical examinations Dr. Barry Crown diagnosed me with a neuropsychological and psychological disability and Dr. Robert Fox diagnosed me with post-traumatic stress disorder.

continued,

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator      Date

WHITE Facility Grievance Coordinator Copy   CANARY File Copy   PINK Action Return Copy
GOLDEN ROD Inmate Copy

Superintendent's Office
SCI Phoenix
DEC 01 2020

Received

Thereafter, Mr. Nolas sent Dr. Crown's and Dr. Fox's declaration/findings to the prison's mental health staff.

The Pennsylvania Department of Corrections were deliberately indifferent to my neuro/psychological vulnerabilities by placing me in prolonged isolation, in violation of the Eighth Amendment and Title II of the Americans with Disabilities Act 42 U.S.C. §§12131-12134 and under the Civil Rights of Institutional Persons Act 42 U.S.C. §1997.

See Department of Justice May 31, 2013 Findings Letter, https://www.justice.gov/sites/default/files/crt/legacy/2013/06/03/cresson_findings_531-13.pdf, (finding, that the PDOC uses isolation in a way that violates the rights of prisoners with serious mental/intellectual disabilities).

My disabilities have exacerbated due to the effects of the prolonged isolation.

I am seeking relief in the form of compensatory and punitive damages, with assistance from private consultant CRAIG HANEY, PH.D,J.D.

The defendant is John E. Wetzel, et al,.

I hereby certify that the statements set forth above are true and correct to the best of my personal knowledge, information and belief, pursuant to 28 U.S.C. §1746 and 18 Pa.C.S. §4904.

R. L. Williams
ROY LEE WILLIAMS

Date: November 30, 2020



# Rejection Form

SCI Phoenix
1200 Mokychic Drive
Collegeville, PA, 19426

12/02/2020 02:45

| | | | |
|---|---|---|---|
| **Inmate Name:** | WILLIAMS, ROY L | **DOC #:** | CF4784 |
| **Facility:** | Phoenix | **Unit Location:** | P / B 1014 |
| **Grievance #:** | 902000 | | |

This serves to acknowledge receipt of your grievance to this office. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", I have reviewed all documents provided as part of the grievance. Upon consideration of the grievance, it is the decision of this office to reject your grievance due to a failure to comply with the provisions of the DC-ADM 804, as specified below:

**Rationale:**

- The grievance was not submitted within fifteen (15) working days after the events upon which claims are based.

**Response:**

| | |
|---|---|
| **Signature:** | |
| **Name:** | G. Orlando |
| **Title:** | Facility Grievance Coordinator |
| **Date:** | |

cc: Facility Grievance Coordinator
DC-15

**DC-ADM 804, Inmate Grievance System Procedures Manual**

**Section 1 - Grievances & Initial Review, Attachment 1-C** Issued: 1/26/2016 Effective: 2/16/2016

CF4784 Grievance #:902000

WILLIAMS, ROY L Page 1 of 1

**JA245**

# Facility Manager's Appeal Response

SCI Phoenix
1200 Mokychic Drive
Collegeville, PA, 19426

12/15/2020 08:37

| **Inmate Name:** | WILLIAMS, ROY L | **DOC #:** | CF4784 |
|---|---|---|---|
| **Facility:** | Phoenix | **Unit Location:** | P / B |
| **Grievance #:** | 902000 | | |

This serves to acknowledge receipt of your grievance appeal to the Facility Manager for the grievance noted above. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to me and any other documents submitted.

**Decision:Uphold Response**

It is the decision of this Facility Manager to uphold the initial response, uphold the inmate, dismiss, or Uphold in part/Deny in part. This response will include a brief rationale, summarizing the conclusion, any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.

**Response:**

I am in receipt of your grievance appeal in which you claim that you were diagnosed with having a psychiatric disability in 1994. You claim that you were then diagnosed with a neuropsychological and psychological disability and post-traumatic stress disorder in 1996. You claim that the Pennsylvania Department of Corrections have been indifferent to your neuro/psychological vulnerabilities by placing you in prolonged isolation. You are seeking relief in the form of compensatory and punitive damages, with assistance from private consultant Craig Haney.

In my investigation, I find that your grievance was rejected, as grievance was not submitted within fifteen (15) working days after the events upon which claims are based.

Additional information will not be addressed, as it was not included in the initial grievance.

I must therefore, uphold the decision of the grievance officer and deny your grievance and requested relief.

| **Signature:** | |
|---|---|
| **Name** | K. Sorber |
| **Title:** | Facility Manager |
| **Date:** | |

CC: DC-15
File

Inmate Appeal to Final Review

**GRIEVANCE**

| INMATE NUMBER | NAME | FACILITY | DATE | GRIEVANCE# |
|---|---|---|---|---|
| CF-4784 | Roy L. Williams | Phoenix | 12/21 2020 | 902000 |

I received my appeal from the Superintendent on 12/ 17 2020 and have the following appeal issues.

Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions. Appeals must relate to the issue presented in the initial grievance and 1st level appeal.

Please provide a BRIEF (no longer than two pages) appeal statement.

DECLARATION/AFFIDAVIT OF ROY LEE WILLIAMS
PURSUANT TO U.S.C. §1746 AND 18 Pa.C.S. §4904

In 1994 J. Spector Ph.D., of the mental health staff at SCI Graterford diagnosed me with having a psychiatric disability, and I was placed on the prison mental health roster.

In 1996 Billy H. Nolas, Esq., hired Barry Crown Ph.D., and Robert A. Fox, M.D., to conduct clinical examinations.

In September of that same year after conducting their clinical examinations Dr. Barry Crown diagnosed me with a neuropsychological and psychological disability and Dr. Robert Fox diagnosed me with post-traumatic stress disorder.Thereafter, Mr. Nolas sent Dr. Crown's and Dr. Fox's declaration/findings to the prison's mental health staff.

The Pennsylvania Department of Corrections were deliberately indifferent to my neuro/psychological vulnerabilities by placing me in prolonged isolation, in violation of the Eighth Amendment and Title II of the Americans with Disabilities Act 42 U.S.C. §§12131-12134 and under the Civil Rights of Institutional Persons Act 42 U.S.C. §1997.

See Department of Justice May 31, 2013 Findings Letter, https://www.justice.gov/sites/default/files/crt/legacy/2013/06/03/cresson_findings_531-13.pdf, (finding, that the PDOC uses isolation in a way that violates the rights of prisoners with serious mental/intellectual disabilities).

continued,

INMATE SIGNATURE: R. L. Williams

Inmate Appeal to Final Review

# GRIEVANCE

| INMATE NUMBER | NAME | FACILITY | DATE | GRIEVANCE# |
|---|---|---|---|---|
| CF-4784 | Roy L. Williams | Phoenix | 12/21/2020 | 902000 |

I received my appeal from the Superintendent on 12/17/2020 and have the following appeal issues.

Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions. Appeals must relate to the issue presented in the initial grievance and 1st level appeal.

Please provide a BRIEF (no longer than two pages) appeal statement.

My disabilities have exacerbated due to the effects of the prolonged isolation.

I am seeking relief in the form of compensatory and punitive damages, with assistance from private consultant CRAIG HANEY, PH.D,J.D.

The defendant is John E. Wetzel, et al,.

I hereby certify that the statements set forth above are true and correct to the best of my personal knowledge, information and belief, pursuant to 28 U.S.C. §1746 and 18 Pa.C.S. §4904.

R. L. Williams
ROY LEE WILLIAMS

December 21, 2020

INMATE SIGNATURE: R. L. Williams

# Exhibit 3

2021

## Secretary's Office of Inmate Grievances & Appeals

Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

This serves to acknowledge receipt of information associated with your intent to appeal a grievance (identified below, if available) to final review, to communicate your concern(s) to the Secretary's Office of Grievances and Appeals, and/or to check the status of review related to your matter.

| **Inmate Name:** | Roy Williams | **Inmate Number:** | CF4784 |
|---|---|---|---|
| **SCI Filed at:** | Phoenix | **Current SCI:** | Phoenix |
| **Grievance # (if available):** | 916331 | | |

| | | |
|---|---|---|
| | | *a) You have already received final disposition/review on this issue through this Office.* |
| | | *b) This Office has no prior record of receipt of an appeal from you regarding this issue.* |
| | | *c) You have already filed a grievance to seek review and resolution of this matter.* |
| | | *d) You are encouraged to work through institutional channels to resolve your complaint initially. If unable to resolve your complaint informally, be advised that DC-ADM 804 provides a mechanism for all inmates to seek formal resolution for concerns.* |
| | | *e) You failed to provide the official grievance number for identification purposes.* |
| | | *f) Your claim to have grieved and/or appealed this concern at the institutional level without response does not entitle you to direct appeal to final review. Rather, contact the Grievance Coordinator or Facility Manager's office regarding the status of your appeal.* |
| | | *g) You have not yet appealed this issue to the Facility Manager. Final review will not be granted until you do so. Upon receiving a response from the Facility Manager at the respective facility, you may once again submit a timely written appeal to this Office for final review. Be sure that your appeal to this office includes **all** the necessary documents as outlined in DC ADM 804. If **all** documents are not received with your appeal, it may be dismissed. This response does not grant you a right to an appeal if it would otherwise have been untimely to pursue that appeal to the Superintendent.* |
| | X | *h) Your grievance and/or correspondence is being filed without further action for the reason(s) specified in the Comments/Action Taken section below.* |
| | | *i) The following action has been taken in response to the inquiry, request, or concern communicated in your letter.* |

***Comments/Action Taken:***

I am in receipt of the documents you have sent to our office in regards to the above listed grievance number. Your intent for sending these documents is unclear, as you did not submit an appeal to final review or any indication of what you would like us to do with these documents. Until our office receives an appeal or further correspondence from you, these documents will be filed without action.

| **Signature:** | Keri Moore KM | **Title:** | Assistant Chief Grievance Officer |
|---|---|---|---|
| **Date:** | 4/20/21 | | |

KLM/TAK

cc: DC-15/Superintendent - PHX
Grievance Office

U123 PHX

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| FOR OFFICIAL USE |
|---|
| 916331 |
| GRIEVANCE NUMBER |

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: Phoenix | DATE: 2/24/2021 |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) Roy L. Williams CF-4784 | SIGNATURE OF INMATE: R. L. Williams | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: PB 1014 | |

Secretary's Office
Inmate Grievances & Appeals
MAR 12 2021 3/08

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

This Grievance is submitted against John E. Wetzel who is employed by the Commonwealth of Pennsylvania, has acted under color of state law to deprive Roy Lee Williams of his constitutionally protected right to due process of law, guaranteed by the Fourteenth Amendment and his rights under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132-12134. Mr. Williams seeks compensatory and punitive relief to address the violation of his constitutional right and the violation the law of the United States. In support thereof Mr. Williams states the following:

1. On December 3, 1993 I was automatically placed in the RHU, Maximum Administrative Custody ("Indefinite Solitary Confinement") at SCI Graterford due to the Dep't of Corr's. capital case housing policy.

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator

Date

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

Superintendent's Office
SCI Phoenix
FEB 24 2021
Received

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 1/26/2016
Effective: 2/16/2016

*Attachment 1-A*

**JA251**

2.   In February 1994, a DC-ADM 472C prognosis report noted my institutional adjustment is guarded. Susceptible to situational depression, emotional deterioration may require clinical intervention. Jerrold A. Spector, Psychological services Associate.

3.   In March 1994, I sought help from SCI-Graterford's Psychological services, because I was deteriorating emotionally and having "bad thoughts", I told the psychologist that I had a history of suicidal ideation and that I was involuntarily committed to Philadelphia Psychiatric Center when I was 13 years old.

4.   After an attempted suicide I was referred to SCI-Graterford's psychology department, see DC-ADM 472C report related to this incident noting that "suicidal ideation must be taken seriously and cannot be taken lightly".

5.   In September of 1996, after two clinical examinations conducted by Robert A. Fox, M.D., and Barry Crown, Ph.D., I was diagnosed with depression, suicidal ideation, paranoia, lack of insight, problems with self-expression, difficulties with abstract thinking, information processing deficits, emotional lability, impulse control problems and that I needed to be placed in a structured, supportive environment and given consistent and intensive psychotherapy.

6.   The Dep't of Correction's policy of automatically placing all death sentenced prisoners indefinitely in solitary confinement without meaningful review has imposed an atypical and significant hardship on my mental disabilities.

7.   Title II regulation required Secretary Wetzel to reasonably modify the Department's policies, practices, and procedures when necessary, as here, to avoid discrimination against a prisoner with serious mental illness and intellectual disabilities. See Olmstead v. L.C., 527 U.S. 581, 592, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination on the basis of disability.").

Dated:  2/24/2021

/s/ Roy L. Williams

PA

# Rejection Form

SCI Phoenix
1200 Mokychic Drive
Collegeville, PA, 19426

02/24/2021 10:53

| Inmate Name: | WILLIAMS, ROY L | DOC #: | CF4784 |
|---|---|---|---|
| Facility: | Phoenix | Unit Location: | P / B |
| Grievance #: | 916331 | | |

This serves to acknowledge receipt of your grievance to this office. In accordance with the provisions of DC-ADM 804, “Inmate Grievance System Policy”, I have reviewed all documents provided as part of the grievance. Upon consideration of the grievance, it is the decision of this office to reject your grievance due to a failure to comply with the provisions of the DC-ADM 804, as specified below:

**Rationale:**

- The grievance was not submitted within fifteen (15) working days after the events upon which claims are based.

**Response:**

| Signature: | |
|---|---|
| Name: | G. Orlando |
| Title: | Facility Grievance Coordinator |
| Date: | |

cc: Facility Grievance Coordinator
DC-15

**DC-ADM 804, Inmate Grievance System Procedures Manual**

**Section 1 - Grievances & Initial Review, Attachment 1-C** Issued: 1/26/2016 Effective: 2/16/2016

CF4784 Grievance #:916331

WILLIAMS, ROY L Page 1 of 1

**JA253**

This Grievance is submitted against John E. Wetzel who is employed by the Commonwealth of Pennsylvania, has acted under color of state law to deprive Roy Lee Williams of his constitutionally protected right to due process of law, guaranteed by the Fourteenth Amendment and his rights under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132-12134. Mr. Williams seeks compensatory and punitive relief to address the violation of his constitutional right and the violation the law of the United States. In support thereof Mr. Williams states the following:

1. On December 3, 1993 I was automatically placed in the RHU, Maximum Administrative Custody ("Indefinite Solitary Confinement") at SCI Graterford due to the Dep't of Corr's. capital case housing policy.

2. In February 1994, a DC-ADM 472C prognosis report noted my institutional adjustment is guarded. Susceptible to situational depression, emotional deterioration may require clinical intervention. Jerrold A. Spector, Psychological services Associate.

3. In March 1994, I sought help from SCI-Graterford's Psychological services, because I was deteriorating emotionally



## Facility Manager's Appeal Response

SCI Phoenix
1200 Mokychic Drive
Collegeville, PA, 19426

03/02/2021 10:33

| | | | |
|---|---|---|---|
| **Inmate Name:** | WILLIAMS, ROY L | **DOC #:** | CF4784 |
| **Facility:** | Phoenix | **Unit Location:** | P / B |
| **Grievance #:** | 916331 | | |

This serves to acknowledge receipt of your grievance appeal to the Facility Manager for the grievance noted above. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to me and any other documents submitted.

**Decision:Uphold Response**

It is the decision of this Facility Manager to uphold the initial response, uphold the inmate, dismiss, or Uphold in part/Deny in part. This response will include a brief rationale, summarizing the conclusion, any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.

**Response:**

I am in receipt of your grievance appeal in which you claim on12/3/1993, you were placed in the RHU due to the PA Department of Corrections Capital Case housing policy. You claim that the PA Department of Correction's policy of placing al death sentenced prisoners in solitary confinement without review, has imposed atypical and significant hardship on your mental disabilities. You claim that the department's policies, practices, and procedures, when necessary, to avoid discrimination against a prisoner with serious mental illness and intellectual disabilities. You are requesting compensatory and punitive relief to address the violation of your constitutional right and the violation of the law of the United States.

In my investigation, I find that your grievance should have been rejected, as grievance was not submitted within fifteen (15) working days after the events upon which claims are based.

I must therefore, uphold the decision of the grievance officer, and deny your appeal and requested compensatory and punitive relief.

| | |
|---|---|
| **Signature:** | [signature] |
| **Name** | K. Sorber |
| **Title:** | Facility Manager |
| **Date:** | |

CC: DC-15
File



POLICY STATEMENT
Commonwealth of Pennsylvania • Department of Corrections

| Policy Subject: | | Policy Number: |
|---|---|---|
| Inmate Grievance System | | DC-ADM 804 |
| **Date of Issue:** April 27, 2015 | **Authority:** Signature on File John E. Wetzel | **Effective Date:** May 1, 2015 |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections, Department employees, volunteers, contract personnel, visitors and inmates.

## III. POLICY

It is the policy of the Department that every individual committed to its custody shall have access to a formal procedure through which to seek resolution of problems or other issues of concern arising during the course of confinement. For every such issue, there shall be a forum for review and two avenues of appeal. The formal procedure shall be known as the Inmate Grievance System.[1]

[1] 4-4281, 4-4284, 4-4394, 4-ACRS-6B-03

## IV. PROCEDURES

All applicable procedures are contained in the procedures manual that accompanies this policy document.

## V. SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII. RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A. Release of Information

1. Policy

   This policy document is public information and may be released upon request.

2. Confidential Procedures (if applicable)

   Confidential procedures for this document, if any, are <u>not public information</u> and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

### B. Distribution of Policy

1. General Distribution

   The Department of Corrections' policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2. Distribution to Staff

   It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee

expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII. SUPERSEDED POLICY AND CROSS REFERENCE

### A. Superseded Policy

1. Department Policy

   DC-ADM 804, Inmate Grievance System, issued March 31, 2014, by Secretary John E. Wetzel.

2. Facility Policy and Procedures

   This document supersedes all facility policy and procedures on this subject.

### B. Cross Reference(s)

1. Administrative Manuals

   a. DC-ADM 001, Inmate Abuse Allegation Monitoring;

   b. DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities;

   c. DC-ADM 008, Prison Rape Elimination Act (PREA);

   d. DC-ADM 801, Inmate Discipline;

   e. DC-ADM 802, Administrative Custody procedures;

   f. 3.1.1, Fiscal Administration; and

   g. 6.3.1, Facility Security;

2. ACA Standards

   a. Adult Correctional Institutions: 4-4016, 4-4281, 4-4284, 4-4301, 4-4394, 4-4429

   b. Adult Community Residential Services: 4-ACRS-6B-01, 4-ACRS-6B-03, 4-ACRS-7D-36

   c. Correctional Training Academies: None

## Section 1 – Grievances & Initial Review

### A. Filing of an Initial Grievance

1. The Department encourages an inmate to express his/her concerns to staff through respectful, constructive, written, or oral communication so that problems are resolved as soon as possible.[1]

2. The Inmate Grievance System is intended to deal with a wide range of issues, procedures, or events that may be of concern to an inmate. It is not meant to address incidents of an urgent or emergency nature including allegations of sexual abuse. Any allegation of a sexual nature (abuse/harassment) against a staff member or inmate-on-inmate sexual ***abuse must*** be addressed through Department policy **DC-ADM 008, "Prison Rape Elimination Act (PREA)."** When faced with an incident of an urgent or emergency nature, the inmate shall contact the nearest staff member for immediate assistance.

3. An inmate is encouraged to attempt resolution of a concern informally by use of a **DC-135A, Inmate Request to Staff Member** or direct conversation with the Unit Manager or Officer-in-Charge prior to submitting a **DC-804, Part 1, Official Inmate Grievance Form (Attachment 1-A)**. This is not required in cases of allegations of ***physical or sexual abuse***.

   a. A staff member who receives an oral or written concern from an inmate is expected to attempt to resolve the concern if possible.

   b. It is encouraged, when possible, to resolve every concern quickly and informally.

   c. If the staff member is not the appropriate person to resolve the concern raised by the inmate, he/she should be referred to the appropriate staff member.

   d. The Unit Manager or Officer-in-Charge shall document the result of the resolution, including each party involved, in the Inmate Cumulative Adjustment Record (ICAR).

4. While an inmate should make every effort to resolve a concern informally prior to filing an official grievance, failure to attempt to informally resolve a concern will not be cause to reject an official grievance. However, if an attempt was made to resolve the concern informally, this information should be included in **Section B** of the **DC-804, Part 1**.

5. When an inmate has a concern that he/she is unable to resolve, the inmate must submit his/her grievance to the Facility Grievance Coordinator/designee using the **DC-804, Part 1**.

   a. **DC-804, Part 1** forms shall be readily available on every housing unit as well as in the main and mini-law libraries.

---

[1] 4-4016

b. Each copy of the **DC-804, Part 1** form, with the exception of the inmate's copy (GOLDENROD), shall be forwarded to the Facility Grievance Coordinator/designee who will determine whether the grievance will be accepted or rejected.

6. A grievance regarding an allegation of a sexual nature (abuse/harassment) against a staff member or inmate-on-inmate sexual ***abuse*** will not be addressed through the Inmate Grievance System and must be addressed through Department policy **DC-ADM 008, *in accordance with Subsection C.4.b. below***. These allegations are taken seriously by the Department and must and will be investigated to make sure that inmates are safe in the facilities. If a grievance is filed ***against a staff member*** regarding an allegation of a sexual nature (abuse/harassment) or inmate-on-inmate sexual ***abuse***, the grievance will be immediately forwarded to the Security Department as well as the PREA Compliance Manager in accordance with Department policy **DC-ADM 008** to start an investigation ***and will not be addressed through the Inmate Grievance System***.

7. Issues concerning a specific inmate misconduct charge, ***conduct of hearing, statements written within a misconduct and/or other report,*** a specific disciplinary sanction, and/or the reasons for placement in administrative custody will not be addressed through the Inmate Grievance System and must be addressed through Department policy **DC-ADM 801, "Inmate Discipline"** and/or **DC-ADM 802, "Administrative Custody Procedures."** ***Issues other than specified above must be addressed through the Inmate Grievance System.***

8. The inmate must submit a grievance to the Facility Grievance Coordinator/designee, usually the Superintendent's Assistant, within 15 working days after the event upon which the claim is based.

9. A grievance must be filed with the Facility Grievance Coordinator/designee at the facility where the grievance event occurred.

10. The inmate must sign and date the grievance with his/her commitment name and number only, without reference to the UCC, aliases, etc.

11. The text of the grievance must be legible, understandable, and presented in a courteous manner. The inmate must include a statement of the facts relevant to the claim.

    a. The statement of facts shall include the date, approximate time, and location of the event(s) that gave rise to the grievance.

    b. The inmate shall identify individuals directly involved in the event(s).

    c. The inmate shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law.

    d. If the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance.

12. The statement of facts must not exceed two pages and must be handwritten or typed on writing paper (one **DC-804, Part 1** and one one-sided 8 ½” x 11” page).

13. An inmate who has been personally affected by a Department and/or facility action or policy will be permitted to submit a grievance.

14. Any grievance based on separate events must be presented separately, unless it is necessary to combine the issues to support the claim.

15. Any grievance issue that has been or is currently being addressed will not be re-addressed in a subsequent grievance. Any concern disputing previous grievances, ***initial review responses***, appeal decisions, or ***actions of*** staff members who rendered those decisions should be addressed through the appeal process outlined in **Section 2** of this procedures manual.

16. Each grievance must be presented individually. A grievance submitted by one inmate for another inmate or a group of inmates is prohibited and will not be processed.

17. An inmate filing a grievance related to a claim of missing property must provide documentation such as a **DC-153A, Personal Property Inventory Sheet**; **DC-154A, Confiscated Items Receipt**; or a ***Commissary/*****Outside Purchase Form** for evidence or proof that the property items were once in his/her possession. Failure to do so may result in the rejection of the grievance.

18. ***A grievance related to a publication/photograph denial must include a copy of the Notice of Incoming Publication Form in accordance with Department policy DC-ADM 803, “Inmate Mail and Incoming Publications.”***

19. An inmate filing a grievance contesting the accuracy of the **Notification of Deductions Memo** and/or the **Notification of Amended Deductions Memo** of Department policy **DC-ADM 005, “Collection of Inmate Debts**,” must provide valid, official court documentation proving that:

    a. the financial obligations have previously been paid;

    b. the information submitted on the official court documents by the Clerk of Courts was incorrect;

    c. for a sentencing occurring prior to December 26, 2010, the sentencing judge did not impose court costs;

    d. for a sentencing occurring on or after December 26, 2010, the sentencing judge specifically waived court costs;

    e. in the case of an obligation for restitution, reparation, fines, or penalties, the sentencing court did not specifically order you to pay such obligation regardless of the date of sentence;

    f. a more recent court order removed or postponed the financial obligations;

g. the financial obligations are not currently due under the terms of the court order;

h. the Crime Victim Compensation/Victim's Services Fee was not computed in accordance with law;

i. the court costs are related to an adjudication of delinquency, and you have attained the age of 21. If you are not yet 21, and are paying these fees, you should notify the Business Office on your 21st birthday; or

j. you do not owe the financial obligations for any other reason.

**NOTE**: Failure to provide any of the above with your grievance may result in rejection of your grievance.

20. If a grievance is rejected, the grievance may be re-submitted, using the same grievance number, within five working days of the rejection notice date. A rejected grievance may only be re-submitted one time.

21. ***An inmate may appeal the rejected grievance to the Facility Manager in accordance with Section 2 of this procedures manual.***

22. In a case involving personal property, the inmate must clearly notify the Facility Manager or Facility Grievance Coordinator/designee to retain the property pending completion of the grievance process, including any appeal. This notification can be made within the initial grievance.

23. ***For cases regarding confiscated contraband, destruction of the property shall only occur after the appeal process has been exhausted.***

24. No inmate shall be punished, retaliated against, or otherwise harmed for use of the grievance system.[2]

25. At any point in the grievance process, the inmate may withdraw the grievance.

a. To withdraw a grievance, an inmate must use and sign the **Grievance Withdrawal Form (Attachment 1-B)**, identify the grievance to be withdrawn by number, the reason why the grievance was withdrawn, and forward the form to the Facility Grievance Coordinator/designee.

b. The Facility Grievance Coordinator/designee will forward a copy of the **Grievance Withdrawal Form** to the inmate's counselor.

[2] 4-4281

c. The inmate's counselor will meet with the inmate to verify that the grievance was resolved and that the withdrawal was appropriate.

d. The counselor will sign the **Grievance Withdrawal Form** and forward it to the Facility Grievance Coordinator/designee.

e. Once a grievance is withdrawn, the inmate cannot then proceed to appeal to either the Facility Manager or Final Review.

26. Any document(s) attached in support of a grievance becomes part of the official record and will not be returned. The inmate should make copies of the supporting documents prior to submitting to the Facility Grievance Coordinator/designee for use in any subsequent appeals. If copies are needed, the procedures outlined in Department policy **DC-ADM 003, "Release of Information"** ***must*** be followed.

27. A grievance cannot be filed after parole or release from incarceration.

28. An inmate transferred to a county facility or other state must use the grievance system at that facility regarding any issue that arises at that facility.

**B. Where to Place a Grievance**

1. Each Facility Manager/designee shall ensure that a fixed lock-box designated for inmate grievances is on each general population housing unit, ***all Level 5 Housing Units, Specialized Housing Units, and Inmate Dining Halls***.

2. ***Each lock-box shall be clearly labeled "grievances" and the inmate shall be permitted to place grievances in these lock-boxes.***

3. General Population Housing Units

   The Facility Grievance Coordinator/designee will be responsible for the key and retrieval of the lock-box contents each work day.

4. Level 5 Housing Units ***and/or Specialized Housing Units***

   a. The lock-box shall be placed in a location easily accessible to an inmate being escorted to an individual exercise unit and/or shower.

   b. If an inmate chooses not to go to an individual exercise unit and/or shower, he/she may have a staff member place the grievance in the lock-box.

   c. The Facility Grievance Coordinator is responsible for the key and retrieval of the lock-box contents each work day.

5. Inmate Dining Halls

    a. This lock-box is for inmates to place their inmate grievances in which the Facility Grievance Coordinator is the only staff member to collect these grievance forms.

b. The Facility Grievance Coordinator is responsible for the key and the retrieval of the contents of the lock-box each work day.

**C. Initial Review**

1. The Facility Grievance Coordinator/designee shall assign a grievance tracking number to every grievance (even a rejected grievance) upon receipt and enter every grievance into the Automated Inmate Grievance Tracking System.

   a. The Facility Grievance Coordinator/designee shall enter the date the grievance was received, a summary or description of the grievance subject matter, and the category.

   b. The Facility Grievance Coordinator/designee may combine multiple grievances from the same inmate that relate to the same subject.

2. A time extension for filing a grievance will be considered on a case-by-case basis. The inmate must notify the Facility Grievance Coordinator/designee of the reason for the delay. The Facility Grievance Coordinator/designee will consider the reason given and also consider if the delay was caused by:

   a. a temporary transfer from the facility where the grievance should have been filed;

   b. a permanent transfer to another facility from the facility where the grievance should have been filed;

   c. Authorized Temporary Absence (ATA) for an extended period;

   d. another delay with mail delivery; or

   e. any other reason the Facility Grievance Coordinator/designee deems appropriate.

   **NOTE**: If it is determined that a delay was caused by a circumstance listed above, a reasonable extension of time for filing shall be permitted.

3. If the Facility Grievance Coordinator/designee determines that the grievance is properly submitted according to this procedures manual, the Facility Grievance Coordinator/designee will designate a staff member to serve as the Grievance Officer for that grievance. The staff member who serves as the Grievance Officer shall not be directly involved ***in*** or named as the subject of the grievance in **Section A and/or B** of the **DC-804, Part 1**.

   **NOTE**: The PINK copy of the **DC-804, Part 1** form will be returned to the inmate acknowledging acceptance of the grievance.

4. If the Facility Grievance Coordinator/designee determines that the grievance is not properly submitted according to this procedures manual, it shall be rejected and returned to the inmate with a **Grievance Rejection Form (Attachment 1-C)** enumerating the reason(s) the grievance was rejected.

   a. When rejected, the entire grievance packet will be returned to the inmate along with any exhibits. The Facility Grievance Coordinator/designee will retain one photocopy of the grievance ***and any exhibits***.

   b. When the grievance is in regards to Department policy **DC-ADM 008**, the Facility Grievance Coordinator/designee shall do the following:

      (1) immediately forward a copy of the grievance to the Security Office to be investigated in accordance with Department policy **DC-ADM 008** as well as to the PREA Compliance Manager; and

      (2) the rejection notice to the inmate shall state: *"Sexual abuse is taken seriously by the Department of Corrections. Any allegations of a sexual nature (abuse/harassment) against a staff member or inmate-on-inmate sexual **abuse** must be investigated to make sure that inmates are safe in this facility. This grievance is being forwarded to the Security Office and the PREA Compliance Manager for initiation of an investigation*."

5. The Grievance Officer shall:

   a. submit his/her proposed response to the Facility Grievance Coordinator/designee prior to distribution to the inmate;

   b. the response shall be typed on the **Initial Review Response Form (Attachment 1-D)**;

   c. the response shall include a brief rationale summarizing the conclusion and any action taken or recommended to resolve every issue raised as well as any requested relief;

   d. if a policy is being cited within the initial review response, the specific policy number, section, etc., must be included;

   e. the response must include one of the following dispositions: Uphold Inmate, Grievance Denied or Uphold in Part/Deny in Part;

   f. if the grievance is deemed frivolous, the response must include a statement setting forth the reason(s);

   g. the response shall be provided to the inmate within 15 working days from the date the grievance was entered into the Automated Inmate Grievance Tracking System; and

h. an extension of ten additional working days may be requested from the Facility Grievance Coordinator/designee if the investigation of the grievance is ongoing.

6. The Facility Grievance Coordinator/designee shall:

   a. review the proposed response from the Grievance Officer for consistency with policy and procedures;

   b. if further review is required, the response will be returned to the Grievance Officer;

   c. if the proposed response is approved, the Facility Grievance Coordinator/designee shall initial the response and return it to the Grievance Officer for distribution to the inmate;

   d. once the Grievance Officer's response is complete, the date of the response and a summary of the Grievance Officer's decision should be entered into the Automated Inmate Grievance Tracking System; and

   e. if an extension is granted to the Grievance Officer, ***the extension must be entered into the Automated Inmate Grievance Tracking System and*** the inmate must be notified in writing using the **Extension Form (Attachment 1-E)**.

7. A grievance filed against Parole and/or Central Office staff should not be rejected, except for non-policy compliant reasons. If necessary, Parole and/or Central Office staff can be contacted by the facility to supply information needed for the Grievance Officer to provide a complete response. It should be noted that there may be circumstances in which facility staff cannot address a parole issue. If this occurs, the Grievance Officer should provide a response to the inmate which includes an address and/or contact person from Parole to whom the inmate can direct their issue and/or concern.

## D. Allegation of Abuse Grievances

1. This section does not apply to allegations of a sexual nature (abuse/harassment) against a staff member and/or inmate-on-inmate sexual ***abuse***. These allegations will be handled in accordance with **Subsection A.6. above** and Department policy **DC-ADM 008**.

2. A grievance dealing with allegations of abuse shall be handled in accordance with Department policy **DC-ADM 001, "Inmate Abuse."**

3. This may extend the time for responding to the grievance, but will not alter the inmate's ability to appeal upon his/her receipt of the initial review response.

4. When a grievance is related to an allegation of abuse, the Facility Grievance Coordinator/designee will issue an **Extension Notice** to the inmate by checking the box "Notice of Investigation" ***on the Extension Form.***

5. The initial review response will be completed by the assigned Grievance Officer ***after*** the results from the Office of Special Investigations and Intelligence (OSII) are received.

6. If a grievance dealing with allegations of abuse is rejected, the Facility Grievance Coordinator/designee shall:

    a. immediately forward a copy of the grievance to the Security Office to be investigated in accordance with Department policy **DC-ADM 001**; and

    b. the rejection notice to the inmate shall include a statement informing the inmate that his/her grievance was forwarded to the Security Office for investigation in accordance with Department policy **DC-ADM 001**.

**E. Access to Grievances for Special Populations**

1. Pursuant to Department policy **DC-ADM 006, "Reasonable Accommodations for Inmates with Disabilities,"** the Department shall ensure that inmates with disabilities have an equal opportunity to use the grievance system.

2. Written materials will either be delivered in alternative formats that accommodate the inmate's disability or the information will be delivered through alternative methods, such as reading it to the inmate or communicating through an interpreter, which ensure the understanding of the grievance process and material.

3. The Facility Grievance Coordinator/designee will ensure that only staff members, not involved in the grievance, are providing translation for inmates. If a multi-lingual staff member is not available, ***then a current contracted translation service must*** be utilized.

4. Timeline extensions shall be granted in order to secure these services.

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

| FOR OFFICIAL USE |
|---|
| GRIEVANCE NUMBER |

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) | SIGNATURE OF INMATE: | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: | |

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any actions you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8 ½" x 11" page). State all relief that you are seeking.

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator　　　　Date

WHITE Facility Grievance Coordinator Copy　　CANARY File Copy　　PINK Action Return Copy
GOLDEN ROD Inmate Copy

# GRIEVANCE WITHDRAWAL

(Facility)
(Address)

This serves to acknowledge receipt of recent communication indicating your desire to withdraw the grievance noted below. In accordance with the provisions of DC-ADM 804, “Inmate Grievance System,” the Facility Grievance Coordinator will withdraw this grievance in response to your request.

| **Inmate Name:** | | **Inmate Number:** | |
|---|---|---|---|
| **Facility:** | | **Date:** | |
| **Grievance:** | | | |
| **Action:** | **Withdrawal** | | |
| **Inmate’s Signature:** | | **Grievance Officer’s Signature:** | |
| **Grievance Officer’s Title:** | | | |
| **Date:** | | | |
| **Counselor’s Name:** | | **Date:** | |
| **Withdraw Verified:** | ☐ Yes<br>☐ No | | |
| **Comments:** | | | |

cc: Facility Grievance Coordinator
Grievance Officer
DC-15
File

***DC-ADM 804, Inmate Grievance System Procedures Manual***
***Section 1 – Grievances & Initial Review*** ***Attachment 1-B***
Issued: 1/26/2016
Effective: 2/16/2016

**JA269**

## Section 2 – Appeals

### A. Appeal to Facility Manager

1. Inmate Responsibilities

   a. An inmate may appeal an initial review response/rejection to the Facility Manager in writing, within 15 working days from the date of the initial review response/rejection.

   b. The initial review response/rejection from the Facility Grievance Coordinator/designee must be received by the inmate before any appeal to the Facility Manager can be sought.

   c. Only an issue that was raised for initial review, determination of frivolousness, and/or rejection may be appealed. An issue raised for Initial review and determination of frivolousness must be raised for appeal at the same time.

   d. Each appeal must:

      (1) be clearly labeled as an appeal at the top of the document;

      (2) include the grievance number at the top of the document;

      (3) be legible, understandable, and presented in a courteous manner;

      (4) not exceed two pages (two one-sided or one double-sided 8 ½” x 11” page);

      (5) contain reason(s) for appealing the initial review response/rejection;

      (6) be handwritten or typed on writing paper or submitted on the **Inmate Appeal to the Facility Manager Form (Attachment 2-A)**;

      (7) if the inmate is appealing a determination of frivolousness, he/she must clearly indicate that he/she is appealing that determination; and

      (8) only one appeal of any initial review response/rejection is permitted.

   e. Failure to comply may result in the appeal being dismissed.

   f. Any document(s) attached in support of a grievance appeal, ***including the appeal itself***, becomes part of the official record and will not be returned. The inmate should make copies of the ***appeal, and*** supporting documents, including any facility documents, prior to submission to the Facility Manager for any subsequent appeals.

2. Staff Responsibilities

   a. The appeal must be addressed by the Facility Manager/designee. The Grievance Officer, ***and/or a staff member involved in or named as the subject of the grievance*** may not be designated to address the appeal.

   b. The Facility Manager/designee will determine whether the appeal is in accordance with this procedures manual. If the appeal is determined to be in accordance with these procedures, the Facility Grievance Coordinator/designee will enter the date the appeal was received into the Automated Inmate Grievance Tracking System.

   c. A time extension for filing ***an appeal*** will be considered on a case by case basis. The inmate must notify the Facility Manager of the reason for the delay. The Facility Manager/designee will consider the reason given and also consider if the delay was caused by:

      (1) a temporary transfer from the facility where the grievance should have been filed;

      (2) a permanent transfer to another facility from the facility where the grievance should have been filed;

      (3) Authorized Temporary Absence (ATA) for an extended period;

      (4) another delay with mail delivery; and

      (5) any other reason the Facility Manager/designee deems appropriate.

      **NOTE**: If it is determined that a delay was caused by a circumstance listed above, a reasonable extension of time for filing shall be permitted.

   d. The Facility Manager/designee shall:

      (1) notify the inmate using the **Facility Manager's Appeal Response (Attachment 2-B)** of his/her decision within 15 working days of receiving the appeal;

      (2) one of the following dispositions must appear on the appeal response: Uphold Response, Uphold Inmate, Dismiss/Dismiss Untimely or Uphold in Part/Deny in Part;

      (3) a brief statement of the reason(s) for the decision must be included. All appeal points raised by the inmate shall be addressed including the determination of frivolousness of appealed;

      (4) the Facility Manager/designee may authorize an extension of up to ten additional working days if the investigation of the appeal is ongoing. If an extension is

necessary, the inmate shall be advised in writing using the **Extension Form (Attachment 1-E)**; and

(5) alternatively, the Facility Manager/designee may remand the initial review response/rejection to the Grievance Officer for further investigation and/or reconsideration.

e. Remand

(1) When the Facility Manager/designee remands a grievance, notification of the remanded grievance will be provided to the Grievance Officer on the **Remand Grievance – Notice to Grievance Officer (Attachment 2-C)**.

(2) Notification of the remanded grievance will also be provided to the inmate on the **Remand Grievance – Notice to Inmate (Attachment 2-D)**.

(3) The Grievance Officer shall respond to the inmate within 15 working days.

(4) The revised response shall be returned to the Facility Manager/designee for review prior to sending it to the inmate.

(5) The inmate may again appeal to the Facility Manager within 15 working days from the date of the revised initial review response.

(6) The determination to remand the initial review response/rejection may not be appealed or made the subject of a new grievance.

f. The Facility Grievance Coordinator/designee shall enter the date and a summary of the Facility Manager/designee's decision into the Automated Inmate Grievance Tracking System.

g. Personal property related to a grievance shall not be disposed of if the inmate notifies the Facility Manager/designee or Facility Grievance Coordinator/designee to retain the property as required in **Section 1** of this procedures manual. If notification is given, the property related to the grievance shall be placed in a safe location until final disposition is made by the Secretary's Office of Inmate Grievances and Appeals (SOIGA). The inmate will have 20 working days from the date the final SOIGA decision is received to notify the Facility Grievance Coordinator/designee in writing with his/her signature that he/she intends to file a court action relating to the confiscated property. The subject property will be labeled to indicate that it is being held pending possible further legal action and will note the expiration date of the 20 working days. If no notice in writing signed by the inmate is given to the Facility Grievance Coordinator/designee by the end of the 20 working days, the inmate will be told to decide whether the property is to be shipped or destroyed. When the final court proceeding is concluded, the inmate shall, within 20 working days, notify the Facility Grievance Coordinator/designee in writing that the lawsuit is concluded and whether the property is to be shipped or destroyed. Any refusal or failure to select an option

will be documented by the Property Officer and will result in the property being destroyed. If the option to have the property shipped is chosen, the property will be shipped at the inmate's expense. An inmate's failure to communicate the final court disposition to the Facility Grievance Coordinator/designee within 20 working days may result in the property being destroyed with no notice to the inmate.

**B. Appeal to Final Review**

1. Inmate Responsibilities

   a. The decision from the appeal to the Facility Manager/designee must be received by the inmate before an appeal to Final Review can be sought.

   b. Any inmate who is dissatisfied with the disposition of an appeal from the Facility Manager/designee may submit an **Inmate Appeal to Final Review (Attachment 2-E)** within 15 working days from the date of the Facility Manager/designee's decision. Only issues ***raised in the initial grievance and/or*** appealed to the Facility Manager may be appealed to Final Review.

   c. A time extension for filing a grievance appeal to final review will be considered on a case by case basis. The inmate must notify the Chief Grievance Officer of the reason for the delay. The Chief Grievance Officer/designee will consider the reason given and also consider if the delay was caused by:

      (1) a temporary transfer from the facility where the grievance should have been filed;

      (2) a permanent transfer to another facility from the facility where the grievance should have been filed;

      (3) ATA for an extended period;

      (4) another delay with mail delivery; or

      (5) any other reason the Chief Grievance Officer/designee deems appropriate.

      **NOTE**: If it is determined that a delay was caused by a circumstance listed above, a reasonable extension of time for filing shall be permitted.

   d. An appeal to Final Review will not be permitted until the inmate has complied with all procedures established for Initial Review in accordance with **Section 1** of this procedures manual and for Appeal to the Facility Manager in accordance with **Subsection A. above**.

   e. Each appeal must:

      (1) be clearly labeled as an appeal at the top of the document;

(2) include the grievance number at the top of the document;

(3) be legible, understandable, and presented in a courteous manner;

(4) not exceed two pages (two one-sided or one double-sided 8 ½” x 11”page);

(5) contain reason(s) for appealing the Facility Manager/designee’s decision;

(6) be handwritten or typed on writing paper or submitted on the **Inmate Appeal to Final Review**;

(7) if the inmate is appealing a determination of frivolousness, he/she must clearly indicate that he/she is appealing that determination;

(8) only one grievance may be appealed on a piece of paper unless combined by the Facility Manager/designee; and

(9) only one appeal of any Facility Manager/designee’s response is permitted.

f. Failure to comply may result in the appeal being dismissed.

g. An inmate filing an appeal related to a claim of missing property must provide documentation such as a **DC-153A, Personal Property Inventory Sheet**; **DC-154A**, **Confiscated Items Receipt**; or a **Commissary/Outside Purchase Form** for evidence or proof that property items were once in his/her possession. Failure to do so may result in dismissal of the appeal.

h. An inmate filing a grievance contesting the accuracy of the Notification of Deductions Memo and/or the Notification of Amended Deductions Memo in accordance with Department policy **DC-ADM 005, “Collection of Inmate Debts**,” must provide valid, official court documentation proving that:

(1) the financial obligations have previously been paid;

(2) the information submitted on the official court documents by the Clerk of Courts was incorrect;

(3) for a sentencing occurring prior to December 26, 2010, the sentencing judge did not impose court costs;

(4) for a sentencing occurring on or after December 26, 2010, the sentencing judge specifically waived court costs;

(5) in the case of an obligation for restitution, reparation, fines or penalties, the sentencing court did not specifically order you to pay such obligation regardless of the date of sentence;

(6) a more recent court order removed or postponed the financial obligations;

(7) the financial obligations are not currently due under the terms of the court order;

(8) the Crime Victim Compensation/Victim's Services Fee was not computed in accordance with law;

(9) the court costs are related to an adjudication of delinquency, and you have attained the age of 21. If you are not yet 21, and are paying these fees, you should notify the business office on your 21st birthday; or

(10) you do not owe the financial obligations for any other reason.

**NOTE**: Failure to provide any of the above with your grievance may result in your appeal being dismissed.

i. Every appeal to Final Review must be addressed to the following:

**Chief, Secretary's Office of Inmate Grievances and Appeals**
**Department of Corrections**
**1920 Technology Parkway**
**Mechanicsburg, PA 17050**

Failure to properly address the appeal will delay the process.

j. An inmate appealing a grievance to final review is responsible for providing the SOIGA with all required documentation relevant to the appeal. A proper appeal to final review must include:

(1) a legible copy of the Initial Grievance;

(2) a copy of the initial review response/rejection and/or remanded initial review response/rejection;

(3) a legible copy of the Inmate Appeal to the Facility Manager;

(4) a copy of the Facility Manager/designee's decision and/or remanded Facility Manager/designee's decision;

(5) a written appeal to the SOIGA;

(6) failure to provide any of the documentation noted above may result in the appeal being dismissed; and

(7) the copies of the initial review response/rejection and the Facility Manager/designee's decision cannot be handwritten.

k. An indigent inmate as defined in Department policy **DC-ADM 803, "Inmate Mail and Incoming Publications,"** will be afforded copy service and legal postage up to a maximum of $10.00 per month and all money received in the inmate's account shall be used to pay for the cost of the copies and legal postage. A non-indigent inmate will incur copying charges in accordance with Department policy **3.1.1, "Fiscal Administration."**

l. Any documentation submitted in support of the appeal to final review will become part of the official record and will not be returned. The inmate should make copies of supporting documents, including facility documents, prior to submission to final review.

2. Staff Responsibilities

a. The SOIGA will ensure that:

(1) an appeal to final review is responded to within 30 working days of receipt unless otherwise extended ***and/or referred***;

(2) an appeal and response are properly maintained in the Automated Inmate Grievance Tracking System; and

(3) the Chief of SOIGA may authorize an extension of up to ten additional working days if the investigation of the appeal is ongoing. If an extension is necessary, the inmate shall be advised in writing using the **Extension Form (Attachment 1-E)**.

b. Upon request, the Facility Manager/designee will forward to the SOIGA a copy of any formal investigation related to a grievance.

c. The SOIGA will review the **DC-804, Part 1**, the initial review response/rejection, the **Inmate Appeal to the Facility Manager**, the Facility Manager/designee's response, any investigative report(s), any attached exhibits and the **Appeal to Final Review**.

d. Upon completion of the review, SOIGA will respond directly to the inmate in all cases using the **Final Appeal Decision (Attachment 2-F)** or the **Final Appeal Decision Dismissal (Attachment 2-G)**. If the inmate is released/paroled, he/she must provide a forwarding address to SOIGA. SOIGA will forward the final review response to the address provided or, if no address is provided, to the last address of record for the inmate.

e. SOIGA will issue a decision with one of the following dispositions: Uphold Response, Uphold Inmate, Dismiss, or Uphold in Part/Deny in Part.

(1) The Chief/designee, SOIGA, shall notify the inmate and the Facility Manager of the decision and rationale.

(2) If the decision consists of amending or remanding the grievance ***response***, or if the decision is to uphold the inmate or uphold the inmate in part, the appropriate ***Regional*** Deputy Secretary shall also be notified.

(3) In any instance where a determination of frivolousness is overturned, the Facility Grievance Coordinator shall also be notified.

(4) Alternatively, the Chief Grievance Officer/designee may remand the grievance to the Facility Manager for further investigation/reconsideration and/or may review/refer an appeal with/***to*** a different bureau.

f. Referrals

(1) When an appeal is referred to a bureau for review (health care issues with the Bureau of Health Care Services (BHCS), education issues with the Bureau of Correction Education (BCE), etc.) notification of the referral will be provided to the appropriate bureau on the **Grievance Referral (Request to Bureau/Office) (Attachment 2-H)**.

(2) Notification of the referred grievance will be provided to the inmate on the **Grievance Referral (Notice to Inmate) (Attachment 2-I)**.

(3) This review/referral may result in an extension to the time for issuing a final review response to the inmate.

(4) Once a response from the relevant bureau is received by the SOIGA, a final review response will be issued to the inmate.

g. Remand

(1) When an appeal is remanded to the facility for further review notification of the remanded grievance will be provided to the Facility Manager/designee on the **Remand Grievance (Notice to Facility Manager) (Attachment 2-J)**.

(2) Notification of the remanded grievance will also be provided to the inmate on the **Remand Grievance (Notice to Inmate) (Attachment 2-K)**.

(3) Once the investigation is completed, the Facility Manager/designee will provide a revised response to the inmate, with a copy to the Chief of SOIGA, within 15 working days.

(4) If the inmate is dissatisfied with the revised response, he/she may appeal to final review again within 15 working days of the date of the revised response.

(5) ***Once an appeal to a remanded grievance is received at final review, the SOIGA will have 30 working days in which to complete a response.***

(6) The determination to remand the grievance may not be made the subject of a new grievance.

h. The Chief, SOIGA, in consultation with the Secretary, shall take any action deemed necessary to ensure the integrity of this policy. This includes, but is not limited to:

(1) prohibiting the transfer of an inmate until the grievance procedure has been completed, including the appeal process; and

(2) lifting a previously imposed grievance restriction.

i. The Chief, SOIGA/designee shall notify the Facility Manager in those cases where the suspension of an inmate's transfer is being considered pending the disposition of the appeal process.

j. If an inmate who has filed a grievance is transferred, paroled, or released prior to the appeal process being completed, the inmate may continue to pursue the grievance or appeal by notifying the Facility Manager of the facility where the grievance was originally filed. Adjustments shall be made to the various time limitations in order to allow for review.

### *C. Appeal of Publication or Photograph Denial*

1. ***As set forth in Department policy DC-ADM 803, an inmate may appeal the denial of a publication/photograph by filing a grievance under the provisions of this procedures manual.***

2. ***In order to appeal the Incoming Publication Review Committee's (IPRC) denial of a publication/photograph, the inmate must:***

   a. ***address his/her publication/photograph appeal to the Facility Manager on a DC-804, Part 1 within 15 working days from the date of the Notice of Incoming Publication Denial; and***

   b. ***include a copy of the Notice of Incoming Publication Denial Form in accordance with Department policy DC-ADM 803, disapproving the publication/photograph.***

3. ***Publication/Photograph Appeal at the Initial Level/Staff Responsibilities***

   a. ***When an inmate files an appeal to the denial of a publication/photograph, the Facility Grievance Coordinator/designee shall assign a grievance tracking number to the publication/photograph appeal.***

   b. ***The Facility Manager/designee shall:***

(1) ***review the publication/photograph appeal in addition to the Notice of Incoming Publication Denial Form and the publication/photograph and complete a response within 15 working days of receiving the appeal; and***

(2) ***include the grievance tracking number and the name of the publication/photograph (or other description) in his/her response to the inmate.***

4. ***Publication/Photograph Appeal to SOIGA***

   a. ***An inmate appealing a publication/photograph disapproval to Final Review is responsible for providing SOIGA with all required documentation relevant to the appeal. A proper publication/photograph appeal to Final Review must include a copy of the Notice of Incoming Publication Denial Form, appeal to the Facility Manager, the Facility Manager/designee's decision, and a written appeal to Final Review.***

   b. ***Failure to provide the proper documentation may result in the final appeal being dismissed.***

   c. ***SOIGA will refer the grievance appeal challenging the denial of a publication for content reasons to the Office of Policy, Grants, and Legislative Affairs for review.***

**D. State Intermediate Punishment (SIP) Appeals**

1. A SIP participant may appeal an expulsion from the SIP program by filing a grievance to the Facility Grievance Coordinator of the facility housing the inmate within ten days of the date of the expulsion letter. The Facility Grievance Coordinator/designee will assign the grievance a number and email it to "CR, SIP Appeals/Grievance" for review and response in accordance with **37 Pa. Code §97.116**.

2. The grievance must be legible and the statement of facts may not exceed two pages.

3. A participant is responsible for including all required documentation with the grievance. Failure to provide relevant documentation may result in the grievance being dismissed.

4. A participant who is indigent as defined in Department policy **DC-ADM 803**, will be afforded copy service and legal postage up to a maximum of $10.00 per month and all money received in the inmate's account shall be used to pay for the cost of the copies and legal postage. A non-indigent inmate will incur copying charges in accordance with Department policy **3.1.1**.

5. Any documentation submitted in support of a grievance will not be returned. The participant should make a copy of any supporting documentation for submission with the grievance.

6. The Executive Deputy Secretary/designee may decide the grievance based upon the documentation presented as well as other information contained within the Department's files and may interview the inmate and any involved staff member or contractor employee by means of videoconferencing if the Executive Deputy Secretary/designee in his/her sole discretion, believes an interview will assist him/her in understanding and evaluating the grievance.

7. In reviewing a grievance, the Executive Deputy Secretary/designee shall determine whether the participant violated the conditions of his/her Drug Offender Treatment Program (DOTP) or was meaningfully participating in the DOTP. The Executive Deputy Secretary/designee may uphold or reverse the expulsion or take any other action that could have been taken by the Chief of the Department's Bureau of Treatment Services (BTS), Treatment Division, with respect to the alleged conduct at issue.

## E. Grievance Reports

1. SOIGA provides a detailed monthly report to Central Office's administrative staff and Facility Managers indicating grievances filed, related trends, and any noted concerns. This report compares the previous year's grievance information to the current year's grievance information.

2. Central Office's administrative staff review any noted concerns or elevated numbers with the Facility Managers.

3. The Chief Grievance Officer meets with the Secretary, as necessary, to discuss any noted concerns or elevated numbers.

Case 2:21-cv-01245-ER Document 24-9 Filed 02/01/22 Page 27 of 36

**SCI**
**INMATE APPEAL TO FACILITY MANAGER**
**GRIEVANCE**

| Inmate Number | NAME | HOUSING UNIT | DATE | GRIEVANCE# |
|---|---|---|---|---|
| | | | | |

**I received my initial response from the Grievance Office/Coordinator on __________________ and have the following appeal issues.**

**Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions.**

**Please provide a BRIEF (no longer than two pages) appeal statement.**

**INMATE SIGNATURE**:_________________________________

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 2 – Appeals* *Attachment 2-A*
Issued: 1/26/2016
Effective: 2/16/2016

**JA281**

# INMATE APPEAL TO FINAL REVIEW GRIEVANCE

| INMATE NUMBER | NAME | FACILITY | DATE | GRIEVANCE# |
|---|---|---|---|---|
| | | | | |

**I received my appeal from the Superintendent on ________________and have the following appeal issues.**

**Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions.**
**Appeals must relate to the issue presented in the initial grievance and 1st level appeal.**

**Please provide a BRIEF (no longer than two pages) appeal statement.**

**INMATE SIGNATURE**:________________________________

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 2 – Appeals* *Attachment 2-E*
Issued: 1/26/2016
Effective: 2/16/2016

**JA282**

## Section 3 – Grievance Restriction or Grievance Restriction Extension

### A. Grievance Restriction

1. An inmate who has filed five grievances within a 30-day period which have been determined to be frivolous may be placed on grievance restriction.

    a. The maximum length of the grievance restriction period is 90 days.

    b. An inmate placed on grievance restriction shall be notified via the **Grievance Restriction Notice (Attachment 3-A)**.

    c. Once an inmate is placed on grievance restriction, he/she may file no more than one grievance each 15 working days.

    d. The grievance restriction period begins on the date of the written notice to the inmate of the grievance restriction.

    e. The 15 working day period during which one grievance may be filed begins on the 1st working day immediately following the date of the written notice to the inmate of the grievance restriction.

2. The frivolous grievances used to place an inmate on grievance restriction must be within a 30-day period from when the inmate initially filed the frivolous grievances (date of the first frivolous grievance received).

3. A grievance that was withdrawn after an initial review response has been distributed to the inmate shall be considered for grievance restriction if deemed frivolous by the Grievance Officer.

4. The Facility Grievance Coordinator shall provide the inmate with written notice of the grievance restriction on the **Grievance Restriction Notice** and the reason(s) for it.

    NOTE: A copy of the **Grievance Restriction Notice** shall be forwarded to the Regional Deputy Secretary, the Facility Manager and the Secretary's Office of Inmate Grievances and Appeals (SOIGA).

5. It is the inmate's responsibility to determine which issues to grieve while on grievance restriction.

6. An inmate will not be denied a **DC-804, Part 1** due to being placed on grievance restriction.

7. An inmate may appeal a grievance restriction and/or a grievance restriction extension in accordance with **Subsections B. & C. below**.

8. If the Facility Manager/designee determines during the grievance restriction review that the inmate has not submitted five frivolous grievances, the inmate may be removed from grievance restriction. The Regional Deputy Secretary and the SOIGA shall be notified that the restriction was lifted.

9. A prior grievance that was rejected cannot be used towards the number of five frivolous grievances when placing an inmate on grievance restriction. A grievance must be found frivolous in order to be used toward placement on grievance restriction.

10. If an inmate files one or more frivolous grievances while on grievance restriction, the Facility Manager may request an additional 30-day period of restriction through the Regional Deputy Secretary. A copy of the request shall be forwarded to the SOIGA for tracking purposes.

    NOTE: An inmate placed on grievance restriction extension shall be notified via the **Grievance Restriction Extension Notice (Attachment 3-B)** and he/she may file no more than one grievance each 15 working days.

11. A grievance restriction or grievance restriction extension issued at one facility will be continued if the inmate is transferred to another facility.

12. ***A grievance restriction/extension may be suspended if an inmate is sent on an Authorized Temporary Absence (ATA)/Temporary Transfer (TT) for an extended period of time.***

**B. Appeal to Facility Manager**

1. Inmate Responsibilities

    a. An inmate may appeal a grievance restriction or grievance restriction extension, to the Facility Manager in writing, within 15 working days from the date of the notice of a grievance restriction or grievance restriction extension.

    b. The **Grievance Restriction Notice** or **Grievance Restriction Extension Notice** must be received by the inmate before any appeal to the Facility Manager can be sought.

    c. Only the placement on grievance restriction or grievance restriction extension can be appealed.

    d. Each appeal must be clearly labeled as an appeal at the top of the document. The text of an appeal must be legible, understandable and presented in a courteous manner. The statement of facts must not exceed two pages, must contain reason(s) for the appeal and must be handwritten or typed on writing paper (two one-sided or one double-sided 8 ½" x 11" page), or may be submitted on the **Appeal to the Facility Manager Form** (refer to **Section 2** of this procedures manual).

2. Staff Responsibilities

   a. The appeal must be addressed by the Facility Manager/designee.

   b. A time extension for filing a grievance will be considered on a case-by-case basis. The inmate must notify the Facility Grievance Coordinator of the delay. The Facility Grievance Coordinator will consider the reason given and also consider if the delay was caused by:

      (1) a Temporary Transfer (TT) from the facility where the grievance should have been filed;

      (2) a permanent transfer to another facility from the facility where the grievance should have been filed;

      (3) ATA for an extended period;

      (4) another delay with mail delivery; or

      (5) any other reason the Facility Grievance Coordinator deems appropriate.

      NOTE: If it is determined that a delay was caused by a circumstance listed above, a reasonable extension of time for filing shall be permitted.

   c. The Facility Manager/designee shall notify the inmate using the **Facility Manager's Appeal Response** (refer to **Section 2** of this procedures manual) within 15 working days of receiving the appeal.

      (1) A brief statement of the reason(s) for the decision must be included.

      (2) Alternatively, the Facility Manager/designee may overturn the grievance restriction placement.

## C. Appeal to Final Review

1. Inmate Responsibilities

   a. The decision from the appeal to the Facility Manager must be received by the inmate before an appeal to Final Review can be sought.

   b. Any inmate who is dissatisfied with the disposition of an appeal from the Facility Manager may submit an **Inmate Appeal to Final Review Form** (refer to **Section 2** of this procedures manual) within 15 working days from the date of the Facility Manager/designee's decision). Only issues related to the placement of grievance restriction or grievance restriction extension may be appealed to Final Review.

c.  A time extension for filing a grievance will be considered on a case-by-case basis. The inmate must notify the Facility Grievance Coordinator of the reason for the delay. The Facility Grievance Coordinator will consider the reason given and also consider if the delay was caused by:

(1)  a temporary transfer from the facility where the grievance should have been filed;

(2)  a permanent transfer to another facility from the facility where the grievance should have been filed;

(3)  ATA for an extended period; or

(4)  another delay with mail delivery.

NOTE: If it is determined that a delay was caused by a circumstance listed above, a reasonable extension of time for filing shall be permitted.

d.  An appeal to Final Review will not be permitted until the inmate has complied with all procedures established for grievance restriction or grievance restriction extension in accordance with **Subsections A. and B. above**.

e.  The text of an appeal to the SOIGA must be legible, understandable and presented in a courteous manner. The statement of facts must not exceed two pages, and must be handwritten or typed on writing paper (two one-sided or one double-sided 8 ½" x 11" page), or may be submitted on the **Inmate Appeal to Final Review Form** (refer to **Section 2** of this procedures manual).

f.  The appeal must contain a reason for appealing the Facility Manager/designee's decision.

g.  Every appeal to Final Review must be addressed to the following:

Chief, Secretary's Office of Inmate Grievances and Appeals
Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

NOTE: Failure to properly address the appeal will delay the process.

h.  An inmate appealing a grievance restriction or grievance restriction extension to Final Review is responsible for providing the SOIGA with all required documentation relevant to the appeal. This appeal paperwork must include:

(1)  a copy of the written notice of placement on grievance restriction or grievance restriction extension from the Facility Grievance Coordinator;

(2) the appeal of the grievance restriction or grievance restriction extension placement to the Facility Manager;

(3) the Facility Manager/designee's Response; and

(4) a written appeal to the SOIGA.

NOTE: The copies of the grievance restriction notice or grievance restriction extension and the Facility Manager/designee's Response cannot be handwritten. Failure to provide any of the documentation noted above may result in the appeal being dismissed.

i. An indigent inmate as defined in Department policy **DC-ADM 803, "Inmate Mail and Incoming Publications,"** will be afforded copy service and legal postage up to a maximum of $10.00 per month and all money received in the inmate's account shall be used to pay for the cost of the copies and legal postage. A non-indigent inmate will incur copying charges in accordance with Department policy **3.1.1, "Fiscal Administration."**

j. Any documentation submitted in support of a grievance restriction or grievance restriction extension appeal will become part of the official record and will not be returned. The inmate should make copies of supporting documents, including facility documents, prior to submission to Final Review.

2. Staff Responsibilities

a. The SOIGA will ensure that:

(1) an appeal to Final Review is responded to within 30 working days of receipt unless otherwise extended;

(2) the Chief of SOIGA may authorize an extension of up to 10 additional working days if the investigation of the appeal is ongoing. If an extension is necessary, the inmate shall be advised in writing. This may be done using the **Extension Form** (refer to **Section 1** of this procedures manual).

b. SOIGA will review the **Grievance Restriction Notice** or **Grievance Restriction Extension Notice**, the **Appeal to Facility Manager**, **Facility Manager/Designee's Response** and the **Appeal to Final Review**.

c. Upon completion of the review, SOIGA will respond directly to the inmate in all cases using the **Final Appeal Decision** or **Final Appeal Decision Dismiss** (refer to **Section 2** of this procedures manual). If the inmate is released/paroled, he/she must provide a forwarding address to SOIGA. SOIGA will forward the Final Review response to the address provided or, if no address is provided, to the last address of record for the inmate.

d. SOIGA will issue a decision with one of the following dispositions: Uphold Response, Uphold Inmate, Dismiss, or Uphold in Part/Deny in Part. The Chief/designee, SOIGA, shall notify the inmate and the Facility Manager of the decision and rationale.

e. The Chief, SOIGA, in consultation with the Secretary, shall take any action deemed necessary to ensure the integrity of this policy. This includes, but is not limited to:

   (1) prohibiting the transfer of an inmate until the grievance procedure has been completed, including the appeal process; and

   (2) lifting a previously imposed grievance restriction.

f. The Chief/designee, SOIGA/designee shall notify the Facility Manager in those cases where the suspension of an inmate’s transfer is being considered pending the disposition of the appeal process.

g. If an inmate who has filed a grievance is transferred prior to the appeal process being completed, the inmate may continue to pursue the grievance or appeal by notifying the Facility Manager of the facility where the grievance was originally filed. Adjustments shall be made to the various time limitations in order to allow for review.

**Automated Inmate Grievance Tracking System** – A computerized system maintained by the Secretary's Office of Inmate Grievances and Appeals designed to store and retrieve data and trends pertaining to the Inmate Grievance System.

**Appeal to Facility Manager** – The second step of the formal Initial Grievance process during which the Facility Manager/designee reviews the decision of the Grievance Officer.

**Chief, Secretary's Office of Inmate Grievances and Appeals** – A management level employee assigned to the Secretary's Office of Inmate Grievance and Appeals by the Secretary to oversee the inmate grievance and appeal process, train field staff, and respond to appeals.

**Courteous Manner** – The grievance and/or appeal should be written without the use of abusive language, profanities, name calling, etc.

**Department** – The Pennsylvania Department of Corrections.

**Facility Grievance Coordinator** – The Corrections Superintendents Assistant (CSA)/designee in a facility, or a Community Corrections Regional Director/designee, who is responsible for the overall administration of the Inmate Grievance System in that facility/region. This includes determining whether the grievance was filed in compliance with the policy, as well as the data collection, tracking, and statistical reporting.

**Facility Manager** – The Superintendent of a State Correctional Facility, State Regional Correctional Facility, or Motivational Boot Camp, Director of a Community Corrections Center or the Director of the Training Academy.

**Final Review** – The third step of the formal Initial Grievance process during which the Secretary's Office of Inmate Grievances and Appeals reviews the decision of the Facility Manager/designee.

**Frivolous Grievance** – A grievance is frivolous when it is found that the allegations or the relief sought lack any arguable basis in law, fact and/or policy.

**Grievance** – A formal written complaint by an inmate related to a problem encountered during the course of his/her confinement.

**Grievance Rejection Form** – The form used to return a grievance to an inmate when the grievance is not in compliance with this procedures manual.

**Grievance Officer** – An appropriate Department Head or management level staff person designated by the Facility Grievance Coordinator to provide initial review of an inmate grievance arising from his/her specific area of responsibility (a Unit Manager would be assigned to provide initial review of a grievance regarding a housing unit).

**Grievance Restriction** – A limitation on the number and frequency of grievances an inmate may file.

**Initial Review** – The first step of the Initial Grievance process during which a Grievance Officer reviews an inmate grievance.

**Retaliation** – An act of vengeance or threat of action against an inmate or staff in response to an inmate complaint of a problem. Examples include, but are not limited to, unnecessary discipline, intimidation, unnecessary changes in work or program assignments, unjustified transfers or placements, unjustified denials of privileges and services.

**Secretary** – The Secretary of the Department of Corrections.

**Secretary's Office of Inmate Grievances and Appeals (SOIGA)** – The office responsible for review and disposition of all appeals to Final Review arising under this policy.

**Working Days** – For the purposes of this policy, working days are Monday through Friday, excluding state holidays.

IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Roy Lee Williams, | : | |
| v. | : | 2:21-cv-0124-ER |
| John E. Wetzel, et al. | : | § 1983 Civil Rights, ADA |

## Plaintiff's Affidavit

I, Roy Lee Williams, do hereby affirm, subject to the penalties of 28 U.S.C. § 1746, that the following is true:

I am aware that, sometime in 2018, SCI Greene drafted a local policy aimed at beginning to reform operation of the Capital Case Unit. The implementation of that policy, however, was slow and uneven. Many of the reforms existed on paper only.

Unit staff still operated under the dictates of DOC policy 6.5.8. (which was effective until December 2019); they argued that 6.5.8. controlled over local policy.

Furthermore, I was excluded from correctional services and programs until *at least* January 3, 2022, when SCI Phoenix began permitting capital status prisoners access to the facility gym, chapel, library, etc.

Respectfully submitted,

R. L. Williams
**Roy Lee Williams, plaintiff**

March 10, 2022
**Date**

**Certificate of Service**
I hereby certify that I have served the foregoing affidavit on counsel for the defendants via first-class U.S. Mail:
Kathy Le, Esq., 1600 Arch St., 3rd Floor, Philadelphia, PA 19103.

IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Roy Lee Williams,** Plaintiffs, v. | ♦ | Hon. Eduardo Robreno |
| **John Wetzel**, *et al.*, Defendants. | ♦ | No. 2:21-CV-01248 § 1983 Civil Rights Action |

## Motion to Supplement

COMES NOW, Plaintiff Roy Lee Williams, seeking leave to supplement his Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment.

At the time the plaintiff was drafting his memorandum, he was awaiting review of his DOC medical/mental health records with his criminal attorneys. Plaintiff did subsequently review his records in-person. He flagged certain records, and a summary of those records was drafted. Unfortunately, because of a mailing error, the document itself was heavily delayed.

Plaintiff seeks to attach it now, to be considered in conjunction with his memorandum in opposition. *See* exhibit A. This document shows that the defendants were aware of plaintiff's history of mental health disabilities.

R. L. Williams — 4-18-2022

**Roy Lee Williams**
SCI Phoenix, #CF4784
1200 Mokychic Drive
Collegeville, PA 19426

**Date**

**Certificate of Service**

I hereby certify that I have served this motion on counsel for the defendants via first-class U.S. Mail, on the date indicated above:
Kathy Le, Esq., 1600 Arch St., 3d Floor, Phila., PA 19103

**FEDERAL COMMUNITY DEFENDER OFFICE**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

***Capital Habeas Unit***

FEDERAL COURT DIVISION - DEFENDER ASSOCIATION OF PHILADELPHIA

SUITE 545 WEST -- THE CURTIS CENTER
601 WALNUT STREET
PHILADELPHIA, PA 19106

***LEIGH M. SKIPPER***
CHIEF FEDERAL DEFENDER

PHONE NUMBER (215) 928-0520
FAX NUMBER (215) 928-0826
FAX NUMBER (215) 928-3508

***HELEN A. MARINO***
FIRST ASSISTANT FEDERAL DEFENDER

March 28, 2022

****<u>LEGAL MAIL</u>****

Roy Williams CF-4784
SCI Greene
175 Progress Drive
Waynesburg, Pa 15370

Dear Roy,

Hope you are well. I have attached a summary of the psychiatric records that we reviewed during our last visit.

Take care,

*Jahaan Shaheed*

Jahaan Shaheed, Esq.

Encls.

Record: SCI Graterford, Progress Note, date July 5, 1996
- Referred to psych for fashioning a noose in order to commit suicide
- Required intensive observation
- Transferred to the hard cell where he "finally stated" that he intended to manipulate the system to be in the MHU for telephone calls
- Not depressed
- May be seen on a p.r.n. basis while on J Block

Record: SCI Graterford, Initial Psychiatric Evaluation, dated January 29, 1996
- Referred to psychiatrist based on "depression and anxiety" on December 30, 1995
- Patient says that his psych history is limited to visits to the PPC when he was 13
- Since 13, patient has no psychiatric history and mental hospitalizations
- Presented no mental decompensation or emotional problems
- Placed on p.r.n. status

Record: SCI Graterford, Progress Note, dated July 3, 1996
- Notified C.O.s of voices telling him to kill himself
- Admits to fashioning a noose and hiding it behind blanket of cell
- Prozac was offered but patient declined
- Placed in hard cell in paper gown and indestructible mattress
- Patient requested a therapist
- Referred to psych department
- Suicidal ideation must be taken seriously if for no other reason than he verbalizes it
- Noose was found on J Block indiciated that patient may well have suicided but called for help

Record: Progress Notes, dated 8/8/02
- Past psychiatric history includes court ordered psychiatric treatment and an evaluation at 11 years old, 1996 evaluation at SCI Graterford for hallucination and suicidal ideation which later was perceived as "manipulation," no suicide attempts in past, no psychiatric admissions in past
- Seems worried and anxious



SCI- Phoenix
Name Roy Lee Williams
Number CF 4784
1200 MOKYCHIC DRIVE
Collegeville PA 19426
LEGAL MAIL
RECEIVED
APR 20 2022
PA DEPARTMENT OF CORRECTIONS INMATE MAIL
neopost
04/18/2022
US POSTAGE $000.53
ZIP 19426
Kate Barkman, Clerk
James A. Byrne
Federal Courthouse
Rm 2609
Phila, PA 19106-1797
U.S.M.S.
R.A.