

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*     *Washington, D.C. 20035*

March 27, 1995

The Honorable Fob James
Governor
State of Alabama
Alabama State Capitol
600 Dexter Avenue
Montgomery, AL 36130

Re: <u>Notice of Findings from Investigation of Easterling Correctional Facility</u>

Dear Governor Folsom:

On March 29, 1994, we notified your office of our intent to investigate the Easterling Correctional Facility (Easterling) pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 <u>et seq</u>. Pursuant to statutory requirements, we are now writing you to advise you of our findings from this investigation. To the extent permitted by their attorneys, state officials assisted us throughout much of our investigation, and we thank them for their cooperation.

Our investigation of the Easterling Correctional Facility consisted of two three-day tours in June and July, 1994, one conducted by a medical consultant and another conducted by a penologist. During the course of the investigation, we examined numerous documents on-site, interviewed staff and inmates, and examined the physical facilities.

We have enclosed our consultant reports with this letter. Our consultants had a number of favorable comments regarding the facility and its operations. The prison is well-ordered, and inmates spend much of their time doing productive work. The facility is generally clean, new, and adequately equipped. Staff members seem professional and well-trained. Nevertheless, we found significant constitutional violations in two major areas. <u>See</u>, <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991). The major deficiencies found are outlined below.



- 2 -

## I. INMATES ARE DENIED ADEQUATE MEDICAL CARE

Easterling's current medical policies and practices deny inmates timely access to medical care.

Sick call is conducted in the middle of the night, from 12:30 a.m. to 3:00 a.m. Sick call reportedly often begins later than scheduled, and ends earlier than scheduled as well. Inmates may have to wait in line for hours only to be turned away without being examined. Even if a sick call nurse clears an inmate to see a physician, the inmate normally cannot see the physician until the next morning. There are no doctors or R.N.'s assigned to the 11:00 p.m. to 7:00 a.m. shift, so L.P.N.'s must conduct sick call. L.P.N.'s possess only one year of training, and they are not qualified to handle the subtle clinical judgments, triaging, and infirmary management duties which they are being asked to handle. If a physician does eventually see an inmate, the inmate often has trouble getting necessary follow-up care, because there is no way to schedule an additional appointment with the doctor except through the cumbersome sick call process.

Our medical consultant found many significant problems with the pill call procedure as well. For example, the pill line is exposed to the elements, so any sick inmate who needs medication has to stand for extended periods of time exposed to the heat, sun, rain, and cold. Inmates generally cannot go inside during pill call, even if all they want to do is eat their lunch or use the bathroom, because they might lose their place in the long, slow-moving line. Patients with crutches, canes, or swollen ankles have to stand in line just as those who are completely ambulatory. The medical staff dispensing the medications rarely communicate with the patients. Thus, the inmates often do not know what type of medication they have received, and the inmates cannot discuss problems with the staff when special circumstances arise.

Easterling does not provide over-the-counter (OTC) medications to inmates except through the sick call/pill call process. Thus, sick call and pill call are overburdened with inmates who may have minor problems, while inmates with serious illnesses are denied prompt medical care. While the medical staff justify the OTC medications policy on the basis that it allows staff to screen all sick call inmates for more serious underlying illnesses, this justification lacks merit given the delays associated with the current system.

The Justice Department's medical consultant also found several other significant problems including: (1) a medical grievance process which allows the warden's office to answer confidential inmate medical complaints without providing feedback to supervising physicians; (2) inadequate assessment and management of asthma exacerbation, a serious medical condition;

- 3 -

(3) medically unsound disciplinary practices involving a "security bar" discussed in more detail below; (4) no routine physician evaluations of inmates with chronic care needs; (5) a five month waiting list for routine dental care; (6) safety deficiencies at the inmate trade school and work areas, including the failure to require first aid kits, goggles, and work shoes; (7) damaged and poor quality shoes and mattresses throughout the facility; and (8) the absence of physical therapy, as necessary.

II. <u>INMATES ARE BEING SUBJECTED TO INAPPROPRIATE DISCIPLINARY PRACTICES</u>

Inmates at Easterling who are tardy or refuse to work are handcuffed to a "security bar," called the "hitching pole" by inmates. The hitching pole consists of two horizontal "bars" of different heights. Recalcitrant inmates are shackled through rings along one of the hitching poles and forced to stand in one position for up to eight hours. The hitching pole policy is inappropriate and violates constitutional standards.

First, the hitching pole requires improper use of restraints and corporal punishment. While shackled to a security bar, inmates are in an extremely uncomfortable, stationary position, which allows very little movement for extended periods of time. Legal and professional standards mandate that restraints should only be used for medical, emergency or other special conditions. They should never be used as punishment. Practices of this sort cannot be justified no matter how many superficial safeguards exist.

Second, staff do not comply with even the minimal safeguards required by state policies regarding the hitching pole. For example, state officials claim that any inmate who agrees to return to work is immediately released from their shackles. This does not always appear to be the case. We were also told that inmates are allowed indoors whenever their work details return for lunch. However, based upon staff and prisoner interviews, our consultants learned that inmates are often forced to eat their lunches at the hitching pole, with their wrists handcuffed the entire period. Thus, while their cellmates get periodic relief from the elements, prisoners on the hitching pole do not. Inmates also complained about being placed on the bar arbitrarily and for reasons over which they had no control.

Third, inmates with medical conditions which prevent them from working can be placed on the hitching pole without medical clearances. The only medical safeguard associated with the hitching pole is an examination which takes place <u>after</u> an inmate has already been punished. Use of the hitching pole is potentially dangerous from a medical standpoint. Inmates with respiratory problems or prescription-related photosensitivity

- 4 -

could be seriously harmed by prolonged exposure to the elements under such adverse conditions.

III. <u>INMATES ARE NOT PROVIDED ADEQUATE CLOTHING OR SHOES</u>

The inmates at Easterling do not receive adequate clothing or work shoes. We observed inmates with shirts and trousers which were badly torn. Most inmates have only one set of clothing, and outer garments such as jackets are almost non-existent. The quality of the shoes is also poor. One inmate's boots even had exposed nails in the interior. The inmate wearing the shoes could not therefore rest his weight. Other inmates work in muddy fields with shoes which have partially detached soles.

<u>MINIMUM REMEDIAL MEASURES</u>

In order to bring Easterling up to constitutional standards, we recommend implementation of the remedial measures discussed in our consultant reports and which are summarized below.

I. <u>Medical care</u> -

A. Conduct sick call during evening hours. All sick call medical staff should be supervised by a qualified R.N., and provisions must exist for advanced scheduling of follow-up care and other medical services.

B. Conduct pill call in the dorms, or construct a building which meets all building codes to provide adequate shelter, toilet facilities, and seating to inmates waiting in line for their medication. Providing OTC's through the commissary for a reasonable fee may reduce some of the current delays in medical care.

C. Revise the grievance process so that all medical grievances are reviewed by the physician and responded to by medical staff.

D. Devise and implement policies to adequately assess patients for asthma exacerbation risks.

E. Provide chronic care patients with regular physician evaluations.

F. Provide inmates with prompt, routine, dental care.

G. Ensure that all inmates follow safety precautions in trade school and at work. Equip all classrooms with complete first aid kits, and periodically restock the kits.

- 5 -

II. <u>Disciplinary practices</u> - Cease use of the "security bar" or any other form of corporal punishment or improper restraint including, but not limited to: shackling inmates to fences, posts, rails, cell bars, or other stationary objects.

III. <u>Clothing, Shoes, Mattresses</u> - Ensure that all inmates have adequate clothing, sturdy shoes, and sanitary, fire-safe, standard, institutional mattresses. Ensure that such items are replaced when damaged or worn-out.

Pursuant to CRIPA, the Attorney General may initiate a lawsuit to correct deficiencies at an institution forty-nine days after appropriate local officials are notified of them. 42 U.S.C. § 1997b(a)(1). Therefore, we anticipate hearing from you before that date with any response you may have to our findings and a description of the specific steps you will take or have already taken to implement each of the minimum remedies set forth above and in our consultant reports. If you do not respond within the stated time period, we will consider initiating an action against your jurisdiction to remedy the unconstitutional conditions. We look forward to working with you and other County officials to resolve this matter in a reasonable and expeditious manner. If you or any member of your staff have any questions, please feel free to contact attorneys Andrew Barrick at (202) 514-6249 or Christopher Cheng at (202) 514-8892.

Sincerely,

Deval L. Patrick
Assistant Attorney General
Civil Rights Division

Enclosures

cc: The Honorable Jeff Sessions
    Attorney General
    State of Alabama

    David B. Byrne, Esquire

    Mr. Leslie H. Thompson
    Warden

    Charles Redding Pitt, Esquire
    United States Attorney

A Review of Medical Care
at Easterling Correctional Center

Clio, Alabama

June, 1994

Captured by the Third Circuit Libraries on 9/30/2024

2

## INTRODUCTION

The following report is a review of the health care services provided at the Easterling Correctional Center in Clio, Alabama. This report reflects observations made during a site visit June 27-29, 1994, at the request and with the guidance of the Special Litigation Section in the Division of Civil Rights for the United States Department of Justice.

The medical delivery system was evaluated by several methods: interviews with the patient care and support staff, interviews with correctional officials, direct observation of operations, a site tour, random and specific chart reviews, examination of policy and procedure documents, review of inmate grievance forms, confidential patient interviews, and discussions with small groups of inmates.

Appreciation is extended to the Warden Thompson who fully cooperated with this review, and had staff and inmates available for interviews. Additionally, Mr. Johnson, of the Alabama Department of Corrections was especially helpful and cooperative, and escorted our team during the entire visit. The medical staff was also completely available and helpful for our requests. And Dr. Sam Eichold of the Governor's Medical Advisory Committee for Prisons was cordial and helpful.

Submitted by:

*[signature]*

John May, MD
Cermak Health Services of Cook County

July 20, 1994

3

## OVERVIEW

Medical services are provided to Easterling Correctional Center (and all state prisons) through contract to Questcare, Inc. by the State of Alabama since November of 1991. Laura Ferrell, RN, Administrative Director of the Southern Region for Questcare, oversees five (5) prisons including Easterling. Medical care for the State Correctional System is overseen by the Clinical Director, Dr. George Lyrene, who visits Easterling approximately eight (8) hours each month and reviews clinical requests for off-site referrals. Dr. Lyrene is available 24-hours each day by pager for any emergencies and authorizations for emergency medical transfers. Dr. Guest is the primary physician provider for the institution. He works at Easterling Monday through Friday for several hours each morning, and then works at another State correctional unit, Ventress, each afternoon. In addition, the medical staff consists of 16 full time nurses: 2 Registered Nurses (RN) including the Director of Nursing (who is also on-call 24-hours each day), and 14 Licensed Practical Nurses (LPN). The staff also includes 1 psychiatrist who works 8 hours each week, 1 psychologist, 3 Dentists who work a total of 16 hours each week, 1 medical records clerk, and 1 unit secretary. Quality Assurance is performed by Mrs. Guest. The pharmacist is located in Birmingham with C.P.S.I., which is required to fill and deliver prescriptions within 24-hours.

Overall, many parts of medical care met minimal standards. I was particularly impressed with the dedication of Dr. Lyrene, but who seemed to be stretched over too many institutions. The staff including Dr. Guest, Ms. Ferrell, Ms. Shipman, and Ms. Johnson, also seemed dedicated to providing quality care. Furthermore, no deaths were reported at the institution. Most charts were in good order, and had complete documentation.

Significant problems, however, exist in at least four (4) areas of health care delivery; and several other conditions present less significant, yet notable, problems.

4

SIGNIFICANT PROBLEMS;

**1) Access to Sick Call**

a) Description:

If an inmate would like to see a health professional, he signs up in his housing unit. He will then be evaluated at the next sick call. (Emergencies as recognized by the security staff are supposed to be brought immediately to the health care unit.) The sick call operates the next morning from 12:30am to 3:00am. A security officer will wake inmates from sleep and announce that it is time for the sick call. Once at the health care unit, the patient will wait on a bench with the other patients until called. The sick call is operated by LPN's who register vital signs and assess the complaint. If the condition or symptoms requires a physician's evaluation as written in protocols, the patient will be asked to return to the physician's sick call later in the morning. Non-prescription medications can be dispensed by the LPN at that time.

b) Evaluation:

Although a mechanism exists for access to sick call, the reality is that the system is extremely inconvenient for the patients and consequently deters access to medical care. The operation of sick call during the early morning hours creates undo burden for sick patients. Some patients stated that they are waken up at 12:30am for the sick call, but often it does not begin until 1:30am. They claimed that if too many patients are waiting to be seen, and after waiting for several hours in the middle of the morning, they will be sent back without being examined and told to sign up again the next day. Additional comments included: "I try not to bother with it [sick call], because it is too difficult." "Too many people are trying to get to sick call, so I just try to avoid it."

During our visit of the early morning sick call, one patient (150591) was observed waiting who had sustained abrasions and injuries during a softball game the previous day. No one had allowed him to see medical personal immediately after the injury. He was told to sign up for sick call. Now he was waiting at 1:00am to have his wounds cleaned and examined. Another patient (172591) was attending sick call for the second time in a week to find a remedy for several sharp nails which were protruding inside of his State-issued shoes. During his previous sick call visit, he was told to notify an officer to repair his shoes. He was unable to find anyone who would listen to his concern, so he decided to try again at the early morning sick call.

This arrangement is unacceptable because it requires an extraordinary effort on behalf of a patient, who might be

5

quite ill, to access medical care. We were told that the schedule of early morning sick call hours is to accommodate those who might be working or involved in other activities during the daytime. Another motivation however behind this scheduling, as Ms. Ferrell admitted, is the belief that a daytime sick call would be too busy and therefore would "make our jobs too difficult." If indeed, a daytime sick call resulted in more patients seeking care, then it would be the responsibility of the institution to provide more staff.

Another problem with this arrangement is the availability of only LPNs during sick call. This is addressed in a later section.

   c) Recommendation:

   Improve access to sick call by operating it during daytime or early evening hours.


2) Operation of the "pill call"

   a) Description:

   The medication delivery system is through a process named "pill call" in which all patients receive their medications through a single window on a dose-by-dose basis. The window operates 4:00am-5:00am, 11:30am-12:30pm, 4:30pm-5:30pm, and 9:00pm-9:30pm. The window is operated by LPNs who page through a binder to find the patient's medication profile card, then locate a drawer which contains the patient's medications, place the proper dose of medications into a paper cup, pass the cup to the patient, and sign-off on the patient's medication profile card that the medication has been given.

   b) Evaluation:

   Because of the large number of patients prescribed medications, and several other barriers, the existence of a single site for medication distribution forces patients to expend exceptional effort and motivation to receive medications. The "pill call" system was one of the most consistent and urgent complaints cited by most inmates. Some of the problems as stated by the inmates include:

-The window often opens late and closes early.
-The line is extremely long and slow-moving.
-They stand outdoors, unprotected from the heat, sun, rain, or cold, waiting for their medication.
-No toilet facility is available while they wait (and if they leave the area to use a toilet, they will loose their place in line).

6

- They sometimes must miss lunch or other meals or activities in order to receive their medications.
- They are waken up at 3:00am for the 4:30am pill call line.
- One day "pill call" was canceled with no explanation.
- Medications which are to be taken only once daily are offered at only during one specific "pill call" session, with no flexibility for alternative dosing times.
- The persons dispensing the medications rarely communicate with the patients, hence they have difficulty describing special circumstances. (E.g., some patients claimed that they have been given the wrong medications, but were not given the opportunity to discuss the error with the persons in the window)
- Distribution of ointments or creams is by squeezing a tube into a paper cup to be applied as a dose (and yet some require more).
- Medication prescriptions written "as needed" are given whether they are wanted or not.
- Rarely is a security officer present to keep order while patients wait in the line.
- Patients with crutches, canes, painful or swollen ankles, etc. must stand in the line just as those completely ambulatory.

Furthermore, additional problems observed with the "pill call" system were observed:

- The medications are given to the patients without labels or verbal identification of each pill, so that few patients could state the name or dose of their medication.
- If a patient misses a dose of medications, a mark is made on his medication profile card to indicate that he was absent. If several of these absent marks appear in a row, the LPN supposedly notifies the sick call staff. Although this system exists, no one could describe or explain it with certainty, suggesting that it does not function very well.
- For one patient (120513), a prescribed medication which was non-formulary had not been delivered from the pharmacy, so it was marked as missing each day on the patient medication card, yet no one took the initiative to investigate the reason it was missing.

As a consequence of all of the above problems, many patients do not receive medications. For many the process is too formidable or, despite their best efforts, they are unable to receive medications. Unfortunately, many of these patients are mislabeled as "non-compliant" and uninterested in their medical care which is not the case.

c) Recommendation:

- Improve the system of medication distribution by any of several different options:

7

>       -additional "pill call" windows and
>        expanded hours
>       -adopt a "keep-on-person" system where
>        patients
>        can keep a 7-day or more supply of medication
>       -distribute medications in each housing unit

-Provide shelter and toilet facilities for those waiting in line.

-Improve communication between patients and those distributing medication.
-Establish clear policies for patients who miss medication doses or for whom medications have not arrived from the pharmacy.

### 3) Availability of Non-prescription Medications

a) Description:

No over-the-counter medications (such as cold remedies or pain relievers) are available to inmates except through the sick call. Consequently, each time an inmate has a minor problem, he must enter the cumbersome sick call and "pill call" process.

b)   Evaluation:

By denying inmates the opportunity to obtain (either by purchase or free distribution) simple over-the-counter medications, an extra burden is placed on the sick call and "pill call" systems. The time and resources could be better spent treating more serious ailments. It is also an unreasonable burden for the inmate. For example, if he developed a headache in the morning, he would have to sign up for sick call, and then wait until sometime early the following morning to receive something for pain relief. Dr. Lyrene explained that this system allows the staff to screen for more serious underlying illnesses that might be signalled by the symptom. While this is laudable, unless the evaluation can be done within an appropriate time, it is not practical. Other mechanisms should be established to screen for serious illnesses or alert the medical staff if someone is using too many over-the-counter preparations.

c)   Recommendation:

Allow non-prescription medications (such as acetaminophen, decongestants, antihistamines, antifungal creams, etc.) to be available for the inmates' use, either by purchase at the commissary, or through a correctional officer or medical staff in each housing unit.

8

### 4) LPN Coverage

a) Description:

While the daytime shifts have a physician or RN on shift, the 11:00pm-7:00am shift is covered only by LPNs. These LPNs are required to conduct the sick call, manage the infirmary, and respond to emergencies. The Director of Nursing (an RN) and a physician are available by telephone if necessary.

b) Evaluation:

The LPNs observed during the night shift appeared competent, concerned, and committed. The potential exists, however, for problems with this arrangement. An LPN has only one year training. LPNs do not receive adequate training for subtle clinical judgements, triaging, and management of an infirmary; yet this is what they are being asked to do. LPNs should not make independent assessments without an RN or professional of similar training. Most institutions have health professionals at the level of RN or more to manage the sick call or infirmary.

Two cases were reviewed which suggested that a nurse's assessment might have been incorrect. One involved a patient who sustained a laceration on the ventral surface of his finger. The nurse reported the wound as being 1/4" thick, and treated it with steri-strips. In actually, the wound was deep enough to cause apparent tendon damage, because now the patient has limited flexion ability of the finger. Another case involved a patient with right-sided abdominal pain. A nurse admitted him overnight to the infirmary. The next morning, upon the physician's assessment, the patient was sent to the hospital where he was treated for a perforated appendix. It is unclear whether earlier intervention would have prevented the perforation, however the case illustrates the potential for such events.

c) Recommendations:

LPNs should not be left alone to manage the health care unit or manage sick call or the infirmary.

### OTHER DEFICIENCIES:

### 1) Grievance forms

a) Description:

If inmates file a grievance regarding their medical care, the response is written by the Warden or Warden's assistant. The

information is obtained through communication (it is unclear if it is written or verbal) between the Warden and the Director of Nursing.

b)  Evaluation:

This process is problematic for several reasons. For one, the primary care physician is seldom aware of any grievances or special concerns from patients which might be legitimate. For example, in one grievance, a patient (122446) passionately wrote that he could not take the full insulin dose which was prescribed for fear of a hypoglycemic (low glucose) reaction. He wrote that he was being forced to take that dose or face the consequences of not complying with medical care. The Warden responded by saying that he was told: "if you do not take all of your insulin and continue to squirt some of it out, that there would be no way to accurately evaluate your insulin coverage and adjust it." Upon the reviewing the chart, the patient was indeed having several low glucose levels. It would have been helpful for this information to have been conveyed to the physician.

Another problem with this process is that the confidentiality of the patient is violated when the Warden's office becomes aware of communication between the patient and medical staff.

Finally, despite the completeness of some of the responses from the Warden's office, it is more appropriate for a complaint about medical care to be answered by a medical professional.

2) Asthma documentation

a)  Description:

Persons entering the health care unit with an exacerbation of asthma are triaged with vital signs and inconsistent physical assessments. A Peak Expiratory Flow Rate (PEFR) is not routinely performed.

b)  Evaluation:

An asthma exacerbation is one of the most serious and threatening medical emergencies. With proper management, most cases are reversible. Part of that management, however, include proper assessment. One of the quickest and most helpful tools for assessing an asthma exacerbation is the PEFR. In most charts reviewed with exacerbations of asthma, a PEFR was not recorded. Vital signs were frequently recorded, but in some cases auscultation of the lungs was not even documented. In reviewing the asthma cases (e.g. 111633), it was difficult to determine the severity of the event, except perhaps by noting the extent of the treatment. It is unclear how a physician, who might be giving

10

treatment orders via the telephone in an emergency, is making decisions based on the level of assessment in the chart.

3)   "Security bar"

a)   Description:

Inmates who refuse to work for various reasons are put on a "security bar" (called the "hitching pole" by the inmates) until they agree to work. Two bars exist to accommodate the different heights of inmates. The inmate is handcuffed by both wrists to a horizontal bar at mid-chest level. His feet are also shackled together. The inmate remains in the standing position at the bar for up to four hours (as claimed by security officers, although inmates stated that some are at the bar for 8 hours). The inmate is offered water each 15 minutes, and offered the opportunity to use a toilet when necessary. Security states that the inmate is released to eat a meal, but none of the inmates stated that this was the case, and instead insist that they eat standing up with their wrists cuffed. The bar is in the open air, not protected from the sun, heat, or rain. After being taken off the bar, the inmate is brought to the health care unit for an assessment, usually in the form of a "Body Chart" which would document any injuries.

b)   Evaluation:

No evidence was found that a serious medical problem developed as the result of an inmate being at the security bar. Nevertheless, it was significant that neither Dr. Lyrene nor Dr. Guest knew that the bar existed. ("What is that, some type of torture device?" said Dr. Guest.) Some "Body Charts" (e.g. 126574) of inmates who were on the bar were reviewed. Most charts were signed by a nurse, and none noted a significant problem.

It must be stated, however, that a potential exists for significant medical problems resulting from time at the bar. The most serious consequences would be for individuals who have compromised health, such as individuals with significant respiratory disorders. Certainly, the potential for heat stroke, heat exhaustion, or sunburns exists. Serious photosensitivity reactions might occur with individuals who are taking certain medications with that side-effect profile (such as some antipsychotics or antibiotics).

Medical screening before someone was place on the bar would be a conflict of medical ethics for the health care provider who would be contributing to a process that harms the patient. Medical screening after the bar is too late.

Captured by the Third Circuit Libraries on 9/30/2024

11

c)  Recommendation

Abandon the "security bar" process.

4)  **Chronic Care Clinics**

a)  Description:

Patients with chronic medical conditions, such as hypertension, epilepsy, or diabetes, are assigned to regular appointments in the chronic care clinic. The clinic is operated by an RN (Ms. Johnson) who follows a flow sheet which charts clinical progress. As per the protocol each illness, patients should also be periodically seen by a physician.

b)  Evaluation:

It was poorly documented in many charts whether a physician actually evaluated the patients during the chronic care clinic. Although the nursing notes were co-signed by the physician, an independent evaluation by a physician was often missing even though the protocol periodically requires it.

c)  Recommendation:

Insure that a mechanism exists for patients who attend the chronic care clinic have periodic evaluations by a physician.

5)  **Dental Services**

a)  Description:

Full dental services are provided three days each week (but not full days) by three rotating dentists with one fully-equipped dental chair.

b)  Evaluation:

Because only one dentist works at a time (only one dental chair), routine dental care is delayed. Many inmates complained of the long wait for procedures such as teeth cleaning or items such as dentures. During this site visit, the waiting list was five (5) months.

c)  Recommendation:

Reduce the waiting list for routine dental care.

12

6) Follow-up for Sick Call

a)   Description:

Since patients who are seen in physician's sick call were referred from the nursing sick call several hours earlier, no system for advanced scheduling exists.

b)   Evaluation:

Often patients who are treated for an acute complaint (as which might occur in the physician's sick call) should have a follow-up evaluation. The present system requires the patient to initiate the return visit, or for the physician to make a special memory note to see the patient again, both of which increase the potential that the patient might miss the follow-up evaluation.

c)   Recommendation:

A written, advanced scheduling system for sick call would reduce the potential for patients to miss follow-up evaluations.

7) Safety Precautions in Worker and Industry Areas

a)   Description:

Many inmates work in the Trade School learning things such as paint making, wood working, and masonry. Although clean and orderly in appearance, many of these work environments have the potential for injuries. Despite the operation of electric saws, only one of approximately fifteen inmates in the wood working area was wearing safety goggles. The inmates admitted it was their choice not to wear the goggles. The work shoes for inmates were not protective against sharp object injuries. First aid kits were not readily in some of the areas.

b)   Evaluation:

Proper precautions to prevent injuries is very important. Inmates should be properly equipped and protected before being allowed to operate potentially hazardous machinery.

c)   Recommendations:

Improve the safety precautions in the work areas by insisting on proper use of safety goggles, safety boots, and easily accessible first aid kits.

13

8) Condition of Shoes and Other State-Issued Items

a) Description:

One of the most common complaints from the inmates was the poor quality of the State-issued shoes. Others complained about items such as bed mattresses.

b) Evaluation:

The shoes were of poor quality. Many had holes in the soles, ventilation was poor (except for the shoes with worn-out holes), and at least one pair had exposed nails inside the shoe. Several mattresses were also observed to be of poor quality, with tattered ends and torn covers.

c) Recommendation:

Improve the quality of State-issued items such as shoes and some mattresses.

9) Absence of Physical Therapy

a) Description:

No physical therapy program exists.

b) Evaluation:

At least two (2) patients (147466, 142605) might have benefitted from physical therapy, but none exists.

c) Recommendation:

Provide physical therapy as needed, or transfer those patients who require it to the appropriate setting.

**Internet Sources Cited in Opinions**

In order to preserve information for research purposes, websites cited in precedential and nonprecedential opinions for the United States Court of Appeals for the Third Circuit are captured when possible. Because some URLs cited in opinions may change over time or disappear altogether, an attempt is made to capture, as closely as possible, the material cited in an opinion at the time of its release. However, capture dates may not match the "as visited" date contained in an opinion's citation to that material. **Any use of captured website information is the sole responsibility of the user.**  All captured information is provided in good faith for research purposes. The Third Circuit Court of Appeals and its employees shall have no responsibility for the accuracy, content, completeness, legality, or reliability of captured information and cannot be held liable for any loss, damage, or expense which arises as a result of use. The content of a capture may be protected by copyright and/or related rights. Use of captured information may require permission from the rights holder(s).

