IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

**No. 22-2399**

_____

**ROY L. WILLIAMS,**

**Appellant,**

**v.**

**SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS,**

**Appellees.**

_____

**APPELLEES' PETITION FOR PANEL REHEARING OR, ALTERNATIVELY, FOR REHEARING *EN BANC***

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
ENTERED ON JULY 21, 2022

MICHELLE A. HENRY
*Attorney General*

Office of Attorney General          BY:    ANTHONY T. KOVALCHICK
1251 Waterfront Place                      *Deputy Attorney General*
Mezzanine Level
Pittsburgh, PA 15222                       SEAN A. KIRKPATRICK
Phone: (412) 565-2543                      *Chief Deputy Attorney General*
akovalchick@attorneygeneral.gov            *Appellate Litigation Section*

DATE: October 25, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

REASONS FOR GRANTING THE PETITION .......................................2

I.    THE PANEL MAJORITY IMPROPERLY USED A LETTER FROM THE
      DEPARTMENT OF JUSTICE TO DETERMINE WHEN AN ALLEGED
      CONSTITUTIONAL RIGHT WAS CLEARLY ESTABLISHED. ....................................2

      A.    The Panel Majority's Opinion Violates Longstanding
            Separation of Powers Principles and Undercuts our
            Constitutional Structure...........................................................2

      B.    Secretary Wetzel is Clearly Entitled to Qualified Immunity. ..............6

      C.    The Undisputed Evidentiary Record Further Supports Secretary
            Wetzel's Entitlement to Qualified Immunity. .....................................11

II.   THE DOC DID NOT VIOLATE TITLE II OF THE ADA........................................15

CERTIFICATE OF COUNSEL ...............................................................19

CERTIFICATE OF SERVICE ................................................................20

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ........................................................2

*Behrens v. Pelletier*, 516 U.S. 299, 306-307 (1996)................................................12

*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)................................15

*Carroll v. Carman*, 574 U.S. 13, 17-20 (2014) (*per curiam*)..................................14

*Clark v. Coupe*, 55 F.4th 167, 172-174, 182 (3d Cir. 2022) ..................... 10, 11, 14

*Commonwealth v. Williams*, 846 A.2d 105, 110-111 (Pa. 2004) ...........................13

*Davis v. Scherer*, 468 U.S. 183, 194, n. 12 (1984) ..................................................9

*Disability Rights New Jersey, Inc. v. Commissioner, New Jersey Dept. of Human Services*, 769 F.3d 293, 306 (3d Cir. 2015) ........................................................17

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ........................................................6

*Furgess v. Pennsylvania Dept. of Corrections*, 933 F.3d 285, 291-292 (3d Cir. 2019) ....................................................................................................................15

*Hope v. Pelzer*, 536 U.S. 730, 745 (2002) ...............................................................4

*Kisela v. Hughes*, 584 U.S. 100, 106-107 (2018) (*per curiam*)........................ 10, 14

*Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2257 (2024) .....................3

*Marbury v. Madison*, 1 Cranch 137, 177 2 L.Ed. 60 (1803) ................................2, 3

*Medellin v. Texas*, 552 U.S. 491, 523-532 (2008) ....................................................5

*Mullenix v. Luna*, 577 U.S. 7, 16 (2015) (*per curiam*) .............................................14

*Palakovic v. Wetzel*, 854 F.3d 209, 216, 225-229 (3d Cir. 2017) ............... 9, 10, 14

*Peterkin v. Jeffes*, 855 F.2d 1021, 1023-1033 (3d Cir. 1988).......................... 3, 4, 7

*Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) ......................................................14

*Porter v. Clark*, 923 F.3d 348 (4th Cir. 2019) ...................................................... 7-8

*Porter v. Pennsylvania Dept. of Corrections*, 974 F.3d 431, 450-451 (3d Cir. 2020)

...................................................................................... 1, 6, 7, 10, 11

*Procunier v. Navarette*, 434 U.S. 555, 562 (1978)....................................................5

*United States v. Nixon*, 418 U.S. 683, 704 (1974)................................................5, 6

*White v. Pauly*, 580 U.S. 73, 79 (2017) (*per curiam*)..............................................14

*Williams v. Secretary Pennsylvania Dept. of Corrections*, 848 F.3d 549, 558-570

(3d Cir. 2017)..........................................................................................9

*Williams v. Secretary Pennsylvania Dept. of Corrections*, No. 22-2399, 2024 WL

4262139, at *9, 12-13, 16, 18 (3d Cir. Sept. 20, 2024) ........................ 3, 6, 15, 16

*Williams v. Secretary Pennsylvania Dept. of Corrections*, No. 22-2399, 2024 WL

4262139, at *42-44 (3d Cir. Sept. 20, 2024) (Phipps, J., dissenting in part) .. 2, 4,

5, 7, 8

*Wilson v. Layne*, 526 U.S. 603, 618 (1999) .............................................................11

*Young v. Quinlan*, 960 F.2d 351, 354-355, 363-365 (3d Cir. 1992) .........................8

**Statutes**

42 Pa. C.S. §§ 9541 *et seq.* ........................................................................13

42 U.S.C. § 1997a(a) ....................................................................................7

42 U.S.C. § 1997a(c) ....................................................................................7

42 U.S.C. §§ 12131-12134 ...........................................................................1

# RULE 35.1 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the Panel's decision is contrary to decisions of the United States Court of Appeals for the Third Circuit and the Supreme Court of the United States, and that consideration by the full Court is necessary to secure and maintain uniformity of decisions in this Court, *i.e.*, the Panel's decision is contrary to *Porter v. Pennsylvania Dept. of Corrections*, 974 F.3d 431 (3d Cir. 2020).

This appeal also involves two questions of exceptional importance: *First*, whether former Secretary of Corrections John E. Wetzel is entitled to qualified immunity from suit for Eighth Amendment claims premised on the continuation of a preexisting policy requiring death-row inmates to be housed in solitary confinement; *Second*, whether a death-row inmate housed in solitary confinement pursuant to a standard policy can establish a violation of Title II of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12131-12134] without demonstrating that he was treated differently than nondisabled death-row inmates.

## REASONS FOR GRANTING THE PETITION

I.    THE PANEL MAJORITY IMPROPERLY USED A LETTER FROM THE DEPARTMENT OF JUSTICE TO DETERMINE WHEN AN ALLEGED CONSTITUTIONAL RIGHT WAS CLEARLY ESTABLISHED.

### A.    The Panel Majority's Opinion Violates Longstanding Separation of Powers Principles and Undercuts our Constitutional Structure.

It is axiomatic that, in order for a right to be "clearly established" for purposes of qualified immunity, "existing *precedent* must have placed the [relevant] statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added). For 220 years, it has been well understood that *the Judiciary*—not the Executive Branch—interprets our Constitution. *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803). Breaking with this longstanding precedent, "the Majority Opinion makes a grievous error offensive to basic principles of separation of powers" by elevating an opinion of an executive agency to that of binding precedent by a court. *Williams v. Secretary Pennsylvania Dept. of Corrections*, No. 22-2399, 2024 WL 4262139, at *43 (3d Cir. Sept. 20, 2024) (Phipps, J., dissenting in part). In so doing, the panel majority purports to bind the entirety of this Court to a novel methodology for determining when a constitutional violation is "clearly established" for qualified immunity purposes. In the words of Judge Phipps, this was "a big mistake." *Williams*, 2024 WL 4262139, at *43. The panel majority's supplanting of judicial authority fundamentally undercuts our constitutional structure.

2

As Judge Phipps explains in his dissent, "the Judiciary, not the Executive Branch, has the authority to announce binding interpretations of the Constitution." *Ibid.* Since *Marbury v. Madison*, it has been "emphatically the province and duty of the judicial department to say what the law is." 1 Cranch 137, 177. The legal opinions of the Executive Branch, after all, shift with each new administration. The Framers intentionally "structured the Constitution to allow judges to exercise th[eir] judgment independent of influence from the political branches[,]" so as to ensure the "steady, upright and impartial administration of the laws." *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2257 (2024) (quoting The Federalist No. 78 at 522 (A. Hamilton)). The panel majority's opinion undoes this foundational constitutional structure.

Recognizing that no existing case law placed the constitutional question at issue here beyond debate, the panel majority relied solely on a letter authored by the United States Department of Justice (DOJ) to hold that, as of 2014, Secretary Wetzel was personally on notice that the Eighth Amendment prohibited the Pennsylvania Department of Corrections (DOC) from housing mentally ill death-row inmates in solitary confinement. *Williams*, 2024 WL 4262139, at *12-13. And this was despite case law from *this Court* upholding the previously longstanding DOC policy. *See Peterkin v. Jeffes*, 855 F.2d 1021, 1023-1033 (3d Cir. 1988). Thus, the panel majority improperly allowed an agency letter to overrule this Court's prior judgment.

3

In justifying its reliance on an agency letter, the panel majority cited to language in *Hope v. Pelzer*, 536 U.S. 730 (2002), explaining that a DOJ letter warning Alabama prison officials that the Eighth Amendment prohibited them from handcuffing prisoners to hitching posts buttressed a prisoner's claim that his right to avoid such a restraint had been clearly established. *Williams*, 2024 WL 4262139, at *11-13. But the "obvious cruelty inherent in th[e] practice" challenged in *Hope* rendered the practice unconstitutional from the Eighth Amendment's inception. *Hope*, 536 U.S. at 745. The letter was used to illustrate why the unconstitutional practice challenged in that case had "*always* been cruel and unusual" under the Eighth Amendment. *Williams*, 2024 WL 4262139, at *44 (Phipps, J., dissenting in part) (emphasis in original).

In contrast, here the panel majority improperly used the 2014 DOJ letter to establish when a recent *change* to this Court's Eighth Amendment jurisprudence was clearly established. *Williams*, 2024 WL 4262139, at *12-13. Again, this Court had previously found the practice of housing death-row inmates in solitary confinement to be constitutional. *Peterkin*, 855 F.2d at 1023-1033. A letter from an executive agency simply cannot overrule this Court's interpretation of the Constitution if separation of powers is to have any meaning.

As Judge Phipps explained, the panel majority improperly used the DOJ letter in this case as a substitute for a judicial decision providing Secretary Wetzel "with

notice of the evolved nature of the Eighth Amendment's protections." *Williams*, 2024 WL 4262139, at *44 (Phipps, J., dissenting in part). That is not permissible. Even in areas where deference to executive decisionmaking is the norm, executive declarations or communications cannot control the outcome of judicial proceedings or otherwise usurp the authority of the other branches of government. *Medellin v. Texas*, 552 U.S. 491, 523-532 (2008). It follows *a fortiori* that such declarations or communications cannot be given controlling weight in determining the meaning of the Constitution, which is a core function of the Judiciary. The judicial power vested in Article III courts "can no more be shared with the Executive Branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto." *United States v. Nixon*, 418 U.S. 683, 704 (1974).

Simply put, again by Judge Phipps, the panel majority "misuses" the DOJ letter "in its efforts to defeat qualified immunity" in this case. *Williams*, 2024 WL 4262139, at *44 (Phipps, J., dissenting in part). And it improperly exposes Secretary Wetzel to personal liability for failing to "predict the future course of constitutional law" in this Circuit based on a letter by the DOJ. *Procunier v. Navarette*, 434 U.S. 555, 562 (1978). Our constitutional structure does not permit this. Because the panel majority's decision is "contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government"

established by the Constitution, it cannot be allowed to stand. *Nixon*, 418 U.S. at 704.

**B.    Secretary Wetzel is Clearly Entitled to Qualified Immunity.**

A prisoner bringing an Eighth Amendment claim must show that he or she was exposed to an objectively serious risk of harm, and that prison officials subjectively acted with deliberate indifference to his or her health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In *Porter v. Pennsylvania Dept. of Corrections*, 974 F.3d 431, 451 (3d Cir. 2020), this Court announced for the first time that "prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test" in cases involving death-row inmates.    Critically, however, because a death-row inmate's qualified right to avoid prolonged solitary confinement had *not* been clearly established prior to this 2020 decision, prison officials (including Secretary Wetzel) were shielded by qualified immunity. *Porter*, 974 F.3d at 450-451.

In this case, the panel majority disregarded *Porter* and incorrectly rejected Secretary Wetzel's defense of qualified immunity on the erroneous theory that the right of a death-row inmate "with a known preexisting mental illness not to be placed and held in prolonged solitary confinement" without an individualized "penological justification" had been "clearly established" during the relevant period of time. *Williams*, 2024 WL 4262139, at *9. That determination was premised on a letter that

6

the DOJ had sent to Governor Tom Corbett on February 24, 2014. As Judge Phipps correctly observed, however, this letter cannot serve as a substitute for binding precedent.[1] *Williams*, 2024 WL 4262139, at *43-44 (Phipps, J., dissenting in part). And no actual precedent existed during the period of time relevant to Roy Williams' Eighth Amendment claim against Secretary Wetzel.

Secretary Wetzel became the Secretary of Corrections in January 2011. Williams testified that the conditions underpinning his claims had ceased to exist on December 3, 2019.  JA098, JA101-JA102. Between January 2011 and December 2019, no decision of this Court or the Supreme Court "clearly established" the right of a death-row inmate to avoid being housed in solitary confinement in the absence of an individualized penological justification.  Indeed, in 1988, this Court specifically determined that no such right existed. *Peterkin*, 855 F.2d at 1023-1033.

Before this Court decided *Porter*, only one federal appellate court had held that the conditions experienced by death-row inmates housed in solitary confinement could satisfy the objective prong of an Eighth Amendment claim. *Porter*, 974 F.3d at 451 (citing the coincidentally captioned *Porter v. Clark*, 923 F.3d 348 (4th Cir.

---

[1] It is also worth noting that "findings letters" issued by the DOJ do not carry the force of law.  In order for a DOJ action to require a response, it must be commenced in a federal complaint. 42 U.S.C. § 1997a(a).  Interestingly, the relevant statutory provision requires the Attorney General to "personally sign any complaint" filed thereunder.  42 U.S.C. § 1997a(c).  That did not occur here.

2019)). But this Court explicitly found that "single out-of-circuit case" to be "insufficient to clearly establish a right" that could penetrate Secretary Wetzel's qualified immunity. *Ibid*. Thus, the District Court correctly determined that Williams' Eighth Amendment claim was foreclosed by this Court's decision in *Porter*, and that Secretary Wetzel was shielded by qualified immunity. JA030-JA032.

The decisions cited by the panel majority do not cast doubt on the District Court's decision. In *Young v. Quinlan*, 960 F.2d 351, 354-355, 363-365 (3d Cir. 1992), this Court held that a prisoner had raised a genuine issue of material fact concerning the constitutionality of his conditions of confinement by claiming that he had been placed in a "dry cell" (*i.e.*, a cell with no toilet and no running water) for four days as a punishment for intentionally clogging a toilet and flooding his cell. But that prisoner was not on death row. *Williams*, 2024 WL 4262139, at *42 (Phipps, J., dissenting in part) (observing that *Young* involved "a general population inmate" and "not a death-sentenced inmate"). Moreover, and more fundamentally, the prisoner in *Young* maintained that he had been denied opportunities to leave the dry cell to urinate and defecate, and that prison officials had refused to give him toilet paper, drinking water, and water to wash his hands before eating. *Young*, 960 F.2d at 363. Williams makes no such allegations here.

In *Williams v. Secretary Pennsylvania Dept. of Corrections*, 848 F.3d 549, 558-570 (3d Cir. 2017), this Court clarified that a prisoner whose death sentence has been vacated possesses a constitutionally-protected liberty interest in avoiding solitary confinement while he or she is waiting to be resentenced, and that meaningful and regular review of the relevant placement decision is required under the Due Process Clause of the Fourteenth Amendment. But Williams' death sentence has never been vacated. JA010. The holding in *Williams* did not put Secretary Wetzel on notice that it was unconstitutional to house prisoners with *active* death sentences in solitary confinement. Furthermore, the rule announced in *Williams* was not based on the Eighth Amendment. Instead, it was based solely on the Due Process Clause. *Williams*, 848 F.3d at 558-570. Because Williams' claim against Secretary Wetzel is based on a different constitutional provision, the earlier decision in *Williams* cannot provide a basis for penetrating Secretary Wetzel's qualified immunity in this case. *Davis v. Scherer*, 468 U.S. 183, 194, n. 12 (1984).

This Court's decision in *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), did not clearly establish the alleged right implicated in this case either. *Palakovic* involved a mentally ill prisoner who committed suicide after being repeatedly placed in solitary confinement. Based on allegations that the prisoner's mental impairments had been known to the relevant prison officials, and that those officials had denied the prisoner access to medical care that could have alleviated his symptoms, this

9

Court concluded that actionable Eighth Amendment claims had been stated in the complaint. *Palakovic*, 854 F.3d at 225-229. As both Judge Phipps and this Court in *Porter* correctly point out, however, the prisoner in *Palakovic* was not on death row, thereby rendering the holding in that case insufficient to "provide the requisite notice to defeat qualified immunity in this case." *Williams*, 2024 WL 4262139, at *42 (Phipps, J., dissenting in part); *Porter*, 974 F.3d at 450 (finding a death-row inmate's reliance on *Palakovic* to be "unavailing" because the prisoner in that case had not been on death row).

*Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022), of course, was decided after December 2019. Therefore, the holding in *Clark* could not have placed Secretary Wetzel on notice that it was unconstitutional to house a death-row inmate in solitary confinement without having an individualized penological justification for doing so. *Kisela v. Hughes*, 584 U.S. 100, 107 (2018) (*per curiam*) (observing that "a reasonable officer is not required to foresee judicial decisions that do not yet exist"). And while *Clark* addressed events that were alleged to have occurred in 2016, those events (like the events in *Young* and *Palakovic*) did not involve a death-row inmate. *Clark*, 55 F.4th at 173-174. For this reason, the earlier decisions underpinning the holding in *Clark* provide no basis for the majority's determination that Secretary Wetzel is not entitled to qualified immunity in this case. *Porter*, 974 F.3d at 450 ("Cases that challenge interpretation of death row policy and conditions on death

row are distinct from cases brought by inmates in general population subject to solitary confinement.").

\* \* \*

Before this Court decided *Porter* in 2020, no decision of this Court (or the Supreme Court) had recognized that a death-row inmate could satisfy the objective prong of an Eighth Amendment claim simply by demonstrating that he or she has been housed in solitary confinement. *Porter*, 974 F.3d at 451. It is fundamentally unfair to subject Secretary Wetzel to "money damages for picking the losing side of the controversy" simply because he continued a longstanding policy that ended in 2019. *Wilson v. Layne*, 526 U.S. 603, 618 (1999).

## C.   The Undisputed Evidentiary Record Further Supports Secretary Wetzel's Entitlement to Qualified Immunity.

In *Clark*, this Court declared that "the right of a prisoner known to be seriously mentally ill to not be placed in solitary confinement for an extended period of time by prison officials who were aware of, but disregarded, the risk of lasting harm posed by such conditions" had been clearly established by 2016. *Clark*, 55 F.4th at 173, 182. In this case, the majority clarified (for the *first* time) that the "clearly established right" recognized in *Clark* "extends to individuals on death row." *Williams*, 2024 WL 4262139, at \*15. But Williams did not fall within the parameters of this defined "right" even if it was "clearly established" before December 2019.

11

Because this matter comes before the Court on appeal from a decision granting the Secretary's motion for summary judgment, Secretary Wetzel's entitlement to qualified immunity must be judged on the evidentiary record (and not Williams' mere allegations). *Behrens v. Pelletier*, 516 U.S. 299, 306-307 (1996). Although Williams was hospitalized in 1979 for psychiatric reasons, he had "no psychiatric history" for the next sixteen years. JA294. Williams was committed to the DOC's custody in December 1993 and, according to his testimony, attempted suicide on July 3, 1996. JA099; JA113-JA114.  In order to protect Williams from self-harm, officials removed his clothes, dressed him in a paper gown, and placed him in a hard cell with an indestructible mattress. JA294. Williams remained in a psychiatric observation cell for two to three days. JA113-JA115.

Williams later told the attending mental health professionals that he had not really tried to kill himself, and that he had only been "faking" a suicide attempt in order to get out of his cell to make a telephone call. JA114. After refusing a prescription for Prozac, Williams stated that he did not need any medications and insisted that "nothing was wrong" with him. JA115. In a progress note dated July 5, 1996, a mental health professional reported that Williams was not depressed, and that he had merely "intended to manipulate the system" in order to be placed in the Mental Health Unit for telephone calls. JA294; ECF No. 28 at 3. From that point

forward, Williams did not seek mental health treatment or otherwise exhibit signs of mental illness. JA116.

In September 1996, Dr. Barry Crown and Dr. Robert Fox submitted declarations opining that Williams was suffering from a mental illness in order to support his request for relief under Pennsylvania's Post Conviction Relief Act (PCRA) [42 Pa. C.S. §§ 9541 *et seq.*]. But those opinions were specifically rebutted (and discredited) during the PCRA proceedings. *Commonwealth v. Williams*, 846 A.2d 105, 110-111 (Pa. 2004). In *this* case, the Capital Habeas Unit of the Federal Community Defender Office for the Eastern District of Pennsylvania supplemented the evidentiary record with a written summary of Williams' medical records. JA292-JA295. That summary confirmed that Williams had "no psychiatric history" between 1979 and 1995, that his suicidal conduct in 1996 had been regarded as an attempt to "manipulate the system" (because Williams himself had described it as such), and that the DOC had no indication that Williams was suffering from a mental illness at any time after 1996. JA294.

Of course, Secretary Wetzel did not take office until 2011. By that time, Williams had not exhibited *any* signs of mental illness for fifteen years. When Secretary Wetzel took office, Williams' medical records described his 1996 suicide attempt as a form of "manipulation" while stating that he had "no suicide attempts" in his past. JA294. Secretary Wetzel had no reason to believe that Williams was

13

mentally ill between 2011 and December 3, 2019. Thus, Williams was not comparable to the prisoner in *Palakovic*, who was on the "D" Roster and known to be suicidal, or to the prisoner in *Clark*, who had been diagnosed with manic depression and paranoid schizophrenia. *Palakovic*, 854 F.3d at 216; *Clark*, 55 F.4th at 172-174.

In cases involving qualified immunity, the Supreme Court has repeatedly—and with increasing asperity—instructed courts "not to define clearly established law at a high level of generality," "since doing so avoids the crucial question [as to] whether the [relevant] official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal quotation marks omitted); *see also White v. Pauly*, 580 U.S. 73, 79 (2017) (*per curiam*). The High Court has admonished lower courts for failing to heed these instructions and has summarily reversed them for improperly denying qualified immunity based on generalized principles. *See, e.g.*, *Kisela*, 584 U.S. at 106-107; *White*, 580 U.S. at 79-80; *Mullenix v. Luna*, 577 U.S. 7, 16 (2015) (*per curiam*); *Carroll v. Carman*, 574 U.S. 13, 17-20 (2014) (*per curiam*).

Given that Williams did not exhibit *any* signs of mental illness during Secretary Wetzel's tenure, it would not have been clear to Wetzel that the Eighth Amendment prohibited him from leaving Williams in solitary confinement because of his death sentence. *Mullenix*, 577 U.S. at 16 (explaining that qualified immunity

must be considered in "the specific context of the case" and not on the basis of a "general proposition") (*quoting Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)).

Nothing in the law or in the record would have placed Secretary Wetzel on notice that continuing a longstanding DOC policy violated Williams' Eighth Amendment rights. As in *Porter*, Wetzel is clearly entitled to qualified immunity here.

## II.    THE DOC DID NOT VIOLATE TITLE II OF THE ADA.

The panel majority also erred in reversing the District Court's decision granting the Secretary's motion for summary judgment on Williams' Title II claim. In making that determination, the panel majority relied on *Furgess v. Pennsylvania Dept. of Corrections*, 933 F.3d 285 (3d Cir. 2019). *Williams*, 2024 WL 4262139, at *18. But the reasoning employed in *Furgess* illustrates precisely why Williams *cannot* establish a violation of the ADA in this case.

In *Furgess*, this Court held that a physically disabled prisoner had alleged a violation of Title II by averring that his placement in a restricted housing unit (RHU) had unlawfully denied him access to showers, since the RHU was not equipped with a shower that could be physically accessed by an individual suffering from his disability. *Furgess*, 933 F.3d at 291-292. The prisoner stated a claim in *Furgess* because: (1) the provision of showers constituted "a part of the programs, activities,

15

or services" referenced in the ADA; and (2) the prisoner's physical disability was the "sole cause" of his inability to shower, which was something that "able-bodied inmates" in the RHU were able to do. *Id.* at 291. In this case, by contrast, the panel majority baldly asserted that, if Williams had a known mental illness, "the DOC had an obligation to modify its practices to ameliorate the harms of prolonged solitary confinement on Williams." *Williams*, 2024 WL 4262139, at *18. But the panel majority never identified a single program, activity, or service that Williams had been unable to access because of his alleged disability.

The record indicates that Williams was denied access to the *same* programs, activities, and services that were denied to *all* death-row inmates. JA129-JA130, JA291. "Because people with and without disabilities may have different needs, there are instances in which providing equal treatment will not achieve the ADA's goals of equal opportunity." *Williams*, 2024 WL 4262139, at *18. But the panel majority never explained why *this* was one of those instances, or what *opportunity* was available to death-row inmates who did not suffer from mental illnesses. That fatal omission clearly distinguishes this case from *Furgess*. Thus, the panel majority had no reason to vacate the District Court's decision granting the Secretary summary judgment on Williams' ADA claim. *Disability Rights New Jersey, Inc. v. Commissioner, New Jersey Dept. of Human Services*, 769 F.3d 293, 306 (3d Cir.

2015) (observing that "a Title II claim must allege that a disabled person has been denied some benefit that a public entity has extended to nondisabled people").

# CONCLUSION

This Court should grant panel rehearing or rehearing *en banc*.

Respectfully submitted,

MICHELLE A. HENRY
Attorney General

By:    /s/ Anthony T. Kovalchick

ANTHONY T. KOVALCHICK
Deputy Attorney General
Bar No. 89056 (Pa.)

SEAN A. KIRKPATRICK
Chief Deputy Attorney General
Appellate Litigation Section

Office of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
Phone: (412) 565-2543
akovalchick@attorneygeneral.gov

DATE: October 25, 2024

## CERTIFICATE OF COUNSEL

I, Anthony T. Kovalchick, Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That a virus detection program was run on the file, and that no virus was detected.

3. That this petition contains 3,796 words within the meaning of Federal Rule of Appellate Procedure 35(b)(2)(A). In making this certificate, I have relied on the "word count" feature of the word-processing system used to prepare the petition.

/s/ Anthony T. Kovalchick

ANTHONY T. KOVALCHICK
Deputy Attorney General

## CERTIFICATE OF SERVICE

I, Anthony T. Kovalchick, Deputy Attorney General, hereby certify that I

have electronically served the foregoing Petition for Panel Rehearing or,

Alternatively, for Rehearing *En Banc* on the following counsel of record by means

of the CM/ECF System:

Matthew A. Feldman, Esquire
Pennsylvania Institutional Law Project
718 Arch Street
Suite 304 South
Philadelphia, PA 19106
mfeldman@pailp.org

/s/ Anthony T. Kovalchick

ANTHONY T. KOVALCHICK
Deputy Attorney General

DATE: October 25, 2024

**EXHIBIT**

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2399
_____

ROY L. WILLIAMS,
                              Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF
CORRECTIONS
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:21-cv-01248)
District Judge:  Honorable Eduardo C. Robreno
_____

Argued on July 14, 2023

Before:   PHIPPS, MONTGOMERY-REEVES and McKEE,
*Circuit Judges.*

(Opinion filed: September 20, 2024)
_____

Matthew A. Feldman [Argued]
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304 South
Philadelphia, PA 19106
          *Counsel for Appellant*

Michelle A. Henry
Anthony T. Kovalchick [Argued]
J. Bart DeLone
Office of Attorney General of Pennsylvania
Appellate Litigation Section
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
          *Counsel for Appellee*

———————————

OPINION OF THE COURT

———————————

McKEE, *Circuit Judge*.

　　Roy Lee Williams, a death-row prisoner with a history of mental illness, was held in solitary confinement on the Capital Case Unit (CCU) of a Pennsylvania state correctional institution for twenty-six years. Williams filed this action alleging that, given his known history of serious mental illness, being continuously held in solitary confinement for twenty-six years without penological justification violated the Eighth Amendment's cruel and unusual punishment clause and the Americans with Disabilities Act (ADA). The District Court granted summary judgment for Defendants. It held that

Secretary John E. Wetzel, the former Secretary of the Pennsylvania Department of Corrections (DOC), was entitled to qualified immunity on the Eighth Amendment claim and that Williams could not show that the DOC was deliberately indifferent under the ADA.[1] Williams now appeals the District Court's grant of Defendants' motion for summary judgment on both claims.

Prior to the District Court's summary judgment decision, on April 1, 2021, the District Court sua sponte dismissed Williams' Fourteenth Amendment claim, pursuant to 28 U.S.C. § 1915(e)(2)(b)(ii), for failure to state a claim. Williams also appeals that decision.

Our review of the District Court's decision requires us to draw all reasonable inferences in Williams' favor, including that the Secretary had knowledge of Williams' preexisting serious mental illness. We must then determine if the Secretary should have known that holding this death-row prisoner with preexisting serious mental illness in solitary confinement from 1993 to 2019 without penological justification violated the Eighth Amendment.

We conclude that the Secretary had "fair and clear warning" that his conduct was unconstitutional and should

---

[1] Since Plaintiff filed suit, George Little has replaced Secretary Wetzel as the acting Secretary of Corrections. Accordingly, the Court has deemed Plaintiff's ADA claim to be against George Little in his official capacity as the Secretary of Corrections. For purposes of this opinion, we refer to Secretary Wetzel and George Little as "the Secretary" throughout.

have known that keeping Williams in solitary confinement would constitute cruel and unusual punishment.[2]  Therefore, the doctrine of qualified immunity does not shield the Secretary from Williams' Eighth Amendment claim.  Our prior precedents and the record before us leave no room for doubt that it has long been clearly established that someone with a known preexisting serious mental illness has a constitutional right not to be held—without penological justification—in prolonged solitary confinement.

As to Williams' Title II ADA claim, the District Court correctly determined that there was a material factual dispute as to whether the DOC knew that Williams had a serious mental illness.[3]  However, the court erroneously concluded that a trier of fact could not find that the DOC was deliberately indifferent to the risk of harm it caused by placing and keeping Williams in solitary confinement despite his preexisting serious mental illness.

Accordingly, we will vacate the District Court's grant of summary judgment on both claims and remand for further proceedings.  We will affirm the District Court's dismissal of Williams' Fourteenth Amendment claim.

## I.    Factual Background

Roy Lee Williams was held on death row in solitary confinement in the CCU from 1993 to 2019—twenty-six years.

---

[2] *United States v. Lanier*, 520 U.S. 259, 271 (1997).

[3] J.A. 012, 035.

Astonishingly, he was only subject to an active death warrant for thirty-six years.[4]

## A. Williams' Mental Health History

Williams' history of serious mental health issues dates back to childhood. In 1979, when Williams was fourteen, he was involuntarily committed to the Philadelphia Psychiatric Center for making suicidal threats and exhibiting violent behavior.[5] There, he was diagnosed with depression and suicidal ideation.[6]

In 1994, while in custody at SCI-Graterford, Williams sought help from the Psychological Services Department because he was deteriorating emotionally.[7] A psychiatrist

---

[4] Williams' death warrant is no longer active. His first death warrant was signed on October 11, 1995. His execution was scheduled for October 26, 1995, and stayed on October 20, 1995. His second death warrant was signed on February 2, 1996. His execution was scheduled for February 20, 1996, and stayed on February 12, 1996. His third death warrant was signed on December 20, 2004. His execution was scheduled for February 17, 2005, and stayed on January 7, 2005.

[5] J.A. 108; 110–11.

[6] Three to six months after his discharge, Williams voluntarily returned to the Philadelphia Psychiatric Center for ninety additional days of inpatient treatment. He participated in family therapy sessions for roughly one year after his second hospitalization.

[7] He informed a psychologist that he had a history of suicidal ideation and that he had been involuntarily committed to the Philadelphia Psychiatric Center as a teenager.

diagnosed him with a psychiatric disability and placed him on the DOC's Mental Health Roster, with a "C" designation.[8] At some point during his incarceration, he was downgraded to the "B" Roster.[9]

On December 30, 1995, Williams was referred to a psychiatrist at SCI-Graterford due to manifestations of "depression and anxiety."[10] During an evaluation performed on January 29, 1996, Williams described his psychiatric history of visits to the Philadelphia Psychiatric Center as a young teenager.[11] Mental health staff found that he "[p]resented no mental decompensation or emotional problems."[12]

---

[8] The DOC scores the mental health of incarcerated people "on a four-point nominal scale system." J.A. 205. People on the "A" Roster have "no identified psychiatric/[intellectual disability] needs or history of psychiatric treatment." *Id.* People on the "B" Roster have an "identified history of psychiatric treatment, but no current need for psychiatric treatment; [these individuals are] placed on inactive [mental health]/[intellectual disability] roster." *Id.* People on the "C" Roster are "currently receiving psychiatric treatment, but [are] not currently diagnosed with a [serious mental illness] or functional impairment and do[] not have an [intellectual disability] or [are] not [guilty but mentally ill]. *Id.* Finally, the "D" Roster is for people who are "currently diagnosed with a [serious mental illness], [intellectual disability], credible functional impairment, or [are] [guilty but mentally ill]." *Id.*

[9] J.A. 121.

[10] J.A. 294.

[11] *Id.*

[12] *Id.*

However, in 1996, in support of Williams' Post Conviction Relief Act (PCRA) petition, Dr. Barry Crown, a psychologist and neuropsychologist, and Dr. Robert Fox, a psychiatrist, evaluated Williams and shared their conclusions with his criminal defense attorneys who, in turn, shared them with the DOC.[13]  Both doctors provided information about Williams' traumatic childhood and his struggles with mental illness, including his psychiatric hospitalization.  Dr. Crown documented Williams' brain damage and the resulting "impairments and deficiencies" that neuropsychological testing had revealed.[14]  These included "impaired cognition," "emotional lability," and deficiencies in "reasoning capacity."[15]  The evaluation confirmed, in his opinion, that Williams was "severely psychologically, cognitively and emotionally impaired."[16]   Similarly, Dr. Fox described Williams as having "ingrained psychological and emotional impairments," including symptoms of Post-Traumatic Stress Disorder and "depression."[17]  Williams asserts that copies of

---

[13] The DOC notes that "those declarations were not mentioned in the summary of Williams' medical records that had been drafted during a review completed by attorneys working for the Capital Habeas Unit of the Federal Community Defender Office for the Eastern District of Pennsylvania."  Appellee Br. 25 n.5.  The District Court determined, however, that there was an issue of fact as to whether these declarations were provided to the prison's mental health staff.  *Williams v. Wetzel*, No. 21-1248, 2022 WL 2869316, at *9 (E.D. Pa. July 21, 2022).

[14] J.A. 51–52.

[15] J.A. 52–53.

[16] J.A. 55.

[17] J.A. 56.

the doctors' declarations were provided to the DOC mental health staff.[18]

On July 3, 1996, during his period of incarceration at SCI-Graterford, Williams attempted to commit suicide by "ma[king] a noose out of a sheet."[19]  In the period leading up to this suicide attempt, Williams told correctional officers that he heard "voices telling him to kill himself."[20]  Because of the suicide attempt, Williams was placed in a psychiatric observation cell for two or three days.  The cell is "like an isolation cell where they take all your clothes."[21]  While confined there, Williams was offered Prozac, which he declined.  Williams later told his attending physician and the other mental health professionals that he was "faking" the suicide attempt and had attempted suicide "to get to another [housing] unit[,] to make a phone call[,] just to get out [of] the cell."[22]  When subsequently deposed, however, Williams

---

[18] The Secretary argues that even if it had been provided with the doctors' declarations, these declarations "could not have placed Secretary Wetzel . . . on notice that Williams was mentally ill" because the experts' opinions were rejected during subsequent PCRA proceedings.  Appellee Br. 25–26 (citing *Commonwealth v. Williams*, 846 A.2d 105, 110–11, 113 (Pa. 2004)).  However, there is no evidence in the record that the DOC was aware of the subsequent PCRA proceedings, and thus nothing to suggest that the determinations in the PCRA proceedings would have altered the DOC's assessment of whether Williams had a preexisting mental illness.

[19] J.A. 114.

[20] J.A. 294.

[21] J.A. 113–14.

[22] J.A. 114.

swore that he had in fact attempted suicide, and only told mental health staff that he had been "faking" the attempt in order to get out of the psychiatric observation cell.[23]

Following this incident, DOC officials removed Williams from the psychiatric observation cell and placed him in disciplinary custody for roughly six months. As a result of his custody status, his property—including his tv and radio—were removed from his cell, and he visited the yard alone. Williams describes disciplinary status as being "isolated on top of being isolated."[24] After being placed in disciplinary custody, Williams did not have further contact with the Mental Health Department.[25]

## B. Confinement on Death Row

Although the Secretary argues that Williams' placement in solitary confinement was required under Section 4303 of Pennsylvania's Prison and Parole Code,[26] that statute was not enacted until five years *after* Williams was placed in solitary confinement.[27] Williams was placed in solitary initially

---

[23] J.A. 114.

[24] J.A. 115–16.

[25] This is with the exception that on August 8, 2002, his psychiatric records indicate that he "seem[ed] worried and anxious." J.A. 294.

[26] *See* 61 Pa. Cons. Stat. § 101 (setting "Prisons and Parole Code" as the reference title for Title 61).

[27] In 1998, the Pennsylvania legislature passed Senate Bill 252 (Pr. No. 253), now known as Section 4303. Section 3 of the Act of June 18, 1998, Providing for a Procedure and Method

pursuant to the DOC's internal policy.[28]   Section 4303
thereafter mandated that upon receipt of a death warrant, "the
secretary [of corrections] shall, until infliction of the death
penalty . . . keep the [incarcerated person] in solitary
confinement."[29]   However, where, as here, an inmate's death
warrant expired, it was "entirely a matter of the Department's
discretion where to house an inmate."[30]  Until November 2019,
the DOC held individuals with expired death warrants in
solitary confinement *indefinitely*.  The DOC only abandoned
that policy when it settled a class-action brought on behalf of
CCU inmates alleging that their CCU conditions violated their
Eighth and Fourteenth Amendment rights.  The DOC began
implementing changes pursuant to the settlement agreement in
December 2019.

The conditions of death row solitary confinement have
been well-documented by this Court.   Before the 2019
settlement agreement, prisoners in the CCU lived in cells no
larger than seven feet by twelve feet.[31]  They were forced to
"spend[] the overwhelming majority of [their] time in [their]

---

of Execution; and Making Repeals, P.L. 80.   Williams was
placed in solitary confinement in 1993.

[28] In November 1982, the DOC began segregating individuals
sentenced to death from the general population on its own
accord—not pursuant to state statute.  *See Peterkin v. Jeffes*,
661 F. Supp. 895, 902 (E.D. Pa. 1987), *aff'd in part and
vacated in part*, 855 F.2d 1021 (3d Cir. 1988).

[29] 61 Pa.C.S. § 4303 (2009).

[30] *Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431, 445 n.9 (3d Cir.
2020) (quoting *Clark v. Beard*, 918 A.2d 155, 160 (Pa.
Commw. Ct. 2007)).

[31] *Porter*, 974 F.3d at 436.

cell[s], including eating [their] meals alone."[32]  They were not allowed to leave their cells for more than ten hours per week, including for basic hygiene and work duty and were only permitted to exercise in "cages . . . no more than twice the size of a typical CCU cell."[33]  When permitted to leave their cells, CCU prisoners were "handcuffed from behind, or handcuffed in front using a belt and tether" and they were forced to "undergo a visual strip search."[34]  Their "[j]ob assignments [we]re limited to janitorial duties on the CCU block, and performed in confined small spaces under close observation and monitoring."[35]  Prisoners in the CCU were "precluded from participation in adult basic education courses, vocational learning opportunities or the chance to work towards a high school diploma" and were not permitted to attend group religious services.[36]

In 2014, the United States Department of Justice (DOJ) published a comprehensive report, in the form of a letter, following its investigation of the Pennsylvania DOC's use of solitary confinement on individuals with serious mental illnesses, including individuals placed in the CCU.[37]  In addition to facts we set forth in *Porter*,[38] the DOJ investigation found that all individuals in solitary confinement had to spend almost their entire day confined to cells that are less than 100

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] We attach the 2014 DOJ report as an Appendix to this opinion.

[38] 974 F.3d at 436–37.

square feet.  Most cells lacked exterior windows, and therefore any natural light.  Although the lighting inside the cell could be dimmed, it could "never be turned off, even at night," and "the noise level c[ould] be high . . . because of yelling and banging of neighboring prisoners."[39]  The DOJ also found that "the air quality [wa]s often poor because of inadequate sanitation and ventilation[,]" which was of particular concern when individuals smeared feces on the wall; "it[] [was] often left like that for days and the entire pod [would] reek[] of shit and make[] you want to vomit."[40]

In addition to physical conditions, the DOJ reported on the DOC's practices with respect to individuals with serious mental illness held in solitary confinement.  The DOJ condemned the DOC's punitive responses to prisoners exhibiting symptoms of mental illness, noting that the DOC "respond[s] to behaviors that signal mental illness not by seeking to ensure that the inmate received adequate mental health treatment, but instead by imposing additional restrictions on the conditions of the prisoners' confinement."[41]  This included "us[ing] housing assignments within the solitary confinement units as a way to punish prisoners for conduct related to their mental illness," confining prisoners to their cells 24/7, denying them bedding material and/or running water, and taking away their clothes.[42]  The DOC also resorted

---

[39] J.A. 070.

[40] *Id.*

[41] J.A. 071.

[42] J.A. 071–72.  Perhaps the most repugnant response to manifestations of individuals' mental illness detailed in the report was one individual's allegation that when he created a

to the unnecessary use of full-body restraints—often for more than seven hours at a time.

The DOJ found that the DOC's subjection of prisoners with serious mental illness to prolonged periods of solitary confinement was often unjustifiably harsh and resulted in serious harm.  The DOJ warned the Secretary that pursuant to Supreme Court precedent set forth in *Estelle v. Gamble*[43] and *Farmer v. Brennan*,[44] the DOC's use of solitary confinement violated the Eighth Amendment.[45]  Specifically, it informed the Secretary that the DOC's use of solitary confinement for extended periods of time on individuals with serious mental illness "constitutes precisely the type of indifference to excessive risk of harm the Eighth Amendment prohibits."[46] The DOJ's analysis emphasized that individuals with serious mental illness suffer more during prolonged periods of solitary confinement than individuals who do not have this preexisting condition.[47]  After referencing this Court's pronouncement that

---

makeshift noose and "stood on his toilet preparing to kill himself, a group of officers encouraged him . . . .  According to the prisoner, the officers told him that they 'wanted to see his feet dangling,' and chanted, '1 . . . 2 . . . 3 . . . kill yourself,' repeatedly."  J.A. 072.

[43] 429 U.S. 97 (1976).

[44] 511 U.S. 825 (1994).

[45] J.A. 064–65 (first citing *Estelle*, 429 U.S. at 102; and then citing *Farmer*, 511 at 843).

[46] J.A. 065.

[47] J.A. 070 ("[T]he particular use of solitary confinement on inmates with SMI in the PDOC system, when examined under the totality of the circumstances, includes unjustifiably harsh

"[t]he touchstone [of an Eighth Amendment violation] is the health of the inmate,"[48] the DOJ found the manner in which the DOC used solitary confinement on prisoners with serious mental illness violated the Eighth Amendment because it: (1) resulted in serious "harm or an unreasonable risk of harm," (2) interfered with the DOC's "ability to provide adequate mental health treatment," and (3) constituted "unjustifiably harsh" and "dehumanizing" conditions.[49]

The DOJ reached a similar conclusion when considering the DOC's use of solitary confinement under Title II of the ADA. Specifically, the DOJ found that the DOC's practices violated Title II because the DOC: (1) unnecessarily segregated individuals with disabilities and failed to modify its policies and practices; (2) failed to individually assess individuals to determine whether placement in segregation was appropriate or justified; and (3) unnecessarily denied opportunities for individuals to engage in and benefit from programming.

---

conditions, even though some of these conditions, standing alone, might not be inappropriate in other circumstances.").

[48] J.A. 068 (quoting *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992)).

[49] J.A. 068–70 (emphasis omitted). At the outset of the report, the DOJ recognized that the DOC had begun reforming the way in which it uses solitary confinement on prisoners with serious mental illness but noted that despite "important improvements, much more work needs to be done to ensure sustained compliance with the mandates of the Constitution and the ADA." J.A. 063.

## II.    Procedural Background

Williams filed a pro se complaint against the Secretary, asserting Eighth and Fourteenth Amendment claims under 42 U.S.C. § 1983, and a claim under Title II of the ADA.  He requested nominal, compensatory, and punitive damages under the Eighth Amendment and the ADA based upon his continued placement in solitary confinement "in light of his history of depression and suicidal ideation."[50]

The District Court sua sponte dismissed Williams' Fourteenth Amendment claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).[51]

Thereafter, Defendants filed a motion for summary judgment, which the District Court granted.[52]  The District Court determined that, pursuant to *Porter v. Pennsylvania*

---

[50] J.A. 009–10.

[51] The District Court also sua sponte dismissed Williams' official capacity claim under §1983 and his individual capacity claim under Title II of the ADA**.**  It determined that Williams' official capacity claim under § 1983 was barred by the Eleventh Amendment but allowed Williams' claim against Secretary Wetzel in his individual capacity to proceed.  The District Court also held that because Title II of the ADA prohibits only a "public entity" from discriminating against people with disabilities, Williams' official-capacity ADA claim was tantamount to a claim against the DOC.

[52] Prior to this motion, the District Court permitted the defendants to depose Williams, but did not allow for other discovery.

*Department of Corrections*,[53] the Secretary was entitled to qualified immunity on Williams' Eighth Amendment claim. The District Court also granted summary judgment on Williams' ADA claim. It determined that, although there was a factual dispute as to whether Williams had a disability under the ADA, he could not establish the intentional discrimination necessary to obtain compensatory damages.

### III.    Jurisdiction and Standard of Review

We have jurisdiction over Williams' appeal under 28 U.S.C. § 1291, and we conduct plenary review of the grant of summary judgment.[54] Summary judgment should be granted only where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[55] We draw all reasonable inferences in the nonmovant's favor.[56]

### IV.    Discussion

Williams argues that the Secretary was not entitled to qualified immunity from Williams' Eighth Amendment allegations. He contends that the Secretary should have known that continuing to hold someone with his mental and medical history in solitary confinement violated a clearly established right. Defendants, on the other hand, dispute whether the Secretary had adequate notice to defeat the shield of qualified

---

[53] 974 F.3d at 431.

[54] *See Williams v. Sec. Pa. Dep't of Corrs.* ("*Williams I*"), 848 F.3d 549, 557 (3d Cir. 2017).

[55] Fed. R. Civ. P. 56(a).

[56] *Williams I*, 848 F.3d at 557.

immunity, as well as whether the Secretary knew of Williams' mental problems.[57]

Williams further argues that the District Court erred in granting summary judgment on his ADA claim. Finally, Williams argues that the District Court erred when, pursuant to § 1915(e)(2)(b)(ii), it sua sponte dismissed with prejudice his Fourteenth Amendment claim for failure to state a claim. We will address these arguments in turn.

## A. Eighth Amendment Claim

Williams claims that the Secretary forced him to languish in solitary confinement, despite knowledge of his preexisting serious mental frailty, in deliberate indifference to his health and safety, in violation of his Eighth Amendment rights.[58] In response, the Secretary only argues that he is

---

[57] At summary judgment, we view the facts in the light most favorable to Williams. *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000). Accordingly, on this record, we must assume that Williams had a preexisting serious mental illness when placed in solitary confinement and notified the DOC of his preexisting serious mental illness.

[58] To prove deliberate indifference under the Eighth Amendment, a plaintiff must establish that "(1) he had a serious medical need, (2) the defendants were deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff." *See Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023) (describing what a litigant must plead at the motion to dismiss phase). A prison official is deliberately indifferent pursuant to the Eighth Amendment if

entitled to qualified immunity because Williams' right was not clearly established. The Secretary does not dispute that Williams' Eighth Amendment right to be free from cruel and unusual punishment was violated.[59]    Accordingly, that argument is forfeited.[60]

### 1. Qualified Immunity

"Under the doctrine of qualified immunity, 'officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.'"[61] To determine whether a government official is entitled to qualified immunity, we must ask whether (1) the facts put forward by the plaintiff show a violation of a constitutional right and whether (2) the right was clearly established at the

---

the official knows an incarcerated person faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

[59] He would have been hard-pressed to make such an argument, given that *Porter* recognized that "prolonged solitary confinement . . . poses a substantial risk of serious psychological and physical harm." 974 F.3d at 441–43.

[60] *See Barna v. Board of School Directors of Panther Valley School District*, 877 F.3d 136, 146 (3d Cir. 2017) ("'[F]orfeiture is the failure to make the timely assertion of a right,' an example of which is an inadvertent failure to raise an argument.") (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

[61] *Williams I*, 848 F.3d at 557 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

time of the alleged misconduct.[62]  We need not "tackle these steps in sequential order."[63]  Because the Secretary does not dispute that Williams' Eighth Amendment right was violated, we need only consider whether the right was clearly established at the relevant time.

To determine whether the right was clearly established, we examine the state of the relevant law when the violation allegedly occurred.[64]  A right is clearly established where existing precedent has "placed the statutory or constitutional question beyond debate."[65]  "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning . . . ."[66]  Moreover, the facts in existing precedent "need not perfectly match" the circumstances of the case at hand.[67]  The "ultimate question" in the qualified immunity analysis "is whether the defendant had fair warning that his conduct deprived his victim of a constitutional right."[68]  "[O]fficials can still be on notice that their conduct violates established law

---

[62] *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).

[63] *Williams I,* 848 F.3d at 557–58 (first *citing Pearson v. Callahan*, 555 U.S. 223, 234–36 (2009); and then citing *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 176 (3d Cir. 2015)).

[64] *Williams I*, 848 F.3d at 570.

[65] *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (first citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); and then citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[66] *Lanier*, 520 U.S. at 271.

[67] *Williams I*, 848 F.3d at 570.

[68] *Schneder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002) (internal quotation marks omitted)).

even in novel factual circumstances"[69] because "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'"[70] Therefore, common sense may dictate that a constitutional violation has occurred where a constitutional violation is "so obvious" that a government official has "fair warning" that the conduct is unconstitutional.[71]

Given the nearly infinite combination of factors that can underlie a given claim, requiring an exact factual match with prior decisions would be tantamount to morphing qualified immunity into absolute immunity because no plaintiff could ever identify a sufficiently identical precedent.[72] We do not, therefore, limit our focus to whether we have previously decided cases with identical facts and circumstances.

However, before we can turn to relevant caselaw, we must appropriately "frame the right"[73] that Williams alleges was violated, "with all reasonable inferences drawn in" his

---

[69] *Hope*, 536 U.S. at 741.

[70] *Id.* (quoting *Lanier*, 520 U.S. at 270–71) (alteration in original).

[71] *Id.*

[72] *See Williams I*, 848 F.3d at 570 ("Requiring that precedent and subsequent disputes rest on identical facts would license state actors to violate constitutional rights with impunity simply by varying some irrelevant aspect of constitutional violations.").

[73] *Peroza-Benitez*, 994 F.3d at 165.

favor, as the nonmovant.[74]  The Supreme Court has cautioned against framing the right at "a high level of generality."[75] Instead, we must "define the right allegedly violated at the appropriate level of specificity"[76] to determine "whether the violative nature of *particular* conduct is clearly established."[77] This inquiry should consider the specific context of the case, not simply a broad proposition.[78]

The District Court appears to have defined the right at issue here as a death row prisoner's Eighth Amendment right not to be held in solitary confinement.  It then determined that pursuant to our prior decision in *Porter*, Williams' alleged right had not been clearly established.  However, in its analysis, the District Court failed to frame the right with the "appropriate level of specificity" [79] because it ignored the relevance of Williams' preexisting serious mental illness and the Secretary's knowledge of it, along with the lack of a penological justification for placing and continuing to hold Williams in solitary confinement.

---

[74] *Mack v. Yost*, 63 F.4th 211, 228 (3d Cir. 2023) (first citing *Peroza-Benitez*, 994 F.3d at 165–66; and then citing *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)).

[75] *Ashcroft*, 563 U.S. at 742.

[76] *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006)).

[77] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Ashcroft*, 563 U.S. at 742).

[78] *See Peroza-Benitez*, 994 F.3d at 165.

[79] *Peroza-Benitez* 994 F.3d at 165 (quoting *Sharp*, 669 F.3d at 159).

There is evidence in the record that Williams was diagnosed with depression and suicidal ideation before he began his twenty-six years in solitary confinement. There is also evidence that he told a DOC psychologist that he "had a history of suicidal ideation and [had been] involuntarily committed to [the] Philadelphia Psychiatric Center when [he] was 13 years old."[80] It is undisputed that, at some point during his incarceration, he was placed on the DOC's Mental Health Roster with a "C" designation, which is reserved for individuals requiring psychiatric treatment.[81] Viewing the facts in the light most favorable to Williams, we also consider that declarations from Williams' doctors, documenting his childhood psychiatric hospitalization, "impaired cognition," "emotional lability," and deficiencies in "reasoning capacity," were provided to the DOC.[82]

Although the Secretary argues that the record does not support Williams' assertion that the Secretary knew or should have known about his preexisting serious mental illness, the record does raise a genuine dispute of fact as to the DOC's knowledge that Williams was seriously mentally ill. Where "issues of fact may preclude a definitive finding on the question of whether the plaintiff's rights have been violated, the court must nonetheless decide whether the right at issue

---

[80] J.A. 252.

[81] The DOC's classification of Williams's mental illness is a relevant—but not dispositive—factor when analyzing whether his mental illness was serious. And the record raises a genuine dispute of material fact about whether Williams had a known preexisting serious mental illness for the reasons provided above.

[82] J.A. 52–53.

was clearly established."[83]  Therefore, we must decide whether the right of a death row prisoner, with a known preexisting serious mental illness not to be placed and held in prolonged solitary confinement—without penological justification—was clearly established at the relevant time.  We hold that it was.

    2.  <u>Individuals with a Known History of Serious Mental Illness Have a Clearly Established Right to Not Be Subjected to Prolonged Solitary Confinement Without Penological Justification</u>

It is well established that prison officials may not act with "deliberate indifference" to a person's health or safety,[84] and that we may infer the existence of this subjective state of mind from the fact that the risk of harm at issue is obvious, though ignored.[85]  Further, this Court has long held that in assessing the conditions of segregated housing units, the "touchstone is the health of … inmate[s]," including their mental health.[86]  Undoubtedly, holding a prisoner with a known preexisting serious mental illness in solitary confinement for a protracted period without penological justification would result in "unnecessary and wanton infliction of pain."[87]  This violation is so obvious that the Supreme Court and Third Circuit cases gave respondents fair notice that this treatment of Williams was unlawful.

---

[83] *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 n.4 (3d Cir. 2015).
[84] *Hudson v. McMillian,* 503 U.S. 1, 8 (1992).
[85] *Farmer,* 511 U.S. at 842.
[86] *Young*, 960 F.2d at 364.
[87] *Whitley v. Albers*, 475 U.S. 312, 320 (1986).

Our precedents leave no room for doubt that individuals with a known history of serious mental illness have a clearly established right not to be subjected to prolonged solitary confinement without penological justification, regardless of their sentence. In *Young*, one of the many cases the DOJ report relied upon, we held that the district court had erred by granting summary judgment to the defendants on Young's Eighth Amendment claims because Young had raised a material dispute as to the conditions of his solitary confinement.[88] In so doing, we clarified that when evaluating Eighth Amendment allegations concerning segregated housing units, "[t]he touchstone is the health of the inmate."[89] Further, we explained that "[t]he duration and conditions of segregated confinement cannot be ignored in deciding whether such confinement meets constitutional standards."[90] Highly relevant to this analysis is that prisons may not punish in a way that "threatens the physical and mental health of prisoners."[91] Indeed, after recognizing that segregated detention cannot be "foul, inhuman or totally without penological justification,"[92] we

---

[88] *Young*, 960 F.2d at 363–64.

[89] *Id.* at 364.

[90] *Id.* (first citing *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978); and then citing *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984)).

[91] *Id.* at 685–86 ("Courts . . . have universally condemned conditions of segregation inimicable [sic] to the inmate-occupants' physical health, and, in some instances, have also considered conditions that jeopardize the mental health or stability of the inmates so confined. . . . While the prison administration may punish, it may not do so in a manner that threatens the physical and mental health of prisoners.").

[92] *Id.*

explained that Young's preexisting physical illness made his solitary confinement even more inhumane,[93] just as Williams' preexisting mental illness did here.

We have recently explained that *Young* "recognized that determining the constitutionality of prison conditions is a heavily fact-specific inquiry, where the particular characteristics of the prisoner raising the challenge are taken into consideration."[94]  Relying on Supreme Court precedent, we held, in *Clark*, that someone with a known preexisting serious mental illness has a clearly established right since at least 2016 not to be held in prolonged solitary confinement.[95] There, the plaintiff's allegations that "he was kept in conditions of almost complete isolation for seven months by officials who knew him to be seriously mentally ill" were sufficient to allege an Eighth Amendment violation.[96]  In so holding, we drew from *Palakovic v. Wetzel*,[97] and a "robust consensus of [district court] decisions" holding unconstitutional the practice of "assigning mentally ill prisoners to solitary confinement."[98]  In

---

[93] *Id.* at 365 (noting the fact that Young's HIV-positive status made his unsanitary conditions "all the more revolting" because he was "more susceptible to infection and disease").

[94] *Clark*, 55 F.4th at 179, 181–82, 184–85.

[95] *See id.*

[96] *Id.* at 186.

[97] 854 F.3d 209 (3d Cir. 2017),

[98] *Clark*, 55 F.4th at 186–87 (citing *Ind. Pro. & Advoc. Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, No. 1:08-cv-01317-TWP-MJD, 2012 WL 6738517, at *23 (S.D. Ind. Dec. 31, 2012) (placing seriously mentally ill inmates in solitary confinement threatened permanent injury and violated the

reaching this conclusion, we noted that Clark had adequately alleged deliberate indifference because he claimed that, like in *Palakovic*, the DOC defendants knew he was seriously mentally ill and knew that placing him in solitary confinement would cause him severe harm.[99]  In *Palakovic*, a plaintiff, "diagnosed with a number of serious mental disorders,"[100] committed suicide after he was repeatedly placed in solitary confinement for "multiple 30-day stints" during a thirteen-month period.[101]  There, we held that allegations that "prison

---

Eighth Amendment); *Jones "El v. Berge*, 164 F. Supp. 2d. 1096, 1101–02 (W.D. Wis. 2001) (granting injunctive relief where conditions of solitary confinement "can be devastating" to mentally ill individuals housed in supermax prison); *Madrid v. Gomez*, 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995) (concluding that mentally ill inmates "in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe' and therefore unconstitutional"); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320–21 (E.D. Cal. 1995) (concluding that segregating inmates with serious mental disorders violates their Eighth Amendment rights); *Casey v. Lewis*, 834 F. Supp. 1477, 1549–50 (D. Ariz. 1993) (holding the practice of assigning seriously mentally ill inmates to segregated housing "despite their knowledge of the harm" constitutes an "appalling" Eighth Amendment violation); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1989) (holding viable claim that prison officials" failure to "screen out" those inmates that "by virtue of their mental condition, are likely to be severely and adversely affected by placement there")).

[99] *Clark*, 55 F.4th at 180–81.

[100] 854 F.3d at 216.

[101] *Id.* at 217, 225.

officials knew the conditions of confinement "were inhumane for [Palakovic] in light of his mental illness,"[102] yet continued to subject him to severe isolation, were "more than sufficient" to state an Eighth Amendment claim.[103]

We then determined in *Clark* that qualified immunity did not apply because "the right of a prisoner known to be seriously mentally ill to not be placed in solitary confinement for an extended period of time by prison officials who were aware of, but disregarded, the risk of lasting harm posed by such conditions," was well established at the time of the violative conduct.[104] Even though *Clark* concerned violations that began in January 2016, we recognized that the constitutional right was "*long protected by Eighth Amendment jurisprudence*,"[105] including *Young*, *Farmer*, and *Hope*.[106] We determined that Third Circuit and Supreme Court precedent supported our conclusion that Clark's right was clearly established, and found that the defendant had fair notice that he was violating Clark's right in light of our precedents, prison policy, state statute, and a federal lawsuit that survived a motion to dismiss.[107] Here, we rely on much of the same law

---

[102] *Clark*, 55 F.4th at 179 (quoting *Palakovic*, 854 F.3d at 225).
[103] *Palakovic*, 854 F.3d at 226. Because *Palakovic* did not consider qualified immunity, we had no occasion to determine whether the Eighth Amendment right was clearly established at the time of the violative conduct, which began in 2011, *id.*, and do not rely on this case in concluding that Williams' right was clearly established as of at least 2014.
[104] *Clark*, 55 F.4th at 182.
[105] *Id.* at 181 (emphasis added).
[106] *Id.* at 183–85.
[107] *Id.* at 180–88.

that we did in *Clark* and determine that the Secretary had fair notice that Williams's conditions of confinement violated the Eighth Amendment because controlling precedent clearly established the right of a death row prisoner with a known preexisting serious mental illness not to be held in prolonged solitary confinement without penological justification.

This conclusion is easily buttressed by the comprehensive 2014 DOJ report, which—relying on *Farmer*, *Hope*, *Young*, and other binding precedent—warned the Secretary that the DOC's practices of knowingly holding seriously mentally ill prisoners in solitary confinement for extended periods of time was cruel and unusual.[108]  The DOJ concluded a months' long investigation and determined that the DOC's "use of a harsh form of solitary confinement for extended periods of time on hundreds of prisoners with [serious mental illness]/[intellectual disability] *constitutes precisely the type of indifference to excessive risk of harm the Eighth Amendment prohibits*."[109]  The DOJ then advised the DOC—and Secretary Wetzel specifically—of its findings, including its detailed analysis of how the DOC's practices violated Supreme Court and Third Circuit precedent.

We have recognized that a variety of sources can be considered when evaluating whether officials received fair warning that their conduct was unlawful.[110]  The Supreme

---

[108] *Id.* at 180.

[109] J.A. 065 (emphasis added).

[110] *Clark v. Coupe*, 55 F.4th 167, 188 (3d Cir. 2022) ("Both Supreme Court and this Court's precedents consider district court cases, prison regulations, and state statutes in

Court recognized in *Hope v. Pelzer* that DOJ reports like this one should not be ignored when determining whether officials had fair notice that they were violating clearly established law.[111]   In *Hope*, the Supreme Court held that the DOJ's warning to the Alabama Department of Corrections that its practice of shackling individuals to a hitching post was unconstitutional supported the determination that it was clearly established that such practices violated the law.[112]   Even though there was "nothing in the record indicating that the DOJ's [report was] communicated to [the individual defendants]," the Court nonetheless relied on it because other DOJ communications with the Alabama Department of Corrections "len[t] support to the view that reasonable officials in the ADOC should have realized" the alleged treatment violated the Eighth Amendment.[113]

The 1994 DOJ report in *Hope* was not nearly as authoritative and informative as the letter that the DOJ sent to the Secretary here.   The 1994 DOJ report stated that "[t]he hitching pole policy is inappropriate and violates constitutional standards."[114]   In three paragraphs, it explained that the

---

determining whether officials received fair warning that their conduct was unreasonable.").

[111] 536 U.S. at 744–46.

[112] *Id.* at 744.

[113] *Id.* at 745.

[114] U.S. Dep't of Justice, Notice of Findings from Investigation of Easterling Correctional Facility (Alio, Alabama), inc. Review of Medical Care at Easterling Correctional Center June 1994 (Mar. 27, 1995) at 3, https://clearinghouse.net/case/535/. The DOJ also noted at the outset of the document that it found

hitching pole "should never be used as punishment," that the staff does not comply with its own policies regarding the hitching pole, and that the dehumanizing practice is "potentially dangerous."[115]  However, unlike the DOJ report here, the 1994 report did not rely upon, nor cite to cases or external sources to support its conclusions.

In contrast, the 2014 DOJ report, which was twenty-five-pages long and sent directly to the Secretary, was replete with citations to Supreme Court and Third Circuit cases, case studies, and statistics to support its conclusion that the DOC's solitary confinement of individuals with serious mental illness violated the law.  More than ten pages of the report analyzed and explained how the DOC's specific practices violated the Eighth Amendment.  In *Hope*, the DOJ's conclusory constitutional determination buttressed the Court's conclusion that the law was clearly established.  The 2014 DOJ report serves the same function and provides the same notice as it did in *Hope*.[116]

---

"significant constitutional violations in two major areas."  *Id.* at 1.  It explained that "[i]n order to bring Easterling up to constitutional standards, [it] recommend[ed] implementation of . . . remedial measures," including "[c]eas[ing] use of the 'security bar' or any other form of corporal punishment or improper restraint including, but not limited to: shackling inmates to fences, posts, rails, cell bars, or other stationary objects."  *Id.* at 4–5.

[115] *Id.* at 3.

[116] *Id.* at 745-46 ("Even if there might once have been a question regarding the constitutionality of this practice, the Eleventh Circuit precedent . . . as well as the DOJ report

---

Relying on *Hope*, the 2014 DOJ report explained precisely why the DOC's use of solitary confinement on prisoners with serious mental illness was unconstitutional under controlling precedent:

> By subjecting prisoners with [serious mental illness ("SMI")] to prolonged periods of solitary confinement under harsh conditions that are not necessary for legitimate security-related reasons, [the DOC] exposes them to an excessive and obvious risk of serious harm. *See Farmer,* 511 U.S. at 828; *Hope v. Pelzer,* 536 U.S. 730, 738-745 (2002) (holding that prison officials show deliberate indifference where they disregard obvious risks to prisoner safety). Moreover, our expert-consultants observed that as a direct result of these practices, prisoners with SMI have suffered serious psychological and physical harms, including psychosis, trauma, severe depression, serious self injury, and suicide. *Cf Young v. Quinlan,* 960 F.2d 351, 364 (3d Cir. 1992) ("The touchstone is the health of the inmate. While the prison administration may punish, it must not do so in a manner that threatens the physical and mental health of prisoners.").[117]

---

condemning the practice, put a reasonable officer on notice that the use of the hitching post under the circumstances alleged by Hope was unlawful.").

[117] J.A. 068.

The DOJ went on to explain that the manner in which the [DOC] used solitary confinement posed an "excessive risk to the mental health of prisoners" and "violated the Eighth Amendment."[118]    First, it specifically stated that "lengthy periods of solitary confinement involve[d] conditions that [the DOJ's] expert-consultants found subjected prisoners to harm or an unreasonable risk of harm and contribute[d] to the Constitutional violation."[119]    Undoubtedly, this included individuals like Williams, who had a history of serious mental illness and had nevertheless been held in solitary confinement for over twenty years.  Second, the DOJ found that "the manner in which []DOC use[d] solitary confinement interfere[d] with its ability to provide adequate mental health treatment to prisoners with SMI and contribute[d] to the Constitutional violation."[120]    The Pennsylvania DOC's use of solitary confinement likely also interfered with Williams' treatment. This record supports the conclusion that Williams' already-fragile mental health deteriorated to the point that he attempted suicide while held in solitary confinement.  Although the Secretary notes that Williams was offered Prozac after his suicide attempt, the 2014 DOJ report makes clear that "[a]ppropriate mental health treatment for prisoners with SMI should involve much more than medication."[121]    And third,

---

[118] *Id.* (citing *Peterkin v. Jeffes,* 855 F.2d 1021, 1024-25 (3d Cir, 1988)).

[119] *Id.* (emphasis omitted).

[120] J.A. 069 (emphasis omitted).

[121] J.A. 069.

citing the Supreme Court's decision in *Wilson v. Seiter*,[122] the 2014 DOJ report recognized that "unjustifiably harsh conditions often attend[ed] [DOC]'s use of prolonged solitary confinement on prisoners with SMI. In combination, these conditions [we]re dehumanizing and cruel and contribute[d] to the Constitutional violation."[123] It further explained how the DOC's use of solitary confinement on prisoners with serious mental illness resulted in harm, noting, for example, that "*more than 70 percent* of documented suicide attempts between January 1, 2012 and May 31, 2013 occurred in solitary confinement units."[124]

The significance of the 2014 DOJ report simply cannot be ignored. The Secretary was directly informed that *under binding precedent*, placing someone with a known history of serious mental illness in solitary confinement for a prolonged period of time without penological justification clearly was unlawful.[125] We therefore conclude that the Secretary *personally* had fair warning by 2014—at the very latest—that

---

[122] 501 U.S. 294, 304 (1991) (holding that conditions of confinement violate the Eighth Amendment when they combine to "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need").

[123] J.A. 070 (emphasis omitted).

[124] J.A. 064 (emphasis added).

[125] This notice is similar to that in *Clark*, in which we determined that a federal lawsuit surviving a motion to dismiss gave "prison officials . . . *direct notice* that their conduct regarding solitary confinement potentially violated the Eighth Amendment," and supported our conclusion that Clark alleged the violation of a clearly established law. 55 F.4th at 186 (emphasis added).

Williams's conditions of confinement clearly violated basic principles of Eighth Amendment established by controlling precedent.[126]  And that personal notice buttresses our holding that a reasonable person in the Secretary's shoes would have known that it clearly violated basic principles of Eighth Amendment law—established by controlling precedent—to hold a death row prisoner with a known history of serious mental illness in solitary confinement for a prolonged period of time without penological justification.

The Secretary argues that *Porter* forecloses this conclusion, but that argument fails.  *Porter*, like *Clark* and *Palakovic*, also concerned prolonged solitary confinement, but it only concerned people of sound mind when first placed in solitary confinement.  In *Porter*, we held that keeping a prisoner sentenced to death in solitary confinement for thirty-three years violated the Eighth Amendment, however, qualified immunity applied because "[w]e ha[d] not found Eighth Amendment cases with sufficiently similar fact patterns."[127]  Although *Palakovic* "certainly acknowledge[d] the dangers of solitary confinement," we "distinguishe[d] *Palakovic* from Porter's case" on the basis "that the plaintiff was not on death row *and had specific known mental health*

---

[126] In *Busanet v. Wetzel*, No. CV 21-4286, 2023 WL 5003573, at *10–14 (E.D. Pa. Aug. 4, 2023), the court—on similar facts—concluded that the right of an individual on death row with preexisting mental illness not to be held in prolonged solitary confinement was clearly established.  We find Judge McHugh's reasoning to be sound, and echo many of the same principles throughout this opinion.

[127] 974 F.3d at 450.

*issues pre-assignment to solitary confinement.*"[128]   Therefore, it was not yet clearly established that the Eighth Amendment prohibited placing a person *without a known preexisting serious mental illness* in prolonged solitary confinement while on death row prior to our deciding *Porter* in 2020.[129]

The Secretary argues that based on *Porter*, Williams' sentence—and not his health—controls the analysis.  *Porter* indeed recognized that the sentence an individual serves may be relevant, but the "touchstone" of an Eighth Amendment analysis has long been, and remains, "the health of the inmate[,]"[130] not his sentence.  Just as the known preexisting mental illness pre-assignment to solitary confinement was a distinguishing factor in *Porter*, it is a distinguishing factor here.  As *Porter* recognized, this distinction is important.  Our precedents have made clear that solitary confinement can "cause cognitive disturbances" after "even *a few days*"[131] in a person without a preexisting mental illness; obviously, such prolonged confinement is particularly cruel for a person with "severely compromised mental health."[132]   In other words, *Porter* certainly suggests that being on death row may be relevant to an Eighth Amendment analysis in some contexts. It is not possible, however, to read *Porter* as standing for the proposition that the Eighth Amendment rights for individuals with known preexisting serious mental illness turn on the nature of their sentences—a non-health related concern.

---

[128] *Id.* (emphasis added).

[129] *See id.* at 450.

[130] *Young*, 960 F.2d at 364.

[131] *Williams I*, 848 F.3d at 562 (citation omitted).

[132] *Clark*, 55 F.4th at 181. (alterations in original).

Next, the Secretary argues that respondents did not violate clearly established law because the DOC purportedly kept Williams in solitary confinement pursuant to an internal policy interpreting 61 Pennsylvania Consolidated Statute, Section 4303. In doing so, the Secretary gives tremendous weight to an internal DOC policy that is actually irrelevant. The Secretary begins by noting that Williams was initially placed in solitary confinement pursuant to Section 4303. That is simply wrong.[133] Williams was initially placed in solitary confinement in 1993, and Section 4303—directing placement in solitary confinement for death-row prisoners—did not go into effect until five years later.[134] In other words, although the DOC knew that Williams had a preexisting serious mental illness, Williams nevertheless languished in solitary confinement after the expiration of his death warrant, not because of Section 4303, but because of the DOC policy that remained in effect until 2019, when the DOC settled the Eighth Amendment and ADA claims brought against it.

According to the Secretary, he is entitled to qualified immunity because keeping Williams in solitary confinement for twenty-six years was "consistent with the [DOC] policy in effect during the relevant period of time."[135] The sole support

---

[133] *See supra* Section I.b., n. 34, 35.

[134] 1998 Pa. Legis. Serv. Act 1998-80 (West).

[135] Appellee Br. 21. Defendants do not argue that Section 4303 prohibited them from removing death-row prisoners, like Williams, from solitary confinement after their death warrant had expired. Nor could they. The Pennsylvania Commonwealth Court has held that pursuant to Section 4303, "[o]nce [a death] warrant has expired . . . . 'it is entirely a

for this conclusory assertion is a citation to *Williams I*, in which we stated that the DOC's interpretation of Section 4303, which resulted in the DOC's continued confinement of individuals on death row, was "not without support."[136]

The relevant passages from *Williams I* are inapposite, as that opinion addressed alleged violations of procedural due process rights, not cruel and unusual punishment.[137] Moreover, in *Williams I*, we had no occasion to consider whether the DOC's indiscriminate practice of keeping people with known preexisting serious mental illness in solitary confinement indefinitely without penological justification was reasonable because *the plaintiff did not allege that he had a known preexisting serious mental illness*. And absent individualized evidence demonstrating that prison officials kept an inmate in solitary confinement for a legitimate penological purpose, DOC's blanket policy of keeping people with known preexisting serious mental illness in solitary confinement solely because they were sentenced to death, even

---

matter of the Department's discretion where to house an [incarcerated person].'" *Porter*, 974 F.3d at 445 n.9 (quoting *Clark v. Beard*, 918 A.2d at 160). Therefore, after 2005, when Williams' warrant expired, the DOC had discretion as to where to hold him.

[136] *Williams I*, 848 F.3d at 571.

[137] *See id.* at 557–76. Even if *Williams I* did concern cruel and unusual punishment, it would still be inapplicable. In *Williams I*, we concluded that the DOC's policy was "only relevant to our qualified immunity analysis because the case law . . . did not adequately inform [the defendants] that the policy ran counter to Plaintiffs' protected liberty interests." As explained, that is not the case here.

in the absence of an active death warrant, amounted to "foul" and "inhuman" "conditions of confinement . . . without penological justification,"[138] a classic Eighth Amendment violation.[139]   Moreover, we are not willing to accept the argument that one can escape liability by relying upon a policy that s/he knows to be unconstitutional.[140]  Given the 2014 DOJ report, the Secretary had to know that any policy requiring an individual with a known preexisting serious mental illness to be confined in solitary without a legitimate penological justification was contrary to law.[141]

Accordingly, we hold that individuals with a known history of serious mental illness have a clearly established right not to be subjected to prolonged, indefinite solitary

---

[138] *Clark*, 55 F.4th at 183 (quoting *Young*, 960 F.2d at 364).

[139] The cruelty of the DOC's policy is exacerbated by the practice of keeping lights in solitary cells on twenty-four hours a day.  We cannot think of any legitimate penological purpose for this—especially given the impact it could have on someone with serious mental illness; and the Secretary offers none.

[140] Just as we do not "equate policy violations with constitutional violations," *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009), adherence to policy does not compel the conclusion that no constitutional violation occurred.

[141] Moreover, Secretary Wetzel readily admits that he "is familiar with the work of [researcher] Dr. [Craig] Haney, which sets forth at length the harmful effects of solitary confinement." *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 779 (M.D. Pa. 2016).  In light of this research, he acknowledges that "'long term' solitary confinement 'certainly could' have negative effects on mental health." *Id.*

confinement—without penological justification—by an official who was aware of that history and the risks that solitary confinement pose to someone with those health conditions. To hold otherwise would fail in the face of Eighth Amendment jurisprudence. [142]  Given this record, the right at issue was clearly established.

The dissent improperly truncates our holding, and then criticizes the subsequent vagueness created by its own truncation. Despite the dissent's assertion to the contrary, we do not hold that "prison officials [are prohibited] from housing a mentally ill inmate in solitary confinement for long periods of time."[143]  Indeed, our holding is limited to the specific allegations of this appeal from the grant of summary judgment and is as we have just stated in the preceding paragraph.

---

[142] As previously stated, Williams also argues that the Secretary is not entitled to qualified immunity because he was deliberately indifferent to Williams' health and safety by knowingly subjecting him to twenty-six years in solitary confinement, despite his awareness of the serious risks such confinement posed. The District Court did not address this argument, and we need not reach it because we determine that the Secretary is not entitled to qualified immunity since there is a material issue of fact as to whether Williams put forth enough evidence to show a violation of a constitutional right, and the right at issue was clearly established.

[143] Dissent at 2 (quoting *Clark v. Coupe*, 55 F. 4th at 167) (internal quotation marks omitted) (describing how the lower court framed the right before clarifying the right to be more specific).

Lest there be any confusion, we reiterate that we hold "that individuals with a *known* history of *serious* mental illness have a clearly established right not to be subjected to prolonged, *indefinite* solitary confinement—*without penological justification—by an official who was aware of that history and the risks that solitary confinement pose to someone with those serious health conditions*."[144]    That is nearly identical to the holding in *Clark v. Coupe*,[145] and it is hardly a novel or surprising proposition.    In *Clark*, we framed the clearly established right at issue as: "the right of a prisoner known to be seriously mentally ill to not be placed in solitary confinement for an extended period of time by prison officials who were aware of, but disregarded, the risk of lasting harm posed by such conditions."[146]    Relying on much of the same binding precedent *Clark* did,[147] our current holding merely clarifies that the clearly established right in *Clark* extends to individuals on death row.

Having clarified our holding, and again highlighted the many cases we rely upon to conclude that the right was clearly established here, the remainder of the dissent's criticisms about our use of the 2014 DOJ report have little force.    As we noted, the 2014 DOJ report concisely packaged much of the relevant

---

[144] Op. 33-34 (emphasis added).

[145] 55 F.4th 168 at 182.

[146] *Id.*

[147] *Clark* relied, inter alia, on *Hope v. Pelzer*, 536 U.S. 730 (2002), *Farmer v. Brennan*, 511 U.S. 825 (1994), *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), and *Young v. Quinlan*, 960 F.2d 351 (3d Cir. 1992), in concluding that the right at issue was clearly established. We do the same.

and binding law and delivered it to the defendant's doorstep.[148] In disparaging the relevance of the DOJ report to our analysis, our dissenting colleague misses the point. The DOJ letter addressed to Secretary Wetzel is not important because it had the force of legal precedent. We agree that it obviously did not and could not have had the force of legal precedent. That is simply not the point, and it is not why the DOJ report that was on the record here is so important. Rather, it is important because it directly informed the Secretary that the practice of solitary confinement that had been investigated was a violation of the Eighth Amendment based upon the judicial decisions cited in the letter. The dissent would prefer we ignore that notice, but binding precedent and the fact that Secretary Wetzel was personally informed of the constitutional violation establish its relevance. And that personal notice simply buttresses our conclusion that *controlling precedent* clearly established that the conditions of Williams's confinement violated the Eighth Amendment.

---

[148] Op. at 24. Notably, the dissent relies upon the hallowed precedent of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), to suggest that our holding somehow violates the separation of powers, ignores the obvious principle that the courts, and not the executive branch, determine what is legal precedent. *See* Dissent at 5.

Ironically, while expressing concern that the Majority disregards the role of the courts as set forth in *Marbury v. Madison*, our dissenting colleague relies on a single judge concurrence that disparages Supreme Court jurisprudence. Dissent at 7 (citing *United States v. Grant*, 9 F.4th 186, 201–07 (3d Cir. 2021) (en banc) (Hardiman, J., concurring) (criticizing the Supreme Court for "stray[ing] far from the text and original meaning of the Eighth Amendment")).

Moreover, our use of the DOJ report here is no more in tension with *Marbury v. Madison* than the Supreme Court's use of the analogous DOJ report in *Hope v. Pelzer.* In both cases, the DOJ report buttresses the conclusion that "a reasonable person would have known" of the Eighth Amendment violation.[149] Following *Lanier*, which established the "fair warning" standard, *Hope* makes clear that for purposes of qualified immunity, the "salient question" is whether the state of the law gives defendants "fair warning" that their alleged conduct was unconstitutional.[150] Following that precedent, the Supreme Court explicitly held that "in light of binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, *and a DOJ report informing the ADOC of the constitutional infirmity in its use of the hitching post* . . . the respondents' conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"[151]

It should not be a controversial or novel proposition that a personalized report setting forth binding, applicable case law, and detailing how a specific defendant is systematically violating the Eighth Amendment, is highly relevant to a finding that such defendant had "fair notice." We simply cannot agree with our dissenting colleague's belief that the defendants should nevertheless be wrapped in the protective cloak of

---

[149] *Hope*, 536 U.S. at 744 (citing *Harlow*, 457 U.S. at 818).

[150] *Id.* at 741.

[151] *Id.* at 741–42 (citing *Harlow*, 457 U.S. at 818) (emphasis added).

qualified immunity after such "fair and clear warning" of the clearly established law.[152]

Finally, the dissent complains that even if we are correct in concluding that individuals with a known serious mental illness have the right not to be held in prolonged, indefinite solitary confinement, the case law upon which we rely does not provide adequate notice with regard to individuals on death row.[153] But as already explained, the health of the incarcerated person is what drives the Eighth Amendment analysis, not the type of sentence.[154] Moreover, as early as the 19th century, the Supreme Court has recognized that solitary confinement is a severe and additional punishment *even for people on death row.*[155]

## B. Fourteenth Amendment

The District Court assumed Williams was bringing a substantive due process claim under the Fourteenth Amendment and concluded that Williams' conditions-of-confinement claim was only cognizable under the Eighth

---

[152] *Lanier*, 520 U.S. 259, 271 (1997).

[153] *See* Dissent at [5].

[154] *See* Op. at 31.

[155] *See In re Medley*, 134 U.S. 160, 167–71 (1890). Although the Eighth Amendment was not considered in *Medley*, the Court concluded without hesitation that solitary confinement is "an additional punishment of the most important and painful character" that violates the *ex post facto* provision of the Constitution when added to a sentence after the offense has been committed because it increases the punishment. *Id.* at 171.

Amendment.  We review de novo a district court's sua sponte dismissal of a claim under 28 U.S.C. § 1915(e)(2), and we review a district court's decision not to grant leave to amend for abuse of discretion.[156]

Because Williams was proceeding pro se, his complaint should have been liberally construed as asserting a Fourteenth Amendment procedural due process claim.[157]  Williams' allegations that he was subjected to "automatic placement in indefinite solitary confinement" and "without either individually assessing the risk he may actually and objectively pose for others . . . or otherwise justifying the need for isolations [sic]," indicates that he was alleging that he had been kept in solitary confinement without meaningful review or an opportunity to be heard.[158]

Nonetheless, at the time of Williams' confinement, the due process rights of an active death-row prisoner had not been clearly established.  The Court in *Williams I* held that individuals on death row who had been granted resentencing hearings had a liberty interest that prohibited the state from housing them in solitary confinement on death row without "*regular and meaningful* review of their continued placement."[159]  However, we did not reach a conclusion as to whether the due process clause of the Fourteenth Amendment limited the State's ability to subject prisoners with active death

---

[156] *Dooley v. Wetzel*, 957 F.3d 366, 373, 376 (3d Cir. 2020).

[157] *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021).

[158] J.A. 048–49.

[159] 848 F.3d at 576 (emphasis in original).

row sentences to prolonged solitary confinement.[160]  Similarly, in *Porter* we did not reach a determination as to whether prisoners with active death row sentences had a procedural due process claim.[161]  Given that we have not determined whether an active death-row prisoner has a procedural due process interest in avoiding continued solitary confinement, the DOC is entitled to qualified immunity on this claim.

### C. Claim Under the Americans with Disabilities Act (ADA)

The DOC does not escape liability under the ADA because it placed and held Williams in solitary confinement pursuant to a since-revoked DOC policy.  The District Court acknowledged that there was a material dispute of fact as to whether the Secretary knew Williams suffered from serious mental illness.  Drawing all inferences in favor of Williams, we must assume that the Secretary was aware of Williams' serious mental illness.  Therefore, under the ADA, the DOC had an obligation to modify its practices to ameliorate the harms of prolonged solitary confinement on Williams, or alternatively, demonstrate that the modifications would

---

[160] *See id*. at 552 n.2 (stating that the Court "take[s] no position on whether any inherent risk posed by inmates whose death sentences are still active and viable is sufficient to raise a presumption that their continued confinement on death row is justifiable").

[161] *See Porter*, 974 F.3d at 438 n.2 (reasoning that it need not decide whether a prisoner on death row who has "not been granted [a] resentencing[] hearing and vacatur ha[s] a procedural due process interest in avoiding continued solitary confinement" (citing *Williams I*, 848 F.3d at 552 n.2)).

fundamentally alter the nature of the "service, program or activity."[162]  The DOC failed to do either of those things. Additionally, we find that Williams has stated a claim of deliberate indifference under the ADA where—viewing the facts in the light most favorable to Williams—the Secretary knew Williams had a preexisting serious mental illness, was aware of the risk of prisoner safety, and failed to act despite this knowledge.

### 1. The Elements of an ADA Claim

To bring a claim under the ADA, Williams "must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."[163]  The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment."[164]  "[M]ental illness qualifies as a disability under" the ADA.[165]  The District Court correctly concluded that there is an issue of material fact as to whether the DOC knew that Williams had a serious mental

---

[162] 28 C.F.R. § 35.130(b)(7).

[163] *Haberle v. Troxell*, 885 F.3d 170, 178–79 (3d Cir. 2018) (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475, F.3d 524, 533 n.32 (3d Cir. 2007)) (alterations in original).

[164] 42 U.S.C. § 12102(1).

[165] *Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs.*, 796 F.3d 293, 301 (3d Cir. 2015); 28 C.F.R. § 35.108(d)(2)(iii).

illness, and therefore knew that he had a disability under the ADA.

Nevertheless, the Secretary now argues that Williams' ADA claim fails because he was not placed in solitary confinement "by reason of" his disability but instead because of his death sentence.[166]   Initially, we note that the DOC forfeited this argument by not raising it before the District Court.[167]   However, even if the DOC had raised this argument, it would have failed, because it misconstrues Williams' claim. Williams does not argue that he was placed in solitary confinement "by reason of" his disability.  Instead, he argues that, considering his disability, the DOC failed to "take certain pro-active measures to avoid the discrimination proscribed by Title II [of the ADA]."[168]  We agree.

Our decision in *Furgess v. Pennsylvania Department of Corrections*[169] is instructive.  There, we considered whether Furgess, an incarcerated person with a disability, had suffered discrimination "by reason of his disability."[170]  Furgess, who had received the accommodation of an accessible shower stall in general population, was placed in the Restrictive Housing Unit (RHU), "which lacked accessible shower facilities."[171]  In response to Furgess' disability discrimination claim, the DOC argued that Furgess was "deprived of a shower because his own

---

[166] Appellee Br. 30 (emphasis omitted).
[167] *Barna*, 877 F.3d at 146 (citing *United States v. Olano*, 507 U.S. 725, 733 (1993).
[168] *Chisholm v. McManimon*, 275 F.3d 315, 325 (3d Cir. 2001).
[169] 933 F.3d 285 (3d Cir. 2019).
[170] *Id*. at 291.
[171] *Id.*

misconduct landed him in the RHU, which lacked accessible shower facilities, not because the [DOC] intentionally discriminated against him on the basis of his disability."[172] We disagreed, and determined that the DOC had misconstrued the causation element under the ADA. We explained: "the reason why Furgess was housed in the RHU is irrelevant . . . . [A] prison's obligation to comply with the ADA . . . does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there."[173]

This same reasoning applies to Williams' claim under the ADA. Although Williams was placed in solitary confinement pursuant to a prison policy, the DOC's obligation to comply with the ADA did not disappear because of his death sentence. One who violates the ADA (or any other statute) cannot escape liability merely because the violation is a result a state policy that conflicts with federal law. Indeed, a contrary holding would erode the protections afforded by remedial statutes such as the ADA, as the rights they confer would depend on the vagaries of governmental policies. Just as the DOC's failure to provide accessible showers in the RHU was not *by reason of* Furgess' alleged misconduct, the DOC's failure to provide Williams with reasonable accommodations for his disability was not *by reason of* his death sentence.

The DOC has an obligation to make "reasonable modifications" to "policies, practices, or procedures" where modifications are necessary to avoid discrimination on the

---

[172] *Id.*

[173] *Id.*

basis of a disability.[174]   Assuming that Williams had a known mental illness, the DOC had an obligation to modify its practices to ameliorate the harms of prolonged solitary confinement on Williams.  The only way the DOC could avoid this responsibility is by "demonstrat[ing] that making the modifications would fundamentally alter the nature of the service, program, or activity."[175]   The record is devoid of evidence that providing Williams with accommodations would have fundamentally altered the DOC's services, programs, or activities.

Moreover, the DOC's argument that no ADA violation exists because Williams' treatment is the same as that of non-disabled death-row prisoners reflects a "lack of appreciation for one of the chief purposes of the ADA."[176]   The purpose of the ADA is to ensure that persons with disabilities can participate equally in society.[177]   Because people with and without disabilities may have different needs, there are instances in which providing equal treatment will not achieve the ADA's goals of equal opportunity.  As Judge McHugh stated in *Anderson v. Franklin Institute*, "a facially neutral policy can still result in discrimination."[178]   "[A] person with a

---

[174] 28 C.F.R. § 35.130(b)(7)(i).

[175] *Id.*

[176] *Anderson v. Franklin Inst.*, 185 F. Supp. 3d 628, 645 (E.D. Pa. 2016).

[177] 42 U.S.C.A. § 12101(a)(7).

[178] 185 F. Supp. 3d at 645.  That decision explained, "[t]he ADA was promulgated in part to level the playing field for disabled individuals . . . . Stated differently, if disabled persons protected under the ADA were similarly situated to all other

disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation."[179]    And as the Ninth Circuit has recognized, because facially neutral policies may "disparately impact people with disabilities," "a public entity may be required to make reasonable modifications" to these policies.[180]

Given the factual dispute as to whether the DOC knew that Williams had a serious mental illness and because the DOC failed to make modifications or accommodations to Williams' conditions of confinement, Williams' claim under the ADA survives summary judgment.

---

persons, there would be no need for the ADA in the first place." *Id.*

[179] *Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998) (citation omitted).

[180] *Payan v. L.A. Cmty. Coll. Dist.*, 11 F. 4th 729, 738 (9th Cir. 2021).  We are not persuaded by the DOC's argument that, pursuant to our precedent in *Disability Rights*, 796 F.3d at 306, Williams must have pointed to evidence that he was "denied some benefit that a public entity has extended to nondisabled people."  Appellee Br. 31.  Although in *Disability Rights*, we held as much, that was in the context of a claim that the appellant had been denied "public services, programs, and activities."  796 F.3d at 301.  In contrast, Williams argues that he was discriminated against *because of* his disability.

2.  <u>Compensatory Damages</u>

Compensatory damages, as Williams seeks here, are unavailable "absent proof of 'intentional discrimination,'"[181] which requires at least deliberate indifference.[182]  To prove deliberate indifference, the (1) "defendant must actually have known or been aware of the excessive risk to [prisoner] safety"[183] and (2) failed to act despite that knowledge. [184]

The District Court determined that Williams failed to put forth evidence that the DOC acted with deliberate indifference.   We disagree.   The evidence here is uncontradicted as to the second factor: by neither removing Williams from solitary confinement for *twenty-six years*, nor making modifications to his conditions of confinement, the DOC failed to act.  Assuming that Williams had a preexisting serious mental illness that the DOC was aware of, the only question is whether there is a genuine factual dispute as to whether the DOC actually knew that prolonged solitary confinement caused an "excessive risk" to prisoner safety.[185]

We have already explained that the record includes evidence that suggests the DOC knew that prolonged solitary confinement causes an excessive risk of harm to prisoners with serious mental illness.  For instance, the 2014 DOJ report

---

[181] *Haberle*, 885 F.3d at 181 (quoting *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013)).
[182] *S.H. ex rel. Durrell*, 729 F.3d at 263.
[183] *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).
[184] *Haberle*, 885 F.3d at 181 (quoting *S.H. ex rel. Durell*, 729 F.3d at 265).
[185] *See S.H. ex. Rel. Durrell*, 729 F.3d at 266 ("The relevant inquiry is knowledge.").

concluded that the DOC was violating the ADA by (1) automatically placing individuals with serious mental illness in solitary confinement without an individualized assessment of their mental health needs and the appropriateness of such placement; and (2) failing to ensure that prisoners with serious mental illness placed in solitary confinement for reasons unrelated to their disabilities could "participate in and benefit from prison activities, programs, and services."[186]  That letter also provided the DOC with "narrowly tailored" remedies it could implement to ensure its compliance with obligations under the ADA.[187]

The DOC's contention that Williams improperly relied on a "generalized history" of ADA violations is unavailing. Although we have explained that "a generalized history of civil rights violations . . . would not necessarily demonstrate 'a pattern'"[188] of violations sufficient to prove deliberate indifference, the DOJ's report does far more than provide a "generalized history" of ADA violations.  It documents the DOC's pattern and practice of placing individuals with preexisting mental illness in prolonged solitary confinement, and explains that even where "solitary confinement is necessary," the DOC fails "to adjust the conditions of solitary confinement to avoid harm to the prisoner."[189]  That report—

---

[186] J.A. 081–82.

[187] J.A. 083.

[188] *Haberle*, 885 F.3d at 182 (quoting *Beers-Capitol*, 256 F.3d at 137).

[189] J.A. 080.  This situation is much more akin to that in *Haberle v. Borough of Nazareth,* 936 F.3d 138 (3d Cir. 2019), in which we found that deliberate indifference had been

coupled with the robust body of caselaw and reports on the harms caused to prisoners with preexisting mental illness[190]—creates a genuine issue of material fact as to whether the DOC was deliberately indifferent in subjecting Williams to prolonged solitary confinement under the circumstances alleged here. Accordingly, we will vacate the District Court's grant of summary judgment on Williams' ADA claim and remand for further proceedings.

## V.   Conclusion

For the above reasons, we will affirm the District Court's order dismissing Williams' Fourteenth Amendment claim, and we will vacate the District Court's order granting summary judgment for the Secretary on Williams' Eighth Amendment and ADA claims and remand for further proceedings consistent with this opinion.

---

plausibly pled in allegations that a police department was aware of a pattern of police encounters causing harm to people with mental disabilities but failed to adopt an accommodation policy. 936 F.3d at 141–42.

[190] *See supra* Part IV.A.



**U.S. Department of Justice**

Civil Rights Division

*Assistant Attorney General*
*950 Pennsylvania Ave, NW - RFK*
*Washington, DC 20530*

FEB 2 4 2014

The Honorable Tom Corbett
Governor's Office
225 Main Capitol Building
Harrisburg, PA 17120

Re:   <u>Investigation of the Pennsylvania Department of Corrections' Use of Solitary</u>
<u>Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities</u>

Dear Governor Corbett:

The Civil Rights Division has completed its investigation of the Pennsylvania Department of Corrections' ("PDOC") use of solitary confinement on prisoners with serious mental illness ("SMI") and intellectual disabilities ("ID"). The investigation was conducted pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. CRIPA authorizes the Department of Justice to seek equitable relief where conditions in state correctional facilities violate the rights of prisoners protected by the Constitution or laws of the United States.

We opened this systemwide investigation after having found that one of Pennsylvania's prisons—the State Correctional Institution at Cresson—routinely subjected prisoners with SMI/ID[1] to solitary confinement under conditions that violated their constitutional rights and their rights under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C §§ 12131-12134. We notified you of both our findings concerning Cresson and our decision to conduct a systemwide investigation in a letter dated May 31, 2013 ("Cresson Findings Letter"). *See* www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf.

Our systemwide investigation found that the Commonwealth uses solitary confinement in ways that violate the rights of prisoners with SMI/ID. However, it is important to note that in the months since we issued our Cresson Findings Letter, the overall number of prisoners with SMI/ID that PDOC subjects to solitary confinement has gone down. Moreover, PDOC's leadership has been developing new policies that, if adopted and implemented, would further reduce the number of prisoners with SMI/ID in solitary and improve mental health services for prisoners with SMI. Nonetheless, much more needs to be done. Throughout the PDOC system, hundreds of prisoners with SMI/ID remain in solitary confinement for months and sometimes

---

[1] We use the shorthand "SMI/ID" in this letter, but note that, while there is some overlap, most prisoners with SMI do not have ID and vice versa.

**JA062**

Case: 22-2399    Document: 46    Page: 85    Date Filed: 00/26/2024

years, with devastating consequences to their mental health, in violation of their rights under the Eighth Amendment and the ADA.

In our review, we looked at the totality of the conditions confronting prisoners in solitary and the presence or absence of mechanisms to mitigate harms arising from those conditions.  To reach our investigative findings, it was necessary to assess the conditions in which prisoners were held, the practices of PDOC, the duration of confinement, the decisions made relating to security reasons and penological concerns, the available programs and services, and the precise harms found by our expert-consultants.  We concluded that these conditions collectively violated the constitutional and statutory rights of prisoners with serious mental illness and intellectual disabilities.[2]

Throughout our investigation, Secretary John Wetzel and his staff have provided us with exceptional cooperation.  We look forward to collaborating with them in the coming months to fashion an agreement between the United States and the Commonwealth that effectively addresses our shared concerns.

## I.    SUMMARY OF FINDINGS

PDOC has begun reforming the way in which it uses solitary confinement on prisoners with SMI/ID.  In recent months, PDOC has implemented new procedures for the disciplinary process.  It has also implemented new protocols for the treatment of prisoners with SMI in certain specialized housing units.  These reforms have led to a reduction in the number of prisoners with SMI subjected to solitary confinement.  Moreover, PDOC is in the process of drafting policies geared toward further reducing the number of prisoners with SMI/ID housed in isolation units and improving mental health care for prisoners with SMI.  While the Commonwealth has made important improvements, much more work needs to be done to ensure sustained compliance with the mandates of the Constitution and the ADA.  Below we summarize our factual determinations and our ongoing concerns:

- **The manner in which PDOC subjects prisoners with SMI to prolonged periods of solitary confinement involves conditions that are often unjustifiably harsh and in which these prisoners routinely have difficulty obtaining adequate mental health care:**  In the one-year period between May 2012 and May 2013, PDOC confined more than 1,000 prisoners on its active mental health roster in solitary confinement for more than 90 days.[3] Nearly 250 of those prisoners were in solitary for more than a year.  There are still roughly 115 prisoners PDOC identifies as having SMI who are in solitary.  Our expert-consultants have concluded that the 115 number grossly understates the number of prisoners with SMI currently subjected to solitary confinement, estimating that there are hundreds more.[4]  The

---

[2]  In making these findings, the Department of Justice does not intend to suggest that every use of solitary confinement on persons with SMI/ID is a *per se* violation of the Eighth Amendment or the ADA.

[3]  PDOC separates its active mental health roster into two categories: (1) those prisoners designated as having "the most serious need for mental health services;" and (2) those designated as having a "present mental health need."

[4]  PDOC has newly revised its active mental health roster.  It designates only those in the first category as having SMI.  However, after reviewing medical records and interviewing prisoners, we and our expert-consultants in mental health have concluded that a very significant number of the prisoners currently designated as not having SMI

Case: 22-2399    Document: 46    Page: 80    Date Filed: 08/26/2024

conditions that prisoners with SMI face while in solitary confinement are harsh. They are routinely confined to their cells for 23 hours a day; denied adequate mental health care; and subjected to punitive behavior modification plans, forced idleness and loneliness, unsettling noise and stench, harassment by correctional officers, and the excessive use of full-body restraints.

- **The manner in which PDOC uses solitary confinement on prisoners with SMI results in serious harm:** PDOC uses isolation on prisoners with SMI in a way that exacerbates their mental illness and leads to serious psychological and physiological harms. Indeed, our expert-consultants interviewed and reviewed the records of more than two dozen prisoners whom they concluded were seriously harmed by solitary confinement in various ways, including severe mental deterioration, psychotic decompensation, and acts of self-harm. For instance, even though only a small fraction of the prisoners at the prisons we toured were housed in solitary confinement units, most of the suicide attempts occurred in those units. Specifically, more than 70% of the documented suicide attempts between January 1, 2012 and May 31, 2013 occurred in the solitary confinement units.

- **Numerous systemic deficiencies contribute to PDOC's extensive use of solitary confinement on prisoners with SMI:** PDOC routinely resorts to using prolonged solitary confinement on those with SMI primarily because systemic deficiencies interfere with its ability to provide adequate mental health treatment. When we initiated our investigation in May, prisoners with SMI were placed in solitary confinement at twice the rate of prisoners without SMI. Too often, instead of providing appropriate mental health care, PDOC's response to mental illness is to warehouse vulnerable prisoners in solitary confinement cells.

- **The manner in which PDOC uses solitary confinement also harms prisoners with ID:** PDOC uses solitary confinement on a significant number of prisoners with ID, as defined below. Prisoners with ID are especially susceptible to the harmful effects of PDOC's use of solitary confinement. They have limited coping mechanisms and their mental health is prone to deteriorating when subjected to the stressors present in PDOC's solitary confinement units. We believe PDOC is not adequately addressing such concerns.

- **The manner in which PDOC uses solitary confinement often discriminates against prisoners with SMI/ID:** PDOC often unnecessarily and inappropriately places prisoners in solitary confinement because they have SMI/ID. Isolating prisoners on the basis of their SMI/ID without adequate justification constitutes impermissible discrimination and unjustifiably denies them access to services and programs provided to most other prisoners. PDOC has failed to make reasonable modifications to its policies, procedures, and practices to meet the needs of prisoners with SMI/ID in the most integrated setting appropriate to their needs and consistent with legitimate safety requirements. Instead, it has routinely elected to segregate these prisoners unnecessarily in its solitary confinement units.

PDOC's solitary confinement practices violate the Eighth Amendment's prohibition against "cruel and unusual punishments." Embodying "broad and idealistic concepts of dignity,

---

and thus are assigned to PDOC's second category indeed have SMI. We also identified other prisoners with SMI who are left off PDOC's active mental health roster entirely.

Case: 22-2399   Document: 46   Page: 83   Date Filed: 09/26/2024

civilized standards, humanity, and decency," *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), the Amendment prohibits officials from disregarding conditions of confinement that subject prisoners to an excessive risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 843 (1994). PDOC's use of a harsh form of solitary confinement for extended periods of time on hundreds of prisoners with SMI/ID constitutes precisely the type of indifference to excessive risk of harm the Eighth Amendment prohibits.

The practices described in this letter also violate the ADA. The ADA prohibits prisons from discriminating against prisoners with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). It generally obligates prisons to provide qualified prisoners with disabilities the opportunity to participate in and benefit from prison services, programs, and activities, and, absent legitimate justification, to do so in the most integrated setting appropriate to individual prisoners with disabilities. *See* 28 C.F.R. §§ 35.130(a), (d), 35.150, 35.152; *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Chisolm v. McManimon*, 275 F.3d 315, 324-25 (3d Cir. 2001). PDOC uses solitary confinement in a way that is at odds with these requirements.

## II.   METHODOLOGY, DEFINITIONS, AND BACKGROUND

### A.   Methodology

In August 2013, we conducted on-site inspections of six PDOC prisons.[5] We conducted the tours with the assistance of two expert-consultants in mental health treatment, suicide prevention, and the effects of solitary confinement. We interviewed PDOC leadership, administrative staff members, security staff members, medical and mental health staff members, and prisoners. We reviewed documents related to the use of solitary confinement at all 26 of the Commonwealth's prisons before, during, and after our site visits. These include policies and procedures, medical and mental health records, cell histories, incident reports, disciplinary reports, suicide reviews, and unit logs. We also observed prisoners in various settings throughout the facilities. Consistent with our commitment to providing technical assistance and conducting a transparent investigation, we conducted exit conferences after each of our on-site inspections.

### B.   Definitions

Terms we use throughout this letter are defined as follows:

- **"Isolation" or "solitary confinement"** means the state of being confined to one's cell for approximately 23 hours per day or more.

- **"Solitary confinement unit" or "isolation unit"** means a unit where either all or most of those housed in the unit are subjected to solitary confinement.

- **"Serious mental illness" or "SMI"** means "a substantial disorder of thought or mood that significantly impairs judgment, behavior, [or] capacity to recognize reality or cope with the ordinary demands of life." Pa. Dep't of Corr., *Access to Mental Health Care,*

---

[5] One of the prisons we toured—SCI Greene—is the facility using solitary confinement on the greatest number of prisoners by far. We also toured SCI-Fayette, SCI-Smithfield, SCI-Rockview, SCI-Muncy, and SCI-Dallas.

Case: 22-2399   Document: 46   Page: 84   Date Filed: 09/26/2024

> *Policy 13.8.1., Section 2-Delivery of Mental Health Services* § A.1.a.(2) (2013) (we note that for this letter we have adopted PDOC's own definition of SMI).

- **"Intellectual disability" or "ID"** means a disability characterized by both a significant impairment in cognitive functioning, and deficits in adaptive functioning, such as communication, reasoning, social skills, personal care, and organizing school or work tasks. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 33 (5th ed. 2013). An intellectual disability begins before the age of 22 and is chronic. As a substantial number of inmates may have some lesser form of ID, for the purposes of this letter, ID will refer to having a highly significant impairment of functioning, generally indicated by an IQ score of 70 or below, that would be adversely impacted by prolonged placement in a solitary confinement unit.

## C.   Background

PDOC operates 26 facilities, housing approximately 50,000 prisoners. PDOC subjects at least 2,800 of those prisoners—roughly 6% of the system's prisoners—to solitary confinement.

Roughly 2,400 of those in solitary are housed in Restricted Housing Units ("RHU"). Prisoners are housed in RHUs for violating prison rules (disciplinary segregation) or to protect the security of the prison or the individual prisoner (administrative segregation). Prisoners in the RHUs are usually confined to their cells for roughly 23 hours a day.

Another 400 prisoners are housed in one of the following types of solitary confinement units: a unit of Psychiatric Observation Cells ("POC") (for prisoners who are mentally decompensating to the point of being considered a danger to themselves, other prisoners, and/or property); the Capital Case Unit ("CCU") (for prisoners who have been sentenced to death); the Special Management Unit ("SMU") (for prisoners who exhibit behavior that presents a risk to the orderly running of the prison); and the Secure Threat Group Management Unit ("STGMU") (for prisoners who pose a risk to the prison because of their affiliation with, and active involvement in, gangs).[6]

Until recently, PDOC used solitary confinement on many of the approximately 70 prisoners housed in its Secure Special Needs Units ("SSNUs"). The SSNUs were used to house prisoners with SMI who had a history of disciplinary infractions. Within the last couple of months, PDOC has eliminated its SSNUs, replacing them with Secure Residential Treatment Units ("SRTUs"). PDOC has represented to us that it does not intend to use solitary confinement on any of the prisoners housed in its new SRTUs.

---

[6] Until this summer, prisoners in the CCU were confined to their cells for roughly 23 hours a day. In recent months CCU prisoners have been permitted one additional hour of recreation time per day. Prisoners in POC are confined to their cells for approximately 24 hours per day. Most prisoners housed in SMUs and STGMUs spend at least 23 hours a day in their cells. A small minority of the prisoners housed in SMUs and STGMUs are allowed a few additional hours of out-of-cell time per week after progressing to the least-restrictive part of these units' step-down programs.

5

Case: 22-2399   Document: 46   Page: 89   Date Filed: 09/26/2024

## III.   DISCUSSION

### A.   PDOC has begun to address the way in which it uses solitary confinement on prisoners with SMI and to improve its mental health care practices.

In recent months, PDOC has been reforming its solitary confinement practices. Currently, PDOC is preparing draft policies that, if correctly implemented, may reduce the number of prisoners with SMI subjected to prolonged isolation and improve the mental health care for this population. Moreover, during the summer, PDOC started to implement changes even though policies have not been finalized or adopted. Those changes include: (1) involving mental health staff members in the disciplinary process when the prisoner has SMI; (2) training a significant number of staff members in crisis intervention; (3) converting SSNUs that functioned like isolation units into SRTUs that provide more treatment, out-of-cell activities, and positive incentives; and (4) training and using peer specialists in some PDOC facilities to provide additional support to prisoners with SMI housed in general population.

These initial reform efforts are already producing positive results. Over a three month period this summer, PDOC reduced the number of prisoners with SMI in solitary confinement by well over 100.[7]  Our expert-consultants found that these changes have dramatically improved the mental health of those removed from solitary. For example, one prisoner who had spent many months in an RHU and is now housed in an SRTU told us that "he came to hate himself" when he was in solitary, and that he now feels much better because he can more regularly get out of his cell. He also noted that he has greatly benefited from group therapy in the SRTU, where he can talk to prisoners facing similar difficulties. Line-staff members have also noted the positive changes. For instance, a staff psychologist commented on how she has recently seen a marked reduction in negative behaviors by prisoners as out-of-cell activities have increased.

Although progress has been made, there is still work to be done. Many of our major findings concerning the way in which Cresson misused solitary confinement still apply with equal force to the PDOC system as a whole. In the following sections, we discuss these serious, ongoing problems with the manner in which PDOC uses solitary confinement on prisoners with SMI. We also discuss the systemic failures that remain in place and contribute to PDOC's excessive reliance on solitary confinement as a control tool.[8]

### B.   The manner in which PDOC continues to use solitary confinement on prisoners with SMI violates their rights under the Eighth Amendment to the U.S. Constitution.

Despite the progress that has been made in recent months, we find that the manner in which PDOC continues to use solitary confinement on prisoners with SMI violates the Eighth Amendment's prohibition against punishments that are "cruel and unusual." There is no static test for determining whether conditions are "cruel and unusual." Instead, the Eighth Amendment

---

[7]  As we noted in the Summary of Findings section, PDOC has identified roughly 115 prisoners with SMI presently housed in solitary confinement units. Our expert-consultants have concluded that this number grossly underestimates the actual number of prisoners with SMI/ID still in solitary.

[8]  In December 2013, PDOC officials reported to us progress they felt had been made since our August inspections. These efforts included beginning to review serious injurious behaviors, establishing suicide prevention committees at each facility, accelerating crisis intervention training schedules for officers, and drafting a proposal to have an independent organization conduct a segregation reduction project on all prisoners regardless of their vulnerabilities.

"must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

By subjecting prisoners with SMI to prolonged periods of solitary confinement under harsh conditions that are not necessary for legitimate security-related reasons, PDOC exposes them to an excessive and obvious risk of serious harm. *See Farmer*, 511 U.S. at 828; *Hope v. Pelzer*, 536 U.S. 730, 738-745 (2002) (holding that prison officials show deliberate indifference where they disregard obvious risks to prisoner safety). Moreover, our expert-consultants observed that as a direct result of these practices, prisoners with SMI have suffered serious psychological and physical harms, including psychosis, trauma, severe depression, serious self-injury, and suicide. *Cf. Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) ("The touchstone is the health of the inmate. While the prison administration may punish, it must not do so in a manner that threatens the physical and mental health of prisoners.").

1. **PDOC subjects prisoners with SMI to prolonged periods of solitary confinement under harsh conditions where they routinely have difficulty obtaining adequate mental health care, which in combination pose an excessive risk to the mental health of prisoners.**

The manner in which PDOC uses solitary confinement involves a number of factors that in combination violate the Eighth Amendment. *See Peterkin v. Jeffes*, 855 F.2d 1021, 1024-25 (3d Cir. 1988) (holding that the district court appropriately considered the "totality of conditions" when assessing the constitutionality of Pennsylvania's death row unit, where prisoners were confined to their cells for approximately 22 hours per day). We did not consider any individual factor to be determinative. Instead, we assessed the constellation of conditions in PDOC's solitary confinement units and the harms found by our expert-consultants that resulted from these conditions and practices.

In reaching our conclusion, we considered the following factors:

(1) the length of time prisoners with SMI spent in solitary confinement;

(2) the extent to which the use of solitary confinement on prisoners with SMI interfered with staff members' ability to provide adequate mental health care; and

3) the unjustifiable harshness of the conditions that attended PDOC's use of solitary confinement on prisoners with SMI.

**First, the manner by which PDOC routinely subjects prisoners with SMI to lengthy periods of solitary confinement involves conditions that our expert-consultants found subjected prisoners to harm or an unreasonable risk of harm and contributes to the Constitutional violation.** As one court noted, long periods of isolation for those with SMI can be "the mental equivalent of putting an asthmatic in a place with little air to breathe." *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995); *see also* Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012) ("Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."); *Morris v. Travisono*, 499 F. Supp. 149, 160 (D.R.I. 1980) (noting that "[e]ven if a person is confined to an air conditioned suite at the Waldorf Astoria,

7

**JA068**

Case: 22-2399   Document: 46   Page: 67   Date Filed: 00/26/2024

denial of meaningful human contact for . . . an extended period of time may very well cause severe psychological injury"); *United States v. Bout*, 860 F. Supp. 2d 303, 308 (S.D.N.Y. 2012) ("It is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee.").

From May 2012 to May 2013, over 1,000 prisoners identified on PDOC's active mental health roster spent three or more continuous months in solitary confinement. Nearly 250 of these prisoners have been in solitary confinement for more than a year. Most of these prisoners were held in an RHU or one of the other solitary confinement units.

For many with SMI, PDOC's use of prolonged isolation is mentally taxing because they can see no end point to it. We interviewed many prisoners with SMI who told us they believed they would never get out of solitary. Some told us that they had accumulated years of disciplinary time in the RHU and feared they would never be returned to general population. Others explained that they had lost all faith in their ability to conform their conduct to the prison's rules in a way that would allow them out of their isolation cell.

**Second, the manner in which PDOC uses solitary confinement interferes with its ability to provide adequate mental health treatment to prisoners with SMI and contributes to the Constitutional violation.** *See Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (adopting the magistrate judge's conclusion that "inmates are denied access to necessary mental health care while they are housed in [solitary confinement]"). Appropriate mental health treatment for prisoners with SMI should involve much more than medication. Nat'l Comm'n on Corr. Health Care, *Standards for Mental Health Services in Correctional Facilities*, § MH-G-02 (2008). Prisoners with SMI must also have, among other things, "programming or appropriate therapies (or both) to meet the mental health needs of patients." *Id.*[9] Unfortunately, for much of last year, hundreds of prisoners with SMI spent months in solitary confinement receiving only medication and occasional "cell-side" visits from mental health staff members, even though our expert-consultants found more care was needed for those inmates.[10]

Recently, staff psychologists at many of the prisons have started to conduct at least one out-of-cell therapy session per month for prisoners with SMI currently housed in an isolation unit. This approach constitutes a significant improvement over past practices.

However, PDOC continues to use practices that fail to ensure that prisoners with SMI in solitary confinement receive the mental health treatment they need. *Cf. Casey v. Lewis*, 834 F. Supp. 1477, 1547-49 (D. Ariz. 1993) (describing the inappropriate use of isolation for prisoners

---

[9] According to our consultants, prisoners with SMI may also need regular and meaningful counseling from mental health staff members, peer and other counseling skill building, and structured and unstructured activities. Activities may include eating out of cell, outdoor recreation, and showers. They explain that these types of activities provide opportunities for both socializing and organizing one's life in the facility in a way that is therapeutic and important to the health of prisoners with SMI.

[10] A cell-side visit typically involves a member of the mental health staff standing outside a prisoner's cell, attempting to speak to the prisoner through a food tray slot or cracks in a doorframe amid the commotion on the unit. Such a visit typically lasts for only a few minutes at a time, lacks confidentiality, and cannot be equated with a face-to-face, out-of cell consultation/therapy session. As one staff member explained, "You can't do therapy in a hallway."

8

with serious mental illness because "[d]uring lockdown, inmates are provided improper mental health care or no mental health care").

PDOC also uses solitary confinement in a way that interferes with staff members' ability to identify prisoners who are mentally deteriorating in their cells. The problem is particularly acute for under-diagnosed prisoners not on the mental health roster. One former staff psychologist explained that he found it difficult to appropriately assess the condition of prisoners in solitary confinement. He emphasized that his manager discouraged him from doing anything other than cursory cell-side assessments of prisoners' mental health. He noted that for inmates who were inactive and in their cells most of the time, it was next to impossible to fully assess the condition of prisoners from cell-side without an out-of-cell visit.

**Third, unjustifiably harsh conditions often attend PDOC's use of prolonged solitary confinement on prisoners with SMI. In combination, these conditions are dehumanizing and cruel and contribute to the Constitutional violation.** *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (holding that when conditions of confinement combine to "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need," they violate the Eighth Amendment); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1247 (9th Cir. 1982) ("[T]he court must consider the effect of each condition in the context of the prison environment, especially when the ill effects of particular conditions are exacerbated by other related conditions."). While conditions for those housed in PDOC's solitary confinement units vary somewhat by prison, there are consistent themes. PDOC's prisons consistently subject prisoners with SMI to not just prolonged isolation, but also unnecessarily harsh and disorienting housing conditions, punitive behavior modification plans, and the excessive use of full-body-restraints. These conditions serve only to exacerbate their mental illness. We discuss these conditions below:

*Harsh conditions*: Although by its nature solitary confinement typically includes aspects that would be considered harsh in the ordinary sense of the word, the particular use of solitary confinement on inmates with SMI in the PDOC system, when examined under the totality of the circumstances, includes unjustifiably harsh conditions, even though some of these conditions, standing alone, might not be inappropriate in other circumstances. Every prisoner placed in solitary confinement must spend almost his entire day confined to a cell that is less than 100 square feet in size—about the size of an average American bathroom. The cell contains a metal bed frame, a thin plastic mattress, metal sink, metal toilet, and metal desk with an attached metal seat, and sometimes a small shelf. At some of the prisons, the cell will also have a small exterior-facing window, but at many of the prisons, the cell has no exterior window and no natural light coming directly into it. Usually, the prisoner is locked in his cell behind a solid metal door. The door has a narrow slot (used for passing food trays and for handcuffing the prisoner before he can leave the cell), and a small plastic window with a view to either a hallway or the housing unit's common area.

The lighting in the cell can be dimmed, but it can never be turned off, even at night. The noise level can be high, even at night, because of the yelling and banging of neighboring prisoners. The prisoner with SMI in solitary confinement in PDOC has limited out-of-cell time. Typically, he is allowed, at most, one hour in an empty and caged outdoor pen, five times a week, and a 15-minute shower three times a week. Recently, conditions for the prisoner PDOC has identified as having SMI also often includes one out-of-cell therapy session per month with a staff psychologist.

9

Case: 22-2399   Document: 46   Page: 88   Date Filed: 09/26/2024

Before he can leave his cell, a prisoner must first submit to a strip search. Further, to get from his cell to an out-of-cell activity, the prisoner is at all times escorted by correctional officers and has his arms and legs shackled together. Many prisoners we spoke to told us that they rarely leave their cells because of these procedures. They explained that being strip searched, handcuffed, and led by tether by two corrections officers made them feel like animals. The female prisoners told us that the strip searches remind them of past sexual abuses.

Our expert-consultants found that in the solitary confinement units, conditions for the prisoner with SMI also routinely involve unnecessarily forced idleness and loneliness, where the idleness was unjustified by legitimate penological goals and not mitigated. For instance, looking at the totality of the circumstances, the prisoner with SMI in disciplinary custody at an RHU generally has no access to television or radio; has only limited access to reading materials; cannot make telephone calls (with the exception of emergency calls approved by management); is denied contact visitation privileges; is denied any opportunity to have non-contact visits with friends; and, at most, can only have one non-contact visit per month with an immediate family member, lasting for no longer than an hour.[11]

Living conditions in the RHU routinely involve a mix of disorienting and uncomfortable sensory experiences. For example, the air quality is often poor because of inadequate sanitation and ventilation. At one of the solitary confinement units we visited where the sanitation was especially bad, prisoners complained *en masse* to us about the smell of the place. A prisoner there explained, "The smell is terrible. When a prisoner smears feces on the walls, it's often left like that for days and the entire pod reeks of shit and makes you want to vomit."

*Punitive responses to symptoms of mental illness*: In most of the solitary confinement units we toured (which were mainly RHUs), staff members routinely respond to the prisoner exhibiting symptoms of his mental illness by making his living conditions even more inhospitable. Prisoners with SMI in the solitary confinement units frequently engage in behaviors that may be signals of mental illness instead of intentional misbehavior, such as smearing fecal matter on their cell walls or repeatedly failing to comply with prison rules, including minor infractions like where to stand in the cell when receiving meals. All too often corrections officers respond to behaviors that signal mental illness not by seeking to ensure that the inmate received adequate mental health treatment, but instead by imposing additional restrictions on the conditions of the prisoners' confinement. Restrictions can include harsh measures, such as unjustifiably requiring the prisoner to remain confined to his cell 24/7; denying the prisoner bedding material or running water and taking away the prisoner's clothes. Corrections officers are empowered to impose these restrictions for up to seven days at a time without conferring with mental health staff members and with nothing other than the approval of the unit's shift commander.

Corrections staff members also use housing assignments within the solitary confinement units as a way to punish prisoners for conduct related to their mental illness. For instance, in one of the RHUs, we found an unusually narrow cell that had no furniture in it other than a bed. When we asked about the cell, the corrections staff members at the unit assured us that prisoners

---

[11] We do note, however, that it is appropriate for a correctional system to remove privileges as a part of the disciplinary process.

10

Case: 22-2399   Document: 46   Page: 90   Date Filed: 00/26/2024

were never assigned to the cell for more than a couple of days at a time, and then only for their own safety. However, our records review confirmed the allegations of the prisoners on the unit who had told us that a prisoner with SMI had been housed in the cell for nearly half a year.

At all of the facilities we toured, prisoners with SMI in the solitary confinement units complained of officers verbally abusing them. Some prisoners alleged that officers had encouraged them to kill themselves. For instance, one prisoner with SMI alleged that as recently as July 2013, when he tied a bedsheet to his vent and stood on his toilet preparing to kill himself, a group of officers encouraged him to go through with it. According to the prisoner, the officers told him that they "wanted to see his feet dangling," and chanted, "1 . . . 2 . . . 3 . . . kill yourself," repeatedly.[12]

Prisoners also alleged that officers working the solitary confinement units intentionally provoke prisoners with SMI into acting out. The prisoners claimed that the officers "push the buttons" of prisoners with SMI so as to have a basis for imposing additional restrictions on their conditions.

*Unnecessary and excessive use of restraints*: Excessive uses of full-body restraints often attend the use of solitary confinement on prisoners with SMI. Full-body restraints are a type of restraint that should only be used in exigent circumstances, and only for the briefest time necessary to ensure the safety of the prisoner or those around him. *See Cresson Findings Letter* at 16-18. According to our consultants, corrections officers should rarely have to use a full-body restraint on a prisoner for anywhere close to seven hours. Nonetheless, of the more than 260 full-body restraint incidents between January 2012 and June 2013, almost 75% lasted longer than 7 hours, and 15% lasted longer than 12 hours. This data, along with our review of the records related to PDOC's uses of restraints, indicate that corrections officers routinely use full-body restraints for far longer than is needed to avoid harm. Instead, they often appear interested in using the restraints as a means to discipline prisoners by causing discomfort or pain.

In sum, we have identified three factors indicating that PDOC uses solitary confinement in a way that poses an excessive and obvious risk of harm to prisoners with SMI. First, PDOC often uses solitary confinement on vulnerable prisoners with SMI for prolonged periods of time. Second, PDOC uses solitary confinement on prisoners with SMI in a way that frequently interferes with its ability to provide them with the mental health care they need. And third, extreme conditions—such as the excessive use of full-body restraints—routinely attend PDOC's use of solitary confinement on prisoners with SMI.

## 2. The way in which PDOC uses solitary confinement on prisoners with SMI has resulted in serious harm.

The way PDOC uses solitary confinement on prisoners with SMI has led to serious harm. At the prisons we visited, a disproportionate amount of the self-harm continues to occur in the isolation units, just as it did in Cresson. Between January 1, 2012 and May 31, 2013, although only a small fraction of PDOC's prisoners were housed in one of the solitary confinement units, 206 of the 288 documented suicide attempts occurred there. Our expert-consultants interviewed and/or reviewed records of more than two dozen prisoners who they have concluded were

---

[12] Prisoners housed in nearby cells provided accounts of the incident that were substantially consistent with what this prisoner had told us.

Case: 22-2399   Document: 46   Page: 85   Date Filed: 09/26/2024

directly harmed by their conditions in solitary confinement in various ways, including mental deterioration, increased psychosis, and acts of self-harm and suicide.

Below we discuss the experiences of two of the individuals our expert-consultants interviewed in greater detail to illustrate the types of harms prisoners are suffering as a consequence of the way in which PDOC uses solitary. The first case involves a prisoner PDOC initially identified as having SMI, who PDOC held in solitary confinement for roughly ten months. The expert-consultant who interviewed the prisoner and reviewed his records concluded that the way in which solitary confinement was used on him led to a deterioration in his mental health and to suicide attempts.

The second case involves a prisoner who went into solitary confinement without SMI. According to a former staff psychologist we spoke to, PDOC failed to identify him as someone in need of treatment mainly because PDOC uses solitary confinement in a way that interferes with its ability to effectively screen for mental illness. Now, after many years in solitary, this prisoner has schizophrenia and has difficulty speaking in complete sentences. According to the expert-consultant who interviewed this prisoner and reviewed his records, this prisoner's decompensated state is principally attributable to his experiences in solitary confinement.

### Example 1 – Prisoner AA[13]

In February 2013, Prisoner AA—who has a mood disorder, an IQ of 66, and is on PDOC's mental health roster—attempted to hang himself after more than five months in solitary confinement in the facility's RHU. After his suicide attempt, staff moved him to a POC for one day, and then returned him to the RHU. After another roughly five months in solitary confinement in the RHU, Prisoner AA again attempted to hang himself. Fortunately, a week before we toured the facility, Prisoner AA was transferred to the SRTU. Conditions there are markedly better. Prisoner AA is no longer subjected to solitary confinement. He receives much more mental health care treatment, and his mental health has improved considerably.

According to one of our expert-consultants who interviewed Prisoner AA and reviewed his medical records, at the time of his suicide attempts, Prisoner AA exhibited symptoms consistent with a type of delirium that can result from subjecting a prisoner with SMI to prolonged isolation under certain conditions. Prisoner AA had told our consultant that while in the RHU, he became hypersensitive to sights and sounds. He also experienced visual hallucinations. For instance, he recalled sometimes seeing his deceased brother encouraging him to cut himself and "come join me." Prisoner AA also told our expert-consultant that when he experienced visual hallucinations of his brother, guards laughed at him and walked away, instead of referring him to psychology. He explained that in the RHU he became really depressed, and that his feelings of hopelessness made him want to kill himself and act out against the guards.

Finally, while Prisoner AA was in solitary, staff failed to pay sufficient attention when Prisoner AA expressed his intent to kill himself. For instance, records establish that before his second suicide attempt, Prisoner AA told staff he wanted to kill himself because they were ignoring his requests for a change in medication. The record also shows that just prior to his suicide attempt, Prisoner AA also "asked to see Psychiatry for a week and a half and . . . was

---

[13]  To protect the identity of prisoners, we use coded initials.

Case: 22-2399   Document: 46   Page: 88   Date Filed: 08/26/2024

tired of waiting to be seen." Notably, the facility did not have a full-time psychiatrist at the time.

Example 2 – Prisoner BB

Prisoner BB has been imprisoned in PDOC for approximately 25 years. For almost all of that time he has been housed in solitary confinement. BB had no mental illness when he entered the prison system. On his initial evaluation, he was described as friendly, motivated to engage in educational activities (he was functionally illiterate), and unlikely to be a problem while incarcerated. After spending years in solitary, his mental health has badly deteriorated. Prisoner BB is floridly psychotic, disorganized, and unable to take care of his own personal hygiene and nutrition. He is locked in a cycle of chaotic behavior, mental deterioration, and disciplinary infractions.

According to our expert-consultant who interviewed Prisoner BB and reviewed his medical records, he has received virtually no mental health treatment while in solitary. Twice (in 2008 and 2012) his condition so deteriorated that he was admitted to an off-site inpatient unit that provides intensive mental health treatment. On admission, the records reflected that he had bizarre speech, disorganized behavior, extremely poor hygiene, and was responding to hallucinations. On both occasions, he improved dramatically while receiving the intensive care at the off-site inpatient unit. Instead of recognizing that his improvement confirmed that solitary confinement was harming his mental functioning, PDOC viewed it as evidence that he had faked or "malingered" mental illness while in solitary. After each of his brief stays at the off-site inpatient unit, Prisoner BB was returned to solitary.

As recently as April 2013, Prisoner BB was not on PDOC's active mental health roster and remained in solitary confinement. Fortunately, a week prior to our tour he was placed on the roster and recommended for admission to a psychiatric unit "to gain a better understanding of what mental illness, if any, is present."

When we first encountered Prisoner BB in the RHU, we noted that the floor of his cell was covered in food. When our expert-consultant interviewed him, he mumbled that he was fine. Yet quite clearly he was not. He appeared disheveled and confused, trembled in fear, and was almost incoherent.

To compound matters, we were told by multiple prisoners that BB is often harassed by corrections officers because of his delusions and incoherence. According to our consultant, an environment such as this makes it more difficult to develop an alliance for medication compliance.

One psychologist we spoke to told us that when he had earlier raised the issue of BB's mental instability with his supervisor, the supervisor had "turned a blind eye" to the situation. The psychologist told us that he was very concerned about Prisoner BB's mental deterioration, but that his supervisor was of the view that the monthly cell-side check-in psychologists provided to all prisoners in Prisoner BB's solitary confinement unit would constitute adequate mental health care for this prisoner.

13

Case: 22-2399    Document: 46    Page: 83    Date Filed: 09/26/2024

These examples speak to the harm that has been directly caused by the specific manner in which PDOC uses solitary confinement on prisoners with SMI.

Though many of the prisoners with SMI have become too ill to describe their mental suffering while in solitary, many others were eager to tell us how solitary had harmed them. One prisoner told us, "I feel like it's hard for me to breathe here. I feel claustrophobic . . . I feel trapped . . . I feel angry inside . . . I feel like giving up. I'm helpless behind the door." Another simply told us, "It's just a black hole. They put you back here and leave you." A prisoner with SMI who is now doing well in general population told us that in solitary he used to think a lot about "pounding [his] head against the wall." Another prisoner with SMI still in solitary told us, "The only way you can talk to someone or get something done is if you try to kill yourself."

## C. Systemic deficiencies undermining PDOC's mental health program pose an excessive risk of harm to prisoners and contribute to PDOC's overreliance on solitary confinement as a means of controlling prisoners with SMI.

Instead of having systems in place to ensure adequate mental health care throughout its facilities, PDOC uses isolation to control prisoners with mental illness as they become more ill and less stable. The structural deficiencies plaguing PDOC's mental health care system include inadequate: (1) continuity and coordination of care; (2) standing for mental health staff members; (3) criteria for assessing mental illness; (4) treatment capacity; and (5) oversight tools. These deficiencies lead to the unconstitutional use of isolation on prisoners with SMI, and pose a serious and obvious risk of harm to prisoners. *See Estelle*, 429 U.S. at 103-05; *Inmates of Allegheny County v. Pierce*, 612 F.2d 754, 761-63 (3d.Cir. 1979) (holding that the Eighth Amendment prohibits deliberate indifference to prisoners' serious mental health care needs).

### 1. Poor coordination and continuity of care leads to inadequate mental health care treatment and the use of solitary confinement on prisoners with SMI.

Systemwide problems concerning coordination and continuity of care among staff members have impeded PDOC's ability to provide adequate mental health care. Poor continuity of care leads to more prisoners becoming mentally unstable. It also means that PDOC staff members are less able to identify how mental instability contributes to prisoners' conduct and more likely to resort to the use of solitary confinement as a control tool.

PDOC's mental health staff members routinely fail to coordinate with each other. This can result in confusion over diagnoses and a failure to follow treatment plans. For example, in one record we reviewed, a psychiatrist prescribed a medication for a prisoner only to have a different psychiatrist discontinue it at the next meeting and prescribe another medication with no explanation for the abrupt change. On at least one occasion, when we asked staff members about a treatment mistake that had led to harm, they each disavowed responsibility and blamed one another.

Poor recordkeeping also hampers continuity and coordination of mental health care. Prisoner records are regularly missing vital mental health information, including information concerning diagnoses, prior treatment, medications, and family history of psychiatric disorders. Moreover, the mental health information PDOC does have is routinely scattered in different places not readily accessible to mental health staff members.

14

Case: 22-2399   Document: 46   Page: 68   Date Filed: 09/26/2024

Our consultants identified many instances where inadequate continuity of care resulted in harm to prisoners. In one example, a staff member's failure to consider medications that had worked in the past for a prisoner led to the prisoner acting out in ways characteristic of bipolar disorder. PDOC staff members responded to the prisoner's behavior by disciplining him with time in the RHU. In solitary, he decompensated badly and attempted suicide.

### 2. Inadequate consideration given to the views of mental health staff members often leads to assignment of prisoners with SMI to solitary confinement units.

Systemwide, PDOC must do more to expand the role of mental health staff members in determining the conditions of confinement for prisoners with SMI. For instance, while we applaud PDOC's recent effort to enhance mental health staff members' role in the disciplinary process, that role is limited and not always credited in determining whether to house prisoners with SMI in solitary confinement units. For prisoners with SMI, mental health clinicians should have a large role in housing decisions because they have the clearest sense of how such prisoners will be affected by a particular housing placement.

Some mental health staff members we interviewed expressed frustration and resentment at the lack of respect shown to them by security staff members. They complained about the extent to which security staff members feel at liberty to ignore their recommendations.

### 3. Difficulties in recognizing how mental illness may cause maladaptive behaviors leads to the inappropriate use of solitary confinement on prisoners with SMI.

If PDOC is to avoid subjecting prisoners to solitary confinement for engaging in conduct related to their illness, it will have to ensure that its staff members, especially mental health staff members, can recognize the effects of mental illness when they see them. Our review of mental health records reveals a disturbing tendency by many of PDOC's clinicians to describe almost all disruptive conduct as purely willful and behavioral, and to overlook the role of the prisoner's mental instability in causing the conduct. Our consultants found cases of maladaptive behavior rooted in mental instability that PDOC's mental health staff members incorrectly characterized as "manipulative" or "malingering" behavior.

### 4. PDOC needs to commit more resources to mental health services in both general population and its specialized housing units to avoid warehousing prisoners with SMI in solitary.

PDOC holds large numbers of prisoners with SMI in solitary, in part, because it devotes insufficient resources to mental health care. If PDOC had more staff members to provide adequate care in general population, fewer prisoners would deteriorate to the point of having to be placed in isolation. PDOC must have an adequate number of mental health staff members and therapeutic beds to provide prisoners with the care they need.

Inadequate staffing is a problem throughout PDOC's mental health system. Our mental health expert-consultants found that at each of the facilities they visited, clinicians had large, unmanageable caseloads due to understaffing. For example, one facility we toured is supposed

15

Case: 22-2399   Document: 46   Page: 89   Date Filed: 09/26/2024

to have seven full-time psychologists, but has only four.[14]  An experienced psychologist we interviewed there expressed the belief that, even if the facility filled all seven slots, at least three more staff members would be needed to provide adequate care given the needs at this particular facility.

Resource constraints also prevent prisons from transferring prisoners to settings with more intensive mental health treatment.  Mental health staff members we spoke to told us that they sometimes hold back on recommending transfers to such units because of a perception that bed space is limited.  Further, delays occur because already-stretched mental health staff members must complete lengthy referrals for PDOC's review before transfers to therapeutic units can occur.  If approved, prisoners must then wait for a bed to become available.  Each delay adds to the time prisoners wait in solitary confinement without the mental health care they need. *Cf. Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011) (recognizing that prolonged isolation may result in inappropriate delays in the provision of mental health care).

The need for more mental health staff members will only increase if PDOC follows through with its plans to have mental health staff members conduct more out-of-cell sessions in the solitary confinement units.  Plans to expand the amount of mental health services provided in the new SRTUs will also require more staff.

### 5.  PDOC lacks essential oversight tools to identify harms caused by inadequate mental health care and its overreliance on solitary confinement.

PDOC continues to lack key oversight mechanisms that would identify and address the harmful effects of solitary confinement and ensure the provision of adequate mental health care. We detailed at length in our Cresson Findings Letter how these essential oversight mechanisms did not exist and how this contributes to the system's dangerous use of solitary confinement. *See Cresson Findings Letter* at 26-31.  PDOC's plans to begin tracking and analyzing mental health-related information remain aspirational.  Currently, PDOC does not track the number of prisoners with SMI in solitary confinement units; does not examine the role of solitary confinement in causing suicides; does not track self-injurious behavior; does not critically review serious self-injuries; and does not track or analyze the additional punitive responses that prisoners with SMI experience in solitary confinement units, including, for example, use of force, food loaf, and hardened cells.  This flawed oversight system prevents PDOC from identifying and correcting harms to prisoners.

### D.  PDOC's use of solitary confinement also poses an excessive risk of serious harm to prisoners with ID.

In the course of our investigation, we encountered prisoners with ID housed in PDOC's solitary confinement units.  Most of these prisoners also have SMI.  According to our expert-consultants, some of these prisoners are especially susceptible, because of their limited coping mechanisms, to the harsh conditions of solitary confinement at PDOC.  For example, we spoke to a prisoner who felt especially empty and lonely while in solitary because reading was the only

---

[14] In the past year, this same facility went eight months without a full-time psychiatrist.  During that time, a part-time psychiatrist and two part-time psychiatric nurse practitioners tried to piece together enough hours to meet prisoners' psychiatry needs.

distraction he was allowed, and his intellectual disability had rendered him functionally illiterate. Prisoners with ID also consistently described the solitary confinement units as places where the officers were more hostile than in the other units, and complained about the officers taunting them and calling them names, such as "retards."

PDOC should have better systems in place to assess whether prisoners with ID who are held in solitary confinement for extended periods have limited coping mechanisms that must be addressed to ensure proper mental health care. For instance, PDOC does not screen for ID. Instead, it screens for prisoners with low IQs—a flawed proxy for ID, as it is only one of several factors used in making a diagnosis of ID. Until PDOC fixes this problem, it will have difficulty keeping prisoners with ID out of solitary.

E.   **The way in which PDOC uses solitary confinement on prisoners with SMI/ID also violates Title II of the ADA.**[15]

PDOC's solitary confinement practices also violate Title II in a variety of ways. *See* 42 U.S.C. § 12132. PDOC unjustifiably denies many of its prisoners with disabilities, including those with SMI and/or ID, the opportunity to participate in and benefit from correctional services and activities, such as classification, security, housing, and mental health services, or unnecessarily provides prisoners with psychiatric and intellectual disabilities unequal, ineffective, and different or separate opportunities to participate in or benefit from PDOC's classification, security, housing, and mental health services. *See* 28 C.F.R. § 35.130(b)(1)(i)-(iv). PDOC unlawfully segregates and warehouses prisoners with SMI and/or ID in isolation units, without either individually assessing each such prisoner concerning the risk the prisoner may actually and objectively pose to others, 28 C.F.R. §§ 35.130(d); 35.139, or otherwise justifying the need for segregation, *id.* §§ 35.130(b)(8), (h). PDOC also fails to reasonably modify policies, practices, and procedures where necessary for PDOC to avoid discrimination on the basis of disability. *Id.* § 35.130(b)(7).

As discussed above, our factual determinations concerning PDOC's misuse of solitary confinement on those with SMI/ID largely mirror the determinations we made in the Cresson investigation. Systemwide, PDOC's practices violate Title II because the prison: (1) unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies and practices; (2) fails to either properly assess prisoners on an individual basis to determine whether segregation in an isolation unit is appropriate housing or otherwise justify their segregation; and (3) unnecessarily denies opportunities to participate in and benefit from services, programs, or activities to prisoners with SMI/ID who have to be segregated from general population but should not be isolated in their cells.

---

[15]   The Department of Justice is charged with enforcing and implementing Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134. The Department may conduct investigations and compliance reviews of public entities, enter into voluntary compliance agreements, and enforce compliance through litigation. *See* 28 C.F.R. pt. 35, subpt. F.

17

Case: 22-2399   Document: 46   Page: 97   Date Filed: 09/26/2024

1. **PDOC unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies and practices.**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II extends to all of the prison's services, programs, and activities, including classification, housing, recreation, and medical and mental health treatment, among others, for which prisoners are otherwise qualified. *See Pa. Dep't of Corr.*, 524 U.S. at 209-10, 213 (finding, without exception, that Title II "unmistakably includes State prisons and prisoners within its coverage" and discussing "recreational activities" and "medical services" as covered under Title II to find a motivational boot camp to be a covered entity).

Both serious mental illness and intellectual disabilities, as defined here, qualify as disabilities under the ADA. 42 U.S.C § 12102 (including "mental" impairments under definition of "disability" where they substantially limit major life activities).

The regulation implementing Title II of the ADA requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); *see also Olmstead v. L.C.*, 527 U.S. 581, 592, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination on the basis of disability."). The Justice Department explained in the 1991 Preamble to the Title II regulation: "Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services relegates persons with disabilities to second-class status." 28 C.F.R. pt. 35, App. B. Moreover, a covered entity, such as PDOC, may not provide unequal services to qualified individuals with disabilities, *id.* § 35.130(b)(1)(ii), and may not provide different or separate services to qualified individuals with disabilities unless the different or separate services are necessary to provide benefits that are as effective as those provided to others. *Id.* § 35.130(b)(1)(iv). A covered entity also may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability. *Id.* § 35.130(b)(3)(i).

Under the ADA, a prison must "take certain proactive measures to avoid discrimination." *Chisolm*, 275 F.3d at 324-26 (holding that facility may have violated the ADA and discriminated against a deaf prisoner when it gave the prisoner pencil and paper instead of an American Sign Language interpreter, and failed to provide the prisoner a device to allow him to place telephone calls in private). The Title II regulation requires the Prison to reasonably modify its policies, practices, and procedures when necessary, as here, to avoid discrimination against prisoners with serious mental illness and intellectual disabilities. 28 C.F.R. § 35.130(b)(7). Prisoners with disabilities thus cannot be automatically placed in restrictive housing for mere convenience. If prisoners with SMI/ID can be housed in general population by being provided adequate care, the prison may not house such prisoners in segregated housing without showing that it is necessary to make an exception. *See id.* § 35.130(b)(3)(i)-(ii) (prohibiting the prison from utilizing "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; . . . [or] have the purpose

18

or effect of defeating or substantially impairing accomplishments of the entity's program with respect to individuals with disabilities").

PDOC unnecessarily segregates and isolates prisoners with disabilities and fails to reasonably modify its policies, practices, and procedures where necessary to avoid discrimination on the basis of disability. We found that PDOC is twice as likely to use solitary on prisoners with SMI and that over 1,000 prisoners identified on PDOC's active mental health roster spent three or more continuous months in solitary from May 2012 to May 2013. What we have learned from our tours of the facilities, our prisoner interviews, and our record reviews is that there is an overreliance at PDOC on isolation of prisoners with SMI (many of whom also have ID), and that PDOC has a practice of routinely warehousing prisoners with SMI/ID in solitary on account of their disabilities.

The practice of segregating prisoners in solitary confinement units where reasonable modifications would permit those with disabilities to remain integrated in the prison's general population conflicts with the mandates of the ADA. PDOC typically fails to identify prisoners who have SMI/ID that makes them susceptible to harm in solitary confinement and therefore fails to consider whether reasonable modifications are needed for such prisoners before deciding to house them in solitary confinement. Even when PDOC has identified that a prisoner's behavior is caused by SMI, it fails to consider reasonable modifications to either avoid confining the prisoner to solitary confinement, or if solitary confinement is necessary, to adjust the conditions of the solitary confinement to avoid harm to the prisoner. As described above, PDOC could enable many more of its prisoners with SMI/ID to remain in general population by increasing coordination and continuity of care, expanding the roles of mental health staff in determining the conditions of confinement, providing more resources to mental health services in general population, and improving its screening mechanisms for identifying prisoners with ID. *See supra* pp. 14-16. Because PDOC fails to do so, prisoners with SMI/ID are unnecessarily and impermissibly segregated and isolated.

PDOC must ensure that qualified prisoners with SMI/ID have as equal an opportunity as other prisoners to participate in and benefit from its housing and classification services, programs, and activities, and the benefits that flow from them, such as out of cell time, interaction with other prisoners, and movement outside of confined environments, consistent with legitimate safety and security concerns.[16]

---

[16] The American Correctional Association Standards similarly provide:

> The institution may be required to take remedial action, when necessary, to afford program beneficiaries and participants with disabilities an opportunity to participate in and enjoy the benefit of services, programs, or activities. Remedial action may include, but is not limited to: . . . making reasonable modifications to policies, practices, or procedures.

ACA, Standards for Adult Correctional Institutions § 4-4429 (4th ed. 2003 and Supp. 2010).

19

Case: 22-2399   Document: 46   Page: 99   Date Filed: 09/26/2024

**2. PDOC fails to properly assess prisoners on an individual basis to determine whether segregation is appropriate housing.**

PDOC may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities, including classification, housing, and mental health services. 28 C.F.R. § 35.130(h). But PDOC "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.*; *cf. Defreitas v. Montgomery Cnty. Corr. Facility*, 525 Fed. App'x 170, 179 (3d Cir. 2013) (holding that "courts should ordinarily defer to [a prison's] judgment" so long as the "officials have [not] exaggerated their response to these considerations"). Similarly, PDOC may only impose or apply eligibility criteria that screen out or tend to screen out individuals with disabilities or any class or individuals with disabilities from fully and equally enjoying any service, program, or activity if such criteria are necessary for the provision of the service, program, or activity being offered. 28 C.F.R. § 35.130(b)(8). Based on information available to us during the investigation, PDOC's practices do not qualify under either of these standards.

Finally, Title II does not require a public entity "to permit an individual to participate in or benefit from . . . services, programs, or activities . . . when the individual poses a direct threat to the health and safety of others." 28 C.F.R. § 35.139; *see Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 278-88 (1987) (finding direct threat under Section 504, which was codified at 28 C.F.R. § 35.139 for Title II, requires a showing of a "significant risk" to the health or safety of others that cannot be eliminated or reduced to an acceptable level by the public entity's modification of its policies, practices, or procedures).

PDOC cannot categorically deny qualified prisoners with SMI/ID the opportunity to participate in and benefit from housing, classification, and mental health services. In order to establish direct threat, Title II requires PDOC to make individualized assessments of prisoners with SMI/ID, and their conduct, relying on current medical or best available objective evidence, to assess: (1) the nature, duration, and severity of the risk; (2) the probability that the potential injury will actually occur; and (3) whether reasonable modifications of policies, practices, or procedures will mitigate or eliminate the risk. 56 Fed. Reg. 35,694, 35,701 (July 26, 1991); 75 Fed. Reg. 56,180 (Sept. 15, 2010); *Arline*, 480 U.S. at 287-88. The Department explained in the preamble to the original Title II regulation in 1991 that "[s]ources for medical knowledge include guidance from public health authorities." 56 Fed. Reg. 35,701; *see also Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) (explaining that, while not necessarily conclusive in all circumstances, "the views of public health authorities, such as the U.S. Public Health Service, CDC, and National Institutes of Health, are of special weight and authority").

Applying the *Arline* factors, the individualized assessment should, at minimum, include a determination of whether the individual with a disability continues to pose a risk, whether any risk is eliminated after mental health treatment (e.g., whether the individual was denied medications, which resulted in the threat in the first place), and whether the segregation is medically indicated.[17]

---

[17] *See, e.g.*, Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), http://www.psychiatry.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf ("Placement of inmates with a serious mental illness in these settings can be contraindicated because of

20

Fundamentally, the individualized assessment should consider the views of mental health providers as to the prisoners' mental health needs and the appropriateness of the placement. *See* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ."); *cf. Purcell v. Pa. Dep't of Corr.*, No. 50-181J, 2006 WL 891449, at *13 (W.D. Pa. Mar. 31, 2006) (finding that a genuine issue of material fact existed as to whether a "reasonable accommodation" was denied when the DOC refused to circulate a memo to the staff concerning a prisoner's disability (Tourette's Syndrome) that explained that some of his behaviors were related to his condition, not intentional violations of prison rules).

To be sure, a public entity may, however, impose neutral rules or criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary for the safe operation of the program, provided that safety requirements must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities.

PDOC has recently begun to include mental health staff members when making individual assessments of prisoners with SMI during disciplinary proceedings. However, the policy requiring participation of mental health staff members in disciplinary proceedings is currently only in draft form, and is not being consistently applied throughout PDOC's facilities. Further, mental health staff members are not involved in a review of prisoners who received disciplinary time *before* these policy changes occurred. These prisoners continue to remain in solitary. Also, at present, mental health staff members are not involved in administrative segregation decisions. For this reason, prisoners with SMI/ID are still being automatically placed in RHUs without an individualized assessment. Finally, PDOC does not and cannot conduct an individualized assessment of prisoners with ID when placing them into isolation, because it does not screen prisoners properly, as described above. *See supra* p.19.

Accordingly, PDOC must continue to modify its policies and practices to ensure it is not unjustifiably and automatically placing prisoners with SMI/ID in segregation. Unfortunately, at present, PDOC often fails to meet the requirements of the ADA. Pursuant to the direct threat defense, each individualized analysis must evaluate whether the prisoner poses a health or safety risk to others, based on objective and medical evidence, including treating mental health professionals, and whether modifications that do not result in automatic segregation will eliminate or reduce the risk to an acceptable level.

3.  **PDOC denies participation in and benefit from services, programs, or activities to qualified prisoners with SMI/ID who have to be segregated from general population but should not be isolated in their cells.**

PDOC fails to ensure that prisoners placed in segregated housing for legitimate nondiscriminatory reasons can participate in and benefit from prison activities, programs, and services. For those prisoners with SMI/ID who cannot be integrated into the general population, the Facility still has an obligation to provide qualified prisoners with the opportunity to

---

the potential for the psychiatric conditions to clinically deteriorate or not improve. Inmates with a serious mental illness who are a high suicide risk or demonstrating active psychotic symptoms should not be placed in segregation housing as previously defined and instead should be transferred to an acute psychiatric setting for stabilization.").

participate in and benefit from mental health services and activities, and other services, programs, and activities to which prisoners without disabilities have access. *See* 28 C.F.R. § 35.130(b). While we applaud PDOC's efforts to provide prisoners with SMI/ID housed in its new SRTUs with access to equivalent activities, services, and programs, those who remain in the solitary confinement units do not have access to anything remotely equivalent to what is provided to prisoners in the general population. *See supra* pp. 8-11.

## IV. MINIMUM REMEDIAL MEASURES

To remedy PDOC's unconstitutional and unlawful use of solitary confinement on prisoners with SMI/ID, its failure to provide constitutionally adequate mental health care to prisoners, and the violations of Title II and its implementing regulation, the Commonwealth should promptly implement the minimum remedial measures set forth below.

The remedies proposed in this letter are narrowly tailored to remedy the conditions that we found throughout the Pennsylvania prison system and are closely tied to our factual and legal conclusions. These proposals are remedial in nature, and seek to address the policies, practices, training, supervision and accountability systems changes necessary for Pennsylvania to overcome existing deficiencies and to come into compliance with the Constitution and the ADA. We note there may be different remedial approaches that would be adequate to address these types of issues.

### A. Prolonged Isolation

PDOC shall ensure that:

1. PDOC's policies, practices, and procedures are reasonably modified and maintained so prisoners with SMI/ID are not unnecessarily segregated and/or isolated.

2. If a prisoner shows credible signs of decompensation in isolation, the prisoner's mental health needs are addressed promptly, and if the prisoner shows credible signs of decompensation and the possibility of removing the prisoner from isolation is considered. Whenever a prisoner manifests signs of decompensating, a mental health professional shall assess the prisoner's credibility.

3. PDOC properly assesses prisoners with SMI/ID on an individualized basis to determine appropriate housing.

4. The disciplinary or administrative segregation placement process accounts for the risk of self-harm from placement into isolation. Specifically, PDOC shall ensure that prisoners with SMI/ID can effectively participate in disciplinary proceedings, including the provision of appropriate auxiliary aids and services where necessary for effective communication and reasonable modifications where necessary to ensure a prisoner's meaningful participation in disciplinary proceedings. PDOC shall also develop and implement policies and procedures to assess whether to divert from isolation those prisoners whose SMI/ID contributed to their misconduct.

5. PDOC reports and reviews data regarding lengths of stay in isolation, particularly with respect to prisoners with SMI/ID, and shall take appropriate corrective action.

6. For inmates with SMI/ID who have to be segregated from general population, that such prisoners have the opportunity to participate in and benefit from services, programs, and activities available to prisoners without disabilities consistent with legitimate safety and security concerns.

### B. Suicide Prevention and Protection from Harm

PDOC shall ensure that:

1. Prisoners are protected from suicide, suicide attempts, and self-harm.

2. Placement into the POC is short-term with intensive treatment and that prisoners are not discharged from POC to the RHU or other isolation without accounting for the risk of self-harm from such isolation.

3. All staff members are properly trained regarding appropriate responses to suicide attempts or self-harm, are trained on de-escalation techniques, notify mental health staff when time permits, and do not resort to force prematurely.

4. Staff members are properly trained and supervised regarding rounds in the isolation units; that rounds entail a meaningful observation of each prisoner's condition; and that signs of decompensation, risk of self-harm, or suicidal ideation are immediately addressed.

5. Suicides, suicide attempts, and self-injurious behavior are thoroughly documented and reviewed for implications to both security operations and mental health treatment, especially regarding the impact of isolation, and appropriate corrective action is taken.

6. PDOC shall develop an effective risk management system that adequately screens for suicidal or self-injurious behavior and monitors prisoners at risk for these types of harm.

### C. Mental Health Treatment

PDOC shall ensure that:

1. Prisoners with SMI receive adequate mental health treatment and that such treatment is provided in a manner that ensures confidentiality.

2. Prisoners are properly screened and assessed for potential mental illness upon intake into the prison. All reasonable efforts to obtain a prisoner's prior mental health records are taken and that this information, along with all screenings, is incorporated into a prisoner's charts.

3. Prisoners on the mental health caseload receive a timely treatment plan that is periodically reviewed and updated.

4. Prisoners with SMI in segregated placements are offered adequate therapeutic and recreational out-of-cell treatment, consistent with their security levels and treatment needs, which is appropriately documented.

23

**JA084**

5. Prisoners with SMI have adequate access to more intensive mental health care units.

6. There are sufficient mental health staffing levels, taking into consideration the concentration of specialized units and the mental health population at the prison.

7. All staffing components coordinate with each other to ensure that prisoners have access to necessary mental health care and are informed of the practices and procedures on other units.

8. Mental health staff members have sufficient standing at PDOC facilities, especially with regard to housing determinations.

9. Staff members assigned to the specialized units are trained regarding the needs of, and appropriate responses to, the mental health population and prisoners with intellectual disabilities.

10. Documentation of prisoners' mental health contacts and treatment is uniform, comprehensive, organized, and legible.

11. A meaningful quality assurance system for the mental health treatment program is in place and a range of data is collected, aggregated, and reviewed for appropriate corrective action.

## D. Use of Force

PDOC shall ensure that:

1. The restraint chair, and other uses of force are not used as punishment or as a substitute for mental health interventions and are instead used only in instances where a prisoner poses a physical threat.

2. Staff members are trained on crisis intervention and de-escalation techniques and that mental health staff members are called in the case of a mental health-related crisis or a planned use of force for a prisoner with mental illness or an intellectual disability.

3. Data is provided and reviewed to assess whether the restraint chair is being overused and as part of an early warning system to identify staff members in need of additional training.

## V. CONCLUSION

Like other state correctional systems, PDOC increasingly has been called upon to take on the task of serving as the state's primary caregiver for those with SMI. Many of these prisoners also have significant intellectual disabilities. However, PDOC's unenviable burden of having to take care of these prisoners cannot excuse its all too routine practice of using a harsh form of solitary confinement to control those with SMI and/or ID instead of providing them with the mental health care treatment they need.

Now is the time to put a stop to these harmful solitary confinement practices and to meaningfully improve the mental health services PDOC provides. We look forward to working

24

Case 2:21-cv-23899   Document 46   Page 104   Date Filed 09/25/2014

collaboratively with Secretary Wetzel and his staff to address the violations of law we have identified in the context of settlement discussions.

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website. The lawyers assigned to this investigation will be contacting PDOC counsel to discuss this matter in further detail. If you have any questions, please feel free to contact Jonathan Smith, the Chief of the Special Litigation Section, at (202) 514-6255, Special Litigation Counsel Avner Shapiro, at (202) 305-1840, or the lead attorney on the matter, Kyle Smiddie, at (202) 305-6581.

Sincerely,

Jocelyn Samuels
Acting Assistant Attorney General
United States Department of Justice
Civil Rights Division

David J. Hickton
United States Attorney
United States Attorney's Office
Western District of Pennsylvania

cc:   John E. Wetzel
      Secretary
      Pennsylvania Department of Corrections

      Nancy Giroux
      Superintendent
      State Correctional Institution at Albion

      David Pitkins
      Acting Superintendent
      State Correctional Institution at Benner Township

25

**JA086**

Joyce Wilkes
Superintendent
State Correctional Institution at Cambridge Springs

Laurel Harry
Superintendent
State Correctional Institution at Camp Hill

John C. Thomas
Superintendent
State Correctional Institution at Chester

Vincent Mooney
Superintendent
State Correctional Institution at Coal Township

Jerome Walsh
Superintendent
State Correctional Institution at Dallas

Brian Coleman
Superintendent
State Correctional Institution at Fayette

Michael Overmyer
Superintendent
State Correctional Institution at Forest

Brenda Tritt
Superintendent
State Correctional Institution at Frackville

Michael Wenerowicz
Superintendent
State Correctional Institution at Graterford

Louis Folino
Superintendent
State Correctional Institution at Greene

Kenneth Cameron
Superintendent
State Correctional Institution at Houtzdale

**JA087**

Tabb Bickell
Superintendent
State Correctional Institution at Huntingdon

Trevor Wingard
Superintendent
State Correctional Institution at Laurel Highlands

John Kerestes
Superintendent
State Correctional Institution at Mahanoy

Brian Thompson
Superintendent
State Correctional Institution at Mercer

Robert Smith
Superintendent
State Correctional Institution at Muncy

Eric Bush
Superintendent
State Correctional Institution at Pine Grove

Mark Capozza
Superintendent
State Correctional Institution at Pittsburgh

Kenneth Cameron
Superintendent
Quehanna Boot Camp

Theresa DelBalso
Superintendent
State Correctional Institution at Retreat

Steve Glunt
Superintendent
State Correctional Institution at Rockview

Jon Fisher
Superintendent
State Correctional Institution at Smithfield

27

Case: 22-2399   Document: 46   Page: 107   Date Filed: 09/25/2024

Gerald Rozum
Superintendent
State Correctional Institution at Somerset

Wayne Gavin
Superintendent
State Correctional Institution at Waymart

Theron Perez
Chief Counsel
Governor's Office of General Counsel

28

**JA089**

*Williams v. Secretary Pennsylvania Department of Corrections*, No. 22-2399

PHIPPS, *Circuit Judge*, dissenting in part.

In denying qualified immunity to the former Secretary of the Pennsylvania Department of Corrections, John Wetzel, with respect to death-row inmate Roy Lee Williams's claim for cruel and unusual punishment brought under 42 U.S.C. § 1983, the Majority Opinion relies on a new rule of constitutional law: death-sentenced inmates with *any* known history of mental illness cannot be subjected to prolonged solitary confinement. To arrive at the conclusion that such a constitutional right was clearly established between 2014 and 2019, when Williams was in solitary confinement, so as to defeat qualified immunity here, where Secretary Wetzel relies only on the 'clearly established' prong in seeking such immunity, the Majority Opinion ignores this Court's precedent and misapplies foundational principles. For those reasons, elaborated below, I respectfully dissent.

The lynchpin of the Majority Opinion is its statement that "[u]ndoubtedly, holding a prisoner with a known preexisting serious mental illness in solitary confinement for a protracted period without penological justification would result in unnecessary and wanton infliction of pain." Maj. Op. at 23 (citation omitted). Using that principle, the Majority Opinion articulates the right at issue as that of "a death row prisoner, with a known preexisting serious mental illness not to be placed and held in prolonged solitary confinement . . . without penological justification." *Id.* at 22–23. The Majority Opinion, however, provides no caselaw clearly establishing such a substantive right, much less its applicability to death-row inmates.

The Majority Opinion relies heavily on *Young v. Quinlan*, 960 F.2d 351 (3d Cir. 1992), but that case involved confinement in a dry cell as a means of enforcing prison

1

discipline for a general population inmate – not a death-sentenced inmate in a non-dry cell. *Id.* at 363. And this Court in *Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022), has since emphasized that the articulation of Eighth Amendment rights in the context of solitary confinement is a "heavily fact-specific inquiry." *Id.* at 183. The *Clark* decision applied that principle even after fully considering *Young*, by underscoring that "solitary confinement does not *per se* violate the Constitution 'as long as the conditions of confinement are not foul, inhuman or totally without penological justification.'" *Id.* (quoting *Young*, 960 F.2d at 364). Thus, in light of the guidance from *Clark*, the factual differences between *Young* and this case preclude *Young* from providing the requisite notice with respect to the Eighth Amendment claim at issue here.

The Majority Opinion's conclusion regarding the clarity of the right at issue also cannot be reconciled with this Court's most recent solitary confinement decisions.

In *Williams v. Secretary Pennsylvania Department of Corrections*, 848 F.3d 549 (3d Cir. 2017), this Court first announced a rule that a prison's policy of continuing to house death-sentenced inmates whose death sentences had been vacated in solitary confinement was unconstitutional. *Id.* at 570. But that rule was newly articulated, and this Court held that qualified immunity applied because that articulation of the right was not clearly established. *Id.* at 553. Moreover, the rule announced in *Williams* was based on procedural due process principles and not the Eighth Amendment. *Id.* at 552. Also, that rule applied to only inmates whose death sentences had been vacated, but here, Williams's sentence remains in effect. The *Williams* decision therefore does not provide the heavily fact-specific notice needed to clearly establish that Secretary Wetzel violated Williams's Eighth Amendment rights.

Also in 2017, in *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), this Court overruled a District Court's dismissal of an

2

Eighth Amendment claim for an inmate's solitary confinement. *See id.* at 225–26. The allegations there differ in several key respects from the facts of this case: the inmate was not on death row – he was repeatedly housed in solitary confinement for penal purposes; the inmate was mocked for his mental health issues and abused by staff; and the inmate was denied medical care despite the documented deterioration of his mental health. *See id.* at 216–17, 228. Thus, under the heavily fact-specific inquiry applicable to the 'clearly established' prong, *Palakovic* does not provide the requisite notice to defeat qualified immunity in this case. *See id.*

This Court's decision in *Porter v. Pennsylvania Department of Corrections*, 974 F.3d 431 (3d Cir. 2020), similarly does not provide the notice required to defeat qualified immunity. That case expressed a new rule applicable to death row inmates that "prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim, particularly where . . . [d]efendants have failed to provide any meaningful penological justification." *Id.* at 451. Because that articulation of the right had not previously been clearly established, this Court held that the defendants in that case were entitled to qualified immunity. *See id.* And even if *Porter* were factually similar enough to provide the requisite notice, it could not do so here because it was decided in 2020, after Williams's period of solitary confinement ended.

Finally, in 2022, in *Clark v. Coupe*, this Court articulated an Eighth Amendment right with respect to solitary confinement with several qualifiers. But *Clark*, like *Young* and *Palakovic*, was not a case involving a death-sentenced inmate. And as recently as the *Porter* decision in 2020, this Court emphasized the significance of status on death row for purposes of assessing the constitutionality of solitary confinement:

3

> Cases that challenge interpretation of death row policy and conditions on death row are distinct from cases brought by inmates in general population subject to solitary confinement.

*Porter*, 974 F.3d at 450; *cf. id.* at 461–62 (Porter, J., concurring in part and dissenting in part) ("Our Court has not held that the conditions of confinement on Pennsylvania's death row are unconstitutional, and we have a long train of decisions to the contrary."). Thus, even if the formulation of the right by the Majority Opinion were correct as to the general prison population, that would not be enough to provide adequate notice: there would still have to be additional precedent applying that formulation of the right to death-row inmates. And the Majority Opinion identifies no such case.

Under that tapestry of precedent, the right as articulated by the Majority Opinion was not clearly established between 2014 and 2019 when Williams was in solitary confinement.

Lacking precedent from the relevant time period for the proposition that it is unconstitutional to place death-row inmates with any history of serious mental illness in solitary confinement, the Majority Opinion makes a grievous error offensive to basic principles of separation of powers: it substitutes a 2014 findings letter from the United States Department of Justice for binding precedent. *See* Letter from Jocelyn Samuels, Acting Assistant Attorney General for the Civil Rights Division of the United States Department of Justice, & David J. Hickton, United States Attorney for the Western District of Pennsylvania, to the Honorable Tom Corbett, Governor of the Commonwealth of Pennsylvania (Feb. 24, 2014) (JA62–89) (hereinafter the '2014 Letter'). But the Judiciary, not the Executive Branch, has the authority to announce binding interpretations of the Constitution. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2257 (2024) ("To ensure the 'steady, upright and impartial

administration of the laws,' the Framers structured the Constitution to allow judges to exercise that judgment independent of influence from the political branches." (quoting The Federalist No. 78, at 522) (Alexander Hamilton) (J. Cooke ed., 1961)). And qualified immunity, which depends on fair notice at the time of the alleged violation of a federal right,[1] looks to judicial opinions – not letters from federal agencies – as the sources for such notice. *See Porter*, 974 F.3d at 449. So, treating constitutional interpretations of a federal agency as having the force of judicial precedent is plainly incorrect. *See Loper Bright*, 144 S. Ct. at 2257 ("The Framers also envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts.'" (quoting The Federalist No. 78, at 525)). Thus, a letter from a federal agency cannot satisfy the 'clearly established' standard for qualified immunity. And if the 2014 Letter – which addressed solitary confinement of both general population and death-sentenced inmates – did provide adequate notice of a clearly established constitutional right, then why has no subsequent decision of this Court – *Williams*, *Palakovic*, *Porter*, or *Clark* – relied on the 2014 Letter for that purpose? The answer is simple: a letter from an Executive Branch agency does not suffice for notice under the 'clearly established' prong of qualified immunity.

---

[1] *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (explaining a government official has 'fair notice' if at the time of the alleged constitutional violation it was 'beyond debate' such that "*every* reasonable official would have understood that what he is doing violates that right" (quoting *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam))); *Burns v. Pennsylvania Dep't of Corr.*, 642 F.3d 163, 177 (3d Cir. 2011) ("Because qualified immunity is intended to protect officials absent 'fair warning' that their conduct violates constitutional guarantees, we examine qualified immunity from the perspective of the official at the time of the violation.").

By contravening that principle and doing what those prior cases did not, the Majority Opinion makes a big mistake.

The Majority Opinion attempts to legitimatize its reliance on the 2014 Letter by noting that the Supreme Court in *Hope v. Pelzer*, 536 U.S. 730 (2002), relied on a report from the United States Department of Justice. But the Supreme Court used that report – not as a substitute for precedent – but rather as evidence for the proposition that the conduct at issue there (tying a shirtless prisoner to a hitching post in the Alabama sun for seven hours without bathroom breaks and with only one or two offers of water) was obviously a violation of the Eighth Amendment. *See id.* at 734–35. Here, however, the Majority Opinion does not use the 2014 Letter for that purpose. Instead, it uses the 2014 Letter to set a date certain on which a constitutional right was clearly established – the date of the 2014 Letter.

That is impermissible under *Hope*. Although the modern Eighth Amendment jurisprudence uses an evolving-standard-of-decency analysis, *see United States v. Grant*, 9 F.4th 186, 201–07 (3d Cir. 2021) (en banc) (Hardiman, J., concurring) (recounting with skepticism the development of that strand of Eighth Amendment jurisprudence because it "strayed far from the text and original meaning of the Eighth Amendment"), the *Hope* exception for obvious constitutional violations applies only to conduct that has *always* been obviously cruel and unusual. *See Hope*, 536 U.S. at 741–42; *see also Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (per curiam) (holding "any reasonable officer should have realized" that it was unconstitutional to confine an inmate for six days in two cells – one, which "was covered, nearly floor to ceiling in massive amounts of feces," and another, which was "frigidly cold" and required the inmate to sleep naked on a sewage-covered floor (quotation omitted)); *Camreta v. Greene*, 563 U.S. 692, 728 (2011) (Kennedy, J., dissenting) ("That rule permits clearly established violations to be found when extreme though unheard-of actions violate the Constitution.").

6

For conduct that becomes viewed as cruel and unusual by virtue of evolving standards of decency, *Hope* does not apply; rather, case law provides the notice of the updated reach of the Eighth Amendment, as it typically does for qualified immunity. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (explaining that case law must provide notice such that it places the constitutional violation "beyond debate"); *Montemuro v. Jim Thorpe Area Sch. Dist.*, 99 F.4th 639, 645 (3d Cir. 2024) ("A right is clearly established if the *case law* at the time of the alleged violation of the right would have put government officials on fair notice that their conduct violated the plaintiff's rights." (emphasis added)). Any other approach would impermissibly deny qualified immunity to § 1983 defendants without first providing them with notice of the evolved nature of the Eighth Amendment's protections. *See Ziglar v. Abbasi*, 582 U.S. 120, 150–51 (2017) (explaining "[t]he doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'" (quoting *Al–Kidd*, 563 U.S. at 743)).

In short, because it does not rely on the 2014 Letter as evidence that placing a death-row inmate with a history of mental illness in solitary confinement has *always* constituted cruel and unusual punishment, the Majority Opinion misuses the 2014 Letter in its efforts to defeat qualified immunity.

\* \* \*

For these reasons, I respectfully dissent from the denial of qualified immunity, and I would affirm the judgment of the District Court in all respects.[2]

---

[2] I also would affirm the judgment against Williams's claim under Title II of the Americans with Disabilities Act because Williams has conceded that he is entitled to only compensatory damages for his Title II claim and despite having the opportunity to do so through supplemental briefing, Williams

has not produced evidence of a physical injury in connection with his exclusion from a service, program, or activity, yet the Prison Litigation Reform Act bars statutory claims that are not accompanied by such a physical injury, *see* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)."); *see also Mitchell v. Horn*, 318 F.3d 523, 534 (3d Cir. 2003) (holding that 42 U.S.C. § 1997e(e) requires a "less-than-significant-but-more-than-de minimis physical injury"); *but cf. Allah v. Al-Hafeez*, 226 F.3d 247, 252 n.5 (3d Cir. 2000) (explaining, in the context of an alleged violation of a constitutional right (but not a statutory right), that the PLRA's physical injury requirement may not bar claims for nominal and punitive damages). Although the Majority Opinion does not affirm the District Court's rejection of Williams's Title II claim on that alternative ground, as it could, *see TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019), nothing about the opinion precludes the District Court from rejecting Williams's Title II claim on that basis on remand.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-2399

_____

ROY L. WILLIAMS,
                                                Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:21-cv-01248)
District Judge:  Honorable Eduardo C. Robreno

_____

Argued on July 14, 2023

Before:   PHIPPS, MONTGOMERY-REEVES and McKEE, *Circuit
Judges.*

_____

JUDGMENT

_____

This cause came to be considered on the record from the United States District Court
for the Eastern District of Pennsylvania and was argued on July 14, 2023.

On consideration whereof, it is hereby ORDERED and ADJUDGED that the order
of the District Court entered July 21, 2022, be and is hereby AFFIRMED in part and
VACATED in part.  This matter is REMANDED to the District Court for further
proceedings.  Costs shall not be taxed.  All of the above in accordance with the Opinion of
this Court.

ATTEST:

s/ Patricia S. Dodszuweit
Clerk

Dated: September 20, 2024

OFFICE OF THE CLERK

**PATRICIA S. DODSZUWEIT**

**CLERK**



UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA  19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995

September 20, 2024

Matthew A. Feldman
Pennsylvania Institutional Law Project
718 Arch Street
Suite 304 South
Philadelphia, PA 19106

Anthony T. Kovalchick
Office of Attorney General of Pennsylvania
Appellate Litigation Section
1251 Waterfront Place
Pittsburgh, PA 15222

RE: Roy Lee Williams v. Secretary Pennsylvania Department of Corrections
Case Number: 22-2399
District Court Case Number: 2-21-cv-01248

<u>ENTRY OF JUDGMENT</u>

Today, **September 20, 2024** the Court entered its judgment in the above-captioned matter
pursuant to Fed. R. App. P. 36.

If you wish to seek review of the Court's decision, you may file a petition for rehearing. The
procedures for filing a petition for rehearing are set forth in Fed. R. App. P. 35 and 40, 3rd Cir.
LAR 35 and 40, and summarized below.

<u>Time for Filing</u>:
14 days after entry of judgment.
45 days after entry of judgment in a civil case if the United States is a party.

<u>Form Limits</u>:
3900 words if produced by a computer, with a certificate of compliance pursuant to Fed. R. App.
P. 32(g).
15 pages if hand or type written.

<u>Attachments</u>:
A copy of the panel's opinion and judgment only.
Certificate of service.
Certificate of compliance if petition is produced by a computer.
No other attachments are permitted without first obtaining leave from the Court.

Unless the petition specifies that the petition seeks only panel rehearing, the petition will be construed as requesting both panel and en banc rehearing. Pursuant to Fed. R. App. P. 35(b)(3), if separate petitions for panel rehearing and rehearing en banc are submitted, they will be treated as a single document and will be subject to the form limits as set forth in Fed. R. App. P. 35(b)(2). If only panel rehearing is sought, the Court's rules do not provide for the subsequent filing of a petition for rehearing en banc in the event that the petition seeking only panel rehearing is denied.

A party who is entitled to costs pursuant to Fed.R.App.P. 39 must file an itemized and verified bill of costs within 14 days from the entry of judgment. The bill of costs must be submitted on the proper form which is available on the court's website.

A mandate will be issued at the appropriate time in accordance with the Fed. R. App. P. 41.

Please consult the Rules of the Supreme Court of the United States regarding the timing and requirements for filing a petition for writ of certiorari.


For the Court,


<u>s/ Patricia S. Dodszuweit</u>
Clerk


s/ pdb for Kr Case Manager