# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

### No. 22-2399
_____

ROY L. WILLIAMS,

Plaintiff-Appellant,

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS and
JOHN E. WETZEL,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2:21-cv-1248)
District Judge: Honorable Eduardo C. Robreno

_____

**APPELLANT'S RESPONSE TO PETITION FOR PANEL REHEARING OR REHEARING *EN BANC***

_____

 

Matthew A. Feldman
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
215-925-2966
mfeldman@pilp.org

*Counsel for Plaintiff-Appellant*

November 12, 2024

# INTRODUCTION

The Secretary's petition for rehearing should be denied. This case does not meet the Court's strict criteria for *en banc* rehearing: the panel decision is not contrary to *Porter* or *Peterkin* because neither involved individuals with preexisting mental illness; the case does not present questions of exceptional importance because death-row solitary confinement no longer exists in this circuit; and the Secretary's fact-bound arguments are inappropriate for *en banc* review. Moreover, the Secretary's newly asserted argument about the DOJ letter is forfeited. It is also wrong: the panel majority's inclusion of the DOJ letter in its qualified-immunity analysis was consistent with precedent. Finally, the Secretary's arguments about the ADA claim are based on a fundamental misreading of the statutory text.

# ARGUMENT

**I. Rehearing should be denied because this case does not meet the stringent requirements for rehearing *en banc* and the Secretary's primary argument is forfeited.**

The panel majority's thorough opinion dutifully applied precedent to the factual circumstances of this case—circumstances that will likely never again occur anywhere in this circuit. *En banc* rehearing is disfavored and is not warranted unless it is "necessary to secure or maintain uniformity of the court's decisions" or the case "involves a question of exceptional importance." Fed. R. App. P. 35(a); 3d Cir. L.A.R. 35.1; 3d Cir. I.O.P. 9.3.1. These are the only bases for *en banc* rehearing, *id.*, and neither is present here. Moreover, the Secretary's primary argument for rehearing—

1

that the panel majority erred in its qualified-immunity analysis by considering a letter from the DOJ to the Secretary—is not only wrong, *see infra* § II, but forfeited.

The panel majority's holding broke little new ground. Consistent with this Court's precedents, the panel held that "individuals with a known history of serious mental illness have a clearly established right not to be subjected to prolonged, indefinite solitary confinement—without penological justification—by an official who was aware of that history and the risks that solitary confinement pose to someone with those health conditions." Slip Op. 38–39. This "is nearly identical to the holding in *Clark v. Coupe* [55 F.4th 167 (3d Cir. 2022)]." Slip Op. 40. The panel majority simply applied this established principle to the facts of this case by "clarif[ying] that the clearly established right in *Clark* extends to individuals on death row." *Id.* Granted, the panel majority held that this right was clearly established at least as far back as 2014, before the facts at issue in *Clark*, which occurred in 2016. *Id.* at 27–28. But this is because, in *Clark*, the Court "recognized that the constitutional right was '*long protected by Eighth Amendment jurisprudence.*'" *Id.* at 27 (quoting *Clark*, 55 F.4th at 181 (emphasis in Slip Op.)); *see also* Slip Op. 25 & n.98 (explaining that *Clark*'s holding was based in part on Supreme Court precedent and "a robust consensus of district court decisions," and collecting cases cited by *Clark* (cleaned up));[1] *cf. El v. City of Pittsburgh*, 975 F.3d 327, 340 (3d Cir. 2020). The panel majority "rel[ied] on much of the same law that [the Court] did in *Clark*," Slip Op. 27–28, and applied it to the facts of this case. Reviewing a panel's application of a correct

---

[1] *See also* Opening Br. 30–31.

statement of law to the circumstances of the case is not what *en banc* rehearing is for. *See* 3d Cir. I.O.P. 9.3.2.

Moreover, the panel majority's opinion is not contrary to *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431 (3d Cir. 2020) or *Peterkin v. Jeffes*, 855 F.2d 1021 (3d Cir. 1988).[2] Their facts are easily distinguishable from the facts of this case.

In *Porter*, the plaintiff's claim was that prison officials violated his Eighth Amendment rights "by subjecting him to solitary confinement for thirty-three years." *Porter*, 974 F.3d at 440. The plaintiff did not claim to have preexisting mental illness. *See id.* at 447 & n.12; Slip Op. 34 ("*Porter* . . . only concerned people of sound mind when first placed in solitary confinement."). Here, in contrast, Mr. Williams's claim is that his placement in indefinite solitary confinement violated his rights in light of his history of mental illness and suicidality. *Id.* at 15.

Since "the touchstone [of the Eighth Amendment analysis] is the health of the inmate," this distinction makes all the difference. *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992). Granting the Secretary qualified immunity based on *Porter*, which, unlike this case, did not involve a plaintiff with preexisting mental illness, would defy the Supreme Court's repeated warnings that "the crucial question" when analyzing a qualified-immunity defense is "whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018) (cleaned up); *see* Slip Op. 21. The "particular circumstances" the Secretary

---

[2] Although *Peterkin* is not mentioned in the Secretary's Rule 35.1 Statement, the Secretary seems to argue—for the first time—that it forecloses the result reached by the panel majority. *See* Pet. 3, 4, 7.

3

faced here involved the prolonged, indefinite solitary confinement of an individual with a known history of serious mental illness and suicidality. Those were not the circumstances faced by the defendants in *Porter*. *See Porter*, 974 F.3d at 450 (distinguishing plaintiff's claim from cases that involved "specific known mental health issues pre-assignment to solitary confinement"). So there is no inconsistency between *Porter*'s holding that the Eighth Amendment right at issue there was not clearly established and the panel majority's holding that the right at issue here was. *Compare id.* at 450–51 *with* Slip Op. 23–43.

Ironically, it is the Secretary's preferred outcome that would disturb the uniformity of this Court's precedents. Granting the Secretary qualified immunity based on *Porter* would sow confusion among litigants and district courts as to how to analyze Eighth Amendment claims brought by individuals with mental illness challenging their prolonged solitary confinement. This Court's precedent is that "[t]he touchstone is the health of the inmate." *Young*, 960 F.2d at 364. So, in *Clark*, the Court defined the right at issue without reference to the reason the plaintiff had been placed in solitary confinement. 55 F.4th at 182. Likewise, in *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), the Court did not even consider the reasons Mr. Palakovic was repeatedly placed in solitary confinement in holding that he had a viable Eighth Amendment claim. *Clark*, 55 F.4th at 177 n.9 (citing *Palakovic*, 854 F.3d at 225–26). The panel majority was on solid ground rejecting the argument that Mr. Williams's death sentence, rather than his health, controls the analysis. Slip Op. 35, 43. A

contrary decision would upend this Court's precedents,[3] making the reason prisoners were placed in the conditions they are challenging the touchstone of the analysis, rather than their health.[4]

Nor is the panel majority's opinion inconsistent with *Peterkin*. This case is distinguishable from *Peterkin* in at least three ways. First, *Peterkin* was a class action bringing a facial challenge to death-row conditions generally. *Peterkin*, 855 F.2d at 1022; *see Porter*, 974 F.3d at 443. Mr. Williams's claim, on the other hand, is an as-applied challenge to his death-row solitary confinement based on his particular characteristics. Second, unlike Mr. Williams's claim, the claim in *Peterkin* was not based on prisoners' preexisting mental illness or other vulnerabilities to the harms of solitary confinement. *See Peterkin*, 855 F.2d at 1022–23. Third, Mr. Williams spent much more time in solitary confinement than the plaintiffs in *Peterkin*. While Mr. Williams spent twenty-six years in solitary confinement, the longest any of the *Peterkin* plaintiffs had been in solitary confinement was four years. *Id.* at 1029; *Porter*, 974 F.3d at 444. Duration is a crucial factor in determining whether solitary confinement withstands Eighth Amendment scrutiny. *Young*, 960 F.2d at 364 (citing

---

[3] It would also conflict with Supreme Court precedent. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (identifying, without qualification, the "restraints" and "duties" the Eighth Amendment imposes on prison officials).

[4] To be sure, prison officials' reasons for imposing the challenged conditions can sometimes be considered. Because the Eighth Amendment "prohibits punishments without penological justification," courts "may . . . consider whether officials had a legitimate penological purpose behind their conduct." *Porter*, 974 F.3d at 446 (cleaned up). But there is no basis for considering penological purpose here because the Secretary opted not to introduce any evidence as to why he believed it necessary to keep Mr. Williams—or even death-sentenced individuals, generally—in solitary confinement.

5

*Hutto v. Finney*, 437 U.S. 678, 686–87 (1978)). Indeed, the *Peterkin* Court acknowledged the death-row conditions under review there might "become cruel and unusual" if they continued to be imposed for "an inordinate" amount of time. *Peterkin*, 855 F.2d at 1033. Especially in light of the other extant case law, no reasonable official in the Secretary's position could have believed *Peterkin* gave him license to keep Mr. Williams, with his history of serious mental illness and suicidality, in solitary confinement for twenty-six years.

*En banc* review is particularly unwarranted here because the factual circumstances that gave rise to this case—an individual with mental illness being held in solitary confinement solely because of his death sentence—will likely never arise again anywhere in this circuit. Pennsylvania is the only jurisdiction in the Third Circuit that has the death penalty,[5] and it ended its policy of housing all death-row prisoners in solitary confinement five years ago. *See* Slip Op. 10. So it is extremely unlikely any new case will ever be brought in this circuit presenting the questions this appeal resolved. Questions that will not recur can hardly be considered "of exceptional importance." Fed. R. App. 35(a).

That the Secretary is also attempting to relitigate the facts underscores the inappropriateness of *en banc* review here. Pet. 11–15. The panel majority carefully reviewed the factual record and properly applied the summary-judgment standard.

---

[5] *See* DEATH PENALTY INFORMATION CENTER: STATE BY STATE, https://deathpenaltyinfo.org/states-landing (last visited Nov. 5, 2024) (showing that New Jersey and Delaware abolished the death penalty); *People of the V.I. v. Velasquez*, 60 V.I. 22, 37 (Super. Ct. 2014) (same, regarding the U.S. Virgin Islands).

Slip Op. 4–9, 16–17 & n.57, 20–23; *see Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The panel majority accurately stated that the record contains evidence that Mr. Williams attempted suicide while in solitary confinement, that the DOC designated him on the Mental Health Roster as needing psychiatric treatment, and that the DOC was aware of Mr. Williams's long history of mental illness from multiple sources. Slip Op. 8–9, 22. The panel majority thus recognized a genuine dispute of fact as to the Secretary's knowledge[6] and defined the right at issue based on a construal of the record in the light most favorable to Mr. Williams. *Id.* 22–23; *see Mack v. Yost*, 63 F.4th 211, 228 (3d Cir. 2023). The Secretary's attempts at disputing the evidence again now are therefore unavailing. Pet. 12–13. Contesting evidence is for trial, not summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). And it is certainly not what *en banc* review is for. *See* 3d Cir. I.O.P. 9.3.2.

The Secretary's petition has another fatal flaw: his argument about the DOJ letter is forfeited. Prior to the Secretary's rehearing petition, he never contested the relevance of the DOJ letter to the qualified-immunity analysis. He never addressed the DOJ letter in the district court even though the only substantive argument Mr. Williams asserted on the qualified-immunity issue in his *pro se* brief was that "the 2014 DOJ Report . . . provided 'fair and clear warning' and therefore should be 'sufficient to preclude the defense of qualified immunity at the summary judgment stage.'" Dist. Ct. ECF No. 27 at 2 (quoting *Hope v. Pelzer*, 536 U.S. 730, 745–46

---

[6] *But see* Slip Op. 18 (recognizing that the Secretary does not dispute that he violated Mr. Williams's Eighth Amendment rights and thus has forfeited that issue).

(2002)). The Secretary opted not to file a reply brief or otherwise respond to this argument.

The Secretary also failed to address the DOJ letter in this Court, until now. Mr. Williams devoted several pages of his opening brief to the DOJ letter and argued that, pursuant to *Hope*, it was properly considered in the qualified-immunity analysis. Opening Br. 26–29. The Secretary did not even mention the DOJ letter in the qualified-immunity section of his response brief, let alone raise the argument he is now asserting. Resp. Br. 19–29. Now, for the first time, the Secretary argues that reliance on the DOJ letter to defeat qualified immunity is improper. But this argument is "too late," so it is forfeited. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 757–58 (3d Cir. 2016); *see, e.g.*, *Royce v. Hahn*, 151 F.3d 116, 124–25 (3d Cir. 1998); *Peter v. Hess Oil V.I. Corp.*, 910 F.2d 1179, 1181 (3d Cir. 1990).[7]

## II. The panel majority's inclusion of the DOJ letter in its qualified-immunity analysis was consistent with precedent.

In including the DOJ letter in its analysis, the panel majority neither violated separation-of-powers principles nor did anything novel; it simply followed the dictates of common sense and the Supreme Court's example in *Hope v. Pelzer*. The "'grievous error'" charged by the Secretary—the alleged "elevat[ion] [of] an opinion of an

---

[7] For the same reasons that this case does not involve questions "of exceptional importance" warranting *en banc* review, Fed. R. App. 35(a), it also does not present "exceptional circumstances" warranting departure from this Court's forfeiture principles, *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017).

8

executive agency to that of binding precedent by a court"—is belied by *Hope* and the panel majority's analysis. Pet. 2 (quoting Dissent 4).

As explained above, the panel majority relied on *Clark* and the authorities cited by *Clark* to hold that the Secretary had fair notice that Mr. Williams's conditions of confinement violated the Eighth Amendment. Slip Op. 27–28. But the record includes an additional source it would have been odd for the panel to ignore: a letter from the DOJ to the defendant explaining, with citations to case law, why the plaintiff's conditions of confinement violated the Eighth Amendment. In its letter, the DOJ stated that the DOC's placement of individuals with serious mental illness in solitary confinement exposed them "to an excessive and obvious risk of serious harm." JA068. The letter then listed the "serious psychological and physical harms" many of those individuals had already suffered and provided detailed narrative examples. JA068; JA072–075. The DOJ concluded that "the manner in which [the DOC] continues to use solitary confinement on prisoners with [serious mental illness] violates the Eighth Amendment[.]" JA067. In support of this conclusion, the DOJ cited several judicial opinions, including *Young* and three of the district court opinions cited by *Clark* and the panel majority. JA067–070; *see* Slip Op. 31.

The panel majority acknowledged that the DOJ letter itself "did not and could not have had the force of legal precedent." *Id.* at 41. But the letter "buttressed" the panel majority's conclusion, *id.* at 28, because it "directly informed the Secretary that the practice of solitary confinement that had been investigated was a violation of the Eighth Amendment *based upon the judicial decisions cited in the letter*," *id.* at 41

9

(emphasis added). Having received this letter—which included *Young*'s binding proclamation that "[t]he touchstone is the health of the inmate"—no reasonable prison official could have believed the Eighth Amendment countenanced Mr. Williams's prolonged solitary confinement. JA068 (quoting *Young*, 960 F.2d at 364); Slip Op. 33–34.

The panel majority's consideration of the DOJ letter was consistent with—indeed, compelled by—the Supreme Court's consideration of a similar, though much less thorough, DOJ letter in *Hope*. *Id.* at 28–30 (citing *Hope*, 536 U.S. at 744–46). In *Hope*, the Supreme Court held that Alabama prison officials' use of the hitching post violated clearly established Eighth Amendment law based on circuit precedent, a prison regulation, and a DOJ letter informing Alabama officials that their use of the hitching post was unconstitutional. *Hope*, 536 U.S. at 741–42; Slip Op. 42.

The DOJ letter here is a far more compelling source of fair notice than the letter considered in *Hope*. First, unlike here, there was no indication in *Hope* that the DOJ letter had been sent to the actual defendants. *Id.* at 29 (citing *Hope*, 536 U.S. at 745). Second, in contrast to the thorough, factually detailed, citation-rich DOJ letter here, the relevant portion of the DOJ letter in *Hope* was less than a page and had no citations. Slip Op. 29–30.[8] While the DOJ letter here cited cases, and was thus reflecting clearly established law, the *Hope* letter was just based on the DOJ's say-so. The *Hope* Court nonetheless saw fit to rely on it. Even the dissenting justices, who

---

[8] The DOJ letter discussed in *Hope* is available at https://clearinghouse.net/doc/2571/. *See* Slip Op. 29 n.114.

10

objected to the Court's reliance on the DOJ letter, did not raise the separation-of-powers concerns the Secretary now presses. *See Hope*, 536 U.S. at 748–64 (Thomas, J., dissenting).[9]

Faced with a Supreme Court decision countenancing inclusion of the DOJ letter in the qualified-immunity analysis, the Secretary has resorted to an invented distinction that collapses under scrutiny. Without explanation, the Secretary declares that "the 'obvious cruelty inherent in th[e] practice' challenged in *Hope* rendered [it] unconstitutional from the Eighth Amendment's inception" and that the DOJ letter there "was used to illustrate why the . . . practice . . . had '*always* been cruel and unusual'. . . ." Pet. 4 (first quoting *Hope*, 536 U.S. at 745, and then quoting Dissent 6). But nowhere in *Hope* does the Court state, or even suggest, that the conduct at issue there had always been unconstitutional. In fact, multiple signs point toward the opposite conclusion.

First, in stating its holding, the *Hope* Court acknowledged the unconstitutionality of the hitching post might not always have been clear: "Even if there might once have been a question regarding the constitutionality of this practice," the Court explained, the combination of circuit precedent and the DOJ

---

[9] The *Hope* dissent raised two objections to the Court's reliance on the DOJ letter: that there was no indication the defendants were aware of the letter's contents and that there were district court opinions that had reached conclusions contrary to the DOJ's. *Hope*, 536 U.S. at 759–60 (Thomas, J., dissenting). Here, in contrast, the letter was sent to the Secretary and he has never cited any cases that contradict its conclusions.

11

report were sufficient to put a reasonable officer on notice that the practice was now unconstitutional. *Hope*, 536 U.S. at 745–46.

Second, take the Court's framing of the question before it: "whether *the state of the law in 1995* gave respondents fair warning that their alleged treatment of Hope was unconstitutional." *Id.* at 741 (emphasis added). Whether the defendants' conduct had *always* been unconstitutional was simply not a question the *Hope* Court considered.

Third, one of the two circuit precedents on which the *Hope* Court relied is *Gates v. Collier*, which "squarely held that several . . . 'forms of corporal punishment run afoul of the Eighth Amendment [and] *offend contemporary concepts of decency. . . .*'" *Id.* at 742 (quoting *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974) (brackets in *Hope*) (emphasis added)). And *Gates* relied on *Jackson v. Bishop*, which held that "the use of the strap . . . is punishment, which, *in this last third of the 20th century,* runs afoul of the Eighth Amendment." *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968) (emphasis added); *see Gates*, 501 F.2d at 1306. If the hitching post and other forms of corporal punishment had been unconstitutional since the founding, there would have been no need to reference contemporary standards.

The panel majority's consideration of the DOJ letter was also consistent with this Court's "broad view of what makes a right clearly established." *Mack*, 63 F.4th at 232 (cleaned up). Among other sources, this Court has considered internal policies and state statutes in determining whether defendants have fair notice of the unconstitutionality of their conduct. Slip Op. 28 (citing *Clark*, 55 F.4th at 188); *see,*

12

*e.g.*, *Thomas v. City of Harrisburg*, 88 F. 4th 275, 285 & n.52 (3d Cir. 2023) (internal policy); *Clark*, 55 F.4th at 185 (same); *Young v. Martin*, 801 F.3d 172, 182 (3d Cir. 2015) (same); *Clark*, 55 F.4th at 187 (state statute); *E. D. v. Sharkey*, 928 F.3d 299, 308 (3d Cir. 2019) (same); *Kane v. Barger*, 902 F.3d 185, 195 (3d Cir. 2018) (same). So, in addition to being consistent with *Hope*, the panel majority's consideration of the DOJ letter fits neatly into this Court's jurisprudence.

## III. The panel majority's ADA analysis is consistent with the statutory text and precedent.

The Secretary's ADA argument is based on a fundamental misreading of the statutory text. The crux of his argument is that Mr. Williams's claim fails because he was denied access to services, programs, and activities due to his death sentence, not his disability. Pet. 16. But this argument ignores Title II's "subjected to discrimination" clause, which is not tied to a public entity's services, programs, or activities. *See City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 609–10 (2015); *Haberle v. Troxell*, 885 F.3d 171, 179–80 (3d Cir. 2018).[10]

There are three ways to establish liability under Title II of the ADA, two of which are connected to services, programs, or activities, and one of which is not. Liability under Title II is established when an individual with a disability is, "by reason of his disability," (1) "excluded from participation in . . . the services, programs, or activities of a public entity," (2) "denied the benefits of the services, programs, or

---

[10] *See* Reply Br. 13–16.

activities of a public entity," or (3) "subjected to discrimination by [a public entity]." 42 U.S.C. § 12132.

Title II's "subjected to discrimination" clause is distinct from its "services, programs, or activities" clauses, and it does not depend on exclusion from or denial of the benefits of services, programs, or activities. *Haberle*, 885 F.3d at 179–80; *see also Sheehan*, 575 U.S. at 609–10; *J.V. ex rel. C.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007). The "subjected to discrimination" clause is broad: it includes failing to provide reasonable accommodations for a plaintiff's disabilities. *Haberle*, 885 F.3d at 180. Because "[a] mentally stable person in [Mr. Williams's] position would have experienced living conditions in segregated housing that—though restrictive—wouldn't have produced nearly the same deleterious impact," a jury could find that accommodations were necessary to avoid discrimination on the basis of disability. *Finley v. Huss*, 102 F.4th 789, 821 (6th Cir. 2024).[11] Thus, regardless of whether Mr. Williams was excluded from any services, programs, or activities due to his disability, a jury could find that the Secretary violated Title II. *See* Slip Op. 48–49.

## CONCLUSION

For the reasons stated above, the Court should deny the Secretary's petition.

---

[11] *See* Appellant's 28(j) Letter of July 22, 2024.

        Respectfully submitted,

        *s/ Matthew A. Feldman*
        Matthew A. Feldman (PA 326273)
        PENNSYLVANIA INSTITUTIONAL LAW PROJECT
        718 Arch Street, Suite 304S
        Philadelphia, PA 19106
        215-925-2966
        mfeldman@pilp.org

Dated: November 12, 2024

## CERTIFICATE OF COMPLIANCE

I, Matthew A. Feldman, hereby certify that this brief complies with the page limitation in the Court's Order because it contains fewer than 15 pages. (It also complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) and 35(e) because it contains 3,897 words, excluding the parts exempted by Fed. R. App. P. 32(f).)

<em>s/ Matthew A. Feldman</em><br>
Matthew A. Feldman<br>
PENNSYLVANIA INSTITUTIONAL LAW PROJECT

Dated: November 12, 2024

## CERTIFICATE OF SERVICE

I, Matthew A. Feldman, certify that on November 12, 2024, this response was served on counsel for Appellees, Anthony Kovalchick, using the Court's CM/ECF system.

*s/ Matthew A. Feldman*
Matthew A. Feldman
PENNSYLVANIA INSTITUTIONAL LAW PROJECT

Dated: November 12, 2024